**IN UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN,

                    Plaintiff,

v.

JUDICIAL WATCH, et. al.

                    Defendants.

Case No: 1:13-cv-20610-CMA

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff Larry Klayman hereby files this opposition to Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(3) for improper venue, and pursuant to Rule 12(b)(5) for insufficiency of service of process.

**INTRODUCTION**

Plaintiff Larry Klayman ("Plaintiff") brought this lawsuit against the Defendants for defamation, defamation by implication, tortious interference with a contract, and for intentional infliction of emotional distress. The action arises out of statements made by Defendant Constance Ruffley which falsely accused Plaintiff of having committed a crime.  Defendants simply move to dismiss on jurisdictional and venue grounds, and do not get to the merits of this issue.  As shown below, the claims made in Defendants' Motion to Dismiss are false based upon public information and the discovery process will provide additional proof that jurisdiction is proper within this district.

**STATEMENT OF FACTS**

This action arises from a series of events that took place after Plaintiff left Judicial Watch, a non-profit organization he had founded, and subsequently gained notoriety and national recognition for his high profile lawsuits through his non-profit organization, Freedom Watch. Compl. ¶ 1. Affidavit of Larry Klayman; Exhibit F. Consequently, Defendants, all agents of Judicial Watch,

acting in concert with each other, had set out to willfully and maliciously harm Plaintiff and his reputation, as well as harm his successful law practice. Compl. ¶ 15. Specifically, Defendants Thomas Fitton ("Fitton"), Paul Orfanedes ("Orfanedes"), Constance Ruffley ("Ruffley), and Christopher Farrell ("Farrell"), directly and through other agents of Judicial Watch, defamed, disparaged, and denigrated Plaintiff in order to discredit him and irreparably damage Plaintiff's reputation.   In addition, the Defendants tortuously interfered with Plaintiff's legal practice in this district and caused him severe emotional distress. Compl. ¶ 36.

Ruffley, an Office Administrator and Representative of Judicial Watch, engaged in a conversation and published with "Dr. Orly Taitz, Esquire" ("Taitz") in or around February 22, 2012, while attending an event. Compl. ¶ 12-13 Taitz is widely known as the founder of the "Defend Our Freedom Foundation" and maintains the popular self-proclaimed website, "The World's Leading Obama Eligibility Website." Compl. ¶ 13.  Klayman had made it known that he had intended to file lawsuits in Florida challenging the eligibility of Barack Obama to run for re-election.  Compl. ¶ 14.

During Ruffley's conversation with Taitz, Ruffley intentionally conveyed a false and defamatory statement about Plaintiff, alleging that Plaintiff had been "convicted" of a crime for not paying child support.[1] Compl. ¶ 15.

Specifically, as pled in the Complaint, this false statement was conveyed to Taitz with the intention and expectation that Taitz would further spread the malicious remark by publishing it on her popular and widely viewed website. Compl. ¶ 13.  Moreover, as evidenced by the facts and circumstances, Defendants not only anticipated that Taitz would publish the false statement on her popular website, but that said publication would perpetuate further dissemination and publication of the false statement in hopes that it would be widely circulated in this district, nationally, and worldwide. Compl. ¶ 13.

---

[1] Plaintiff had a valid defense for not paying the child support since his obligation was nullified under Virginia law as a result of extreme circumstances, in which he was completely and unlawfully denied access to his children. *Hartman v. Hartman,* 33 Vir. Cir. 373. Moreover, Plaintiff has never been convicted of any crime in any circumstance.

Defendants' ploy was successful as the false and malicious statement was, in fact, published on Taitz' website and was, as predicted, further disseminated, nationally and worldwide, directly reaching and effecting Plaintiff in this district. Compl. ¶ 13. More specifically, as a direct result of Defendants' intentional conduct, the false statements were disseminated in and circulated in this district where Plaintiff resides and conducts business as a lawyer licensed to practice in Florida, thus, intentionally harming Plaintiff personally and professionally and his standing in his community. Compl. ¶ 20.

As a result of the false statement, accusing Plaintiff of committing a crime, and the resulting reputational harm, Defendants' not only subjected Plaintiff to ridicule, humiliation, and embarrassment, but also caused Plaintiff severe emotional distress, which effected Plaintiff both professionally and personally. [2] Compl. ¶ 20. In fact, Defendants' acts directly impacted Plaintiff's business in the legal profession. Specifically, Defendants intentionally and unjustifiably interfered with a contractual relationship between Plaintiff and a potential client by spreading per se defamatory statements about Plaintiff, damaging his reputation, and consequently, preventing Plaintiff from engaging in legal representation.   Compl. ¶ 29.

Despite their unlawful conduct, Defendants now seek to evade this Court's jurisdiction by misleading this Court through significant misrepresentations, omissions, and blatant false statements as found in the Affidavits filed by Defendants. Moreover, Defendants' Affidavits prematurely raise substantive issues by alleging false facts, including making false representations regarding their substantial ties to this district and the extent of their travels to the district. However, Defendants ignore the fact that the present issues are purely jurisdictional matters. Specifically, this case is not in a Summary Judgment stage or similar dismissal stage, in which the merits of the claims are at issue and discovery is required. In sum, Defendants' Affidavits, which raise substantive issues are replete

---

[2] Defendants' conduct constitutes defamation by per se, as the false statement provides the reader the false and misleading impression that Plaintiff committed and/or has been convicted of a crime.

with false allegations pertaining to the merits of the case and have no relevance to their Motion to Dismiss Plaintiff's Amended Complaint. The only issue before the Court is jurisdiction and venue.

**A**.   **Plaintiff's Residence**

Plaintiff has, at all material times resided in and conducted business in this judicial district. At the time of Defendants' unlawful conduct at issue, including conveying a false statement about Plaintiff, Plaintiff was a resident of Miami, Florida.  Plaintiff has since moved his residence to Ocala, FL but still maintains substantial ties with this district. As further evidence of Plaintiff's substantial ties with this state, Plaintiff left Judicial Watch in 2003 and ran as a candidate for the U.S. Senate in Florida in the Republican primary election. When he ran for the U.S. Senate in Florida, Plaintiff resided in and primarily had a campaign headquarter on Alton Road in this district. Compl. ¶ 2.

Plaintiff began his legal career in this district, as a young associate for Blackwell and Walker (incidental, where Mr. Klayman began his career with another judge of this Court, The Honorable Ursula Ungaro), then the largest litigation firm in Florida. Compl. ¶ 2.He was admitted into the Florida Bar on December 7, 1977 and became a member of the bar of this court in and around this time as well. Plaintiff has practiced law here continuously and extensively throughout his career, with active cases still pending in this district and elsewhere in the state of Florida.  Compl. ¶ 2.

Plaintiff continues to be legally active in this district. Compl. ¶ 2. As way of example, Plaintiff represented the Cuban community in this district, obtaining a $1.8 million dollar judgment for Jose Basulto of Brothers to the Rescue against Fidel Castro and his government, in addition to representing the family of Elian Gonzalez as well. *Id.* Plaintiff also represented Nicaraguan-American ballerina Alice Alyse in a discrimination lawsuit against the Broadway producers of "Movin' Out," a lawsuit based out of Miami and this Court. Compl. ¶ 3.

In another matter, Plaintiff was to provide legal representation to an individual in a lawsuit challenging Barack Hussein Obama's placement on the 2012 Florida Presidential Preference Primary as well as the 2012 Florida General Election.  Compl. ¶14.  However, Defendants knew of Plaintiff's legal representation in Florida and feared Plaintiff's competition to Defendants' Florida practice and

their fundraising in this district and the state. Compl. ¶ 2,4.Defendants, however, interfered with the potential legal relationship between Plaintiff and the client by spreading the per se defamatory statements about him in their effort to ruin Plaintiff's reputation. Compl. ¶ 29.

More, Plaintiff has a mailing address in Florida, a driver's license issued by the state of Florida, a Florida Concealed Weapon or Firearm License. Compl. ¶ 2. Plaintiff also represented Florida in his candidacy for the U.S. Senate in 2004 in his Republican primary. Compl. ¶ 2. In sum, Florida is Plaintiff's home state and Freedom Watch's principle place of business. Thus, despite Defendants' misplaced contentions regarding Plaintiffs' residence, Plaintiff clearly resides in Florida and has significant ties within this judicial district.

**B**.      **Defendants' Residence and Substantial Activities in Florida**

Despite Defendants' lengthy discussion of Plaintiff's residence, Defendants conveniently limit their discussion of "Residences of Defendants" to a mere seven lines, providing the Court with a misleading and cursory glance of Defendants' residence and connections to Florida. Noticeably absent in Defendants' discussion is the fact that Judicial Watch actually maintains a regional office with two employees in Florida.

Defendant Judicial Watch is registered as a "Foreign Non Profit Corporation" with the Florida Secretary of State and is authorized to, and in fact does, engage in business in Florida. Exhibit B. In fact, Defendant Judicial Watch has been registered to conduct business in Florida since 2000 and has been filing annual reports with the Secretary of State since 2001, approximately twelve (12) years. Furthermore, on April 25, 2013, Defendant filed their 2013 annual report for Judicial Watch with the Secretary of State. Exhibit C. Accordingly, Defendants Fitton, Orfanes, and Farrell are listed as the Officers/Directors of Judicial Watch, which Judicial Watch is clearly a corporation within Florida where it engages in legal activism, conducts substantial business, and has a physical presence in this district. Clearly, these facts establish Judicial Watch as a resident of Florida.

**C.**      **Forum Related Activities**

Defendants also seek to avoid the Courts personal jurisdiction by unjustifiably contending that there is a lack of forum related activities. However, this is clearly contrary to the insurmountable amount of evidence indicating otherwise. Specifically, Defendant Judicial Watch engages in legal activism in Florida and even maintains a regional office in Florida. Moreover, Judicial Watch participated in *Mi Familia Vota Education Fund v. Detzner* (No. 12-cv-1294, M.D. Fla.), among other cases, and continues to be actively involved in litigation and legal issues in Florida.

In fact, on June 26, 2012, Judicial Watch sought to intervene in an action on behalf of its members who are registered to vote in the State of Florida *U.S.A. v. State of Florida and Ken Detzner*, No. 4:12-cv-285, N.D. Fla. Clearly, Florida is not as inconvenient of a jurisdiction for Defendants as they so adamantly claim.

Moreover, by Judicial Watch's own concession, as plead in their Motion for Intervention in *U.S.A. v. State of Florida, et. al.* (No. 4:12-cv-285, N.D. Fla., Docket No. 28)[3], "Judicial Watch has at least 18,728 members in the State of Florida. Each of these members made at least one financial contribution to [Judicial Watch] over the past two years, and thus helped to finance the activities of the organization during this time period. At least some of Judicial Watch's 18,728 members in the State of Florida are registered to vote in the state. These members have a substantial interest in the accuracy and currency of official lists of eligible voters in the State of Florida, as the accuracy and currency of these lists directly affects their right to vote." *Id.* at pp.4.

Judicial Watch goes on to say that, "at least 473 members of Judicial Watch who are registered to vote in Florida have communicated directly with Judicial Watch and requested that it take action to protect their interests from Plaintiff's misguided efforts to stop the State of Florida's list maintenance efforts." *Id.* at pp. 6. More brashly, Judicial Watch further claims that they have a direct and protectable interest in Florida, thus supporting their intervention in the case. Specifically, Judicial Watch alleges that if Florida is unable to ensure its voter roles are accurate, "Judicial

---

[3] The Court is respectfully asked to take judicial notice of this lawsuit.

Watch's registered voter members' confidence in the integrity of the election process will be undermined…" *Id.* at 11.

Further evidencing their forum related activities is Judicial Watch's recent investigation into two small town mayors who run little municipalities in South Florida, Mayor Manuel Marono and Mayor Michael Pizzi. In their article titled "Mayors with Big Political Ties Charged in Bribery Scheme," dated August 7, 2013, Judicial Watch boasted that Judicial Watch was present during a recent Spanish-language television interview with Mayor Marono in Miami, Florida. Judicial Watch also appeared on the news show to discuss its work of local interest.  Exhibit D.

In addition to the above stated conduct by Judicial Watch, its directors often frequent Florida and this District for speaking engagements, fundraisers, and other events to raise funds from this District and elsewhere throughout Florida and to conduct other business related activities *(as described in further detail below).*

### PERSONAL JURISDICTION

The determination of whether a court has personal jurisdiction over a nonresident defendant involves a two-part analysis. *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). As an initial matter, the federal court, "must examine the jurisdictional issue under the state's long-arm statute." *Id.* Then, the federal court "must ascertain whether or not minimum contacts exists to satisfy the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.*

A.   **The Florida Long-Arm Statute**

Florida's Long-Arm Statute, Fla. Stat. §48.193, states in pertinent part:

"(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

7

(a)    Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b)    Committing a tortious act within this state.

(c)    Owning, using, possessing, or holding a mortgage or other lien on any real property within this state.

\* \* \*

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

1.    The defendant was engaged in solicitation or service activities within this state; or

2.    Products, materials, or things processed, serviced, or manufactured by defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

(2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity."

### *Jurisdiction is Proper Under Subsection (1)(a)  of the Florida Long-Arm Statute*

To demonstrate jurisdiction under subsection (1)(a) of the Florida Long-Arm Statute, "the business activities of the nonresident defendant must be considered collectively and must show a general course of business activity in Florida for pecuniary gain." *Homeway Furniture of Mount Airy Inc., v. Horne*, 822 So. 2d 533, 536 (Fla. 2nd DCA 2001). "Among other factors, the Court may consider the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida, the number of clients served…" *American Color Graphics Inc. v. Brooks Pharmacy Inc.*, 2007 WL 3202748 \*2 (M.D. Fla. Oct. 29, 2007); *Horizon Aggressive Growth L.P. v. Rothstein-Kass L.P.*, 421 F.3d 1162, 1167 (11th Cir. 2005).

Judicial Watch and its agents have clearly been "operating, conducting, engaging in, [and] carrying on a business…in this state [and have] an office or agency in this state," and are thus, subject to this Court's personal jurisdiction pursuant to subsection (1)(a) of Florida's Long-Arm Statute. Judicial Watch has an office in Miami, Florida, further satisfying subsection (1)(a) by "having an office or agency in this state."

8

Furthermore, statements by Judicial Watch's own officers and directors, specifically Fitton, Farrell, and Orfanedes, made while under oath, clearly evidence Judicial Watch's business activities in Florida and further verify Judicial Watch's physical presence in the state. Specifically, when Mr. Fitton was asked about Judicial Watch's activities in Florida, he stated, "We maintain our office in Miami." See Tr. at 102, line 5. When asked if anyone was still working in the Miami office, the southern regional office, Mr. Fitton affirmatively responded, "Yes." See Tr. at 100, Lines 17-21. Additionally, Mr. Fitton also states that, as part of his responsibilities and duties as President of Judicial Watch, he supervises the employees of the Miami office. Farrell and Orfanedes similarly state in their sworn affidavits that Judicial Watch has an office in Miami, Florida and both Farrell and Orfanedes communicate with the Miami office and its employees as part of their responsibilities and duties for Judicial Watch.

Thus, given the plain language of §48.193(1)(a), the Court has personal jurisdiction over Judicial Watch by the simple fact that Judicial Watch maintains an office in this state and that Farrell, Fitton, and Orfanedes conduct business and carry on the business activities of Judicial Watch through the Miami, Florida office, through communicating with the office and its employees and, in the case if Fitton, actually overseeing and supervising the Miami office and its employees.

Aside from dealing with the Miami office, each and every one of the Defendants conducts significant business activities within this state in other ways. For example, as Fitton confirmed, at one point, an annual debate was held in Miami Florida, in which all the donors and supporters of Judicial Watch were invited, presumably for fundraising and gaining support. See Exhibit E;  Tr. at 172, lines 7-21. Additionally, Fitton acknowledged that, as part of Judicial Watch's mission, Mr. Fitton and Irene Garza would frequently participate in public speaking engagements in Florida. See Tr. at 103, lines 5-21. Irene Garza, was also responsible for running Judicial Watch's Miami office, while handling fundraising and public relations. She also ran Judicial Watch's "Daily Corruption Chronicles" blog.

In addition, Orfanedes and Farrell also conduct significant business activities in Florida, as evidenced by their own Declaration signed under penalty of perjury. Specifically, both Orfanedes and Farrell were responsible for communicating with the Miami, Florida office, as part of their responsibilities as Director of Litigation and Director of Research and Investigation, respectively. In addition, both Orfanedes and Farrell have travelled to Florida numerous times, for both personal reasons and business reasons. Thus, both Orfanedes and Farrell have conducted business in Florida and have travelled to Florida to conduct business on behalf of Judicial Watch. Therefore, Judicial Watch, Fitton, Orfanedes, and Farrell are subject to Florida's Long-Arm Statute §48.193 (1)(a), for conducting, engaging in, and carrying on a business, specifically Judicial Watch, in Florida.

*Jurisdiction is Proper Under Subsection (1)(f)(1) of the Florida Long-Arm Statute*

Pursuant to subsection (1)(b) of the Florida Long-Arm Statute, jurisdiction is proper when a defendant commits a tortious act within the state. In applying subsection (1)(b), it has been established that a defendant's physical presence is not necessary to commit a tortious act in Florida. *Wendt v. Horowitz,* 822 So. 2d 1252, 1260 (Fla. 2002). Rather, "committing a tortious act" in Florida under section 48.193(1)(b) can occur through the nonresident defendant's telephonic, electronic, or written communications <u>into</u> Florida." Id. (emphasis added). However, in analyzing whether a communication was sent into Florida, the internet poses a more pervasive communication medium for purposes of contemplating whether there is a communication into the state. In addressing this complex issue, the Florida Supreme Court concluded that allegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an electronic communication into Florida when the material is access in Florida.

Plaintiff had made it be known that he would be filing a lawsuit challenging the eligibility of Barack Obama within Florida.  Judicial Watch viewed Plaintiff's legal challenge as a threat to Judicial Watch's legal practice, as Judicial Watch maintained an office in this judicial district. Defendants sought to protect their own pecuniary interests by damaging Plaintiff's reputation as an attorney and interfering with his contractual relations within this district.

In applying the above principles established through case law, it is clear that Defendants' conduct falls within the ambits of Subsection (1)(b) of the Florida Long-Arm Statute. Specifically, by conveying the defamatory statement to Taitz, fully aware of the high likelihood that the false statement would be published on Taitz website, Defendants have directed the communication about a Florida resident to readers worldwide, including readers in Florida. It inherently follows that when the statement is then accessed by a third party in Florida, the material has been "published" in Florida, and Defendants have communicated the material "into" this district in Florida, thereby committing the tortious act of defamation within Florida.

Defendants assert that their acts were not completed in this district and do not involve this district in any manner. However, Defendants' argument ignores the "nature of the web, which is fundamentally different from a telephone call, an e-mail, or letter…" Rather, Defendants caused the defamatory statement to be accessible by anyone with Internet access worldwide. Thus, once the defamatory material is published in this district, Defendants have committed the tortious act of defamation. Given the facts and circumstances, it is indisputable that Defendants' false remark has been accessed and read by a Florida resident, given Plaintiff's involvement in the Florida community, notoriety for his high-profile legal work, and his thirty-six year legal career as a Florida lawyer in good-standing.

### *Jurisdiction is Proper Under Subsection (2) of the Florida Long-Arm Statute*

Pursuant to Subsection (2) of the Florida Long-Arm Statute, "a defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of this state, whether or not the claim arises from that activity." This section was added to the statute in 1984 to expand the jurisdiction of Florida courts to include a defendant engaged in substantial activities in Florida regardless of whether the claim arises from that activity, thus eliminating the "connexity" requirement. *Universal Caribbean Establishment v. Bard*, 543 So. 2d 447 (Fla. Dist. Ct. App. 4th Dist. 1989) citing *Windels, Marx, Davies & Ives v. Solitron Devices, Inc.,* 510 So. 2d 1177 (Fla. Dist. Ct. App. 4th Dist. 1987); *See also*

*Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264 (11th Cir. Fla. 2002) (applying section 48.193 to establish general jurisdiction).

In applying the above principles, Defendants' substantial and ongoing activities in this state subject them to this Court's jurisdiction pursuant to subsection (2), even though Defendants' business conduct is not wholly intrastate. Given Defendants' substantial business activities, as described herein, and further evidenced by their registration with the Florida Secretary of State as a "Foreign Non Profit Corporation," Defendants are subject to the jurisdiction of this state, regardless of whether or not Plaintiff's defamation claim arises from Defendant's activity in this state. Moreover, the "connexity" requirement for torts committed out of state is eliminated under subsection (2) of the Florida Long-Arm Statute, and therefore, applying 48.193(2) establishes general jurisdiction. Thus, despite Defendants' claim that there must be some connection to a specific act committed in this district for personal jurisdiction, connexity is not at issue in this case pursuant to subsection (2) of the Florida Long-Arm Statute.

Even if connexity was at issue, this requirement is clearly satisfied. As stated above, physical presence is not a prerequisite for committing a tort in Florida, as the tort can be accomplished "by making telephonic, electronic, or written communications into this State, provided that the tort alleged arises from such communications." *Wendt v. Horowitz*, 822 So. 2d 1252, 1253 (Fla. 2002). This "connexity requirement" for torts committed out of state requires courts to ask first whether the complaint states a cause of action, and if so, whether the cause of action arises from the out-of-state communications into Florida. *Id*. at 1260; see also *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.,* 421 F.3d 1162, 1168-69 (finding "connexity" where a company's agent made purposefully misleading statements over the telephone to a client in Florida, amounting to "constructive fraud"); *Acquadro v. Bergeron*, 851 So. 2d 665, 670 (Fla. 2003) (finding "connexity" where the out-of-state defendant defamed the plaintiff in a phone call to a person in Florida).

**B.     Constitutional Due Process Requirements Are Satisfied**

Personal jurisdiction is proper when 'minimum contacts' exists to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). This requires the court to determine whether "the defendant has availed itself of the privilege of doing business in Florida or has committed acts with an effect in Florida such that it would anticipate being haled into Florida Courts." *Hilltopper Holding Corp. v. Cutchin*, 955 So. 2d 598, 601 (Fla. 2nd DCA 2007).

In other words, a "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In examining the due process component required for personal jurisdiction, it is evident that Defendants, each and every one of them, have sufficient minimum contacts such that they should reasonably anticipate being haled into court in this district as a result of their substantial connections. As evidenced below, each and every single defendant clearly has sufficient minimum contacts with the state of Florida and, as a result of their substantial connections, should reasonably anticipate being haled into court in this district (particularly since it wouldn't be the first time Defendants are faced with a legal action in Florida):

**<u>Defendant Judicial Watch</u>**

Defendant Judicial Watch has established sufficient minimum contacts with this jurisdiction, as evidenced by the following:

- Defendant Judicial Watch engages in legal activism in Florida and even maintains a Judicial Watch regional office in this district, located in Miami, with two employees.

- Moreover, Judicial Watch participated in *Mi Familia Vota Education Fund v. Detzner*, 12-cv-1294, U.S. District Court, Middle District of Florida, among other cases. In fact, recently, on June 26, 2012, Judicial Watch sought to intervene in an action on behalf of its members who are registered to vote in the state of Florida (*U.S.A. v. State of Florida*, et. al., No. 4:12-cv-285, N.D. Fla.)

- Judicial Watch has recently begun an investigation into two small town mayors who run little municipalities in South Florida, Mayor Manuel Marono and Mayor Michael Pizzi.

• In regard to their mayoral investigation, Judicial Watch published an article titled "Mayors with Big Political Ties Charged in Bribery Scheme," dated August 7, 2013, where Judicial Watch boasted that Judicial Watch was present during a recent Spanish-language television interview with Mayor Marono in Miami. Judicial Watch also appeared on the news show to discuss its work of local interest.

**Defendant Paul Orfanedes**

Mr. Orfanedes has established sufficient minimum contacts with this jurisdiction, as evidenced by the following:

• Mr. Orfanedes states that, as part of his duties and responsibilities at Judicial Watch, he often communicates with the Miami employees and the Miami office by telephone and email.

• Additionally, Mr. Orfanedes recently, in May 2012, traveled to Florida to attend a graduation. In or around March 2011, Mr. Orfanedes also spent approximately ten days in Florida, for family reasons and business reasons.

• In fact, during the March 2011 trip to Florida, Mr. Orfanedes attended approximately three business meetings on behalf of judicial Watch.

• Additionally, Mr. Orfanedes traveled to Florida in 2006 and again in 2007 for personal vacations.

**Christopher J. Farrell**

Mr. Farrell has established sufficient minimum contacts with this jurisdiction, as evidenced by the following:

• Mr. Farrell concedes that Judicial Watch has two employees located in Miami, Florida and that Judicial Watch maintains a small office in Miami, Florida.

• Mr. Farrell states that, as part of his duties and responsibilities at Judicial Watch, he often communicates with one of the Miami employees, Irene Garza, and the Miami office by telephone and email. Additionally, Mr. Farrell recently, in June 2012, traveled to Florida to conduct business on behalf of Judicial Watch.  The following month, in July 2012, Mr. Farrell traveled to Florida in his personal capacity for vacation.

**Thomas J. Fitton**

Mr. Fitton has established sufficient minimum contacts with this jurisdiction, as evidenced by the following:

• Mr. Fitton concedes that Judicial Watch has two employees located in Miami, Florida and that Judicial Watch maintains a small office in Miami, Florida. Mr. Fitton further states that he supervises these employees in Miami as President of Judicial Watch.

• Mr. Fitton states, in his Declaration dated June 26, 2013, that, "In the past twenty (20) years I recall making only one trip to Florida for personal vacations."

- As part of Judicial Watch's mission, Mr. Fitton and Irene Garza would participate in public speaking engagements, which often took place in Florida. See Tr. at 103, lines 5-21.

- Moreover, Mr. Fitton further conceded that, at one point, an annual debate was held in Miami Florida, in which all the donors and supporters of judicial Watch were invited presumably for fundraising and gaining support. See Tr. at 172, lines 7-21.

<u>**Constance Ruffley**</u>

Mr. Ruffley has established sufficient minimum contacts with this jurisdiction, as evidenced by the following:

- Ruffley made false statements regarding Plaintiff to Taitz with the intent that the false statement be published and/or restated in the State of Florida.

- In conveying the false statement to Taitz, Ruffley was aware of the high probability that the false statement would be widely disseminated, and the likelihood that the malicious comment would reach and be disseminated in this District, where Plaintiff resides.

- Ruffley intended to injure, harm, and damage Plaintiff's reputation, personally and professionally, in Plaintiff's community in Florida by conveying the false statement to Taitz, and the consequently wide circulation of the false statement.

- Ruffley has travelled to Florida on two separate occasions to conduct business in Florida on behalf of Judicial Watch.

**C.     <u>The Corporate Shield Doctrine Does Not Apply</u>**

Moreover, the individual Defendants, including Defendants Fitton, Farrell, Orfandes, and Ruffley, are still subject to the Court's jurisdiction, despite their desperate attempt to hide behind the Corporate Shield Doctrine to avoid liability for their tortious conduct. Generally, under the Corporate Shield Doctrine, a corporate officer is protected from being haled into a Florida Court for out-of-state conduct that causes injury when acting for the benefit of the corporation. The Corporate Shield Doctrine, however, does not apply when corporate officers, such as the Individual Defendants in this case, commit an intentional tort. *Byron v. Marine Carriers (USA), Inc.,* 668 So. 2d 273 (Fla. 1st DCA 1996). Thus, Defendants' reliance on the Corporate Shield Doctrine is in vain, as Defendants clearly acted intentionally by making a defamatory statement regarding Plaintiff and then calculatedly ensuring wide dissemination of the defamatory statement. In addition, Defendants tortuously interfered with Plaintiff's contractual relationship with his clients and intentionally inflicted severe emotional distress upon Plaintiff.

15

Defendants sought to deliberately and maliciously cause harm to Plaintiff's reputation, particularly in the legal profession, at a time when Plaintiff was gaining national exposure as a prominent lawyer and was receiving recognition for his legal work in high profile lawsuits. All the while, the Individual Defendants remained corporate employees for Judicial Watch, acting not for any personal reason, but for the benefit of Judicial Watch. Thus, as pled in the Complaint, the Individual Defendant's tortious act of defamation was done intentionally and, as a result, the Corporate Shield Doctrine does not apply.

## III.   **IMPROPER VENUE**

28 U.S.C. §1391 states in relevant part:

(b) Venue in general--A civil action may be brought in—

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

"[P]roper venues are not mutually exclusive. Indeed, venue is subject to the choice of the plaintiffs, not the defendant." *McClure,* 301 F. Supp. 2d at 569. "The Eleventh Circuit has articulated a policy of being restrictive in transferring actions, stating that the plaintiff's choice of forum should not be disturbed unless the movant can show that it is clearly outweighed by other considerations." *Carl v. Republic Sec. Bank, 2002 WL 32167730*, at *5 (S.D. Fla., Jan. 22, 2002) (internal quotation marks and alterations omitted); see *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996).

"In considering a motion to dismiss for improper venue, 'the court may consider matters outside the pleadings such as affidavit testimony.'" *BP Prods. N. Am., Inc. v.  Super Stop 79, Inc.*, 464 F. Supp. 2d 1253, 1256 (S.D. Fla. 2006) (quoting *Wai v. Rainbow Holdings*, 315 F. Supp. 2d

1261, 1268 (S.D. Fla. 2004)) Furthermore, a motion to dismiss on venue grounds should be denied where the action is brought in a district that "'has a substantial connection to the claim, whether or not other forums had greater contacts.'" *Bay County Democratic Party*, 340 F. Supp. 2d at 808-09 (quoting *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998)).

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims as discussed herein. Plaintiff not only resides in Florida but also engages in and conducts substantial business activities in Florida. Is indisputable that Plaintiff was injured in his reputation and standing in the community in this district. His ability to form legal relationships with clients, to earn a livelihood, and to remain in good standing, particularly among the legal community, has been significantly harmed, especially in Florida where he has substantial ties. Simply put, Plaintiff's choice of forum should be given deference, as provided by law, particularly since the damage occurred in Florida and it is indisputable that Florida has a substantial connection to Plaintiff's claims.

## IV.   <u>FORUM NON CONVENIENS</u>

Section 47.122, Florida Statutes (2006), provides:   "For the convenience of the parties or witnesses or in the interest of justice, any court of record may transfer any civil action to any other court of record in which it might have been brought."

 "A plaintiff's forum selection is presumptively correct.   The burden is on the defendant to establish before the trial court that either substantial inconvenience or undue expense requires a change for the convenience of the parties or witnesses." *Safety Nat'l Cas. Corp. v. Fla. Mun. Ins. Trust*, 818 So. 2d 612, 613 (Fla. 5th DCA 2002).   "[W]hen a *forum non conveniens* challenge is raised, it is incumbent upon the parties to submit affidavits or other evidence that will shed necessary light on the issue of the convenience of the parties and witnesses and the interest of justice." *Eggers v. Eggers*, 776 So. 2d 1096, 1098 (Fla. 5th DCA 2001).

In weighing the various private interest and public interest factors, all of the factors weigh heavily in favor of denying Defendant's Motion for Improper Venue and to proceed with this case in

Florida. Moreover, in balancing the public and private interests, it is clear that Plaintiff's choice in forum should be granted substantial deference. Given this great deference allotted to Plaintiff's choice in forum, as well as the fact that the public and private interest weigh in favor of maintaining the case in Florida, Defendants fail to meet their heavy burden and thus, their Motion to Dismiss for forum non conveins should be denied.

A.      **Private Interest Factors Favor Denial of Defendants' Motion to Dismiss**

"The most important consideration of the three statutory factors in section 47.122 is the convenience of the witnesses." *Brown & Williamson Tobacco Corp. v. Young*, 690 So. 2d 1377, 1379 (Fla. 1st DCA 1997). The court must know who the witnesses are and the significance of their testimony in order to consider the convenience of the witnesses. *Id.* (citing *Hu v. Crockett*, 426 So. 2d 1275, 1279 (Fla. 1st DCA 1983)). Other private interest factors include the ease of access of sources of proof, the availability of compulsory process for attendance of witnesses, the cost of obtaining the attendance of an unwilling witness, and any other issues that make the trial of the case easy, expeditious, and inexpensive. *Membreno v. Cosa Crociere*, 425 F.3d 932, 937 (11th Cir. 2005).

As an initial matter, the claims involved arose in Florida after Defendants conveyed a false statement about Plaintiff and ensured publication of the defamatory statement on Taitz' website, which is view throughout the United States, including Florida. Pertinent to the present issues, the unlawful content was viewed by not only Plaintiff but by other residents of Florida as well, which is where Plaintiff resides, conducts business, and where he spent a significant period of his life. Other people located in and residing in Florida viewed the false statement about Plaintiff, a Florida resident and thus, lowered him in the estimation of the community in this district. Moreover, Plaintiff conducts substantial business in Florida and Defendant's defamatory conduct consequently affected Plaintiff's ability to earn a livelihood as a lawyer and an activist, given the loss of reputation in his trade and personally. Simply put, Plaintiff's injuries were primarily in Florida, and included loss of reputation, professional harm, and interference with Plaintiff's contractual relationships, hindering his ability as an attorney to form legal relationships with potential clients.

Additionally, the convenience of the witnesses and the parties clearly support denial of Defendants' motions. As mentioned, Defendants, who are likely witnesses, maintain an office in Miami, Florida and frequently travel to Florida for business on behalf of Judicial Watch and for personal reasons. Additionally, the crucial witnesses, including Plaintiff who was directly harmed by Defendant, as well as Florida residents who viewed the false statement, are located in Florida. Additionally, since Defendants' conduct affected Plaintiff in his reputational and business standing in Florida, a great number of witnesses are located in Florida who can attest to issues, including, but not limited to, the dissemination and viewing of the false statement in Florida, and the impact of the defamatory statement on Plaintiff's reputation and professional standing in the legal community in Florida. Thus, given the direct effect and significant involvement of Defendants' conduct with Florida, the sources of proof will likely be found in this District, not in California or Washington, D.C.

**B.**     <u>**Public Interest Factors Favor Denial Of Defendants' Motion to Dismiss**</u>

Public interest factors to be considered include the sovereign's interests in deciding the dispute, the administrative burdens posed by the trial, and the need to apply foreign law. *Membreno* 425 F.3d at 937.

The consideration of the public interest factors support denial of Defendants' request. Evidencing Florida's interest in deciding this controversy is the fact that the consequences and resulting injuries from Defendants' conduct arose in Florida, and effected citizens of the District. In fact, the claims at issue have minimal relevance to California or Washington D.C.

Moreover, Florida has a significant interest in deciding local controversies and especially this case, particularly since Defendants substantially benefit from conducting business in the District. In fact, Defendants maintain an office in Miami where they can carry on their business in the state and also gain significant revenue from their physical presence in Miami. By Defendants' own concession, as mentioned above, Judicial Watch has at least 18,728 members in Florid and each of these members had made at least one financial contribution to Judicial Watch, which has presumably

impacted Judicial Watch's financial position in a significant and positive way. Defendants plainly benefit from their presence in this District. Notwithstanding this, Defendants are now attempting to avoid the laws of this jurisdiction in which they reap benefits as well as caused harm. Thus, both the private and public interest support denial of Defendants' request.

## DEFENDANT ORFANEDES WAS PROPERLY SERVED

Plaintiff properly served Defendant Orfanedes by leaving a copy of the service and complaint with Judicial Watch's Chief of Staff, Susan Prytherch.  As chief of staff, Ms. Prytherch had the apparent and actual authority to act as Orfanedes' agent in accepting service of process. In addition, Defendant has actual knowledge of this lawsuit and has been actively participating in it along with the other Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that this Court deny Defendants' Motion to Dismiss Plaintiff's Amended Complaint, particularly since Defendants are clearly engaging and conducting significant business in this state. Moreover, Defendants have maintained significant contacts with this district and Florida as a whole and have undoubtedly availed themselves of the privilege of doing business in this district and Florida, such that they should have anticipated being haled into court here.

Respectfully Submitted,

*/s/ Larry Klayman*
LARRY KLAYMAN
2520 Coral Way, Suite 2027
Miami, FL 33145
(310) 595-0800
leklayman@gmail.com

Plaintiff Pro Se

<u>**CERTIFICATE OF SERVICE**</u>

       I HEREBY CERTIFY that on August 9, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                  */s/ Larry Klayman*        
                                    LARRY KLAYMAN

                                    Plaintiff Pro Se

<u>**SERVICE LIST**</u>

**Douglas James Kress**
Schwed Kahle & Jenks, P.A.
11410 North Jog Road
Suite 100
Palm Beach Gardens, FL 33418
561-694-0070
Fax: 561-694-0057
Email: dkress@schwedpa.com

VIA CM/ECF