# EXHIBIT "1"

# In The Matter Of:

*LARRY E. KLAYMAN*
*v.*
*JUDICIAL WATCH, INC.*

———————————————————————————

## *LARRY ELLIOT KLAYMAN - Vol. 1*
### *January 29, 2014*

———————————————————————————

**MERRILL CORPORATION**

**LegaLink, Inc.**

225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171

LARRY ELLIOT KLAYMAN – 1/29/2014

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

------------------------x

LARRY E. KLAYMAN,            )

    Plaintiff,  )   Case No.

   v.              )   13-20610-CIV-ALTONAGA/

JUDICIAL WATCH, INC.,     )   Simonton

    Defendant.  )

------------------------x


VIDEOTAPED DEPOSITION OF LARRY ELLIOT KLAYMAN, ESQUIRE

Washington, D.C.

Wednesday, January 29, 2014

12:58 p.m.


Job No.:  22-244142

Pages 1 – 154

Reported By:  Joan V. Cain

LARRY ELLIOT KLAYMAN - 1/29/2014

```
 1           Videotaped Deposition of LARRY ELLIOT KLAYMAN,

 2     ESQUIRE, held at the offices of:

 3

 4              MERRILL LAD

 5              Suite 200

 6              1325 G Street, Northwest

 7              Washington, D.C. 20005

 8              (202) 861-3410

 9

10           Pursuant to Notice, before Joan V. Cain, Court

11     Reporter and Notary Public in and for the District of

12     Columbia.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 3

```
 1                    A P P E A R A N C E S

 2

 3        ON BEHALF OF PLAINTIFF PRO SE:

 4            LARRY KLAYMAN, ESQUIRE

 5            LARRY KLAYMAN, ATTORNEY AT LAW

 6            Suite 345

 7            2020 Pennsylvania Avenue, Northwest

 8            Washington, D.C. 20006

 9            Telephone:  (310) 595-0800

10            E-mail:  leklayman@gmail.com

11

12        ON BEHALF OF DEFENDANT:

13            DOUGLAS J. KRESS, ESQUIRE

14            SCHWED KAHLE & KRESS, P.A.

15            Suite 100

16            11410 North Jog Road

17            Palm Beach Gardens, Florida 33418

18            Telephone:  (561) 694-0070

19            E-mail:  dkress@schwedpa.com

20

21        ALSO PRESENT:

22            Akim Graham, Videographer

23            Dina James

24            Paul Orfanedes

25
```

LARRY ELLIOT KLAYMAN - 1/29/2014

```
 1                    C O N T E N T S

 2

 3   EXAMINATION OF LARRY ELLIOT KLAYMAN, ESQUIRE    PAGE

 4      By Mr. Kress                                   6

 5

 6                    E X H I B I T S

 7             (Attached to the Transcript.)

 8   DEFENDANT'S DEPOSITION EXHIBITS                 PAGE

 9   EXHIBIT 10   Judgment Entry for Contempt of      39

10                Court, 7/20/09

11   EXHIBIT 11   Judgment Entry for Contempt of      41

12                Court, 6/23/10

13   EXHIBIT 12   Capias Ordered for Larry Klayman,   45

14                2/22/10

15   EXHIBIT 13   Indictment for Larry Klayman        46

16   EXHIBIT 14   Capias Ordered for Larry Klayman,   47

17                3/16/12

18   EXHIBIT 15   Cuyahoga County Prosecutor Press    48

19                Release, 2/3/12

20   EXHIBIT 16   E-mail from Larry Klayman to        85

21                Orly Taitz, 2/26/12

22   EXHIBIT 17   E-mail Larry Klayman to             87

23                Orly Taitz, 2/24/12

24   EXHIBIT 18   E-mail from George Miller to        88

25                Multiple Recipients, 2/26/12
```

```
 1              E X H I B I T S   C O N T I N U E D

 2                  (Attached to the Transcript.)

 3    DEFENDANT'S DEPOSITION EXHIBITS                 PAGE

 4    EXHIBIT 19  Open Letter to Orly Taitz           103

 5    EXHIBIT 20  E-mail from George Miller to        104

 6                Multiple Recipients, 6/7/12

 7    EXHIBIT 21  E-mail from Larry Klayman to        105

 8                George Miller, 2/8/12

 9    EXHIBIT 22  E-mail Chain, 6/7/12                112

10    EXHIBIT 23  Printout from the Website           124

11                Conwebwatch.com

12    EXHIBIT 24  Memorandum Opinion                  135

13    EXHIBIT 25  Decision by Judge Batts             138

14    EXHIBIT 26  Plaintiff's Responses and           143

15                Objections to Defendant's First

16                Set of Interrogatories

17    EXHIBIT 27  Billing Statement                   146

18    EXHIBIT 28  E-mail Chain, 5/7/12                147

19

20

21

22

23

24

25
```

LARRY ELLIOT KLAYMAN – 1/29/2014

| | | |
|---|---|---|
| 1 | P R O C E E D I N G S | 12:57:54 |
| 2 | THE VIDEOGRAPHER:  Here begins Videotape No. | 12:57:54 |
| 3 | 1 in the deposition of Larry Klayman in the matter of | 12:57:57 |
| 4 | Larry E. Klayman versus Judicial Watch, Incorporated, | 12:57:59 |
| 5 | in the United States District Court for the Southern | 12:58:03 |
| 6 | District of Florida, Case No. 13-20610-CIV. | 12:58:05 |
| 7 | Today's date is January 29th, 2014.  The | 12:58:10 |
| 8 | time on the video monitor is 12:58 p.m., and the video | 12:58:15 |
| 9 | operator today is Akim Graham.  This video deposition | 12:58:20 |
| 10 | is taking place at 1325 G Street, Northwest in | 12:58:23 |
| 11 | Washington, D.C. | 12:58:28 |
| 12 | Counsel, please voice identify yourselves | 12:58:28 |
| 13 | and state whom you represent. | 12:58:32 |
| 14 | MR. KRESS:  Doug Kress representing Judicial | 12:58:32 |
| 15 | Watch. | 12:58:35 |
| 16 | MR. KLAYMAN:  Larry Klayman representing | 12:58:35 |
| 17 | myself pro se. | 12:58:37 |
| 18 | THE VIDEOGRAPHER:  The court reporter today | 12:58:38 |
| 19 | is Joan Cain of -- on behalf of Merrill Legal | 12:58:39 |
| 20 | Solutions New York.  Would the reporter please swear | 12:58:43 |
| 21 | in the witness. | 12:58:45 |
| 22 | LARRY ELLIOT KLAYMAN, ESQUIRE | 12:58:45 |
| 23 | having been duly sworn, was examined and did testify | 12:58:45 |
| 24 | as follows: | 12:58:54 |
| 25 | EXAMINATION BY COUNSEL FOR DEFENDANT | 12:58:55 |

LARRY ELLIOT KLAYMAN - 1/29/2014

| | |
|---|---|
| 1   BY MR. KRESS: | 12:58:55 |
| 2       Q    Please state your name for the record. | 12:58:55 |
| 3       A    Larry Klayman. | 12:58:57 |
| 4       Q    Mr. Klayman, my name's Doug Kress and I'm | 12:58:57 |
| 5   assuming that you know what a deposition is and don't | 12:59:01 |
| 6   need a lot of instruction, but I'm going to give you a | 12:59:02 |
| 7   few instructions anyways. | 12:59:05 |
| 8       A    Okay. | 12:59:07 |
| 9       Q    It's my intention to ask clear and | 12:59:07 |
| 10  understandable questions.  If at any point you do not | 12:59:09 |
| 11  understand a question that I ask you, please do not | 12:59:11 |
| 12  answer the question.  Instead, tell me that you do not | 12:59:14 |
| 13  understand, and I will try to rephrase the question | 12:59:17 |
| 14  for you. | 12:59:19 |
| 15           You'll do that for me? | 12:59:20 |
| 16      A    Be happy to, and since I'm serving as | 12:59:22 |
| 17  counsel pro se, I'm going to have to wear two hats | 12:59:24 |
| 18  here, the Larry Klayman witness hat and the lawyer hat | 12:59:28 |
| 19  at the same time. | 12:59:31 |
| 20      Q    Understood.  Understood. | 12:59:32 |
| 21      A    So if you don't understand my objection, you | 12:59:33 |
| 22  can ask me. | 12:59:36 |
| 23      Q    Understood.  If you answer a question, I'll | 12:59:36 |
| 24  assume that you understood it and answered it | 12:59:40 |
| 25  truthfully.  Does that sound fair? | 12:59:43 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 8

| | | |
|---|---|---|
| 1 | A    Well, we'll let the record speak for itself. | 12:59:45 |
| 2 | Q    Okay.  And if you should need to take a | 12:59:47 |
| 3 | break for any reason, let us know and we'll let you | 12:59:51 |
| 4 | take a break.  Let's just jump right into it.  I don't | 12:59:54 |
| 5 | really want to get into background yet.  Let's start | 12:59:59 |
| 6 | right with Plaintiff's Exhibit 2 -- | 13:00:02 |
| 7 | A    Okay. | 13:00:05 |
| 8 | Q    -- which is the Orly Taitz February 23, 2012 | 13:00:06 |
| 9 | web site posting. | 13:00:15 |
| 10 | First question I have for you is, are you | 13:00:17 |
| 11 | familiar with this? | 13:00:19 |
| 12 | A    Yes. | 13:00:19 |
| 13 | Q    When did you first become familiar with this | 13:00:20 |
| 14 | web site posting that's reflected in Exhibit 2? | 13:00:22 |
| 15 | A    It was brought to my attention by someone | 13:00:25 |
| 16 | named George Miller. | 13:00:31 |
| 17 | Q    Who is George Miller? | 13:00:31 |
| 18 | A    George Miller is part of the group of | 13:00:32 |
| 19 | individuals who were funding my efforts in my private | 13:00:34 |
| 20 | capacity as a private lawyer to represent Michael | 13:00:38 |
| 21 | Voeltz in an eligibility lawsuit in Florida concerning | 13:00:43 |
| 22 | President Obama. | 13:00:46 |
| 23 | Q    Okay.  Who else was in that group? | 13:00:47 |
| 24 | A    A woman by the name of Pamela Barnett. | 13:00:50 |
| 25 | Q    And George Miller, where -- where's he live? | 13:00:58 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 9

```
 1      A     He lives in Ventura County, California.      13:01:00

 2      Q     What does he do?                             13:01:03

 3      A     I don't know what he does professionally.    13:01:04

 4   He's the head of the Tea Party there.                 13:01:06

 5      Q     Okay.  And Pamela Barnett, where does she    13:01:09

 6   live?                                                 13:01:13

 7      A     She also lives in southern California.  I    13:01:14

 8   don't know where she lives.                           13:01:16

 9      Q     And what is her employment or --             13:01:18

10      A     I don't know.                                13:01:20

11      Q     -- how do you --                             13:01:21

12      A     She's an activist.                           13:01:22

13      Q     She's an activist?                           13:01:23

14      A     Yeah.                                        13:01:24

15      Q     Is she a Tea Party member as well?           13:01:25

16      A     I'm not sure.                                13:01:28

17      Q     All right.  So there was a two-person party  13:01:29

18   that was funding your efforts to --                   13:01:31

19      A     They were the people that -- George is the   13:01:32

20   one who talked to me first about doing it.            13:01:34

21      Q     Okay.                                        13:01:36

22      A     And then Pamela started to participate, you  13:01:37

23   know, in discussions, and there's another person in   13:01:39

24   Florida called Sam Sterrett.                          13:01:44

25      Q     How do you spell Sterrett?                   13:01:48
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 10

| | | |
|---|---|---|
| 1 | A    I think it's S-t-e-r-r-e-t, and he somehow | 13:01:50 |
| 2 | was connected to Pam and -- and George. | 13:01:53 |
| 3 | Q    Did you speak to Sam at all? | 13:01:56 |
| 4 | A    I may have spoken to him once or twice. | 13:01:57 |
| 5 | Q    Okay. | 13:01:57 |
| 6 | A    I'm not sure. | 13:02:00 |
| 7 | Q    All right.  So George Miller brought this | 13:02:01 |
| 8 | internet article to your attention, correct? | 13:02:03 |
| 9 | A    Correct. | 13:02:05 |
| 10 | Q    How did he do that? | 13:02:05 |
| 11 | A    He called me and told me to take a look on | 13:02:09 |
| 12 | the -- on the web site. | 13:02:13 |
| 13 | Q    What did he tell you when he -- when he | 13:02:14 |
| 14 | called you? | 13:02:16 |
| 15 | A    Well, that there's an outrageous posting on | 13:02:17 |
| 16 | the web site, that he was very concerned about it | 13:02:20 |
| 17 | because it could affect him raising money to pay me as | 13:02:22 |
| 18 | a private lawyer -- | 13:02:25 |
| 19 | Q    Mm-hmm. | 13:02:25 |
| 20 | A    -- and he asked me, you know, whether it was | 13:02:26 |
| 21 | true or not and I told him no, and that was the extent | 13:02:27 |
| 22 | of it. | 13:02:32 |
| 23 | Q    Okay.  Then -- | 13:02:33 |
| 24 | A    And, you know, he told me about Orly Taitz. | 13:02:34 |
| 25 | I didn't even know of Orly Taitz at that time. | 13:02:37 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 11

```
 1       Q    So as of the moment before George Miller's      13:02:40

 2   call on or about February 23, 2012, you really -- you     13:02:42

 3   didn't know Orly Taitz?                                   13:02:46

 4       A    I didn't know Orly Taitz, no.  I'd never         13:02:47

 5   heard of her.                                             13:02:50

 6       Q    Okay.  So this was the first that you had        13:02:51

 7   heard of her when George Miller called you?              13:02:53

 8       A    That's correct.                                  13:02:55

 9       Q    Okay.  So you searched for the article, and      13:02:57

10   did you find it?                                          13:03:01

11       A    Yes.  I was shocked.                             13:03:02

12       Q    Okay.  Let's go through the article.             13:03:04

13       A    Okay.                                            13:03:14

14       Q    Now, actually, the article indicates that       13:03:18

15   Orly Taitz was running as a candidate for the U.S.        13:03:24

16   Senate, and I believe it was for the primary.  Did you    13:03:28

17   come to understand that that was true, that she was       13:03:31

18   running as a candidate?                                   13:03:33

19       A    I never confirmed it officially, but that's     13:03:34

20   what I understood from what was out on her web site.      13:03:37

21       Q    Okay.  Have you talked to Orly Taitz             13:03:40

22   about -- about this web site posting at any time?        13:03:46

23       A    Yes.  She was sent -- oh, I didn't talk to       13:03:50

24   her in terms of talking to her.                           13:03:53

25       Q    That was a poor question.                        13:03:54
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 12

```
 1      A    Okay.  But the documents that I've produced      13:03:55

 2   show that I had communications with her.               13:03:57

 3      Q    Okay.                                           13:03:59

 4      A    And so did George and Pamela, asking that       13:04:00

 5   she correct it and excoriating her for having put it   13:04:02

 6   up on the web site.                                    13:04:08

 7      Q    All right.  And I saw those e-mails that you    13:04:09

 8   produced to me recently.  I guess my -- my question    13:04:11

 9   was poorly asked.  Have you ever spoken verbally to    13:04:17

10   Orly Taitz?                                            13:04:20

11      A    Only recently --                               13:04:21

12      Q    Okay.                                           13:04:22

13      A    -- over the issue of her being deposed.        13:04:23

14      Q    All right.  When you spoke about the issue     13:04:25

15   of her being deposed, did you discuss the -- the       13:04:28

16   substance of her e-mail communi- -- or I'm sorry --    13:04:32

17   the substance of her web site posting?                 13:04:35

18      A    Yes.                                            13:04:40

19      Q    What did --                                     13:04:41

20      A    Yeah.  I wanted her to confirm that indeed     13:04:43

21   Connie Ruffley had said these things.                  13:04:46

22      Q    Okay.                                           13:04:48

23      A    That's what I was interested in.  I said       13:04:48

24   it's not going to be a long deposition --              13:04:50

25      Q    Mm-hmm.                                         13:04:50
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 13

```
 1        A      -- I just need to have you confirm it.        13:04:53

 2        Q      Okay.                                          13:04:55

 3        A      And she confirmed to me that in fact Ruffley   13:04:55

 4   had said those things.                                     13:04:58

 5        Q      All right.  Did she indicate to you that she   13:04:59

 6   was -- did she, being Orly Taitz, indicate to you that     13:05:04

 7   she was trying to avoid service of process?                13:05:07

 8        A      I got that impression from the fact that we    13:05:12

 9   attempted service of process on a number of occasions      13:05:15

10   and she was nowhere to be found, and the process           13:05:18

11   server was trying to contact her.  So, yes, I believe      13:05:21

12   she was evading service of process, and I also know,       13:05:24

13   you know, having researched Orly Taitz since then to       13:05:28

14   some extent, that she's pretty fast on her feet.  So       13:05:31

15   it didn't come as any surprise that it took us a long      13:05:36

16   time to serve her.                                         13:05:38

17        Q      But did you discuss with her whether she was   13:05:39

18   trying to evade or avoid service?                          13:05:41

19        A      I did not.                                     13:05:44

20        Q      Okay.  And when you say you spoke to her       13:05:44

21   just recently, was it within the last week?                13:05:50

22        A      Yes.                                           13:05:54

23        Q      How many times have you spoken with her?       13:05:54

24        A      Two or three.                                  13:05:57

25        Q      All right.  Do you know Connie Ruffley?        13:06:03
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 14

| | | |
|---|---|---|
| 1 | A    Yes. | 13:06:05 |
| 2 | Q    And what do you know about her? | 13:06:05 |
| 3 | A    I know -- I know that she was friends -- | 13:06:10 |
| 4 | there came a point in time -- I'll give you a | 13:06:13 |
| 5 | narrative response -- that Judicial Watch, when I was | 13:06:17 |
| 6 | running it, wanted to have a West Coast office.  It | 13:06:20 |
| 7 | would be our first satellite office.  And we were | 13:06:25 |
| 8 | rented office space at a very reasonable rate by a | 13:06:31 |
| 9 | woman whose name I forget right now, whose name may | 13:06:34 |
| 10 | come up in some other questioning if you ask me about | 13:06:39 |
| 11 | UROC, and we needed someone to manage that office | 13:06:41 |
| 12 | because we weren't going to be there most of the time, | 13:06:45 |
| 13 | and this woman recommended Connie Ruffley who was her | 13:06:51 |
| 14 | friend, who was a conservative. | 13:06:53 |
| 15 | And so, consequently, I hired Connie Ruffley | 13:06:55 |
| 16 | as the office manager for the office in San Marino, | 13:06:59 |
| 17 | California after I interviewed her and after she got | 13:07:02 |
| 18 | references from this woman who was supportive of | 13:07:05 |
| 19 | Judicial Watch. | 13:07:09 |
| 20 | Q    Okay.  So you interviewed Connie Ruffley. | 13:07:10 |
| 21 | How old of a person is Connie Ruffley, if you know? | 13:07:15 |
| 22 | A    At this point -- well, I haven't seen | 13:07:17 |
| 23 | Mrs. Ruffley for about 10 years. | 13:07:20 |
| 24 | Q    Mm-hmm. | 13:07:20 |
| 25 | A    I would guess she's probably around 68, 70 | 13:07:22 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 15

```
 1     is my guess.                                    13:07:29

 2         Q     And you said you hired her as an office  13:07:31

 3     manager.  Was that her official --             13:07:33

 4         A     As the manager of the West Coast office,  13:07:35

 5     yeah.                                          13:07:37

 6         Q     Was that her official title?         13:07:37

 7         A     I don't know whether it's written as such or  13:07:40

 8     not, but that's how I viewed her and that's why I  13:07:43

 9     hired her.  We needed somebody that was going to be  13:07:46

10     there that could manage the day-to-day operations of  13:07:48

11     Judicial Watch, who was responsible.            13:07:51

12         Q     Such as what?  What do you mean by    13:07:53

13     day-to-day operations?                         13:07:55

14         A     Making sure that equipment was running,  13:07:57

15     making sure that there were office supplies that were  13:08:00

16     ordered, liasing with supporters.  Mrs. Ruffley spent  13:08:03

17     a lot of time taking calls and explaining to    13:08:12

18     supporters what we were doing, organizing events  13:08:15

19     organizing my speeches out there if I gave a speech.  13:08:19

20     Really kind of everything.  You know --        13:08:21

21         Q     All right.                           13:08:22

22         A     -- an all-around-purpose individual that  13:08:23

23     would run the organization, and because she was close  13:08:26

24     to the woman who supported Judicial Watch and gave us  13:08:29

25     this very favorable rent in San Marino, it was -- it  13:08:32
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 16

```
1      seemed like a good match.                          13:08:35
2         Q    Okay.  Have you spoken with Connie Ruffley  13:08:37
3      at any time since you left Judicial Watch in 2003?  13:08:40
4         A    No.                                         13:08:45
5         Q    Do you know what Connie Ruffley's official  13:08:45
6      job title was in February of 2012 with Judicial Watch?  13:08:47
7         A    Well, she represented to Orly Taitz that she  13:08:51
8      was the office administrator.                       13:08:55
9         Q    Okay.  Is that something you know or is that  13:08:56
10     something that you've just read?                    13:08:58
11        A    That's something that I read.               13:08:59
12        Q    All right.  Other than --                   13:09:01
13        A    And I might also -- I know that, you know,   13:09:03
14     since I left Judicial Watch there's been an attrition  13:09:06
15     in that office and that she's basically the only one  13:09:10
16     there.  So by -- by default she runs the office.    13:09:12
17        Q    You mentioned -- you asked some questions    13:09:18
18     about the attorney Ernie -- I forget his last name.  13:09:19
19        A    Ernie Norris.                               13:09:23
20        Q    Ernie Norris, you understand he still works  13:09:25
21     there at least part time?                           13:09:29
22        A    I don't know that at all.  My understanding  13:09:30
23     was that he was no longer working for Judicial Watch,  13:09:32
24     that he went off and retired in -- in Wyoming.      13:09:34
25        Q    Mm-hmm.                                     13:09:37
```

LARRY ELLIOT KLAYMAN - 1/29/2014

| | |
|---|---|
| 1   A   He's an elderly gentleman.  And you know, I | 13:09:37 |
| 2  frankly am dubious of any testimony that would say | 13:09:41 |
| 3  that he's still working for Judicial Watch.  I doubt | 13:09:45 |
| 4  it. | 13:09:47 |
| 5   Q   While you're dubious, you don't have any | 13:09:47 |
| 6  personal knowledge one way or the other as to how much | 13:09:49 |
| 7  Ernie is working or not working? | 13:09:52 |
| 8   A   Because what I do know is that when I hired | 13:09:54 |
| 9  Ernie, it was primarily -- he was deputy district | 13:09:56 |
| 10  attorney for Los Angeles County under Gil Garcetti, | 13:09:59 |
| 11  the famous Gil Garcetti from O.J. Simpson fame, and we | 13:10:04 |
| 12  hired him to do judicial monitoring of judges in that | 13:10:10 |
| 13  area.  It was a pilot project.  And we would send | 13:10:13 |
| 14  people into court with Ernie to watch the judges and | 13:10:18 |
| 15  to criticize them if they were doing a bad job and | 13:10:20 |
| 16  praise them if they were doing a good job because | 13:10:25 |
| 17  Judicial Watch was what it says it is, Judicial Watch, | 13:10:27 |
| 18  watching judges in part. | 13:10:30 |
| 19       So that was Ernie's job, and I know that | 13:10:32 |
| 20  Judicial Watch isn't doing that anymore, so | 13:10:35 |
| 21  consequently, he would seem to have no reason for | 13:10:37 |
| 22  being with the office. | 13:10:41 |
| 23   Q   But again you don't know? | 13:10:42 |
| 24   A   I don't know directly. | 13:10:43 |
| 25   Q   Okay. | 13:10:44 |

LARRY ELLIOT KLAYMAN - 1/29/2014

| | | | |
|---|---|---|---|
| 1 | A | I haven't talked to him for quite a while. | 13:10:44 |
| 2 | Q | Have you talked to him since 2003? | 13:10:47 |
| 3 | A | Once or twice. | 13:10:49 |
| 4 | Q | Have you talked to him since 2012? | 13:10:50 |
| 5 | A | Don't think so. | 13:10:53 |
| 6 | Q | All right.  In this article, if we go to the | 13:10:54 |
| 7 | | first substantive paragraph on the second page of | 13:11:05 |
| 8 | | Exhibit 2 -- | 13:11:07 |
| 9 | A | Right. | 13:11:08 |
| 10 | Q | -- Orly Taitz references -- well, before we | 13:11:09 |
| 11 | | get there, in the title it says, "My yesterday's | 13:11:16 |
| 12 | | presentation to" CCI -- "CCIR." | 13:11:19 |
| 13 | | Do you know what CCIR is?  I'll try to help | 13:11:24 |
| 14 | | you.  I believe it's the California Coalition on | 13:11:30 |
| 15 | | Immigration Reform. | 13:11:33 |
| 16 | | Does that sound right? | 13:11:35 |
| 17 | A | I don't know. | 13:11:35 |
| 18 | Q | You don't know? | 13:11:36 |
| 19 | A | I don't know. | 13:11:37 |
| 20 | Q | Do you know if this was a presentation that | 13:11:37 |
| 21 | | was organized by Orly Taitz, or was this a | 13:11:40 |
| 22 | | presentation where she was merely a guest speaker? | 13:11:46 |
| 23 | A | I don't know. | 13:11:48 |
| 24 | Q | All right.  Do you have any knowledge of the | 13:11:49 |
| 25 | | nature of this meeting that took place, other than | 13:11:53 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 19

```
 1    what you've gathered from reading this -- this web    13:11:58

 2    site article?                                         13:12:02

 3        A    No.  After I have an opportunity to depose   13:12:03

 4    Ms. Taitz we may know that better.                    13:12:07

 5        Q    Okay.  But as of now you don't know, though? 13:12:08

 6        A    As of now I don't know one way or the other. 13:12:12

 7        Q    Okay.  "My yesterday's presentation to CCIR  13:12:15

 8    and update on article2SuperPAC-Larry-Klayman."        13:12:17

 9             What's Article II Super PAC?                 13:12:21

10        A    That was an organization that George Miller  13:12:23

11    and Pamela Barnett were affiliated with at one point. 13:12:25

12        Q    Was this a entity that was raising money for 13:12:30

13    your challenge of Obama in Florida?                   13:12:33

14        A    Possibly.  That really didn't concern me.    13:12:37

15    All I knew is that they said they were going to raise  13:12:40

16    the money for it.                                     13:12:42

17        Q    So you didn't know if it was coming from     13:12:43

18    Article II Super PAC or not?                          13:12:45

19        A    No.                                          13:12:47

20        Q    And the remainder of the title refers to     13:12:52

21    "Larry Klayman $25,000 fundraising for non existent   13:12:54

22    law suit affair."                                     13:12:57

23             First of all, in the -- the heading there,   13:12:59

24    which is in bold and underlined, doesn't reference    13:13:04

25    anything about any conviction or an indictment for    13:13:07
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 20

```
1    failure to pay child support.  Would you agree with me    13:13:10

2    on that?                                                  13:13:13

3         A    In the heading?                                 13:13:13

4         Q    In the heading.                                 13:13:15

5         A    Document speaks for itself.                     13:13:16

6         Q    You would agree with me, though?               13:13:17

7         A    Yes, in the heading.                            13:13:19

8         Q    Okay.  If we go about halfway down of the       13:13:20

9    first substantive paragraph, Orly Taitz refers to         13:13:25

10   Connie Ruffley, and the sentence several lines down       13:13:30

11   says I, meaning Orly Taitz, told her, which was Connie     13:13:38

12   Ruffley, that this group Article II Super PAC was         13:13:41

13   soliciting money, that they sent an e-mail and posted     13:13:44

14   on their site an advertisement on February 10 asking      13:13:47

15   for $25,000 claiming that they need to raise $25,000      13:13:50

16   in 96 hours, as the cases in Florida and California       13:13:55

17   need to be filed within a week.                           13:13:59

18            Were you aware of Article II Super PAC           13:14:03

19   attempting to raise $25,000?                              13:14:07

20        A    I was aware that George Miller and Pamela       13:14:08

21   Barnett were seeking to raise the money.                  13:14:12

22        Q    Okay.                                           13:14:14

23        A    I didn't realize focusing on the vehicle        13:14:15

24   they were doing that.                                     13:14:18

25        Q    All right.  Were you aware --                   13:14:19
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 21

| | |
|---|---|
| 1    A    Subsequently, I came to understand that they | 13:14:20 |
| 2  were at first working through that entity. | 13:14:23 |
| 3    Q    Were you aware they were trying to raise | 13:14:28 |
| 4  that money quickly, within 96 hours? | 13:14:31 |
| 5    A    Yes, they wanted to file the case quickly. | 13:14:33 |
| 6    Q    Were you planning to file a case in | 13:14:34 |
| 7  California? | 13:14:37 |
| 8    A    Yes, I was planning to file a case in | 13:14:37 |
| 9  California at the time and move myself in or have | 13:14:40 |
| 10  somebody move me in pro hac vice. | 13:14:43 |
| 11    Q    Okay.  So you -- I take it from that | 13:14:47 |
| 12  answer -- | 13:14:49 |
| 13    A    I also had a lawyer with me who was a | 13:14:49 |
| 14  California lawyer, so either way it would have been | 13:14:51 |
| 15  handled. | 13:14:54 |
| 16    Q    All right.  But you -- I intended to ask | 13:14:54 |
| 17  you, you're not actually admitted to practice law in | 13:14:54 |
| 18  California, are you? | 13:14:57 |
| 19    A    Correct, I'm not. | 13:14:58 |
| 20    Q    Let me -- let me ask it better just because | 13:15:00 |
| 21  the record will be unclear. | 13:15:01 |
| 22    A    Sure. | 13:15:02 |
| 23    Q    On -- in February of 2012 were you admitted | 13:15:02 |
| 24  to practice law in California? | 13:15:06 |
| 25    A    No. | 13:15:08 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 22

```
 1      Q    Okay.  So if you wanted to be involved in        13:15:09
 2  that litigation, you would have to be admitted pro hac    13:15:13
 3  vice?                                                     13:15:18
 4      A    Or I could have my associate handle the          13:15:18
 5  case.                                                     13:15:20
 6      Q    Who's your associate?                            13:15:20
 7      A    Naveed Mahboobian at the time.  He's a           13:15:22
 8  California lawyer.                                        13:15:26
 9      Q    All right.  Okay.  Going on with this --         13:15:26
10      A    And he would me in pro hac vice as well.         13:15:28
11      Q    All right.  So it sounds as if while you may     13:15:34
12  not have known Orly Taitz on or before February 23,       13:15:41
13  2012, it sounds like she knew who you were, correct?      13:15:45
14      A    I would hope so.                                 13:15:49
15      Q    Why would you hope so?                           13:15:50
16      A    I'm joking with you a little bit.  I mean --     13:15:51
17  I have -- you know, I've done a lot of stuff, okay, in    13:15:56
18  my career and I've been a lawyer for a long time.         13:15:58
19      Q    All right.                                       13:15:58
20      A    So I'm joking with you.                          13:16:00
21      Q    And you were certainly -- well, you were         13:16:01
22  involved in the birther cases or at least the birther     13:16:03
23  discussion?                                               13:16:08
24      A    Before now I was never involved in birther       13:16:08
25  cases until George approached me.                         13:16:11
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 23

```
 1      Q    Okay.                                          13:16:13

 2      A    I was following it, but I was not directly     13:16:15

 3   involved.                                              13:16:17

 4      Q    All right.  The next sentence of this          13:16:17

 5   article says, I, meaning Orly Taitz, told her, that it 13:16:20

 6   was a hard sell, they wrote it is now or never, saying 13:16:23

 7   finally Obama's team met their match, dissing 4 years  13:16:27

 8   of my tireless work in the process, and in the end     13:16:31

 9   nothing was ever filed by Larry Klayman.               13:16:35

10        Do you know what she meant -- do you have an      13:16:39

11   understanding of what she meant by someone dissing her 13:16:44

12   4 years of tireless work?                              13:16:47

13      A    We'll have to ask Ms. Taitz when we depose     13:16:49

14   her.                                                   13:16:52

15      Q    So you don't -- you don't have any knowledge   13:16:52

16   of that?                                               13:16:54

17      A    No.  I don't know what her state of mind       13:16:55

18   was.  You know, from the document itself, it looks     13:16:57

19   like she's concerned of competition.                   13:17:00

20      Q    Okay.                                          13:17:03

21      A    That's obvious.                                13:17:04

22      Q    All right.  All right.  Then the next          13:17:04

23   paragraph, "Ms. Ruffley actually advised me that Larry 13:17:08

24   Klayman is not licensed in California."                13:17:11

25        That part of the statement is true, correct?      13:17:14
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 24

```
 1      A    Yes.                                    13:17:17

 2      Q    She told me that he no longer works with  13:17:20

 3  Judicial Watch.  That statement's also true, correct?  13:17:23

 4      A    Correct.                                 13:17:27

 5      Q    And now we get to the statement that you're  13:17:28

 6  concerned about; "and that donors should know about  13:17:36

 7  litigation in Ohio, where he was convicted just  13:17:40

 8  recently of not paying a large amount in child  13:17:43

 9  support."                                         13:17:46

10          I'm going to ask you more about that in  13:17:48

11  detail, but there was litigation in Ohio, correct,  13:17:50

12  about your child support?                         13:17:53

13      A    Yes.                                     13:17:55

14      Q    So that part is true?                    13:17:55

15      A    Yes.                                     13:18:00

16      Q    Your focus is on the word "convicted,"  13:18:00

17  correct?                                          13:18:04

18      A    My focus is on the word "contradicted."  My  13:18:04

19  focus is on the obvious intent to harm donors, you  13:18:08

20  know, of the Article II Super PAC or whatever's  13:18:13

21  raising the money to pay me in my private capacity as  13:18:15

22  a lawyer.  My concern is all the phrases put together  13:18:18

23  showing a malicious animus to hurt me.            13:18:21

24      Q    All right.                               13:18:25

25      A    It all works together.                   13:18:28
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 25

```
 1      Q    Do you know -- well, let me go on to the      13:18:29

 2    next sentence.                                        13:18:36

 3            Well, do you know the specific words that     13:18:37

 4    were said to -- said by Connie Ruffley to Orly Taitz  13:18:42

 5    on that day?                                          13:18:46

 6      A    I know what's written here.                    13:18:47

 7      Q    Did you overhear any of the words?             13:18:49

 8      A    I wasn't there.                                13:18:50

 9      Q    Do you know of anyone other than Orly Taitz    13:18:51

10    and Connie Ruffley who heard the words?               13:18:55

11      A    We're going to find that out when we depose    13:19:00

12    Connie Ruffley and Orly Taitz.                        13:19:03

13      Q    My question is, do you --                      13:19:04

14      A    No.  No, I don't.                              13:19:06

15      Q    Do you know whether this was a one-on-one      13:19:07

16    conversation or whether there were other people       13:19:11

17    involved?                                             13:19:13

18      A    I don't know at this time.                     13:19:14

19      Q    Does it make a difference to you?              13:19:15

20      A    Not in terms of the substance of what's        13:19:19

21    said, because Orly Taitz confirmed to me when I talked 13:19:21

22    to her that in fact Connie Ruffley said these things.  13:19:24

23    In addition, documents that have been filed in this   13:19:26

24    lawsuit in affidavit on behalf of Connie Ruffley      13:19:28

25    claims she can't remember what she said.  So to the   13:19:32
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 26

```
 1    extent that Orly Taitz can remember what she said and    13:19:35
 2    it's written down here and recorded, you know, I have    13:19:38
 3    to go with that as being the most probative, you know,   13:19:41
 4    of what occurred that day.                               13:19:46
 5         Q    Okay.  The next sentence says, "I will         13:19:47
 6    publish only, what is a public record.  I am not         13:19:50
 7    publishing anything, that is not a public record."       13:19:54
 8              At that time was there a public record that    13:19:59
 9    you had been convicted of recently not paying a large    13:20:02
10    amount of child support?                                 13:20:06
11         A    No, there was not.  I've never been            13:20:08
12    convicted of anything.  So assuming that -- that         13:20:10
13    Connie Ruffley looked at a public record, she could     13:20:13
14    never have come to that conclusion.                      13:20:15
15         Q    Well, who's saying -- the I, the person       13:20:18
16    writing this article is Orly Taitz, correct?            13:20:21
17         A    I take it.                                     13:20:24
18         Q    Has it always been your assumption that Orly  13:20:25
19    Taitz is the one who wrote this article?                13:20:28
20         A    Yes.  My assumption is she was recording      13:20:30
21    what Connie Ruffley said to her and she then            13:20:32
22    published --                                             13:20:35
23         Q    When she says, "I will publish only, what is  13:20:35
24    a public record," isn't the I referring to Orly Taitz?  13:20:37
25         A    You have to ask Orly Taitz that.              13:20:41
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 27

```
 1      Q    Okay.  You don't -- you don't know one way    13:20:43
 2   or the other?                                          13:20:45
 3      A    I think what she's conferring there is that    13:20:45
 4   she and Connie Ruffley together are working in tandem  13:20:48
 5   to -- to try to harm me.                               13:20:53
 6      Q    That's just your assumption, though,           13:20:57
 7   correct?                                               13:21:00
 8      A    Well, from the total context of what's being   13:21:00
 9   said here and what Connie Ruffley said in terms of it  13:21:03
10   wasn't just a question of my being convicted of a      13:21:06
11   crime, but we've got to get that information to donors 13:21:09
12   here, you see, and -- and that suggests that there's a 13:21:12
13   motivation here among the two of them to do something  13:21:15
14   to try to impede and harm me from representing my      13:21:19
15   client in eligibility cases.                           13:21:23
16      Q    But that -- that's what you believe,           13:21:26
17   correct?                                               13:21:27
18      A    Correct.                                       13:21:27
19      Q    That's not -- no one has told you that?        13:21:27
20      A    George Miller and Pamela Barnett,             13:21:35
21   particularly George Miller knows Orly Taitz very well. 13:21:40
22      Q    Okay.                                          13:21:40
23      A    They've worked with her, and they did have    13:21:44
24   discussions with Orly Taitz, and that's the conclusion 13:21:46
25   that they reached that they conferred to me, that the  13:21:49
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 28

```
 1    two of them were working together to hurt him in        13:21:53
 2    raising the money to pay me.                            13:21:56
 3        Q    So you're relying on someone else's            13:21:57
 4    conclusions about what someone else said to that        13:21:59
 5    person?                                                 13:22:02
 6        A    I'm not relying on anything.  I'm just         13:22:02
 7    simply telling you what I know.                         13:22:04
 8        Q    Okay.  And then it says, "I am not             13:22:06
 9    publishing anything, that is not in public record."     13:22:08
10    The I there is Orly Taitz, isn't it?                    13:22:10
11        A    Well, the document speaks for itself.          13:22:13
12        Q    Do you assume that the I there means Orly      13:22:15
13    Taitz?                                                  13:22:18
14        A    I'm assuming that she's publishing on behalf   13:22:19
15    of Judicial Watch as well as herself.                   13:22:21
16        Q    Why do you assume she's publishing on behalf   13:22:23
17    of Judicial Watch?                                      13:22:26
18        A    Given the history of the malicious actions     13:22:26
19    of directors of Judicial Watch and also Judicial Watch  13:22:29
20    towards me since I left Judicial Watch.  This isn't     13:22:35
21    the first time something like this happened, and so I   13:22:38
22    have to conclude that the two of them were working      13:22:42
23    together, and Judicial Watch has always viewed me as a  13:22:44
24    competitor.  They feel very defensive about me.  I am   13:22:47
25    the founder, despite the testimony that they can't      13:22:50
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 29

| | | |
|---|---|---|
| 1 | remember who founded Judicial Watch. | 13:22:53 |
| 2 | No one disputes I that I'm the founder.  No | 13:22:55 |
| 3 | one disputes I was general counsel.  No one disputes I | 13:22:57 |
| 4 | was chairman.  But we heard a lot of prevarication and | 13:23:01 |
| 5 | I can't remember during depositions of the directors, | 13:23:05 |
| 6 | and that in and of itself tells you of the -- the | 13:23:07 |
| 7 | malice, the intent, the competitiveness they feel | 13:23:10 |
| 8 | towards me, writing me out of a book that, you know, | 13:23:13 |
| 9 | the first many years of my working and founding | 13:23:17 |
| 10 | Judicial Watch. | 13:23:20 |
| 11 | It wasn't just simply theater of the absurd. | 13:23:22 |
| 12 | It's a fact that they feel very competitive with me | 13:23:24 |
| 13 | and they tried to keep me down ever since I left | 13:23:28 |
| 14 | Judicial Watch because they thought I was going to | 13:23:32 |
| 15 | siphon prestige and business away from them. | 13:23:34 |
| 16 | Q   Mr. Klayman, you're free to tell me whatever | 13:23:37 |
| 17 | you want, but this deposition will go a lot more | 13:23:41 |
| 18 | smoothly if we just focus on the questions, and I | 13:23:44 |
| 19 | really want to get facts from you.  Do you have any | 13:23:47 |
| 20 | facts, any personal knowledge of whether Orly Taitz | 13:23:49 |
| 21 | was referring to herself when she said, "I am not | 13:23:54 |
| 22 | publishing anything, that is not in public record?" | 13:23:58 |
| 23 | Do you know whether she was referring to herself? | 13:24:02 |
| 24 | A   I know how I took it, and that's why I | 13:24:04 |
| 25 | answered it the way I did.  I took it that when she | 13:24:07 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 30

| | | |
|---|---|---|
| 1 | said I, that she meant I'm doing this in conjunction | 13:24:10 |
| 2 | with Connie Ruffley and Judicial Watch.  That's the | 13:24:14 |
| 3 | way I took it. | 13:24:16 |
| 4 | Q    That's your assumption, correct? | 13:24:16 |
| 5 | A    That's -- that's the way I read it. | 13:24:17 |
| 6 | Q    Is that your assumption? | 13:24:18 |
| 7 | A    It's not assumption.  It's the way I read | 13:24:19 |
| 8 | it.  The answer's no.  That's the way I read it. | 13:24:21 |
| 9 | Q    That's the way you read it, okay. | 13:24:24 |
| 10 | A    In the context of everything, and that's why | 13:24:25 |
| 11 | I gave you that narrative response, because you have | 13:24:27 |
| 12 | to come to a conclusion based on past experience. | 13:24:29 |
| 13 | Q    Could you write a book? | 13:24:33 |
| 14 | A    Did I write a book? | 13:24:34 |
| 15 | Q    Could you write a book? | 13:24:35 |
| 16 | A    Yes. | 13:24:37 |
| 17 | Q    Why don't you write a book about your | 13:24:37 |
| 18 | experiences with Judicial Watch? | 13:24:39 |
| 19 | A    I have. | 13:24:41 |
| 20 | Q    Okay. | 13:24:41 |
| 21 | A    Would you like an autographed copy? | 13:24:42 |
| 22 | Q    I would not -- well, maybe.  I don't know. | 13:24:46 |
| 23 | So you've written a book.  So you had -- you had your | 13:24:47 |
| 24 | chance to tell your story, right? | 13:24:49 |
| 25 | A    I'll let the book speak for itself. | 13:24:51 |

LARRY ELLIOT KLAYMAN – 1/29/2014

```
 1      Q    All right.  No one prevented you from          13:24:53

 2  writing a book, right?                                  13:24:55

 3      A    No.                                            13:24:55

 4      Q    All right.  Let's go on in this article.  "A   13:25:00

 5  number of individuals sent me this information," and    13:25:02

 6  then it goes on to say, "Larry Klayman, 60, of Los      13:25:06

 7  Angeles, California was indicted on two counts of       13:25:11

 8  criminal non-support.  He owes $78,861.76 for his two   13:25:14

 9  children, ages 11 and 14.  Two hearings were held in    13:25:20

10  Domestic Relations Court between 2009 and 2010.  The    13:25:23

11  last voluntary payment was made on August 30, 2011 in   13:25:28

12  the amount of $1,014.26.  Arraignment is scheduled for  13:25:31

13  February 7, 2012."                                      13:25:38

14          Do you know who the number of individuals       13:25:39

15  that Orly Taitz is referring to?                        13:25:43

16      A    I don't.  I mean, there's some comments that   13:25:44

17  appear on her web site that are probably some of these  13:25:46

18  people.  I don't know -- but I don't know.  I don't     13:25:50

19  know specifically.                                      13:25:52

20      Q    Okay.  You can't name any of them?            13:25:52

21      A    No, not at this time.                          13:25:54

22      Q    Okay.  Okay.  Let's go on piece-by-piece in    13:25:55

23  this -- in this -- no, we're still -- we're still on    13:25:58

24  that page.  It says, Larry Klayman, 60 years old.       13:26:00

25  Were you 60 years old in -- in February of 2012?        13:26:07
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 32

```
 1      A     Yeah, maybe 59.                              13:26:09

 2      Q     Okay.                                        13:26:09

 3      A     No, I was 60 then.                           13:26:12

 4      Q     Okay.  So that's correct.  "Of Los Angeles, 13:26:13

 5   California."  Were you -- were you of Los Angeles,    13:26:16

 6   California at the time?                               13:26:19

 7      A     No.  I was from everywhere.  I'm a resident  13:26:19

 8   of Florida.                                           13:26:22

 9      Q     Okay.  So that part's incorrect, the of Los  13:26:22

10   Angeles?                                              13:26:28

11      A     Correct.                                     13:26:28

12      Q     Do you have -- do you have a place in        13:26:29

13   California?                                           13:26:30

14      A     Yeah, I rent a place there.                  13:26:30

15      Q     Okay.  And it goes on to say, "Larry         13:26:32

16   Klayman, 60, of Los Angeles, California was indicted  13:26:35

17   on two counts of criminal non-support."              13:26:39

18            Is that true that you were indicted on two   13:26:41

19   counts of criminal nonsupport?                        13:26:43

20      A     I don't remember if it was two counts, but I 13:26:45

21   was indicted on criminal nonsupport, yeah.           13:26:47

22      Q     Okay.  And that was by a criminal court in   13:26:49

23   Cuyahoga County, Ohio, correct?                       13:26:51

24      A     Yes.                                         13:26:55

25      Q     All right.  And it says that you owed that   13:26:56
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 33

```
 1    amount of money, the $78,000 and change to your two --       13:27:02

 2    for his -- for your two children who were 11 and 14.         13:27:06

 3    Did you owe that money to your -- or for your two            13:27:10

 4    children at that time?                                       13:27:13

 5         A    No.                                                13:27:14

 6         Q    Why do you say that?                               13:27:14

 7         A    Because under the case of Hartman v.               13:27:16

 8    Hartman -- I was divorced in Fairfax County, Virginia.       13:27:20

 9    The marital agreement provided that Virginia law would       13:27:23

10    apply if there was ever any dispute in the future, and       13:27:26

11    in that court in the case of Hartman v. Hartman,             13:27:30

12    there's precedent that if a wife keeps the children          13:27:35

13    away from the husband for a substantial period of time       13:27:38

14    and doesn't let him talk to them or visit them or            13:27:40

15    whatever, that there is a defense to the payment of          13:27:43

16    child support and that child support is not due and          13:27:45

17    owing under those circumstances.                             13:27:50

18         Q    Did the Ohio court agree with that?                13:27:52

19         A    They did not.                                      13:27:54

20         Q    Okay.  They found the opposite, correct?           13:27:55

21         A    Which court are you talking about?  The            13:27:57

22    criminal court never reached these issues.                   13:28:01

23         Q    The Ohio Domestic Relations Court.                 13:28:03

24         A    No.  Ultimately, that court applied Ohio           13:28:07

25    law, --                                                      13:28:11
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 34

```
 1        Q    Okay.                                      13:28:11

 2        A    -- in my view improperly and illegally, and  13:28:11

 3   came to another conclusion.                          13:28:14

 4        Q    They concluded that you did owe the money,  13:28:15

 5   correct?                                             13:28:20

 6        A    Correct.                                    13:28:20

 7        Q    And that went from the domestic relations  13:28:20

 8   court, which was a trial-level court, up to the      13:28:22

 9   appellate court, correct?                            13:28:25

10        A    Correct.                                    13:28:26

11        Q    And then it went to the Ohio Supreme Court,  13:28:27

12   correct?                                             13:28:29

13        A    I filed a petition there, yeah.             13:28:31

14        Q    A petition for -- I forget what they call it  13:28:32

15   there?                                               13:28:35

16        A    Review.  It's discretionary.               13:28:35

17        Q    And they -- they denied the discretionary   13:28:38

18   view, correct?                                       13:28:41

19        A    They did, but I'm still pursuing it.        13:28:41

20        Q    Okay.  All right.  On the --               13:28:41

21        A    I'm pursuing it through a motion to vacate  13:28:44

22   the judgment.                                        13:28:46

23        Q    Okay.  That's still pending, though,        13:28:47

24   correct?                                             13:28:49

25        A    That will be filed shortly.                13:28:49
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 35

```
 1      Q    All right.  It goes on to state, "Two        13:28:51
 2  hearings were held in Domestic Relations Court between  13:28:53
 3  2009 and 2010."                                        13:28:55
 4           Is that accurate?                             13:28:58
 5      A    I might add I'm also pursuing it in other    13:28:59
 6  legal proceedings too.  So those have been out there   13:29:02
 7  and they're active.  I'm not giving up.                13:29:05
 8      Q    You're still fighting, correct?              13:29:07
 9      A    I'm still fighting.  I always fight for my   13:29:09
10  kids.                                                  13:29:11
11      Q    All right.  The article references there     13:29:12
12  being two hearings in domestic relations court between 13:29:14
13  2009-2010.  Is that accurate?                          13:29:16
14      A    I don't remember if there were two or not.   13:29:20
15      Q    All right.  Can't say it's inaccurate,       13:29:21
16  though, correct?                                       13:29:23
17      A    I don't recollect that there were two or one 13:29:24
18  or, you know, whatever.                                13:29:27
19      Q    It goes on to state, "The last voluntary     13:29:30
20  payment was made on August 30, 2011."                  13:29:33
21           Is that accurate?                             13:29:37
22      A    I didn't review, you know, the records at    13:29:37
23  this point, okay.  I do know that I always paid child  13:29:39
24  support up to the point that my former wife denied me  13:29:42
25  the children.                                          13:29:45
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 36

```
 1      Q    Mm-hmm.  Okay.  So the last sentence on that      13:29:47
 2  page, page 2 says, "Arraignment is scheduled for           13:29:53
 3  February 7, 2012."                                         13:29:56
 4           Was that accurate?                                13:29:57
 5      A    I don't remember if it was February 7th, but      13:29:59
 6  they did schedule an arraignment.                          13:30:01
 7      Q    Did you appear for an arraignment?                13:30:02
 8      A    No.  I had counsel seek a continuance of          13:30:04
 9  that.                                                      13:30:07
10      Q    Okay.  Would you agree with me that this          13:30:07
11  portion of the article, beginning with "Ms. Ruffley        13:30:16
12  actually advised me" and ending with "arraignment is       13:30:18
13  scheduled for February 7, 2012," would you agree with      13:30:22
14  me that there are some inherent contradictions in --       13:30:24
15  in those paragraphs?                                       13:30:28
16      A    I don't -- didn't understand your question.       13:30:29
17      Q    Well, for instance, it says that you were         13:30:30
18  convicted but that you had just been indicted and that     13:30:32
19  arraignment was just scheduled.                            13:30:38
20      A    That's a compound question.  I can't answer       13:30:40
21  that.                                                      13:30:43
22      Q    Okay.                                             13:30:43
23      A    Objection, as counsel.                            13:30:46
24      Q    I will clarify it for you.  Is the comment        13:30:49
25  that someone was just convicted consistent with the        13:30:54
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 37

```
 1    comment that someone was just arraigned?        13:30:58

 2    A    No.                                         13:31:02

 3    Q    So that's inconsistent?                     13:31:04

 4    A    It's inconsistent.                          13:31:05

 5    Q    All right.                                  13:31:07

 6    A    For -- it's inconsistent insofar as in this 13:31:10

 7    country you're innocent until proven guilty.     13:31:13

 8    Q    Okay.  So if -- if someone read this, they  13:31:16

 9    could say, well, jeez, it says right here he was just  13:31:18

10    convicted, but down here it says he was just     13:31:22

11    arraigned; this doesn't make sense, correct?     13:31:25

12    A    I don't know what is in the mind of someone 13:31:27

13    who reads it.  There are many people in this country  13:31:29

14    who are very unsophisticated who don't understand the  13:31:32

15    distinction, but they do understand what convicted  13:31:35

16    means.  Unfortunately -- unfortunately, in this  13:31:38

17    country, as in all countries -- I love this country --  13:31:42

18    people are not always very well educated.  They don't  13:31:44

19    know the legal system.                           13:31:48

20         And so consequently, the use of the        13:31:49

21    word "convicted," which is very clear, meant that I  13:31:52

22    was found guilty of a crime, and that's why I'm  13:31:56

23    pursuing all of this, and that's why I didn't have a  13:31:59

24    case against the judge in the other case with regard  13:32:01

25    to child support.  I will never give up this and I  13:32:05
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 38

```
 1    will never stop filing legal proceedings and pursuing      13:32:07
 2    them because -- you know, the reason I started             13:32:10
 3    Judicial Watch is because of the sometimes lack of         13:32:13
 4    quality and competence of the judiciary and those that     13:32:20
 5    serve it.                                                  13:32:24
 6            So that's why when you use the                     13:32:26
 7    word "convict," that has a very strong meaning because     13:32:29
 8    most people don't understand the legal system.            13:32:32
 9    Q    Do some people not understand the difference          13:32:35
10    between convicted and indicted?                            13:32:37
11    A    I can't speak for other people, but I only            13:32:39
12    know that this country is -- you know, people are not      13:32:43
13    as well educated as they should be.                       13:32:49
14    Q    Do some people not know the difference                13:32:51
15    between a finding of contempt of court and a               13:32:53
16    conviction?                                                13:32:56
17    A    I can't speak for other people.                       13:32:57
18    Q    All right.  Would it surprise you if some             13:32:58
19    people didn't know the difference between a finding of     13:33:00
20    contempt of court and a conviction?                        13:33:04
21    A    Calls for hypothetical.  You have to give me          13:33:06
22    the name of a specific individual for me to answer        13:33:10
23    that question.                                             13:33:12
24    Q    Fair enough.                                          13:33:12
25    A    I mean, you know, the circles that I travel          13:33:13
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 39

```
 1    in, if you want to narrow it to people who I know,      13:33:16

 2    then maybe I can give you an opinion, but that's just    13:33:25

 3    an opinion.                                              13:33:28

 4         Q    Yeah, I don't think we need to.                13:33:28

 5         A    Let me add here Connie Ruffley certainly       13:34:08

 6    knows the difference between the word "convict" and      13:34:10

 7    "indict."  She works for a legal organization.           13:34:13

 8              MR. KRESS:  Could I just take those stickers   13:34:23

 9    (indicating).                                            13:34:25

10              Thank you.                                     13:34:26

11                   (Defendant's Deposition Exhibit 10 was    13:34:43

12    marked for identification and was attached to the        13:34:43

13    deposition transcript.)                                  13:34:44

14    BY MR. KRESS:                                            13:34:44

15         Q    I show you what's been marked as Defendant's   13:34:44

16    Exhibit 10.                                              13:34:46

17         A    Okay.                                          13:34:47

18         Q    Take as much time as you need to be            13:34:51

19    generally familiar with what it is.                      13:34:55

20         A    Yes.                                           13:34:56

21         Q    Do you recognize the document?                13:34:56

22         A    Yes.  I'm not going to review it to            13:35:17

23    excruciating detail, but let me take a look at each      13:35:19

24    page.                                                    13:35:23

25              Okay.                                          13:35:42
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 40

```
 1      Q    And that is a judgment entry, is it not, of     13:35:43

 2   the Court of Common Pleas Division of Domestic           13:35:45

 3   Relations Cuyahoga County, Ohio, which found you in      13:35:51

 4   contempt of court for failure to pay child support,     13:35:55

 5   correct?                                                 13:35:58

 6      A    Correct.                                         13:36:00

 7      Q    And if you could look at the last date,         13:36:00

 8   what's the date of -- what's the date of filing?        13:36:02

 9      A    It says received for filing September 24th,     13:36:12

10   2009.                                                    13:36:14

11      Q    Okay.  So you acknowledge that you were         13:36:15

12   found in contempt of court around that time, September  13:36:18

13   of 2009, for failure to pay child support?              13:36:20

14      A    Correct.  And to give a narrative, I was        13:36:23

15   advised by counsel, Roger Kleinman, to go into          13:36:29

16   contempt so I could take it up on appeal.               13:36:33

17      Q    Okay.  So you conferred with your counsel       13:36:36

18   and decided that you -- well, you decided to not         13:36:43

19   contest the contempt?                                    13:36:50

20      A    Well, it's civil contempt.  It's a contempt     13:36:51

21   that can be purged at any time if you have to by        13:36:55

22   paying the amount.  It's not criminal contempt.         13:36:57

23      Q    Okay.  But it was -- it was contempt of         13:36:59

24   court nonetheless?                                       13:37:02

25      A    It is what it says it is.  The document         13:37:03
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 41

| | | |
|---|---|---|
| 1 | speaks for itself. | 13:37:05 |
| 2 | Q It's contempt of court, right? | 13:37:05 |
| 3 | A That's what the document says. | 13:37:07 |
| 4 | Q All right. And if you could take a look at | 13:37:08 |
| 5 | Defendant's Exhibit 11, please. | 13:37:24 |
| 6 | (Defendant's Deposition Exhibit 11 was | 13:37:34 |
| 7 | marked for identification and was attached to the | 13:37:34 |
| 8 | deposition transcript.) | 13:37:37 |
| 9 | A Okay. | 13:37:55 |
| 10 | BY MR. KRESS: | 13:37:56 |
| 11 | Q You're familiar with Defendant's Exhibit 11? | 13:37:56 |
| 12 | A I've seen it, yeah. | 13:37:58 |
| 13 | Q And what is it? | 13:37:59 |
| 14 | A It's a judgment entry. | 13:38:00 |
| 15 | Q Finding you in contempt of court, again for | 13:38:01 |
| 16 | failure to pay child support, correct? | 13:38:04 |
| 17 | A Finding me in contempt of court. | 13:38:05 |
| 18 | Q What's the date of that finding? | 13:38:07 |
| 19 | A It's civil contempt. June 24th, 2011. | 13:38:10 |
| 20 | Q Okay. So that's two times that an Ohio | 13:38:16 |
| 21 | court found you in contempt of court for failure to | 13:38:19 |
| 22 | pay child support, correct? | 13:38:21 |
| 23 | A Correct. | 13:38:23 |
| 24 | Q Have you been found in contempt of court in | 13:38:23 |
| 25 | Ohio any other times for failure to pay child support? | 13:38:27 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 42

1       A    I don't recollect.  I didn't review the          13:38:31
2   record before I came in here today.                       13:38:32
3       Q    All right.  Well, finding -- the finding of       13:38:34
4   contempt of court is a serious matter, isn't it?           13:38:36
5       A    Depends the context of it.  If you're            13:38:39
6   talking about the Cleveland family courts, which are       13:38:41
7   highly corrupt, the only way you can challenge it is       13:38:44
8   to go into contempt to take it up on appeal.  So in        13:38:49
9   the Cleveland family court, the lawyers call              13:38:52
10  themselves by the first names.  The judges call them      13:38:55
11  by their first names.  The guardian ad litems are in      13:38:59
12  the hip pocket of everyone.  Everyone is scratching       13:39:03
13  everybody else's back.                                    13:39:03
14       So consequently, I had no choice but to go           13:39:04
15  into contempt.  And I had a defense, and that defense     13:39:05
16  had yet to be litigated.  So this was a choice that I     13:39:08
17  made, based upon the fact that legally this was the       13:39:12
18  strategy that we had worked out with my counsel.          13:39:17
19       And just for the record, I would never deny          13:39:21
20  my kids support.  I love my kids and they're very well    13:39:23
21  taken care of and they live in a house that I paid        13:39:28
22  for.  There's been a lot over time that I've helped       13:39:33
23  them with, even during these proceedings with my          13:39:36
24  former wife.  So I knew that they would be taken care     13:39:38
25  of, and this was a legal decision I had to make as a      13:39:40

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 43

| | | |
|---|---|---|
| 1 | matter of principle and for financial reasons. | 13:39:43 |
| 2 | Q    What do you mean for financial reasons? | 13:39:49 |
| 3 | A    Because I shouldn't be paying money if I | 13:39:50 |
| 4 | can't see my kids.  I shouldn't have to pay to play. | 13:39:53 |
| 5 | Q    Okay.  Nonetheless -- well, you made a | 13:39:55 |
| 6 | decision to violate a court order that required you to | 13:40:01 |
| 7 | pay child support, correct? | 13:40:08 |
| 8 | A    I made a strategic decision to go into | 13:40:09 |
| 9 | contempt so I could raise the issues on appeal and | 13:40:14 |
| 10 | have them heard, yes. | 13:40:17 |
| 11 | Q    And those contempt orders are public | 13:40:23 |
| 12 | records, correct? | 13:40:26 |
| 13 | A    Correct. | 13:40:29 |
| 14 | Q    If anyone wanted to get them, they could | 13:40:30 |
| 15 | contact the -- the court and obtain them today, | 13:40:33 |
| 16 | correct? | 13:40:38 |
| 17 | A    Well, in Cleveland that's easier said than | 13:40:38 |
| 18 | done, but they are matter of public record. | 13:40:41 |
| 19 | Q    Okay.  Are you just referring to it's | 13:40:42 |
| 20 | sometimes -- sometimes the staff is not easy to get | 13:40:44 |
| 21 | records from? | 13:40:46 |
| 22 | A    Well, you can get the docket sheet online. | 13:40:46 |
| 23 | You can see that easily. | 13:40:49 |
| 24 | Q    Right.  Right. | 13:40:51 |
| 25 | A    Okay.  And I don't know when that started in | 13:40:52 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 44

```
 1    Cleveland or not, but I know you can do it now, and,     13:40:54
 2    you know, they are public records, yeah.                 13:40:57
 3        Q    Okay.   So if someone wanted to know,           13:40:59
 4    whether it's a donor or just someone who's interested,   13:41:03
 5    whether you had any child support issues, they could     13:41:06
 6    find out just from -- from those public records,         13:41:09
 7    correct?                                                 13:41:11
 8        A    At the point in time that Orly Taitz made       13:41:12
 9    those representations, yes.                              13:41:16
10        Q    Okay.   So in February of 2012, someone could  13:41:17
11    have researched the docket and saw that you were found   13:41:25
12    in contempt of court twice?                              13:41:27
13        A    Yes, and Ms. Ruffley could have certainly       13:41:29
14    searched the docket.   She's very skilled at that.   She 13:41:32
15    serves as an effective paralegal in the San Marino       13:41:36
16    office, and before she decided to defame me publicly,    13:41:39
17    she could have checked to see whether that was           13:41:42
18    accurate or not, but obviously she decided one way or    13:41:45
19    the other that she was going to say what she was going   13:41:47
20    to say.                                                  13:41:50
21        Q    All right.   And, again, you're making          13:41:50
22    assumptions about what Ms. Ruffley did or did not do?    13:41:52
23        A    Well, I know Ms. Ruff- -- I worked with         13:41:56
24    Ms. Ruffley more than anybody at Judicial Watch.   I     13:41:58
25    was the one that travelled around the offices and made   13:42:00
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 45

| | |
|---|---|
| 1   sure everything was running when I was there for those | 13:42:02 |
| 2   many years, and I trained Ms. Ruffley on how to do | 13:42:05 |
| 3   legal research and -- and other things.  So when she | 13:42:07 |
| 4   made the statement that I was convicted, she knew | 13:42:09 |
| 5   better or she should have known better. | 13:42:12 |
| 6                   (Defendant's Deposition Exhibit 12 was | 13:42:12 |
| 7   marked for identification and was attached to the | 13:42:12 |
| 8   deposition transcript.) | 13:42:16 |
| 9   BY MR. KRESS: | 13:42:16 |
| 10      Q    Showing you what's been marked as | 13:42:16 |
| 11   Defendant's Exhibit 12.  Do you recognize this | 13:42:17 |
| 12   document? | 13:42:24 |
| 13      A    Not specifically.  I mean, I didn't focus on | 13:42:30 |
| 14   this.  Looks like it was part of another document. | 13:42:32 |
| 15      Q    It appears to be a capias that's issued | 13:42:35 |
| 16   directed to you.  Do you understand what a capias is? | 13:42:38 |
| 17      A    Yes. | 13:42:41 |
| 18      Q    What's a capias? | 13:42:42 |
| 19      A    A capias is an arrest warrant. | 13:42:44 |
| 20      Q    Okay.  So were you aware that there was an | 13:42:46 |
| 21   arrest warrant out for you from the domestic relations | 13:42:49 |
| 22   court in -- in Cuyahoga County in or about I think | 13:42:52 |
| 23   that's March of 2010? | 13:42:55 |
| 24      A    Yes. | 13:42:56 |
| 25      Q    Okay.  Were you ever arrested? | 13:42:57 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 46

| | | |
|---|---|---|
| 1 | A     No. | 13:42:59 |
| 2 | Q     Do you view that as a serious matter, that | 13:42:59 |
| 3 | there was an arrest warrant out for you? | 13:43:02 |
| 4 | A     I don't view it as a serious or nonserious | 13:43:04 |
| 5 | matter.  I view it as a consequence of my deciding to | 13:43:07 |
| 6 | go into contempt. | 13:43:10 |
| 7 | Q     All right.  And you were also found in | 13:43:11 |
| 8 | contempt of court by a Virginia court, correct, for | 13:43:12 |
| 9 | failure to pay child support? | 13:43:15 |
| 10 | A     No, it was not with regard to child support. | 13:43:16 |
| 11 | It was with regard to alimony. | 13:43:19 |
| 12 | Q     Okay, fair enough. | 13:43:21 |
| 13 | A     I'd been paying child support until I was | 13:43:23 |
| 14 | denied my kids, which resulted only after I filed a | 13:43:26 |
| 15 | custody petition. | 13:43:33 |
| 16 | (Defendant's Deposition Exhibit 13 was | 13:43:33 |
| 17 | marked for identification and was attached to the | 13:43:33 |
| 18 | deposition transcript.) | 13:43:35 |
| 19 | BY MR. KRESS: | 13:43:35 |
| 20 | Q     I show you what's been marked as Defendant's | 13:43:35 |
| 21 | Exhibit 13, and do you recognize that document? | 13:43:38 |
| 22 | A     Yes. | 13:43:53 |
| 23 | Q     What's that document? | 13:43:54 |
| 24 | A     I believe it's the indictment. | 13:43:55 |
| 25 | Q     And I believe -- for the record, I -- I | 13:43:58 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 47

```
 1    think that possibly two separate indictments were        13:44:02
 2    issued because that only refers to --                    13:44:04
 3        A    Yeah, one for one child and one for the          13:44:06
 4    other.                                                    13:44:08
 5        Q    Yeah, and I won't put her name on the            13:44:08
 6    record, and if you want we'll even redact it.  I don't    13:44:11
 7    know that we need to have her name in the record.         13:44:14
 8        A    I would appreciate that.                         13:44:16
 9        Q    We'll make a note to do that.  So that's         13:44:17
10    dated January 24th, 2012, correct?                        13:44:20
11        A    That's what it says.                             13:44:24
12        Q    So it was on that date that you were            13:44:27
13    indicted for failure to pay child support with respect   13:44:28
14    to your two children?                                     13:44:31
15        A    That's what the document says.                   13:44:32
16        Q    Do you dispute it?                               13:44:34
17        A    No.                                              13:44:35
18             (Defendant's Deposition Exhibit 14 was          13:45:07
19    marked for identification and was attached to the         13:45:07
20    deposition transcript.)                                   13:45:07
21    BY MR. KRESS:                                             13:45:07
22        Q    Showing you what's been marked as               13:45:08
23    Defendant's Exhibit 14.  Do you recognize Exhibit 14?    13:45:09
24        A    I probably do.  I don't remember                13:45:23
25    specifically at the time.  I had a lawyer up in          13:45:25
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 48

| | | |
|---|---|---|
| 1 | Cleveland that was handling these matters, Terry | 13:45:26 |
| 2 | Gilbert, so he had access to all of these documents. | 13:45:30 |
| 3 | Q    So Terry Gilbert was your attorney in | 13:45:32 |
| 4 | Cleveland? | 13:45:34 |
| 5 | A    Yeah. | 13:45:35 |
| 6 | Q    It appears as though there was a capias on | 13:45:35 |
| 7 | an indictment issued for you on December 7, 2012 for | 13:45:38 |
| 8 | nonsupport of -- of dependents.  Would you agree with | 13:45:42 |
| 9 | me that a capias was in fact issued for your arrest? | 13:45:48 |
| 10 | A    It was, but I will dispute that it was a | 13:45:52 |
| 11 | valid capias because I'd never been served with the | 13:45:55 |
| 12 | indictment.  I was never served with an indictment. | 13:45:59 |
| 13 | Q    Were you sometime -- were you at some point | 13:45:59 |
| 14 | served with an indictment? | 13:46:01 |
| 15 | A    According to the position that my counsel | 13:46:04 |
| 16 | was taking, no, okay, because I had to be personally | 13:46:05 |
| 17 | served.  I was never served with it, so there was no | 13:46:09 |
| 18 | force and effect, and if the matter hadn't been | 13:46:12 |
| 19 | dismissed, that matter would have been litigated. | 13:46:15 |
| 20 | Q    Okay.  And ultimately the -- well, I'll get | 13:46:17 |
| 21 | to that in a minute. | 13:46:20 |
| 22 | (Defendant's Deposition Exhibit 15 was | 13:46:23 |
| 23 | marked for identification and was attached to the | 13:46:23 |
| 24 | deposition transcript.) | 13:46:24 |
| 25 | BY MR. KRESS: | 13:46:24 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 49

```
 1        Q    Show you what's been marked as Defendant's       13:46:24
 2   Exhibit 15.  Do you recognize this document?               13:46:26
 3        A    Yes.                                              13:46:32
 4        Q    What is it?                                       13:46:32
 5        A    I think it's a press release.                    13:46:33
 6        Q    And it appears to be dated February 3, 2012,     13:46:35
 7   correct?                                                   13:46:37
 8        A    Yes.                                              13:46:41
 9        Q    And so as of -- this appears to be an            13:46:46
10   internet publication, correct?                             13:46:49
11        A    I don't know.                                    13:46:50
12        Q    Go back to Defendant's Exhibit 2, which I        13:46:51
13   think is still in front of you.                            13:46:53
14        A    Mm-hmm.                                          13:46:53
15        Q    If you look on Exhibit 15 under paragraph 1,     13:46:58
16   there is a statement that is identical to the last         13:47:03
17   paragraph on page 2 of Exhibit 2, correct?                 13:47:10
18        A    I don't understand your question.                13:47:15
19        Q    Well, on Exhibit 15 there was a paragraph 1      13:47:17
20   and it says, "Larry Klayman, 60, of Los Angeles,           13:47:21
21   California was indicted on two counts of criminal          13:47:25
22   non-support.  He owes $78,861.76 for his two children      13:47:27
23   ages 11 and 14.  Two hearings were held in Domestic        13:47:32
24   Relations Court between 2009 and 2010.  The last           13:47:37
25   voluntary payment made on August 30, 2011 in the           13:47:42
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 50

```
 1    amount of $1,014.26.  Arraignment is scheduled for       13:47:46
 2    February 7, 2012," correct?                              13:47:50
 3         A    The documents speak for themselves.            13:47:51
 4         Q    Okay.  But the point I'm making is that it     13:47:54
 5    appears that the last paragraph on page 2 of Orly        13:47:56
 6    Taitz's web site, as reflected on Exhibit 2, was         13:48:04
 7    actually pulled verbatim from this press release from    13:48:06
 8    Ohio, correct?                                           13:48:11
 9         A    I don't know that.  I mean, if the documents   13:48:12
10    match up, people can reach their own conclusion, but I   13:48:15
11    don't know that.                                         13:48:18
12         Q    You don't know that?                           13:48:18
13         A    I don't know.                                  13:48:19
14         Q    You don't -- don't know that they're          13:48:19
15    identical?                                               13:48:21
16         A    Miracles happen, you know.                    13:48:21
17         Q    Okay.  Doesn't it appear that Orly Taitz did  13:48:24
18    in fact just pull that paragraph from the public        13:48:27
19    record?                                                  13:48:30
20         A    I don't -- I don't know where she got it,     13:48:30
21    you know, directly, --                                   13:48:33
22         Q    Mm-hmm?                                        13:48:33
23         A    -- okay, but the documents will speak for     13:48:34
24    themselves.  You can make whatever argument you see     13:48:37
25    fit as counsel in that regard.                           13:48:40
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 51

```
 1      Q    And as a matter of -- as a matter of public    13:48:41

 2   record -- well, strike that.  Let me -- let me start    13:48:43

 3   again.                                                  13:48:49

 4           Your indictment was -- your indictment for      13:48:51

 5   failure to pay child support was certainly in the       13:48:53

 6   public record as of February 22nd and 23rd, 2012,       13:48:56

 7   correct?                                                13:49:01

 8      A    -- what date did you say?                       13:49:02

 9      Q    February 22nd and 23rd of 2012.                 13:49:03

10      A    Well, if this press release was out there,      13:49:07

11   but I don't know that.                                  13:49:09

12      Q    Well, the indictment isn't a private           13:49:10

13   document, is it?                                        13:49:14

14      A    Well, it means what -- you mean it was out      13:49:17

15   there in the public record.  Yeah, it was part of the   13:49:21

16   public record in a criminal court, but people           13:49:25

17   generally don't have access to that.  You have to be    13:49:28

18   somewhat sophisticated to get access to that,           13:49:31

19   sophisticated like Connie Ruffley.                      13:49:33

20      Q    All right.  Well, someone could access if --   13:49:34

21   if they wanted to, correct?                             13:49:36

22      A    If a matter's in a public file, anything is    13:49:37

23   possible.                                               13:49:40

24      Q    All right.  And if this was -- and if this     13:49:40

25   press release was issued by the Cuyahoga County         13:49:44
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 52

```
 1    prosecutor, as reflected in Defendant's Exhibit 15,      13:49:48
 2    that's even more information that's out there in the     13:49:51
 3    public record, correct?                                  13:49:53
 4         A    Well, you're asking me for a hypothetical,     13:49:54
 5    but if it was in the public record, it's in the public  13:49:56
 6    record.  But on the other side of the coin, it was      13:50:00
 7    also in the public record that I was never convicted    13:50:03
 8    of a crime.  Anybody who will read the public record    13:50:05
 9    will see I wasn't convicted of a crime.  So,            13:50:09
10    consequently, Connie Ruffley making that statement to   13:50:12
11    Orly Taitz, she knew or had reason to know that that    13:50:15
12    was a false statement.                                   13:50:18
13         Q    Well, you had been -- as of February 22nd,    13:50:19
14    2012, which is when this alleged statement was made     13:50:22
15    from the -- that's reflected in Plaintiff's Exhibit 2,  13:50:25
16    as of that time you had been indicted for failure to    13:50:31
17    pay child support, correct?                              13:50:33
18         A    Correct.                                        13:50:35
19         Q    You had been found in contempt of court at    13:50:36
20    least twice for failure to pay child support, correct?  13:50:39
21         A    Correct.                                        13:50:41
22         Q    And you made a conscious decision not to pay  13:50:42
23    child support, correct?                                  13:50:45
24         A    Correct.                                        13:50:46
25         Q    Do you believe in a person's First Amendment  13:50:58
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 53

```
 1   rights?                                              13:51:03
 2        A    There -- there are limitations of that     13:51:03
 3   right.  You can't defame someone.  The law is if     13:51:06
 4   you're accusing someone of being convicted of a crime 13:51:10
 5   that's libel per se.  You don't even have to show     13:51:14
 6   malice for that.  So I -- you know, there's no right  13:51:15
 7   to do that, okay.  And in Great Britain you can be    13:51:16
 8   indicted just for saying that -- in some countries.   13:51:18
 9        Q    Do you agree with me that people have the  13:51:20
10   right to speak the truth?                             13:51:22
11        A    If it's the truth, yes.                     13:51:24
12        Q    Let's go -- let's go back to this Exhibit   13:51:34
13   2 --                                                  13:51:36
14        A    Okay.                                       13:51:36
15        Q    -- and spend some more time on it.  So the 13:51:36
16   comments that are attributed to Connie Ruffley, would 13:51:43
17   you agree with me, consist of less than a total of -- 13:51:45
18   of four lines of print?                               13:51:49
19        A    On that page -- no, I mean, there's more    13:51:57
20   than that here.                                       13:51:59
21        Q    Well, the comment --                        13:52:00
22        A    Now here -- let me -- look.  Let's back up. 13:52:01
23   You asked me the question.  I'll give you the answer, 13:52:02
24   okay.  No, there are a lot more lines that are        13:52:05
25   attributed to Connie Ruffley.  It says, I got a very  13:52:08
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 54

| | |
|---|---|
| 1   warm reception.  After my presentation people stood up | 13:52:10 |
| 2   and applauded.  The member of Judicial Watch | 13:52:13 |
| 3   approached me and gave me her card.  Her name is | 13:52:15 |
| 4   Constance Ruffley and she's an office administrator | 13:52:18 |
| 5   for Judicial Watch in their western regional | 13:52:20 |
| 6   headquarters -- with the address. | 13:52:21 |
| 7         She told me that she used to work for the | 13:52:23 |
| 8   FBI and she worked for the Judicial Watch for many | 13:52:25 |
| 9   years.  She actually initiated the discussion about | 13:52:27 |
| 10  Larry Klayman and told me that she had heard that he's | 13:52:30 |
| 11  involved in birther cases.  I told her that this | 13:52:34 |
| 12  group, Article II Super PAC was soliciting money, that | 13:52:37 |
| 13  they sent an e-mail -- | 13:52:41 |
| 14      Q    We can stop. | 13:52:42 |
| 15      A    She gave a lot of information to Orly Taitz | 13:52:43 |
| 16  and she initiated the conversation, okay, so therefore | 13:52:45 |
| 17  she wanted to hurt me, okay.  Orly did not initiate | 13:52:48 |
| 18  that conversation.  Judicial Watch initiated that | 13:52:52 |
| 19  conversation and they came to that event to do a | 13:52:54 |
| 20  number on me and to do a number on the Article II | 13:52:57 |
| 21  Super PAC that was raising money for my case, so | 13:53:01 |
| 22  that's wrong what you were saying, Mr. Kress. | 13:53:03 |
| 23      Q    Okay.  The whole -- the whole reference to | 13:53:06 |
| 24  conviction, though, is within those four lines in the | 13:53:08 |
| 25  second full paragraph of the article, correct? | 13:53:13 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 55

```
 1        A    Well, the document speaks for itself, but      13:53:14
 2     that's what -- that's what I see on the first page,     13:53:16
 3     yeah.                                                    13:53:18
 4        Q    Okay.  And then the rest of this article,        13:53:18
 5     which goes on for the next page and the page after      13:53:22
 6     that, doesn't say anything else about you being         13:53:24
 7     convicted of the crime of not paying child support,     13:53:30
 8     does it?                                                 13:53:32
 9        A    Document speaks for itself.  I don't see         13:53:33
10     that reference there.                                    13:53:34
11        Q    Well, okay.  I know the document speaks for      13:53:35
12     itself, but you're suing --                              13:53:37
13        A    I'm wearing two hats here, so excuse me if      13:53:38
14     I'm a little bit of legalese.                            13:53:42
15        Q    For instance, if we go on to the following      13:53:44
16     page, which is page 3 of the exhibit, there's a link    13:53:46
17     to a web site.  I don't know what that's for.  Then     13:53:52
18     below there there's an FWIW, for what it's worth, you   13:53:55
19     might want to read this suit below filed against        13:54:00
20     Klayman.  From the time this suit was filed against     13:54:04
21     Klayman, he has not honored his promise to pay back     13:54:06
22     what the court ordered, even though it was nowhere      13:54:10
23     near the $25,000 he was trusted with.  I would be       13:54:13
24     worried too if I had donated money to this man.         13:54:16
25            Do you know whether this is Connie Ruffley       13:54:19
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 56

```
 1    saying this or if this is Orly Taitz saying this?        13:54:20
 2         A    I don't know.                                   13:54:33
 3         Q    Okay.  Don't know one way or the other?         13:54:35
 4         A    And I don't know whether this is a comment      13:54:37
 5    that was a result of what was being published by          13:54:40
 6    someone that read it.                                     13:54:43
 7         Q    All right.                                      13:54:46
 8         A    So I don't know.                                13:54:47
 9         Q    Well, in any -- in any event, it's on          13:54:47
10    this -- it's on this web site.  This is what you --       13:54:49
11    you printed out and produced, correct?                    13:54:50
12         A    Correct.                                        13:54:53
13         Q    Then it refers to a bar complaint against      13:54:54
14    you.  Was there a bar complaint against you by the        13:54:56
15    Florida Supreme Court --                                  13:54:58
16         A    Correct.                                        13:55:00
17         Q    -- that was filed by Natalia Humm --            13:55:00
18         A    Yeah, there was.                                13:55:04
19         Q    -- alleging that you had failed to provide     13:55:05
20    her services in her criminal case after she had paid      13:55:06
21    you a $25,000 retainer?                                   13:55:09
22         A    I don't know if that's specifically what was   13:55:11
23    said in that complaint, okay, but that's inaccurate.      13:55:13
24         Q    Well, there -- there was a bar complaint       13:55:22
25    against you, correct?                                     13:55:23
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 57

```
 1      A    Correct.                                    13:55:24

 2      Q    And that's -- that's a public record that we 13:55:24

 3  could get and that would tell us the --             13:55:26

 4      A    Yeah.                                       13:55:28

 5      Q    -- the ultimate finding, correct?          13:55:28

 6      A    Right.                                      13:55:30

 7      Q    Were you sanctioned?                        13:55:31

 8      A    Read it.  I agreed to a reprimand.          13:55:32

 9      Q    Okay.  Why'd you agree to a reprimand?      13:55:35

10      A    I was going through a difficult period of   13:55:38

11  time with my kids.  I should never have agreed to it. 13:55:41

12  And in fact, there are a number of mitigating       13:55:43

13  circumstances in that document.  My law license was 13:55:45

14  not suspended for one day, and in that -- in those  13:55:48

15  mitigating circumstances was the attorney Natalia   13:55:52

16  Humm.  I'd represented her in a criminal proceeding in 13:55:55

17  Miami.  She was alleged to be marrying people        13:55:59

18  illegally, illegal immigrants, and she -- her case was 13:56:02

19  transferred to Orlando.                             13:56:07

20          So she then got an Orlando counsel, and she 13:56:08

21  then demanded money from me, a refund, as she did from 13:56:13

22  a prior lawyer that she had had, same thing.  The   13:56:16

23  lawyer she had in Orlando wrote an e-mail to me and 13:56:19

24  said, Mr. Klayman, if I were you, I wouldn't pay her 13:56:24

25  anything, and that's in that reprimand.  And the    13:56:27
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 58

```
 1    matter went to mediation.  Just to settle the matter,    13:56:30

 2    I agreed to pay her $5,000 --                            13:56:32

 3        Q    Okay.                                           13:56:32

 4        A    -- just to get rid of it so I could get on      13:56:34

 5    and do other things.                                     13:56:37

 6        Q    All right.  And you accepted a reprimand        13:56:38

 7    from the Florida Supreme Court?                          13:56:41

 8        A    Well, I did because I was moving around a       13:56:42

 9    lot and there was a question -- you know, I was having   13:56:44

10    financial difficulties.  At the time, I was making      13:56:47

11    installment payments on that and for a while I was not  13:56:50

12    getting correspondence from the bar, and this matter    13:56:53

13    overtook itself and there was a complaint filed and I   13:56:55

14    settled that complaint with the reprimand.              13:56:58

15        Q    All right.  So a large -- a large portion of   13:57:00

16    this article, this February 22nd -- 23rd, 2012 article  13:57:02

17    deals with that issue with Natalia Humm, the -- the     13:57:07

18    failure to pay the $25,000 -- or failure to do the      13:57:10

19    work after you were paid a $25,000 retainer, correct?   13:57:13

20        A    Well, that's false.  I did work for Natalia    13:57:16

21    Humm.  I did a lot of work for Natalia Humm.            13:57:20

22        Q    That -- that was a poor question.               13:57:20

23        A    I used to visit the prison on a regular        13:57:23

24    basis and hold her hand and give her legal advice.      13:57:25

25    She was a basket case.                                   13:57:30
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 59

```
 1       Q    Is that -- is that something you say about a        13:57:31
 2   former client?                                               13:57:34
 3       A    I'm joking.  I meant that figuratively.             13:57:34
 4       Q    All right.                                          13:57:34
 5       A    Okay.  She was -- she'd never been arrested         13:57:38
 6   before.  She was in -- in jail --                            13:57:40
 7       Q    Okay.  Well, my point --                            13:57:40
 8       A    -- and I was making arguments on her behalf         13:57:41
 9   as to why she shouldn't be transferred to Orlando.          13:57:43
10   She didn't want to be transferred to Orlando, and why       13:57:45
11   she had -- you know, and this is a matter of public          13:57:48
12   record, why she, after she had been indicted skipped        13:57:51
13   the country and went to Belize, where she was then          13:57:59
14   picked up.  So I did a lot of work for Natalia Humm.        13:58:02
15       Q    Okay.  Regardless -- I don't really care if        13:58:07
16   you did a lot of work for Natalia Humm -- a large part      13:58:10
17   of this article deals with that issue with Natalia          13:58:14
18   Humm, correct?                                               13:58:17
19       A    The article speaks for itself.                      13:58:18
20       Q    Does it or does it not?                             13:58:20
21       A    The article speaks for itself.  I don't            13:58:22
22   think that a large part of this deals with Natalia          13:58:23
23   Humm, no.                                                    13:58:27
24       Q    If you look at the title, the title refers         13:58:27
25   to "Larry Klayman $25,000 fundraising for non-existent      13:58:30
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 60

```
 1    lawsuit affair."  It appears that she's -- she's        13:58:34
 2    making a bigger deal out of -- she being Orly Taitz is  13:58:39
 3    making a bigger deal about your failure to -- alleged   13:58:42
 4    failure to do work after taking a retainer, correct?    13:58:45
 5         A    I'll let the document speak for itself.       13:58:49
 6    What I do know this:  From everything I know is that    13:58:52
 7    Connie Ruffley and Orly Taitz know each other.  They    13:58:54
 8    try to help each other.  That's why they go to events.  13:58:56
 9    I mean, there were documents identified in deposition   13:59:01
10    of Judicial Watch directors where Orly Taitz is saying  13:59:03
11    she's so proud that Judicial Watch invited her to this  13:59:05
12    UROC event, okay.  They're in bed with each other.      13:59:08
13         Q    That's what you think?  That's your theory?   13:59:11
14         A    From everything I've seen, yeah.              13:59:13
15         Q    Okay.                                         13:59:13
16         A    And I know the community out there.           13:59:15
17         Q    All right.                                    13:59:17
18         A    So, yeah, I mean, I believe that all this     13:59:17
19    was written in tandem.  That's my belief.               13:59:21
20         Q    You know the community out there because you  13:59:23
21    live out there?                                         13:59:25
22         A    No, I know the community because I've been    13:59:25
23    going out to California throughout my legal career.     13:59:28
24         Q    All right.                                    13:59:28
25         A    I've had many cases out there.                13:59:32
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 61

```
 1        Q    So if we look at the last paragraph on page        13:59:34

 2   3 it says, "The question is:  Who is lying?  Was             13:59:35

 3   Klayman paid or not?"  That's referring to the whole         13:59:38

 4   Natalia Humm dispute, correct?                               13:59:42

 5        A    Where?                                             13:59:45

 6        Q    Okay.  Last paragraph on page 3 of the            13:59:46

 7   exhibit, Bates marked JW 3, the first sentence, "The        13:59:49

 8   question is:  Who is lying?  Was Klayman paid or not?"      13:59:55

 9             MS. JAMES:  I'm sorry.  Can we take a break        14:00:01

10   really quickly?                                             14:00:03

11             MR. KRESS:  Sure.  Well, let him answer the       14:00:04

12   -- have him answer the question first.                      14:00:08

13             THE WITNESS:  Where -- where are you              14:00:10

14   referring to?                                               14:00:10

15   BY MR. KRESS:                                               14:00:10

16        Q    "The question is:  Who was lying?  Was            14:00:11

17   Klayman paid or not?"  That's referring to the Natalia      14:00:14

18   Humm dispute, correct?                                      14:00:19

19        A    I don't know.  I take it -- I take it he          14:00:21

20   was -- they were referring to the Article II Super          14:00:22

21   PAC.                                                        14:00:24

22             MR. KRESS:  Okay.  All right.  We can take a      14:00:24

23   break.                                                      14:00:26

24             THE VIDEOGRAPHER:  Going off the record.          14:00:26

25   The time is 2 p.m.                                          14:00:28
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 62

```
 1              (Recess.)                              14:00:32

 2         THE VIDEOGRAPHER:  Back on the record.  The  14:09:39

 3    time is 2:09 p.m.                                14:09:40

 4         THE WITNESS:  I'd like to clarify a         14:09:43

 5    response.  The portions of the document that you've 14:09:47

 6    been referring to with regard to -- on the Judicial 14:09:49

 7    Watch Bates No. 3 refer to the Article II Super PAC in 14:09:55

 8    raising moneys to pay my legal fees for the      14:10:01

 9    eligibility case.  They do not refer to Natalia Humm, 14:10:04

10    and that's clear from the document itself.       14:10:09

11    BY MR. KRESS:                                     14:10:11

12         Q    All right.  Do you remember seeing     14:10:11

13    Defendant's Exhibit 15 before, the press release which 14:10:18

14    referred to your indictment?                     14:10:21

15         A    I don't understand the question.       14:10:23

16         Q    Have you ever seen this document before, 14:10:24

17    Exhibit 15, before today?                        14:10:26

18         A    Yes.                                    14:10:29

19         Q    You're aware that a press release was in 14:10:29

20    fact issued related to your indictment?          14:10:32

21         A    Well, I picked it up on the internet with 14:10:34

22    Google.                                           14:10:37

23         Q    Okay.  Around the time it happened?    14:10:37

24         A    No.  It was actually long after that.  14:10:38

25         Q    Okay.  But it was -- how long after it was 14:10:41
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 63

| | | |
|---|---|---|
| 1 | it that you found it? | 14:10:47 |
| 2 | A     I don't remember. | 14:10:47 |
| 3 | Q     Okay.  But it was -- | 14:10:48 |
| 4 | A     It was quite a while afterwards.  I didn't | 14:10:50 |
| 5 | realize that they had put out a press release. | 14:10:52 |
| 6 | Q     But you -- but based upon your research, you | 14:10:54 |
| 7 | understand that the Cuyahoga County prosecutor's | 14:10:56 |
| 8 | office did in fact issue a press release related to | 14:11:00 |
| 9 | your indictment and other people's indictments around | 14:11:04 |
| 10 | the time you were indicted? | 14:11:06 |
| 11 | A     Based upon what I saw on the internet. | 14:11:07 |
| 12 | Q     You'd agree with me? | 14:11:09 |
| 13 | A     Yeah. | 14:11:10 |
| 14 | Q     Okay.  All right.  So you -- well, I was | 14:11:15 |
| 15 | going to be done with Exhibit 2, but let's go just for | 14:11:23 |
| 16 | a second more.  As I see it on Exhibit 2, there are | 14:11:27 |
| 17 | four comments from people, and I know those -- as I | 14:11:30 |
| 18 | read those comments, they don't seem to make any | 14:11:36 |
| 19 | reference to your alleged conviction, correct? | 14:11:38 |
| 20 | A     Oh, I think they do. | 14:11:44 |
| 21 | Q     Do they ever specifically mention conviction | 14:11:45 |
| 22 | in any of those comments? | 14:11:48 |
| 23 | A     Well, the documents speak for themselves, | 14:11:49 |
| 24 | but let's just take "Bloodless Coup." | 14:11:51 |
| 25 | Q     The question is, do any of those comments -- | 14:11:55 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 64

```
 1        A    They're directly -- they're directly related      14:11:57

 2   to those statements, yes.                                    14:11:59

 3        Q    All right.  Do any of the comments                 14:12:00

 4   specifically state -- do any of the comments use the         14:12:02

 5   word "convict" or "convicted"?                               14:12:04

 6        A    Let's just take it one by one, and it speaks       14:12:05

 7   for itself.  "Bloodless Coup."                               14:12:07

 8        Q    Let's not read into it the record.                 14:12:11

 9        A    You asked me.  I'll give you an answer.            14:12:14

10        Q    Well, I don't want to hear --                      14:12:14

11        A    You asked for it, you got a Toyota.                14:12:17

12        Q    The question is, do any of these four              14:12:19

13   comments used the word "convict" or "convicted"?            14:12:21

14        A    The actu- -- let me look at the four               14:12:23

15   comments.  I looked at one.  Unless I'm missing              14:12:24

16   something, they don't use the word "convict" --             14:12:53

17        Q    Thank you.                                         14:12:55

18        A    -- in this document.                               14:12:57

19        Q    All right.  Was your challenge -- your            14:12:57

20   planned challenge to the candidacy of Barack Obama a         14:12:58

21   matter of public interest?                                   14:13:03

22        A    I would hope so.                                   14:13:04

23        Q    Okay.  It was a big deal, right?                  14:13:06

24        A    I think it's a big deal.                           14:13:09

25        Q    Okay.  It's a matter that could affect the        14:13:10
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 65

```
 1    entire nation, correct?                              14:13:16

 2        A    If courts were ever willing to litigate it  14:13:17

 3    fairly.                                              14:13:19

 4        Q    Okay.  Did your -- did you hold the belief  14:13:20

 5    that somehow that -- that President Obama's birth    14:13:25

 6    certificate is false or insufficient?                14:13:29

 7        A    I do.  Having researched it, you know, with 14:13:32

 8    what clients gave me and such.  But, see, this is the 14:13:36

 9    problem, if I may amplify the response, is that      14:13:39

10    because this is a very controversial issue and because 14:13:41

11    no one wants to reach the issue, not even republicans 14:13:44

12    because there are Republican Presidential candidates 14:13:47

13    who would not qualify to be President as natural born 14:13:52

14    citizens such as Marco Rubio, such as Ted Cruz, such 14:13:57

15    as others.                                           14:13:57

16             But when someone like Ms. Ruffley, on behalf 14:13:59

17    of Judicial Watch, goes out there and tries to destroy 14:14:01

18    the lawyer who's representing those cases -- the      14:14:04

19    clients in those cases, that does damage to the legal 14:14:05

20    case, notwithstanding financial damage in terms of   14:14:09

21    being paid, and that was what is so malicious about  14:14:12

22    it.                                                  14:14:15

23        Q    What happened to your indictment with       14:14:16

24    child -- for failure to pay child support?           14:14:18

25        A    It was dismissed.                           14:14:20
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 66

| | | | |
|---|---|---|---|
| 1 | Q | You settled it, though, right? | 14:14:21 |
| 2 | A | Yeah, it was dismissed. | 14:14:22 |
| 3 | Q | But you settled it? | 14:14:24 |
| 4 | A | I don't know what you mean by settle. | 14:14:25 |
| 5 | Q | Did you agree to pay child support in | 14:14:27 |
| 6 | | exchange for a dismissal of the indictment? | 14:14:29 |
| 7 | A | I did. | 14:14:33 |
| 8 | Q | Okay.  Did you view that as -- | 14:14:34 |
| 9 | A | I paid it -- I paid it under protest. | 14:14:37 |
| 10 | Q | But it was an admission that you owed the | 14:14:39 |
| 11 | | child support? | 14:14:43 |
| 12 | A | Yes, but, see, I continued to litigate that | 14:14:43 |
| 13 | | issue, and if successful that money would have been | 14:14:46 |
| 14 | | refunded. | 14:14:48 |
| 15 | Q | Okay. | 14:14:49 |
| 16 | A | So I paid it with the expectation of getting | 14:14:50 |
| 17 | | it back someday. | 14:14:52 |
| 18 | Q | And that was in around April of 2012, | 14:14:53 |
| 19 | | correct? | 14:14:55 |
| 20 | A | I don't remember the exact date. | 14:14:56 |
| 21 | Q | It was after the Orly Taitz publication, | 14:14:57 |
| 22 | | correct? | 14:15:00 |
| 23 | A | I don't remember that. | 14:15:00 |
| 24 | Q | Do you have any information to say that it | 14:15:01 |
| 25 | | was before the Orly Taitz -- | 14:15:03 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 67

```
 1      A    I -- I don't remember one way or the other.     14:15:06

 2      Q    Documents would speak for themselves            14:15:07

 3   obviously?                                              14:15:09

 4      A    Not necessarily, because the -- the issue of    14:15:10

 5   settling that matter was a fluid issue, okay, and it    14:15:12

 6   didn't initially come to fruition.  But if you were to  14:15:17

 7   look at what was going on in the case in the public     14:15:20

 8   dockets, you would come to the conclusion that an       14:15:25

 9   effort was being made to have that indictment           14:15:27

10   dismissed.                                              14:15:30

11      Q    Okay, and then it was -- but then there         14:15:30

12   would be a definitive date when it was actually         14:15:31

13   dismissed, correct?                                     14:15:34

14      A    Of course.                                      14:15:35

15      Q    And we could get that from the -- from the      14:15:35

16   docket, correct?                                        14:15:37

17      A    You could.  I assume.  I haven't looked at      14:15:37

18   the docket for the deposition.                          14:15:42

19      Q    Okay.  There came a time after you read the     14:15:43

20   February 23rd --                                        14:15:47

21      A    I might add, I still intend to get the money    14:15:48

22   back, all right?                                        14:15:52

23      Q    All right.                                      14:15:52

24      A    And the kids are very well taken care of.       14:15:52

25   My former wife never even took child support and used   14:15:57
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 68

| | | |
|---|---|---|
| 1 | it for them.  I would have to take them out for a | 14:16:01 |
| 2 | steak when I would go up there.  She would give them | 14:16:03 |
| 3 | black beans and rice for dinner. | 14:16:06 |
| 4 | Q    Going -- turning to Defendant's -- I'm | 14:16:08 |
| 5 | sorry, Plaintiff's Exhibit 3, this is the collection | 14:16:09 |
| 6 | of e-mails and documents exchanged with Attorney | 14:16:12 |
| 7 | Driscoll -- | 14:16:20 |
| 8 | A    Yeah. | 14:16:21 |
| 9 | Q    -- after you found the article.  Why is it | 14:16:21 |
| 10 | that you e-mailed directly with Mr. Driscoll as | 14:16:27 |
| 11 | opposed to contacting a member of Judicial Watch? | 14:16:29 |
| 12 | A    There's a couple reasons for that. | 14:16:35 |
| 13 | Q    What are they? | 14:16:38 |
| 14 | A    Number one, I was in litigation with | 14:16:39 |
| 15 | Judicial Watch and Driscoll was counsel. | 14:16:41 |
| 16 | Q    Okay. | 14:16:43 |
| 17 | A    Number two, I consider Driscoll to be | 14:16:44 |
| 18 | someone that you can talk to.  Unfortunately, I've | 14:16:46 |
| 19 | never been able to have a -- I don't know how to | 14:16:49 |
| 20 | phrase it -- a respectful conversation with the | 14:16:57 |
| 21 | directors of Judicial Watch since I've left.  I never | 14:17:00 |
| 22 | sought controversy with them. | 14:17:03 |
| 23 | I would have liked to have put everything | 14:17:05 |
| 24 | behind us, but for whatever reason, because they've | 14:17:07 |
| 25 | tried to hurt me and they view me a threat -- | 14:17:11 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 69

```
 1   competitive threat, I can't seem to communicate with       14:17:13
 2   them, and Driscoll seemed like he was someone you          14:17:16
 3   could talk to about it, and he had a direct line to        14:17:19
 4   them.                                                      14:17:22
 5        Q    So that's your reason for -- for contacting      14:17:22
 6   Driscoll.  Your comment just brought up another            14:17:25
 7   question.  Have you known Judicial Watch to ever           14:17:27
 8   pursue birther cases?                                      14:17:29
 9        A    I know that they were approached to pursue       14:17:32
10   birther cases.  Mr. Fitton testified to that today.       14:17:36
11        Q    Did they ever take any of those birther         14:17:39
12   cases?                                                     14:17:41
13        A    I don't know.                                   14:17:41
14        Q    Are you aware of Judicial Watch taking any       14:17:42
15   birther cases?                                             14:17:46
16        A    I might add, I don't track all the birther      14:17:47
17   cases throughout the country, I just concern myself        14:17:53
18   with the cases that I have, honestly.                      14:17:55
19        Q    All right.                                      14:17:55
20        A    There are umpteen birther cases throughout      14:17:56
21   the United States.                                         14:17:58
22        Q    Sure.  Well, you mentioned your -- your          14:17:59
23   perception of Judicial Watch viewing you as a              14:18:00
24   competitor.  Would you agree with me that if they're      14:18:03
25   not pursuing any birther cases, they're -- Judicial       14:18:07
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 70

| 1 | Watch is not your competitor for birther cases? | 14:18:10 |
| 2 | A   No, I would not agree with that because, you | 14:18:12 |
| 3 | know, the way -- and this was in my private capacity. | 14:18:14 |
| 4 | So I'm a competitor in a number of different ways. | 14:18:20 |
| 5 | I'm a competitor in their eyes, as I pointed out this | 14:18:23 |
| 6 | morning, you know, when I go on TV, they think somehow | 14:18:26 |
| 7 | I'm stealing their thunder when I'm on TV, and Fitton | 14:18:30 |
| 8 | himself intervened with CNN to keep me off the air and | 14:18:36 |
| 9 | disparage me with CNN, and he knows that. | 14:18:41 |
| 10 | I'm a competitor in the context just | 14:18:43 |
| 11 | generally, of someone out there who's an activist. | 14:18:44 |
| 12 | People still think that I'm at Judicial Watch.  They | 14:18:45 |
| 13 | know that I'm the founder, okay.  And Fitton's | 14:18:49 |
| 14 | extremely jealous that he doesn't think he's ever | 14:18:52 |
| 15 | gotten his due, and he's the one who's public at | 14:18:55 |
| 16 | Judicial Watch.  Mr. Orfanedes generally isn't, nor is | 14:18:58 |
| 17 | Mr. Farrell. | 14:19:00 |
| 18 | So they consider me a competitor in a lot of | 14:19:01 |
| 19 | different ways, and, you know, when they do things to | 14:19:03 |
| 20 | try to harm me, it's basically because they want to | 14:19:07 |
| 21 | raise their profile which then helps them in all the | 14:19:10 |
| 22 | things that they do in raising money for themselves | 14:19:12 |
| 23 | and in terms of their own sense of | 14:19:16 |
| 24 | self-aggrandizement. | 14:19:22 |
| 25 | Q   Has anyone from Judicial Watch ever | 14:19:22 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 71

```
 1    specifically said they want to harm you?          14:19:24

 2        A    I would say actions speak louder than words.   14:19:33

 3    I haven't had -- I haven't had, outside of a       14:19:36

 4    deposition room, any substantive conversations with   14:19:38

 5    anybody from Judicial Watch since I left.          14:19:41

 6        Q    But you've been in deposition rooms with   14:19:43

 7    them how many times?                               14:19:45

 8        A    I think Mr. Fitton one other time -- I think   14:19:48

 9    all of them one other time, yeah.                  14:19:51

10        Q    Okay.  How many lawsuits have you filed   14:19:53

11    against Judicial Watch?                            14:19:54

12        A    You know, I don't recollect.  I would say   14:19:55

13    maybe -- maybe three or four.                      14:19:57

14        Q    All right.  Would it surprise you if it was   14:20:00

15    five or six?                                       14:20:04

16        A    I don't remember the exact number.        14:20:06

17        Q    Which cases --                            14:20:06

18        A    And I might add I filed cases only when I   14:20:10

19    was backed up against a wall.  I had other things to   14:20:13

20    do.  I wanted to get on with my life --            14:20:15

21        Q    Did they --                               14:20:15

22        A    -- and they wouldn't leave me alone.      14:20:18

23        Q    Did anyone back you up against the wall in   14:20:20

24    this case?                                         14:20:23

25        A    Yeah.                                     14:20:23
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 72

```
 1        Q    How did they back you up against the wall?        14:20:23
 2        A    Because I wanted to resolve it.  You see the      14:20:27
 3   correspondence.  I didn't want to have to file suit.        14:20:27
 4        Q    All right.                                        14:20:27
 5        A    I wanted it resolved immediately rather than      14:20:27
 6   left out on the internet for a number of days, and          14:20:30
 7   once something's on the internet it reverberates,           14:20:33
 8   okay.  You can never get it off the internet.  It's         14:20:36
 9   always there and people republish it, and they know         14:20:40
10   that.  It's all over the United States, it's all over       14:20:42
11   Florida.  It's all over the world.                          14:20:44
12        Q    So is your goal --                                14:20:44
13        A    I wanted it -- I wanted it resolved from the      14:20:46
14   inception, and that's why I contacted Driscoll because      14:20:47
15   I thought he could reason with them.  But, you know,        14:20:50
16   they -- they didn't want to do anything.  They haven't      14:20:53
17   done anything about it.  That's apparent from the           14:20:54
18   testimony that we've gotten in the last two days.           14:20:56
19        Q    So is your intention in contacting Driscoll       14:20:58
20   to resolve the issue?                                       14:21:01
21        A    Yes.                                              14:21:01
22        Q    Is that your testimony?                           14:21:02
23        A    Yeah.                                             14:21:03
24        Q    By resolved do you mean to correct the           14:21:04
25   statement?                                                  14:21:06
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 73

| | | |
|---|---|---|
| 1 | A    Correct. | 14:21:06 |
| 2 | Q    Okay, so you were looking to get a | 14:21:07 |
| 3 | correction of that statement? | 14:21:08 |
| 4 | A    Right.  I wanted to see how it was | 14:21:09 |
| 5 | corrected.  I'd reserve my rights to take further | 14:21:11 |
| 6 | action, but I was trying to correct it. | 14:21:15 |
| 7 | Q    Okay. | 14:21:16 |
| 8 | A    And the documents show that.  The exhibits | 14:21:17 |
| 9 | show that, Exhibit 9 shows that, -- | 14:21:19 |
| 10 | Q    Yeah, so -- | 14:21:19 |
| 11 | A    -- Exhibit 3 shows that. | 14:21:21 |
| 12 | Q    So you -- and I don't want to go through all | 14:21:23 |
| 13 | these e-mails, but I just want to identify the dates. | 14:21:25 |
| 14 | You initiated contact with Driscoll on February 23rd, | 14:21:29 |
| 15 | correct, of 2012? | 14:21:34 |
| 16 | A    That's what the -- that's immediately. | 14:21:36 |
| 17 | Immediately when I found out about it. | 14:21:38 |
| 18 | Q    Okay. | 14:21:38 |
| 19 | A    Same day. | 14:21:40 |
| 20 | Q    And it looks like there are some e-mail | 14:21:40 |
| 21 | exchanges back and forth.  Maybe you were missing each | 14:21:44 |
| 22 | other. | 14:21:46 |
| 23 | A    Excuse me. | 14:21:47 |
| 24 | Q    That's all right.  And then ultimately | 14:21:47 |
| 25 | Driscoll sent you a letter on March 5th.  Did you -- | 14:21:54 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 74

```
 1    did you talk to Driscoll?                        14:22:02

 2        A    During that period?                     14:22:05

 3        Q    Right.                                  14:22:06

 4        A    I did.                                  14:22:06

 5        Q    How many times?                         14:22:07

 6        A    Once or twice.                          14:22:08

 7        Q    Do you remember what was said between you   14:22:09

 8    and Driscoll?                                    14:22:10

 9        A    I remember, yeah.                       14:22:11

10        Q    What was said?                          14:22:14

11        A    I said, Rich, this needs to be resolved.  It   14:22:15

12    needs to be corrected.  Your clients have substantial   14:22:17

13    liability here and it's in their best interest to   14:22:19

14    correct it, and he basically told me to stick it.   14:22:22

15        Q    Okay.                                   14:22:27

16        A    And I think the correspondence shows that.   14:22:29

17    Stick it on behalf of them.                      14:22:34

18        Q    Now, the web site where --              14:22:35

19        A    I might add --                          14:22:42

20        Q    Go ahead.                               14:22:43

21        A    He did add this.  I found this most     14:22:44

22    remarkable, that he laid the blame on Constance   14:22:46

23    Ruffley.  Judicial Watch had nothing to do with this.   14:22:49

24    It was just Constance Ruffley.                   14:22:51

25        Q    Okay, that's according -- that's your   14:22:53
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 75

```
 1    statement --                                          14:22:54
 2        A    That's according to what Driscoll told me.   14:22:54
 3        Q    Okay.                                        14:22:54
 4        A    Yeah.  They had no responsibility.  They're  14:22:57
 5    washing their hands of it.  And I said to him, she's  14:22:58
 6    the office administrator, she's the office manager,   14:23:01
 7    she has actual and apparent authority to say what she 14:23:03
 8    said.  He did not deny that she said that.  I         14:23:06
 9    certainly got the impression that he had talked to    14:23:09
10    people at Judicial Watch about it, and I just found it 14:23:11
11    amazing that they would, you know, hang an employee   14:23:20
12    out to dry like that.                                 14:23:21
13        Q    All right.  Your -- the internet site where  14:23:23
14    this was posted was Orly Taitz's internet site,       14:23:25
15    correct?                                              14:23:29
16        A    I don't understand the question.             14:23:30
17        Q    Let me start again because that really       14:23:31
18    wasn't a good question.                               14:23:32
19        A    Yeah, right.                                 14:23:33
20        Q    The statement about you being convicted of a 14:23:34
21    crime was posted on Orly Taitz's web site, correct?   14:23:37
22        A    A web site called --                         14:23:41
23        Q    The World's Leading --                       14:23:43
24        A    -- Obama Eligibility Challenge Web Site.     14:23:45
25        Q    All right.  And you understood that to be    14:23:48
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 76

```
 1    Orly Taitz's web site, correct?                    14:23:50
 2         A    I came to understand that, yeah.         14:23:51
 3         Q    All right.  So if there was going to be a  14:23:52
 4    correction made, there needed to be a correction made  14:23:55
 5    on Orly Taitz's web site, correct?                 14:23:57
 6         A    Well, no.  It was republished a number of  14:23:59
 7    different places.                                  14:24:02
 8         Q    All right.                               14:24:02
 9         A    Yeah, you could start with Orly Taitz's web  14:24:03
10    site.  That would be a help.                       14:24:05
11         Q    And ultimately it was corrected on Orly  14:24:07
12    Taitz's web site, correct?                         14:24:10
13         A    Incorrect.                               14:24:11
14         Q    Well, here.  Take a look at Plaintiff's  14:24:12
15    Exhibit 4.                                         14:24:14
16         A    Mm-hmm.                                  14:24:14
17         Q    And actually it's entitled "Clarification  14:24:14
18    regarding article2legal fund and Larry Klayman."  She  14:24:19
19    raises a number of points.  Number one is about --  14:24:26
20    well, number one is about an issue entering pro per;  14:24:34
21    number two is about you participating in cases in  14:24:40
22    California; and number three is about the Natalia Humm  14:24:43
23    matter.  It's not until paragraph 4 that there's any  14:24:53
24    mention of this alleged conviction comment, correct?  14:24:57
25         A    Where are you looking at paragraph 4?  My  14:25:03
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 77

```
 1    eyes are not too good.                              14:25:05

 2        Q    Oh, right there.                           14:25:06

 3        A    They tear over.                            14:25:11

 4        Q    And I'll read number 4 into the record.  It  14:25:13

 5    says, "I read the first post I made in regards to  14:25:18

 6    Mr. Klayman and I saw that indeed there was an error.  14:25:21

 7    I wrote, that Ms. Ruffley stated that Mr. Klayman was  14:25:23

 8    just recently convicted of non payment of child    14:25:26

 9    support.  The link and the article right under it  14:25:29

10    stated, that he was indicted in 2 counts of criminal  14:25:32

11    non-support, that he owes $78,861.76 and arraignment  14:25:35

12    was scheduled for February 7, 2012.  So, there was an  14:25:41

13    error.  Mr. Klayman was indicted in the state of Ohio  14:25:46

14    on two counts of criminal non-support, but he was not  14:25:49

15    convicted yet.  I am making this correction,        14:25:52

16    Ms. Ruffley made an error.  It was also self-evident  14:25:54

17    in the February 23, 2012 article, as I posted the link  14:25:56

18    right underneath and the link stated, that he was  14:26:01

19    indicted and arraignment scheduled.  The article was  14:26:04

20    published a couple of days ago, on February 23, 2012  14:26:07

21    and I corrected it today, February 26, 2012."       14:26:11

22             Have I read it correctly, as far as you can  14:26:14

23    tell?                                               14:26:17

24        A    It seems that you read it correctly.       14:26:17

25        Q    All right.  So this was Orly Taitz        14:26:19
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 78

```
 1    attempting to correct what she called an error,          14:26:21
 2    correct?                                                  14:26:23
 3        A    Ms. Ruffley's error.  Ms. Ruffley made an       14:26:26
 4    error.                                                    14:26:30
 5        Q    Well, Orly Taitz is trying to make a            14:26:30
 6    correction, correct?                                      14:26:32
 7        A    That's what -- the -- the -- strike that.       14:26:33
 8             The paragraph speaks for itself.  Okay.  I      14:26:38
 9    believe that she was not trying to correct anything.     14:26:41
10    She was trying to work it in a little more on behalf     14:26:42
11    of her, Ruffley, and Judicial Watch.  She keeps          14:26:46
12    pounding that in there, okay, --                          14:26:50
13        Q    Mm-hmm.                                          14:26:50
14        A    -- and in fact there's still references to     14:26:51
15    conviction and the whole implication of it is that      14:26:53
16    Larry Klayman is a criminal.  That's the implication.   14:26:59
17        Q    That's how you take it, correct?               14:27:01
18        A    Well, you know, I haven't been convicted       14:27:04
19    yet.  Yet.                                               14:27:06
20        Q    Okay.                                           14:27:06
21        A    So that's what it means.                       14:27:06
22        Q    That's true, isn't it, you haven't been       14:27:07
23    convicted yet?                                           14:27:09
24        A    I was never convicted.                         14:27:10
25        Q    All right.  If you were arraigned --           14:27:10
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 79

```
 1       A    There's no reason the use the word "yet."        14:27:12

 2    They're digging it in, okay.                             14:27:14

 3       Q    All right.  But she's correcting it to say       14:27:15

 4    he wasn't convicted yet, and she's saying that he was    14:27:17

 5    not convicted?                                           14:27:20

 6       A    No, I was not convicted.  The yet means a        14:27:21

 7    lot there, okay.                                         14:27:24

 8       Q    All right.                                       14:27:26

 9       A    He's going to be convicted, that's what it       14:27:27

10    means.  And that's notwithstanding the clear statement   14:27:29

11    of Connie Ruffley that I was convicted.  That's very     14:27:33

12    close to what Connie Ruffley said.  So it's just a       14:27:36

13    matter of time, Klayman's going to be convicted, so      14:27:38

14    don't donate to the Article II Super PAC and don't       14:27:41

15    support what he's doing.  We're going to do a number     14:27:45

16    on Klayman.                                              14:27:48

17       Q    All right.  It says that the error was           14:27:49

18    self-evident in the February 23, 2012 article because    14:27:51

19    right underneath it she stated that she was -- that      14:27:55

20    you were just indicted and arraignment was scheduled.    14:27:58

21    Would you agree that the -- the error was                14:28:01

22    self-evident?                                            14:28:04

23       A    No.                                              14:28:05

24       Q    Okay.  So you -- you disagree.  You think        14:28:05

25    that Orly Taitz is not telling the truth there?          14:28:09
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 80

| | | |
|---|---|---|
| 1 | A    I think that the two of them, Taitz and | 14:28:12 |
| 2 | Ruffley and Judicial -- three of them -- and Judicial | 14:28:15 |
| 3 | Watch were working to harm me in a number of different | 14:28:19 |
| 4 | ways. | 14:28:21 |
| 5 | Q    And again you don't know -- | 14:28:21 |
| 6 | A    And it's a clever -- it's a clever way | 14:28:24 |
| 7 | because some people don't read that carefully.  Some | 14:28:25 |
| 8 | people don't fully understand, but they don't -- they | 14:28:28 |
| 9 | understand what the word "convict" means.  People know | 14:28:31 |
| 10 | that. | 14:28:35 |
| 11 | Q    These are all assumptions by you, | 14:28:35 |
| 12 | Mr. Klayman, correct? | 14:28:40 |
| 13 | A    Based on my experience. | 14:28:40 |
| 14 | Q    Okay, based on your experience. | 14:28:42 |
| 15 | A    In my experience in dealing with people. | 14:28:42 |
| 16 | Q    But you're not did fact finder in this case, | 14:28:43 |
| 17 | are you? | 14:28:46 |
| 18 | A    No.  We'll -- we'll wait for the fact finder | 14:28:46 |
| 19 | to make the appropriate decision at the appropriate | 14:28:48 |
| 20 | time. | 14:28:51 |
| 21 | Q    If we get there.  All right.  So there was | 14:28:51 |
| 22 | some attempt to make a correction 3 days after the | 14:28:53 |
| 23 | internet posting was first made, correct? | 14:28:59 |
| 24 | A    Well, I'm not agreeing that that was a | 14:29:01 |
| 25 | correction.  I'm -- I'm saying that that was a further | 14:29:03 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 81

```
 1    way to dig it in.                                    14:29:05

 2        Q    So you -- you felt that this was -- this    14:29:06

 3    just made matters worse?                             14:29:08

 4        A    Yes, it made matters worse, I was not       14:29:10

 5    convicted yet.                                       14:29:13

 6        Q    So you weren't -- you weren't happy that she 14:29:13

 7    tried to correct it?                                 14:29:16

 8        A    No, I was not happy.                        14:29:17

 9        Q    So --                                       14:29:17

10        A    I would want a correction that said         14:29:18

11    outright, I was wrong.  I have no evidence that Larry 14:29:20

12    Klayman did anything wrong here, that in this country 14:29:25

13    you're innocent until proven guilty, and I would have 14:29:28

14    expected that both Ms. Ruffley and Ms. Taitz would   14:29:30

15    have come forward with that on that web site, but at 14:29:33

16    that point, Mr. Kress, the way the internet works,   14:29:39

17    this thing's reverberating all over the country, all 14:29:43

18    over Florida, and all over the world, and you can't  14:29:46

19    get it off the internet.                             14:29:48

20        Q    Now, to read her whole statement with the   14:29:49

21    yet in full it says, "Klayman was indicted in the    14:29:52

22    state of Ohio on two counts of criminal non-support, 14:29:54

23    but he was not convicted yet."                       14:29:59

24             That's -- that's true, isn't it?            14:30:02

25        A    No, it's not true.  It's not true because of 14:30:07
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 82

```
 1    the implication that I'm going to be convicted.      14:30:11

 2         Q    Okay.  But that -- that's your             14:30:13

 3    interpretation?                                      14:30:14

 4         A    No, that's anybody who is reading this in  14:30:16

 5    the context of everything that's being said.         14:30:19

 6    Everything that's being said is to try to harm my    14:30:21

 7    reputation and to harm George Miller and the Article 14:30:24

 8    II Super PAC and others.  So every- -- that's -- you 14:30:27

 9    have to take the article as a whole.                 14:30:30

10         Q    All right.                                 14:30:32

11         A    Yet means he's going to be convicted.      14:30:40

12         Q    Who has told you that they saw Orly Taitz's 14:30:43

13    posting that you were allegedly convicted of a crime? 14:30:52

14    I want names.                                        14:30:58

15         A    Well, George Miller saw it, Pamela Barnett 14:31:00

16    saw it, Sam Sterrett saw it, someone in -- I'm trying 14:31:03

17    to remember his name.  I'll remember it by the end of 14:31:14

18    the deposition.  I'll give it to you.  But I've also  14:31:20

19    seen it out on the internet.                         14:31:22

20         Q    So you've seen it?                         14:31:24

21         A    I've seen it republished in stories, you   14:31:24

22    know, in other contexts.                             14:31:27

23         Q    Have you -- have you produced those to us? 14:31:28

24         A    Well, I -- I said that they're available to 14:31:32

25    you publicly.  I didn't make copies of them at the   14:31:34
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 83

```
 1    time.  They're on the internet.                    14:31:37

 2         Q    Well, if you --                           14:31:37

 3         A    You can get them as easily as I can, and  14:31:37

 4    that's the rule.  You can get them.  I don't have   14:31:39

 5    copies of them.                                     14:31:40

 6         Q    But you're the one who has the burden of  14:31:40

 7    proof here to show --                               14:31:42

 8         A    But I have attached them to -- I think I  14:31:43

 9    attached them to the complaint.                     14:31:46

10         Q    Okay.  All right.  Are there any others,  14:31:47

11    that you're aware of, that you have not attached to 14:31:49

12    the complaint?                                      14:31:51

13         A    By the way, I don't have the -- I don't have 14:31:51

14    the duty to search the internet -- I'm talking as a 14:31:53

15    lawyer -- I don't have a duty to search the internet 14:31:55

16    when you can do it equally as well as I can.        14:31:58

17         Q    Have you -- well, I'd think that you would 14:32:00

18    want to prove your case to a jury at some point.    14:32:02

19         A    Well, that may be.  But for purposes of   14:32:05

20    discovery I don't have a duty to -- to search the   14:32:05

21    internet.  You can search the internet.  These people 14:32:07

22    have over 30 employees.  They can search the internet. 14:32:09

23         Q    All right.  So so far you can name the names 14:32:12

24    of three people who told you that they saw this     14:32:15

25    article on the internet?                            14:32:18
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 84

```
 1        A     Gary Laconis was one of them.              14:32:19

 2        Q     Who's Gary Laconis and how do you spell     14:32:22

 3   Laconis?                                              14:32:26

 4        A     He's an activist, L-a-c-o-n-i-s, and he's   14:32:27

 5   active in eligibility matters.                        14:32:31

 6        Q     Where's he from?                            14:32:33

 7        A     I believe he's from Arizona, and people like 14:32:34

 8   Mike Zullo, who was the investigator of Sheriff Joe.  14:32:40

 9   He was attacked as well by Orly Taitz and others      14:32:47

10   around her.                                           14:32:52

11        Q     Anyone else?                                14:32:52

12        A     Well, Mike Voeltz, my client, which is the  14:33:01

13   worst of all.  But, yeah, there are things out on the 14:33:07

14   internet.  It's been picked up by various             14:33:09

15   publications, you know, and -- and republished.       14:33:15

16        Q     Let's talk about what -- so George Miller   14:33:16

17   read this.  Did -- did George Miller still follow     14:33:19

18   through in funding your lawsuit on behalf of          14:33:23

19   Mr. Voeltz against Obama?                             14:33:26

20        A     He couldn't because he couldn't raise money 14:33:28

21   after this.                                           14:33:30

22        Q     Well, you still filed the lawsuit, right?   14:33:30

23        A     I did, because I consider myself a person of 14:33:32

24   principle.  When I say I'm going to do something, I'm  14:33:35

25   going to do it, and I believe the correspondence I    14:33:37
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 85

```
 1    gave you reflects that.                          14:33:40

 2        Q    You -- how much were you paid to file the  14:33:41

 3    lawsuit in -- in Florida against Obama?          14:33:43

 4        A    I don't have the exact amount in my head,  14:33:47

 5    but I gave you documentation.  You can go through it  14:33:49

 6    with me if you want.                             14:33:52

 7        Q    I guess we'll get there.                14:33:53

 8        A    Okay.                                   14:33:54

 9        Q    You gave me some documents this morning,  14:34:01

10    which I only have one copy of.  I will try to go  14:34:03

11    through them.                                    14:34:06

12              (Defendant's Deposition Exhibit 16 was  14:34:18

13    marked for identification and was attached to the  14:34:18

14    deposition transcript.)                          14:34:19

15    BY MR. KRESS:                                    14:34:19

16        Q    Exhibit 16 appears to be a letter from  14:34:19

17    George Miller and Pamela Barnett, correct?       14:34:20

18        A    No.  It appears to be a letter from me.  14:34:26

19        Q    Look more closely.  I think that maybe -- if  14:34:29

20    you look on the second page, it appears to be from --  14:34:31

21        A    No, CC George Miller and Pamela Barnett.  14:34:34

22        Q    Oh.                                     14:34:34

23        A    This is a letter I wrote to Taitz, an   14:34:37

24    e-mail.                                          14:34:40

25        Q    But look at -- oh, you're correct.  I   14:34:41
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 86

```
 1   apologize.                                              14:34:43

 2        A    That's fine.                                  14:34:44

 3        Q    Okay.  So I'm not going to read these         14:34:44

 4   letters for the record, but -- or at least for the     14:34:46

 5   most part.  So on February 24, 2012 you sent a letter  14:34:50

 6   to Orly Taitz basically telling her that she had       14:34:54

 7   defamed you, correct?                                  14:34:58

 8        A    Correct.                                      14:35:00

 9        Q    And you believed --                          14:35:00

10        A    That she and Ruffley had defamed me --       14:35:01

11        Q    But you believe --                           14:35:01

12        A    -- and Judicial Watch.                       14:35:05

13        Q    But you believe that Orly Taitz did defame   14:35:06

14   you, correct?                                          14:35:09

15        A    I believe they all defamed, yeah.            14:35:09

16        Q    So you believe Orly Taitz defamed you?       14:35:11

17        A    Yeah.                                         14:35:14

18        Q    Why didn't you sue her?                      14:35:14

19        A    That's work product.                         14:35:16

20        Q    All right.  How is it work product?          14:35:17

21        A    As George Bush would say, that's stratergy,  14:35:21

22   work product.                                          14:35:26

23        Q    How is it work product?                      14:35:27

24        A    My thought processes on who I'm going to     14:35:28

25   sue, that's work product.                              14:35:30
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 87

```
 1        Q    She bears some responsibility for this    14:35:31
 2   internet posting, correct?                          14:35:34
 3        A    Yes.                                       14:35:37
 4        Q    A large part of it, right?                14:35:39
 5        A    Well you know what, after I get a judgment 14:35:40
 6   against Judicial Watch they can file a contribution  14:35:43
 7   claim or an indemnity claim.  How's that?           14:35:46
 8        Q    You might want to check the law of Florida, 14:35:49
 9   because there's something called the Fabre rule, which 14:35:53
10   you might want to check out.                         14:35:55
11        A    Thank you.                                 14:35:57
12        Q    Well, I guess I do want to ask you one     14:35:58
13   specific question about this.  When you -- no, that's 14:36:01
14   fine.  I don't want to ask you more questions about  14:36:07
15   that.                                                14:36:10
16        A    The Fabre rule?                            14:36:10
17        Q    Yeah, F-a-b-r-e.                           14:36:12
18             (Defendant's Deposition Exhibit 17 was     14:36:19
19   marked for identification and was attached to the    14:36:19
20   deposition transcript.)                              14:36:20
21   BY MR. KRESS:                                        14:36:20
22        Q    And here's another e-mail, Exhibit 17.  It 14:36:20
23   appears to be just an e-mail exchange between you and 14:36:22
24   Orly Taitz about -- about this alleged defamation?   14:36:25
25        A    Yes.                                       14:36:40
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 88

```
 1      Q    Okay.  What's -- I don't want to ask you any      14:36:40
 2   more about that.                                          14:36:44
 3                 (Defendant's Deposition Exhibit 18 was      14:36:49
 4   marked for identification and was attached to the        14:36:49
 5   deposition transcript.)                                   14:36:50
 6   BY MR. KRESS:                                             14:36:50
 7      Q    What's Exhibit 18?                                14:36:50
 8      A    Appears to be an e-mail that George Miller        14:37:06
 9   sent to myself, Pamela Barnett and Sam Sterrett.          14:37:09
10      Q    And it was some revisions to this so-called       14:37:15
11   open letter to Orly Taitz?                                14:37:17
12      A    Well, George wanted to send a letter too.         14:37:26
13      Q    Okay.                                             14:37:26
14      A    She was also defaming him in that --              14:37:28
15      Q    Did George sue her?                               14:37:30
16      A    -- altercation.  I haven't asked George           14:37:33
17   that, but I don't know of any suit that he brought.       14:37:34
18      Q    All right.  Was the -- and just to be clear,      14:37:37
19   you don't know if -- if George Miller has sued Orly?      14:37:51
20      A    I don't know for a fact.                          14:37:54
21      Q    All right.  Did -- did Pamela Barnett treat       14:38:01
22   you any differently after she read the Orly Taitz         14:38:22
23   article?                                                  14:38:24
24      A    Yes.                                              14:38:24
25      Q    How so?                                           14:38:25
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 89

```
 1        A    Well, I think it creates doubts in people's        14:38:28
 2   minds, and she didn't even want to pay me what they          14:38:30
 3   had agreed to pay me at that point.                          14:38:38
 4        Q    But she still continued to work with you?          14:38:40
 5        A    Not really.  George Miller was the -- the          14:38:42
 6   point person.  I didn't really deal with Pamela              14:38:44
 7   Barnett that much.                                           14:38:46
 8        Q    Did you deal with her before the Orly Taitz        14:38:47
 9   comment?                                                     14:38:50
10        A    I did.  I think she saw it as an opportunity       14:38:50
11   not to pay me.                                               14:38:53
12        Q    All right.                                         14:38:53
13        A    I can't -- I can't speak for her.  I do know       14:38:56
14   that, you know, cause and effect.  I mean, after --          14:38:59
15   after that Orly Taitz thing came out, --                     14:38:59
16        Q    Did you --                                         14:38:59
17        A    -- then it became more difficult.                  14:39:05
18        Q    Did you clarify for Pamela Barnett that you        14:39:06
19   were only indicted and not convicted?                        14:39:11
20        A    Yes.                                               14:39:12
21        Q    Did she believe you?                               14:39:12
22        A    You have to ask her.                               14:39:14
23        Q    All right.  Did she ever tell you                  14:39:14
24   specifically that she was changing how she viewed you        14:39:16
25   because of Orly Taitz's web site?                            14:39:19
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 90

| | | | |
|---|---|---|---|
| 1 | A | Well, she told me that they couldn't raise | 14:39:23 |
| 2 | money because of what was said. | | 14:39:25 |
| 3 | Q | Okay.  Did she say anything else? | 14:39:26 |
| 4 | A | Not really. | 14:39:28 |
| 5 | Q | Sam is it Sheppard -- what was it? | 14:39:29 |
| 6 | A | Sterrett. | 14:39:32 |
| 7 | Q | Sterrett, did he say anything to you about | 14:39:33 |
| 8 | Orly Taitz's web site? | | 14:39:36 |
| 9 | A | I believe he did, but I don't have a real | 14:39:38 |
| 10 | specific -- I didn't talk to him very much. | | 14:39:40 |
| 11 | Q | Did he send you any -- | 14:39:42 |
| 12 | A | He was dealing mostly with George and he was | 14:39:43 |
| 13 | trying to raise money to pay me. | | 14:39:45 |
| 14 | Q | Did he send you any documents related to | 14:39:47 |
| 15 | Orly Taitz's web site, he being Sam? | | 14:39:51 |
| 16 | A | Not -- not that I recollect at this point. | 14:39:54 |
| 17 | Q | Did -- | 14:39:54 |
| 18 | A | He may have, but I don't think so, no. | 14:39:56 |
| 19 | Q | Did Gary Laconis say anything to you about | 14:39:58 |
| 20 | what he read on Orly Taitz's web site? | | 14:40:02 |
| 21 | A | Yeah, he said something about it. | 14:40:04 |
| 22 | Q | What did he say? | 14:40:06 |
| 23 | A | He thought it was outrageous. | 14:40:07 |
| 24 | Q | That she would say something -- he didn't | 14:40:08 |
| 25 | believe it, I take it then? | | 14:40:11 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 91

```
 1      A    I don't think he did.                    14:40:13

 2      Q    Okay.                                    14:40:14

 3      A    But I can't speak for him.               14:40:14

 4      Q    All right.  So he saw it, said it was    14:40:15

 5  outrageous, didn't agree with the things stated,  14:40:17

 6  correct?                                          14:40:21

 7      A    I think he remarked.  I don't have a real 14:40:23

 8  deep memory of the conversation with him, but I think 14:40:26

 9  he said to me that this is, you know, very damaging to 14:40:32

10  you and it's out there.  It's on a web site that's 14:40:34

11  most widely viewed for so-called eligibility mavens or 14:40:38

12  birthers, whatever you want to call them.  So he  14:40:44

13  thought it was -- he thought it was bad, you know, 14:40:46

14  that it was out there.                            14:40:49

15      Q    Did -- did Gary know before this article 14:40:50

16  that you had been indicted for failure to pay child 14:40:58

17  support?                                          14:41:01

18      A    No.                                      14:41:01

19      Q    Okay.  So this article brought to light a 14:41:01

20  truth, correct, that you had been --              14:41:05

21      A    No, the article didn't bring forth the   14:41:06

22  truth.  The article brought forth a falsehood.   14:41:10

23      Q    Well, it brought forth the truth that you 14:41:12

24  had been indicted?                                14:41:15

25      A    Not in the context of being convicted, no. 14:41:16
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 92

```
 1    It was false.  The two -- two facts together are       14:41:17
 2    demonstrably, materially false.                        14:41:19
 3        Q    Before --                                     14:41:19
 4        A    The indictment is a predicate to being        14:41:22
 5    convicted, okay, so consequently the operative word is 14:41:25
 6    convict, not indict.                                   14:41:29
 7        Q    Before -- before the Orly Taitz article, did  14:41:30
 8    George Miller know that you had been indicted for      14:41:32
 9    failure to pay child support?                          14:41:35
10        A    I don't think so.                             14:41:36
11        Q    Before the Orly Taitz article --              14:41:37
12        A    He never -- never said anything to me.        14:41:39
13        Q    Before the Orly Taitz article, did Pamela     14:41:40
14    Barnett know that you had been indicted for failure to 14:41:44
15    pay child support?                                     14:41:46
16        A    I don't know what Pamela knew because I       14:41:48
17    didn't talk to her that much.                          14:41:51
18        Q    What about Sam -- forgive me, but I don't --  14:41:52
19        A    I don't know what Sam knew or didn't know.    14:41:54
20        Q    Okay.  How about Mike Zullo, before Orly      14:41:55
21    Taitz's article, did he know that you had been         14:41:59
22    indicted for failure to pay child support?             14:42:01
23        A    I don't know.  You have to ask him.           14:42:04
24        Q    Before the Orly Taitz Article, did Michael    14:42:04
25    Voeltz know that you had been indicted for failure to  14:42:09
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 93

```
 1    pay child support?                               14:42:11

 2        A    I don't -- I don't know.  You'd have to ask    14:42:12

 3    them.  But they were shocked at that posting.    14:42:12

 4    Because, you know, the reason is it impacts on the   14:42:14

 5    case.  Whether or not I was indicted or convicted,   14:42:15

 6    okay, it shows an animus.  It shows -- you're trying   14:42:17

 7    to disparage the lawyer of someone who's trying to   14:42:20

 8    represent you in a proceeding that's already    14:42:26

 9    controversial enough, and as I was saying before,   14:42:29

10    republicans have shied away from this as well, and,   14:42:31

11    you know, to -- to go after the lawyer, to kill the   14:42:35

12    messenger --                                    14:42:37

13        THE WITNESS:  I'm trying to testify here,    14:42:42

14    Mr. Orfanedes, if you -- if you could not make too   14:42:44

15    much commotion, I'd appreciate it.  I don't mind if   14:42:49

16    you talk to your counsel.  We can take a break, but   14:42:50

17    it's disconcerting if you're talking to him when I'm   14:42:53

18    trying to talk.                                 14:42:55

19        MR. ORFANEDES:  I won't disrupt your    14:42:56

20    performance again.                              14:42:59

21        THE WITNESS:  Well, there's another example    14:43:02

22    of the animus.  You have to make a wise remark.  I was   14:43:03

23    being respectful to you.                        14:43:08

24        MR. KRESS:  I thought he was whispering to    14:43:08

25    me.  I was hoping it wasn't -- if he wrote more    14:43:10
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 94

```
 1    clearly I wouldn't have to whisper, but --              14:43:11
 2            THE WITNESS:  No, my per- -- that's --          14:43:11
 3    it's -- pejorative is unnecessary, and I take issue     14:43:11
 4    with that.  The -- and it was disrespectful to be       14:43:14
 5    talking over me while I was, testifying, so that's why  14:43:22
 6    I asked to stop.                                         14:43:22
 7    BY MR. KRESS:                                            14:43:22
 8        Q    Well, for the record, I don't think he was     14:43:25
 9    talking.  He was whispering something to me, which he   14:43:27
10    has a --                                                 14:43:27
11        A    No, it was louder.  I suspect it will be       14:43:29
12    picked up with the -- with the audio.  But the point    14:43:30
13    being made here is that when you're trying to destroy   14:43:33
14    the messenger, trying to destroy the counsel for        14:43:35
15    someone who is trying to pursue his rights in Florida,  14:43:38
16    you know, frankly, that's unethical too, and there was  14:43:43
17    no need to do that, and that's why you see              14:43:46
18    correspondence from George Miller saying, hey, we're    14:43:51
19    all on the same side.  We're trying to get a result     14:43:53
20    here.  We're trying to -- to pursue justice, and this   14:43:56
21    was not the right thing to do, you know, under any      14:43:58
22    circumstance.                                            14:44:01
23        Q    Well, anyone in the -- would you agree with    14:44:01
24    me that anyone in the world, who knew that you were     14:44:04
25    indicted, had the right on February 22nd, 2012 to say   14:44:07
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 95

```
 1    Larry Klayman had been indicted?                      14:44:14

 2         A    What do you mean by the right?             14:44:20

 3         Q    You have the First Amendment right to speak 14:44:21

 4    the truth.                                            14:44:23

 5         A    I can't answer that question because that's 14:44:25

 6    not what was said.                                    14:44:26

 7         Q    Okay.                                        14:44:27

 8         A    Okay.                                        14:44:28

 9         Q    Well, would you agree with me that on       14:44:28

10    February 22nd, 2012 anyone had the right to speak the 14:44:30

11    truth?                                                14:44:35

12         A    People always have the right to speak the   14:44:35

13    truth.  The question is their motivation, okay, and we 14:44:37

14    went through a lot of testimony with regard to        14:44:41

15    directors of Judicial Watch as to malice.  You're     14:44:44

16    claiming that I have to show malice because I'm a      14:44:46

17    public figure.  And this shows that there's malice     14:44:49

18    towards me because it's unnecessary to say that.       14:44:52

19    You're innocent until proven guilty.  People do get    14:44:55

20    indicted in this country unjustly.                     14:44:58

21         You know, I have not been able to see my          14:45:00

22    kids.  I made a legal decision on what I did.          14:45:03

23    Frankly, Kleinman my attorney, told me there was no    14:45:07

24    criminal exposure for not paying child support, that   14:45:11

25    it was all civil.  So, you know, I didn't have any     14:45:15
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 96

| | |
|---|---|
| 1   improper intent towards the justice system.  So to | 14:45:17 |
| 2   imply that or even say that is not only harmful to me, | 14:45:19 |
| 3   it's not only harmful to George Miller and the people | 14:45:24 |
| 4   around him, but it's harmful to Michael Voeltz and | 14:45:27 |
| 5   it's harmful to the public interest. | 14:45:30 |
| 6        Q    Well, the public interest would also be | 14:45:32 |
| 7   harmed if an unethical person were pursuing an | 14:45:34 |
| 8   important lawsuit, correct? | 14:45:37 |
| 9        A    That's a hypothetical and that doesn't apply | 14:45:38 |
| 10  in my context. | 14:45:43 |
| 11       Q    Well, if -- all right.  But Orly Taitz had | 14:45:43 |
| 12  the right to tell people on February 23, 2012 that you | 14:45:54 |
| 13  had been indicted for failure to pay child support in | 14:45:58 |
| 14  Ohio, correct? | 14:46:02 |
| 15       A    If that was all she said, then I'm not going | 14:46:11 |
| 16  to make a legal conclusion or a judgment, but that | 14:46:15 |
| 17  would have been accurate, but that's not what was | 14:46:18 |
| 18  said. | 14:46:20 |
| 19       Q    Okay.  That's -- and she had the right to | 14:46:20 |
| 20  say what was accurate, correct? | 14:46:23 |
| 21       A    She didn't say what was accurate. | 14:46:24 |
| 22       Q    Well, she had the right to say what was -- | 14:46:26 |
| 23       A    I'm -- I'm not going to make a legal | 14:46:28 |
| 24  conclusion.  That's for the court. | 14:46:30 |
| 25       Q    Okay. | 14:46:31 |

LARRY  ELLIOT  KLAYMAN  −  1/29/2014

Page 97

```
 1        A     And the jury.                              14:46:32

 2        Q     Now, do you know if donors would have shied 14:46:41

 3   away from you even if Orly Taitz had only said that    14:46:43

 4   you had been indicted for failure to pay child         14:46:47

 5   support?                                               14:46:50

 6        A     I'll tell you why they shy away from me.    14:46:50

 7        Q     I want you to answer my question.  Do you   14:46:52

 8   know, yes or no or I don't know, whether donors would  14:46:55

 9   have shied away from you if Orly Taitz had said only   14:46:58

10   that Larry Klayman had been indicted for failure to    14:47:02

11   pay child support?                                     14:47:05

12        A     I don't think they would have.             14:47:06

13        Q     All right.                                 14:47:09

14        A     And let me -- let me clarify my question    14:47:10

15   (sic).  But to say that I'd been convicted of a        14:47:12

16   felony -- this was a felony, fifth degree felony -- is 14:47:16

17   that's like saying that Mr. Klayman is going to lose   14:47:20

18   his law license, that he can't do anything anymore.    14:47:23

19   Okay?  And -- and that's why the statement was so      14:47:27

20   harmful and so powerful and why it needed to be        14:47:28

21   corrected immediately and why Judicial Watch should    14:47:32

22   have played a role in correcting it, because they're   14:47:35

23   an ethics organization.  They know better.             14:47:37

24              But instead they pretended at deposition    14:47:40

25   they don't even know what's going on, that, you know,  14:47:41
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 98

```
1    they have no interest in correcting it, they don't        14:47:44

2    care, and, you know, and that's the harm of it.  A        14:47:47

3    lawyer that is convicted for a crime loses his            14:47:50

4    license.                                                  14:47:52

5         Q    Well, wouldn't donors view it as a negative     14:47:56

6    that you had been indicted for a crime?  Wouldn't you     14:48:02

7    expect that?                                              14:48:07

8         A    No.  I'll tell you why I don't expect that.     14:48:09

9    Because the family court system is so inherently          14:48:11

10   incestuous and corrupt that people assume that things     14:48:14

11   happen in the family court system that shouldn't          14:48:19

12   happen, particularly in Cleveland, Ohio.                  14:48:22

13        Q    Do people from -- from Florida know that?       14:48:25

14        A    Which if you read The Plain Dealer in           14:48:27

15   Cleveland Ohio -- that's their newspaper --               14:48:30

16        Q    I know that.                                    14:48:32

17        A    -- considers the Cleveland family court to      14:48:34

18   be a cesspool of corruption.                              14:48:35

19        Q    Do people in Florida know that the Cleveland    14:48:38

20   court is allegedly corrupt?                               14:48:41

21        A    That's my impression from reading The Plain     14:48:44

22   Dealer and -- and discussions there.                      14:48:47

23             Can I take a break?                             14:48:51

24        Q    Sure.                                           14:48:52

25        A    Thanks.                                         14:48:53
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 99

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Going off the record. | 14:48:54 |
| 2 | The time is 2:48 p.m. | 14:48:55 |
| 3 | (Recess.) | 14:48:57 |
| 4 | THE VIDEOGRAPHER:  Back on the record.  Here | 14:57:14 |
| 5 | marks the beginning of Volume 1, Tape No. 2 in the | 14:57:16 |
| 6 | deposition of Larry Klayman.  The time is 2:57 p.m. | 14:57:18 |
| 7 | BY MR. KRESS: | 14:57:25 |
| 8 | Q    All right.  Mr. Klayman, we'll continue on, | 14:57:25 |
| 9 | and I do want to try to wrap it up.  So I'm going to | 14:57:27 |
| 10 | try to hit some specific questions and look for | 14:57:30 |
| 11 | specific answers. | 14:57:32 |
| 12 | Do you file taxes each year? | 14:57:40 |
| 13 | A    Yeah. | 14:57:42 |
| 14 | Q    Do you file state income taxes anywhere? | 14:57:42 |
| 15 | A    Yeah. | 14:57:47 |
| 16 | Q    Where? | 14:57:47 |
| 17 | A    Well, there's no tax in Florida, so there's | 14:57:48 |
| 18 | no state income tax. | 14:57:50 |
| 19 | Q    You -- you said you file tax -- state taxes | 14:57:51 |
| 20 | somewhere. | 14:57:54 |
| 21 | A    Well, I meant I don't have to file them. | 14:57:54 |
| 22 | Q    All right.  Do you file state taxes in | 14:57:56 |
| 23 | California? | 14:57:58 |
| 24 | A    No, because I reside in Florida. | 14:57:59 |
| 25 | Q    All right.  Where do you reside in Florida? | 14:58:01 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 100

| | | | |
|---|---|---|---|
| 1 | A | I was residing in Miami, and I moved to | 14:58:05 |
| 2 | Ocala, Florida. | | 14:58:08 |
| 3 | Q | When did you move to Ocala? | 14:58:09 |
| 4 | A | Within the last year. | 14:58:11 |
| 5 | Q | Do you have a month that you moved there? | 14:58:12 |
| 6 | A | And I changed my residence when I started to | 14:58:19 |
| 7 | do a citizens grand jury in Ocala, Florida. | | 14:58:23 |
| 8 | Q | When did you start to do the citizens grand | 14:58:27 |
| 9 | jury? | | 14:58:32 |
| 10 | A | It was shortly after that, I think about a | 14:58:32 |
| 11 | year ago. | | 14:58:37 |
| 12 | Q | What is 6538 Collins Avenue, Suite 331, | 14:58:38 |
| 13 | Miami Beach, Florida? | | 14:58:42 |
| 14 | A | That's what I use as my address in Miami. | 14:58:44 |
| 15 | Q | Is that a residence? | 14:58:48 |
| 16 | A | It's not a residence. | 14:58:50 |
| 17 | Q | What is it? | 14:58:55 |
| 18 | A | It's a place where I receive mail. | 14:58:56 |
| 19 | Q | It's basically like a post office box? | 14:58:58 |
| 20 | A | A mail drop, yeah. | 14:59:00 |
| 21 | Q | Okay.  So you don't really live there, | 14:59:02 |
| 22 | right? | | 14:59:03 |
| 23 | A | No, I don't live there. | 14:59:03 |
| 24 | Q | Were you living in Miami on -- in February | 14:59:07 |
| 25 | of 2013? | | 14:59:12 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 101

```
 1        A    See, I go to Florida a lot, so I may have      14:59:19
 2    been claiming that Miami was my residence at that time  14:59:21
 3    because it had been for a very long time, but for a     14:59:24
 4    lot of different reasons, I moved my residence to       14:59:27
 5    Ocala.                                                  14:59:30
 6        Q    All right.                                     14:59:31
 7        A    I go to Florida frequently.                    14:59:33
 8        Q    What's -- what was the address where you       14:59:35
 9    resided in Miami?                                       14:59:38
10        A    The last one I resided was, I think, on 34th   14:59:41
11    Street in Coral Gables.                                 14:59:45
12        Q    Did you rent that?                             14:59:49
13        A    Yeah.                                          14:59:50
14        Q    What -- who was your landlord?                 14:59:51
15        A    I don't remember the name.                     14:59:52
16        Q    Could you get the name for us?                 14:59:53
17        A    I'll take it under advisement.                 14:59:54
18        Q    Well, if I ask you for it, can you get it      14:59:56
19    for us?                                                 14:59:59
20        A    I'll take it under advisement.                 14:59:59
21        Q    What do you mean you'll take it under          15:00:02
22    advisement?                                             15:00:04
23        A    I will let you know whether I'll get it for    15:00:04
24    you or not.                                             15:00:07
25        Q    All right.  Well, I am asking for the name     15:00:07
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 102

```
 1    of your landlord where you most recently lived in        15:00:10
 2    Miami, okay?                                             15:00:13
 3       A    Yeah.  Well, I go to Miami and I stay in         15:00:14
 4    Miami.  You know, George Bush, the father, claimed as   15:00:18
 5    his residence a hotel in Houston, Texas.                15:00:24
 6       Q    Right.                                           15:00:24
 7       A    Okay, so, you know, I'm in Miami frequently      15:00:26
 8    and that -- I considered that to be my home until I     15:00:28
 9    moved it to Ocala.                                       15:00:30
10       Q    Okay.  What do you mean?  How frequently do     15:00:32
11    you go to Mia- -- to Florida?                           15:00:35
12       A    It's been a frequency of about once a month.    15:00:38
13       Q    For how long do you stay when you go there?     15:00:41
14       A    I can't tell you generally, but, you know,      15:00:43
15    sometimes it's a week.  Sometimes it's longer than     15:00:45
16    that.                                                    15:00:47
17       Q    Sometimes less?                                 15:00:47
18       A    Sometimes less.                                 15:00:48
19       Q    Do you spend more time in California?           15:00:49
20       A    I wouldn't say so.  I pretty much divide my     15:00:52
21    time between California, Washington, D.C., Florida,     15:00:57
22    and other places throughout the country.               15:00:59
23       Q    Okay.  So you spend less than half of your     15:01:01
24    time in Florida?                                        15:01:03
25       A    I wouldn't say that.  I haven't counted it     15:01:05
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 103

```
 1   all up.                                           15:01:08

 2        Q    All right.                              15:01:08

 3        A    And, as you know, Florida is an intent  15:01:15

 4   state.  You can be a Florida citizen without spending  15:01:17

 5   most of your time in Florida.  You know that,    15:01:20

 6   Mr. Kress.                                        15:01:22

 7        Q    What's Exhibit --                       15:01:23

 8        A    That's what draws people to Florida.    15:01:24

 9        Q    That and the weather.                   15:01:27

10             (Defendant's Deposition Exhibit 19 was  15:01:28

11   marked for identification and was attached to the  15:01:28

12   deposition transcript.)                           15:01:29

13   BY MR. KRESS:                                     15:01:29

14        Q    What's Exhibit 19?                      15:01:29

15        A    That appears to be an open letter to Orly  15:01:41

16   Taitz.                                            15:01:43

17        Q    Do you know who wrote that?             15:01:44

18        A    I believe that it was a combination of  15:01:47

19   George Miller and Pamela Barnett.  That's what it says  15:01:52

20   at the bottom.  It appears to be a draft.         15:01:55

21        Q    Why -- why did you give that to me in  15:01:56

22   discovery?  What's the significance of it?        15:01:58

23        A    Well, that's work product.  That's true work  15:02:00

24   product, okay, not the work product that your clients  15:02:03

25   were claiming earlier.  You know, I gave it to you  15:02:06
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 104

```
 1    because it makes reference to the Article II PAC,        15:02:08
 2    because the Article II PAC was attacked because it's     15:02:12
 3    talking about, you know, the things that were            15:02:14
 4    published on Orly Taitz's web site, and I thought it     15:02:18
 5    was relevant and had to give it to you.                  15:02:21
 6         Q    Okay.  What is --                              15:02:23
 7         A    And it's addressing some of the things         15:02:24
 8    that -- that was on Taitz's web site that, you know,     15:02:26
 9    were false.                                              15:02:29
10              (Defendant's Deposition Exhibit 20 was        15:02:29
11    marked for identification and was attached to the        15:02:29
12    deposition transcript.)                                  15:02:39
13    BY MR. KRESS:                                            15:02:39
14         Q    What is -- what's Exhibit 20?                  15:02:39
15         A    Well, Exhibit 20 is, I guess, a letter from    15:03:13
16    George Miller to various individuals that have an        15:03:16
17    interest, and it says, "To our esteemed donors to       15:03:21
18    Constitutional Action Fund."  Because at some point      15:03:25
19    what I understood is that the Article II PAC, he no      15:03:28
20    longer was working with that, and he was using the      15:03:32
21    vehicle the Constitutional Action Fund to try to raise  15:03:34
22    money to pay my legal bills, okay, and -- and it says   15:03:38
23    here -- talking about Michael Voeltz, the plaintiff in  15:03:47
24    Florida, is a very knowledgeable, committed plaintiff,  15:03:49
25    and later has teamed up with attorney Larry Klayman at  15:03:53
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 105

```
 1    our request.  Larry is the founder of Judicial Watch,    15:03:56
 2    now with Freedom Watch.                                  15:04:00
 3          He took this case on privately and has             15:04:01
 4    poured in far more of his resources than we are able     15:04:04
 5    to fairly compensate him for.  But, he does have to      15:04:07
 6    eat and does nearly all of his work for subprime         15:04:11
 7    "cause" type clients like us.  In addition, there are    15:04:12
 8    hard dollar expenses for court, plane tickets, hotels,   15:04:15
 9    cars, meals, stenographers, serving, transcripts, air    15:04:17
10    freight -- it's amazing.                                 15:04:18
11       Q    Okay, I don't need you to read it.               15:04:21
12       A    What he's trying to do I take it -- you have     15:04:23
13    to ask him -- he's attempting to raise money to pay      15:04:25
14    bill, --                                                 15:04:29
15       Q    Okay.                                            15:04:29
16       A    -- which thanks to what was published on         15:04:30
17    Orly Taitz's web site became near impossible.            15:04:32
18       Q    All right.  Let's get into this.  Let's go       15:04:35
19    to Exhibit 21.                                           15:04:37
20             (Defendant's Deposition Exhibit 21 was          15:04:37
21    marked for identification and was attached to the        15:04:37
22    deposition transcript.)                                  15:04:37
23    BY MR. KRESS:                                            15:04:37
24       Q    This appears to -- it's a two-page document,     15:04:40
25    so I guess it's --                                       15:04:42
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 106

```
1        A    I just want to take these so they stay          15:04:42

2    together.                                                 15:04:45

3        Q    Exhibit 21 appears to be a composite            15:04:45

4    exhibit, the first being an e-mail from you to George    15:04:48

5    Miller dated February 8, 2012 with the subject of the    15:04:53

6    retention agreement with Klayman Law Firm.  I'm sorry    15:05:00

7    to look over -- kind of look over your shoulder here,    15:05:03

8    but I don't have an extra copy.                          15:05:05

9        A    That's okay.                                     15:05:05

10       Q    It says, Dear George, I will prepare --         15:05:07

11   prepare a more formal legal retention agreement today,   15:05:09

12   but here are the terms essential that you can run by     15:05:12

13   the group.  To file suit in Florida we will need an      15:05:16

14   up-front retention of $18,000 which will need to be      15:05:19

15   kept at this level throughout the course of the case     15:05:23

16   by replenishing it with money.  Goes on to say that      15:05:28

17   you will bill $395 per hour, correct?                    15:05:30

18       A    Correct.                                         15:05:33

19       Q    That's your -- that was your agreement with     15:05:34

20   the group to file the Florida suit?                      15:05:35

21       A    Yeah.                                            15:05:36

22       Q    On the next page there's an e-mail from you,    15:05:37

23   Larry Klayman, to George Miller and others.  First      15:05:41

24   line says, this is what you all agreed to, the $18,000   15:05:46

25   was just a retainer and fees were to be billed at $395   15:05:50
```

LARRY ELLIOT KLAYMAN − 1/29/2014

Page 107

| | | |
|---|---|---|
| 1 | per hour, reduced from my ordinary hourly rate of $600 | 15:05:56 |
| 2 | per hour. | 15:06:00 |
| 3 | So from that −− from the tenor of that | 15:06:01 |
| 4 | paragraph it sounds like they did pay the $18,000 | 15:06:02 |
| 5 | retainer, correct? | 15:06:06 |
| 6 | A    I don't know how much they had paid.  I | 15:06:07 |
| 7 | don't recollect right now. | 15:06:08 |
| 8 | Q    You can't say that they didn't pay the | 15:06:09 |
| 9 | 18,000? | 15:06:11 |
| 10 | A    They didn't pay all of it, no, −− | 15:06:12 |
| 11 | Q    But they −− | 15:06:12 |
| 12 | A    −− and they had a difficult time paying it, | 15:06:14 |
| 13 | whatever came came in dribs or drabs because of what | 15:06:18 |
| 14 | was on Orly Taitz's web site. | 15:06:22 |
| 15 | Q    Has anyone told you that? | 15:06:24 |
| 16 | A    Yes. | 15:06:25 |
| 17 | Q    Okay.  Who has told you that? | 15:06:25 |
| 18 | A    George Miller. | 15:06:27 |
| 19 | Q    Okay.  Do you have any records of what you | 15:06:27 |
| 20 | actually billed on the Michael Voeltz litigation? | 15:06:29 |
| 21 | A    It's −− you do have a statement that I gave | 15:06:32 |
| 22 | you. | 15:06:36 |
| 23 | Q    Where is it?  I don't −− I sure don't see | 15:06:36 |
| 24 | it. | 15:06:40 |
| 25 | A    At the bottom of that pack. | 15:06:40 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 108

```
 1      Q     All right.  I did -- I guess I did see that.    15:06:42
 2   But you had an agreement there to give you an 1,800 --   15:06:43
 3   $18,000 retainer and you were to bill from there,        15:06:45
 4   correct?                                                 15:06:48
 5      A     Yeah, and let me point this out too.  Okay?     15:06:48
 6   That was just the retainer, okay.  When the funds got    15:06:53
 7   cut off, I didn't get all of the 18, I don't believe,    15:06:57
 8   and in addition I was already obligated to the case.     15:07:00
 9   I was going forward on two cases in Florida -- three,    15:07:03
10   ultimately three, --                                     15:07:05
11      Q     Mm-hmm.                                         15:07:05
12      A     -- and there has been a heck of a lot of        15:07:06
13   work done on those cases and a lot of billing and a      15:07:09
14   lot of expense.                                          15:07:11
15      Q     Mm-hmm.                                         15:07:11
16      A     I have not prepared a statement for that as     15:07:12
17   of now at this time because there's nobody there to      15:07:13
18   pay me because --                                        15:07:16
19      Q     All right.                                      15:07:16
20      A     -- because, you know, they had no money and     15:07:17
21   I had to go on on my own, and I wasn't going to          15:07:19
22   abandon Michael Voeltz and I wasn't going to abandon     15:07:22
23   the concept, you know, even though it was in my          15:07:25
24   private capacity for the American people.  I was going   15:07:27
25   to keep it up.  So, you know, I would say I've put in    15:07:30
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 109

```
 1    close to two, $300,000 in this case.                    15:07:33

 2         Q    Okay.  And how much have you been paid?       15:07:35

 3         A    Something less than 18.                       15:07:37

 4         Q    Something less than 18.  Have you kept time   15:07:38

 5    records?                                                15:07:40

 6         A    I have records, yeah.                         15:07:41

 7         Q    Why didn't you produce those?                15:07:42

 8         A    But I don't have them in a statement form,   15:07:43

 9    okay.                                                   15:07:45

10         Q    Okay.  So why haven't you produced them?     15:07:46

11         A    I did.  I produced them right there.         15:07:49

12         Q    A statement of the number of hours --        15:07:52

13         A    I didn't -- I didn't produce -- I didn't     15:07:53

14    keep records up to the 18, okay, I started keeping it  15:07:57

15    after that, up to -- up to that point.                 15:08:00

16         Q    Have you kept records of the hours you have  15:08:01

17    devoted to the case?                                   15:08:03

18         A    Not -- not consistently, no, I have not.     15:08:04

19         Q    So any comment about how many hours you put  15:08:07

20    on would just be an estimate, correct?                 15:08:10

21         A    Well, I wasn't being paid, so there was no   15:08:12

22    point in me keeping records.                           15:08:14

23         Q    You didn't keep records?                     15:08:16

24         A    I kept up to a point.  You have a statement  15:08:18

25    there.                                                 15:08:20
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 110

| | | | |
|---|---|---|---|
| 1 | Q | Okay.  We'll get into that, but -- | 15:08:20 |
| 2 | A | Yeah. | 15:08:20 |
| 3 | Q | -- here you say there is -- | 15:08:20 |
| 4 | A | At some point it became, in effect, pro | 15:08:21 |
| 5 | bono, -- | | 15:08:25 |
| 6 | Q | Okay. | 15:08:25 |
| 7 | A | -- so there's no point in keeping records. | 15:08:25 |
| 8 | Q | So you wanted -- you wanted to pursue the | 15:08:26 |
| 9 | case though, didn't you? | | 15:08:31 |
| 10 | A | I'm not the kind of person that abandons a | 15:08:31 |
| 11 | client. | | 15:08:35 |
| 12 | Q | You like fame, too, right?  You -- you like | 15:08:36 |
| 13 | the popularity of the case? | | 15:08:38 |
| 14 | A | You know, I take offense at that.  I know | 15:08:38 |
| 15 | you're a nice person, okay?  All right, everybody | | 15:08:40 |
| 16 | likes fame.  Everybody likes to be recognized for what | | 15:08:40 |
| 17 | they do.  Everybody likes to be treated with respect. | | 15:08:43 |
| 18 | Everybody wants to be important, okay.  I'm no | | 15:08:46 |
| 19 | different than anybody else.  But the reality is here | | 15:08:49 |
| 20 | that, you know, whether I like fame or not, I'm not | | 15:08:53 |
| 21 | going to abandon a client, and I'm true to my word. | | 15:08:57 |
| 22 | Q | Does Natalia Humm think that? | 15:09:03 |
| 23 | A | I've -- I've never done that in my entire | 15:09:06 |
| 24 | life like they did with Peter Paul.  They abandoned | | 15:09:09 |
| 25 | him and cut him loose from any -- he's hung out to dry | | 15:09:11 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 111

| | | |
|---|---|---|
| 1 | under house arrest.  I don't do that.  If I'd been at | 15:09:14 |
| 2 | Judicial Watch, that wouldn't have happened. | 15:09:16 |
| 3 | Q    What is -- would Natalia Humm agree with the | 15:09:17 |
| 4 | statement that you don't leave a client hang out to | 15:09:21 |
| 5 | dry? | 15:09:24 |
| 6 | A    I didn't abandon her. | 15:09:24 |
| 7 | Q    All right. | 15:09:24 |
| 8 | A    She was transferred to Orlando and chose to | 15:09:27 |
| 9 | hire another lawyer. | 15:09:30 |
| 10 | Q    The -- Exhibit twenty -- | 15:09:31 |
| 11 | A    In fact, I offered to keep representing | 15:09:31 |
| 12 | them. | 15:09:31 |
| 13 | Q    Exhibit 21 goes on to say, "That there was | 15:09:32 |
| 14 | no formal written is not controlling," so there was no | 15:09:34 |
| 15 | formal written contract with -- with the -- with the | 15:09:37 |
| 16 | group that was funding this suit, correct? | 15:09:40 |
| 17 | A    After this e-mail, I never put it in an | 15:09:42 |
| 18 | actual document that said contract, but that e-mail is | 15:09:45 |
| 19 | the equivalent of a contract. | 15:09:48 |
| 20 | Q    Okay. | 15:09:50 |
| 21 | A    It's a quasi-contract. | 15:09:50 |
| 22 | Q    Mm-hmm. | 15:09:50 |
| 23 | A    You know, you have a thing called unjust | 15:09:52 |
| 24 | enrichment.  You have a thing called quantum meruit. | 15:09:55 |
| 25 | You know what I'm talking about. | 15:10:00 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 112

| | | | |
|---|---|---|---|
| 1 | Q | Right. | 15:10:00 |
| 2 | A | And there's no -- there's no dispute that | 15:10:02 |
| 3 | those moneys were owed. | | 15:10:03 |
| 4 | Q | Okay.  Did you sue the group for the fees -- | 15:10:03 |
| 5 | A | No, I never sued. | 15:10:06 |
| 6 | Q | Well, you had a contract, right? | 15:10:07 |
| 7 | A | I chose not to sue them because it wasn't | 15:10:08 |
| 8 | their fault that I wasn't being paid. | | 15:10:10 |
| 9 | Q | How was it not your fault? | 15:10:12 |
| 10 | A | It was the fault of your client, Judicial | 15:10:13 |
| 11 | Watch, that I wasn't paid. | | 15:10:15 |
| 12 | Q | Do any bar rules -- | 15:10:15 |
| 13 | A | They -- they were a victim just like I was. | 15:10:22 |
| 14 | Q | Do any bar rules require a written contract? | 15:10:24 |
| 15 | A | Well, that -- that is the equivalent of a | 15:10:26 |
| 16 | written contract. | | 15:10:29 |
| 17 | Q | All right. | 15:10:29 |
| 18 | A | I put it down in writing and they acceded to | 15:10:30 |
| 19 | it. | | 15:10:32 |
| 20 | Q | All right. | 15:10:39 |
| 21 | | (Defendant's Deposition Exhibit 22 was | 15:11:07 |
| 22 | marked for identification and was attached to the | | 15:11:07 |
| 23 | deposition transcript.) | | 15:11:07 |
| 24 | BY MR. KRESS: | | 15:11:07 |
| 25 | Q | Show you what's been marked as Exhibit 22. | 15:11:07 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 113

| | | |
|---|---|---|
| 1 | It appears to be, again, a collection of e-mails. | 15:11:09 |
| 2 | There's one from you to George Miller dated June 7, | 15:11:14 |
| 3 | 2012 that says, "George, as discussed we need to have | 15:11:22 |
| 4 | our full retainer at least before I go to Florida. | 15:11:25 |
| 5 | Thx," correct? | 15:11:28 |
| 6 | A    That's what it says. | 15:11:29 |
| 7 | Q    Did you get your full retainer before you | 15:11:30 |
| 8 | went to Florida? | 15:11:32 |
| 9 | A    No. | 15:11:33 |
| 10 | Q    All right. | 15:11:33 |
| 11 | A    Thanks to what, you know, Ruffley and | 15:11:33 |
| 12 | Judicial Watch and Taitz did, no, I didn't. | 15:11:36 |
| 13 | Q    In any of these e-mails are you saying I | 15:11:38 |
| 14 | know you guys don't want to pay me because of the fact | 15:11:40 |
| 15 | that -- of this web site -- | 15:11:43 |
| 16 | A    We also had conversations and, you know, and | 15:11:44 |
| 17 | George Miller, you know, would say, you know, that she | 15:11:49 |
| 18 | really did a number on them raising money.  You see, | 15:11:53 |
| 19 | the people that are concerned with eligibility, the | 15:11:58 |
| 20 | birthers, as pejoratively they're referred to by those | 15:12:01 |
| 21 | who don't agree with what they're doing, they're a | 15:12:07 |
| 22 | very close-knit group, and they're all over the | 15:12:13 |
| 23 | country, and they read Orly Taitz's Web site | 15:12:15 |
| 24 | religiously -- | 15:12:19 |
| 25 | Q    If they -- | 15:12:19 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 114

| | | |
|---|---|---|
| 1 | A    -- and other web sites. | 15:12:20 |
| 2 | Q    If they read it religiously, they would have | 15:12:21 |
| 3 | seen the February 26, 2012 article which said that you | 15:12:25 |
| 4 | had not been convicted yet, correct? | 15:12:28 |
| 5 | A    Yeah, and I just testified -- if they read | 15:12:32 |
| 6 | it religiously I would testify that that was | 15:12:38 |
| 7 | another -- that was never -- that made it worse, not | 15:12:40 |
| 8 | made it better. | 15:12:41 |
| 9 | Q    That's your impression. | 15:12:42 |
| 10 | A    Klayman hasn't been convicted yet. | 15:12:43 |
| 11 | Q    Has anyone told you that that yet word made | 15:12:45 |
| 12 | it worse? | 15:12:48 |
| 13 | A    It speaks for itself. | 15:12:48 |
| 14 | Q    Has anyone told you that? | 15:12:50 |
| 15 | A    Possibly.  I don't remember right now. | 15:12:51 |
| 16 | Q    Is there any point where you will -- will | 15:12:53 |
| 17 | remember? | 15:12:55 |
| 18 | A    Maybe.  Maybe I'll remember.  Sometimes I | 15:12:55 |
| 19 | remember things all the time that I don't remember at | 15:12:59 |
| 20 | the time. | 15:13:02 |
| 21 | Q    Do you have any problems with your memory? | 15:13:02 |
| 22 | A    Not generally but, you know, I have a lot of | 15:13:03 |
| 23 | things going on in my head at all times.  You know, | 15:13:06 |
| 24 | I'm a lawyer and I have a number of cases and I'm very | 15:13:09 |
| 25 | high -- you know, I'm going against some very high | 15:13:11 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 115

| | | |
|---|---|---|
| 1 | public figures -- | 15:13:15 |
| 2 | Q   All right. | 15:13:15 |
| 3 | A   -- so my mind's on a lot of things. | 15:13:16 |
| 4 | Q   Are you claiming emotional distress in this | 15:13:18 |
| 5 | case? | 15:13:20 |
| 6 | A   Yes. | 15:13:20 |
| 7 | Q   Have you ever sought counseling at any time | 15:13:21 |
| 8 | in your entire life for mental health issues? | 15:13:22 |
| 9 | A   Not for that.  I've sought marital | 15:13:27 |
| 10 | counseling. | 15:13:30 |
| 11 | Q   All right.  Did you -- have you ever taken | 15:13:30 |
| 12 | any medications for mental or emotional issues? | 15:13:37 |
| 13 | A   I have. | 15:13:40 |
| 14 | Q   What medications have you taken? | 15:13:40 |
| 15 | A   It was during the time that I was being | 15:13:42 |
| 16 | accused of sexually abusing my children I took | 15:13:44 |
| 17 | Cymbalta. | 15:13:47 |
| 18 | Q   What did you take? | 15:13:47 |
| 19 | A   Cymbalta for 2 months. | 15:13:50 |
| 20 | Q   What -- and what is that medication designed | 15:13:54 |
| 21 | to treat? | 15:13:56 |
| 22 | A   It's an antidepressant. | 15:13:56 |
| 23 | Q   All right.  Are you taking any medications | 15:13:58 |
| 24 | presently? | 15:13:59 |
| 25 | A   No. | 15:14:00 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 116

```
 1        Q     Did you have to take any medications as a          15:14:00

 2     result of Orly Taitz's article?                            15:14:03

 3        A     I don't have to do anything.                       15:14:04

 4        Q     Did you take any --                                15:14:04

 5        A     Well, look, after -- after taking it for 2         15:14:06

 6     months -- it was handed to me.  You know, doctors give     15:14:08

 7     this stuff out like candy.  You know, it's -- it's         15:14:10

 8     very bad stuff, and I stopped taking it and I wouldn't     15:14:12

 9     take it under any circumstance ever again.                 15:14:15

10        Q     When -- okay.  So let me ask the question          15:14:17

11     again.  Do you believe that you took any medications       15:14:19

12     for mental or emotional issues after the Orly Taitz        15:14:23

13     article because of the Orly Taitz article?                 15:14:28

14        A     I've had a couple glasses of wine from time       15:14:34

15     to time.                                                   15:14:37

16        Q     How about any medication, Mr. Klayman?            15:14:37

17        A     No, I didn't -- at that point in time?  No,       15:14:39

18     I wasn't taking -- I wouldn't ever touch that stuff        15:14:41

19     again.                                                     15:14:44

20        Q     So when did --                                    15:14:44

21        A     You become like a lion at Lion Country            15:14:45

22     Safari.                                                    15:14:48

23        Q     When did -- when did the article come out         15:14:50

24     about you sexually molesting your children -- or when      15:14:51

25     did that dispute arise?                                    15:14:55
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 117

| | | |
|---|---|---|
| 1 | A    Well, those are two questions.  That's | 15:14:56 |
| 2 | compound. | 15:14:58 |
| 3 | Q    I'm sorry? | 15:14:59 |
| 4 | A    That's a compound question. | 15:14:59 |
| 5 | Q    All right.  When -- when were you first | 15:15:01 |
| 6 | accused of sexually molesting your children? | 15:15:03 |
| 7 | A    I don't recollect the exact date.  It was | 15:15:07 |
| 8 | probably back in around 2007. | 15:15:10 |
| 9 | Q    Okay.  Is that when you had to take the | 15:15:12 |
| 10 | medication? | 15:15:14 |
| 11 | A    It was around that time. | 15:15:14 |
| 12 | Q    All right.  And ultimately -- | 15:15:16 |
| 13 | A    I didn't have to take anything. | 15:15:19 |
| 14 | Q    Well, you took it? | 15:15:20 |
| 15 | A    I took it and I decided that it was not a | 15:15:21 |
| 16 | good idea, and I stopped taking it. | 15:15:23 |
| 17 | Q    All right.  Going back to the Orly Taitz | 15:15:25 |
| 18 | article, as a result of the Orly Taitz article, did | 15:15:29 |
| 19 | you seek any medical attention? | 15:15:31 |
| 20 | A    No. | 15:15:35 |
| 21 | Q    Did you seek any professional help | 15:15:35 |
| 22 | whatsoever from any -- any type of medical or mental | 15:15:37 |
| 23 | health professional? | 15:15:40 |
| 24 | A    No, but it was -- because if -- if it's | 15:15:41 |
| 25 | compounded with everything else that is going on, | 15:15:45 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 118

```
 1    okay, and -- and Judicial Watch's constant efforts to        15:15:48
 2    harm me, you know, that's -- this is an emotional            15:15:53
 3    thing.  I want you to understand something.  Paul            15:15:55
 4    Orfanedes started with me 2 years out of law school,        15:15:59
 5    okay, he was with me for 11 years, by his own               15:16:02
 6    testimony.  Tom Fitton was with me for a period of          15:16:05
 7    time, and I trusted him.  And Chris Farrell, I hired        15:16:10
 8    him too, okay.                                              15:16:15
 9         So when people that you trust and that you             15:16:16
10    cared about betray you and try to hurt you, and in         15:16:19
11    conjunction with making false statements that aren't       15:16:26
12    true and putting up Ruffley to do it, that hurts, and      15:16:31
13    that creates an emotional distress.  And so that's         15:16:34
14    what I mean by emotional distress, and the statement       15:16:36
15    is so outrageous that it does affect you in your daily     15:16:39
16    work and your daily activities.  It's quite                15:16:42
17    disturbing.  That doesn't mean you have to go see a        15:16:46
18    doctor about it.                                           15:16:49
19      Q    Did you continue on with your normal               15:16:49
20    activities?                                                15:16:51
21      A    I tried to.  I mean, it does impair your           15:16:51
22    normal activities.  It also takes time away from what     15:16:53
23    you're trying to do.  I wish that I wasn't here right     15:16:56
24    now.  I wish I that could keep my time focused and my     15:17:01
25    mind focused on just the cases that I have where I'm      15:17:03
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 119

1   trying to bring about, you know, some change in this        15:17:06

2   country for my clients and for Michael Voeltz.  I          15:17:09

3   mean, it distracted with me from Voeltz.                   15:17:12

4        I had to deal with this with Pamela.  I had          15:17:14

5   to deal with this with -- with George, I had to deal      15:17:17

6   with it with Sam.  I had to deal with it the people       15:17:19

7   around me.  You know, Larry, is this true?  It took up    15:17:22

8   a lot of time, it was very distracting and it was a       15:17:25

9   lot of emotional distress.  Now the jury can determine    15:17:29

10  what that's worth.                                        15:17:31

11       Q    What do you think -- what do you think it's     15:17:32

12  worth?                                                    15:17:33

13       A    I'm going to let the jury determine that.       15:17:33

14       Q    How much money are you out of pocket?           15:17:35

15       A    Well, I'm -- I'm only claiming in terms of      15:17:36

16  monetary damages what I lost with regard to the Voeltz    15:17:38

17  case.                                                     15:17:41

18       Q    And how much is that?                           15:17:41

19       A    Well, I'm out several hundred thousand          15:17:43

20  dollars.                                                  15:17:45

21       Q    How do you know you're out several hundred      15:17:45

22  thousand dollars?                                         15:17:48

23       A    Because if -- if you added it up -- you         15:17:48

24  could -- you could determine how much time I put into     15:17:51

25  this thing by looking at the pleadings, --                15:17:54

LARRY ELLIOT KLAYMAN − 1/29/2014

Page 120

| | | |
|---|---|---|
| 1 | Q     Mm−hmm. | 15:17:54 |
| 2 | A     −− I mean, although I didn't keep time after | 15:17:56 |
| 3 | a certain point, looking at expenses, travel expenses, | 15:17:58 |
| 4 | that kind of thing. | 15:18:00 |
| 5 | Q     But −− but you've not done that, have you? | 15:18:00 |
| 6 | A     I haven't done it because I knew I wasn't | 15:18:02 |
| 7 | being paid. | 15:18:04 |
| 8 | Q     All right.  But you're in −− you're in | 15:18:05 |
| 9 | litigation now and we've asked you for that in | 15:18:06 |
| 10 | discovery, correct, evidence of your damages? | 15:18:08 |
| 11 | A     Yeah, and I −− and I gave you what I have. | 15:18:11 |
| 12 | Q     Okay. | 15:18:11 |
| 13 | A     I gave you what I have.  Now if −− if before | 15:18:13 |
| 14 | trial I −− I do a calculation, I'll give it to you. | 15:18:15 |
| 15 | But what I'm telling you right now is if you look at | 15:18:18 |
| 16 | the pleadings that were filed, okay, you know, there | 15:18:22 |
| 17 | was a lot of work here and there's a lot of money | 15:18:24 |
| 18 | that, you know, I had to eat because of this. | 15:18:26 |
| 19 | Q     Well, just −− | 15:18:26 |
| 20 | A     It hurt me. | 15:18:29 |
| 21 | Q     Just on the record, just so we're clear | 15:18:30 |
| 22 | about this, you're aware that I served written | 15:18:32 |
| 23 | discovery asking you to identify your damages and to | 15:18:34 |
| 24 | produce documents regarding your damages. | 15:18:36 |
| 25 | A     I produced what I had. | 15:18:40 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 121

```
 1      Q    And what you had isn't -- you haven't        15:18:40
 2   produced evidence of hundreds of thousands of dollars 15:18:42
 3   in damages.                                           15:18:44
 4      A    I -- I didn't create documents after a       15:18:45
 5   certain point, as I was telling you, because I wasn't 15:18:47
 6   going to be paid --                                   15:18:50
 7      Q    Okay.                                         15:18:50
 8      A    -- so I didn't.                               15:18:51
 9      Q    All right.  But in answering -- in answering 15:18:51
10   the interrogatories you didn't state an amount of     15:18:52
11   damages?                                              15:18:56
12      A    If -- if you want copies of all the          15:18:57
13   pleadings that I filed in these cases, I'll give them 15:18:58
14   to you.  Do you want them?                            15:19:01
15      Q    It's -- it's your job to establish your      15:19:03
16   damages.                                              15:19:05
17      A    Well, those don't show how much I spent.     15:19:05
18   It's going to be an analysis.  And we're not at the   15:19:07
19   point of having an expert right now that can testify. 15:19:10
20      Q    Did you -- did you know you had to identify  15:19:12
21   experts about 3 or 4 weeks ago?                       15:19:14
22      A    Well, I don't need -- I don't need an        15:19:16
23   expert.  I can have a lay witness do it.              15:19:18
24      Q    All right.  Well, who's your lay witness     15:19:19
25   because --                                            15:19:22
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 122

```
 1      A    Me.                                          15:19:22

 2      Q    All right.  Well, here you are.  Let's hear  15:19:23

 3   about it.                                            15:19:26

 4      A    I'm not going to eat up more money with      15:19:27

 5   that.  I'm telling you that there's a lot of work.  If  15:19:30

 6   you want all the documents I'll copy them off for you.  15:19:30

 7   As a matter of --                                    15:19:32

 8      Q    You had -- you had the opportunity to do it  15:19:32

 9   and discovery closes in a couple of days.            15:19:34

10      A    We can -- we can argue the legality of your  15:19:37

11   discovery and my discovery.  I think we -- it's not --  15:19:39

12   we shouldn't do it here because your discovery was --  15:19:40

13   was deficient in my view.                            15:19:43

14      Q    All right.  Now, do you have a good          15:19:45

15   reputation in general?                               15:19:46

16      A    Yes.                                         15:19:47

17      Q    I just searched for on Google, does Larry    15:19:48

18   Klayman have a good reputation, and one of the first  15:19:54

19   pages I saw -- well, I don't know if it was first, but  15:19:56

20   on the first page for sure, it's on a site called    15:20:02

21   crooks and liars, and the heading is "Crazy Larry    15:20:07

22   Klayman Joins Melee At White House, Demands Obama Put  15:20:09

23   Down Koran, Surrender."                              15:20:15

24           Did you see that article?                    15:20:17

25      A    I may have.  You know, I'm a conservative.   15:20:18
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 123

| | | |
|---|---|---|
| 1 | I take strong positions.  There are people that love | 15:20:20 |
| 2 | me.  There are people that don't love me. | 15:20:22 |
| 3 | Q    There are people that hate you, right? | 15:20:24 |
| 4 | A    Yeah, Judicial Watch hates me. | 15:20:25 |
| 5 | Q    Other people hate you too? | 15:20:27 |
| 6 | A    Yeah.  You'll have to talk to them.  But | 15:20:29 |
| 7 | the -- the reality is I'm on the cutting edge, okay, | 15:20:33 |
| 8 | and I was on the cutting edge when I was at Judicial | 15:20:35 |
| 9 | Watch too, and, you know, if you're going up against a | 15:20:37 |
| 10 | President that people like, they're going to react | 15:20:41 |
| 11 | against you, okay, and so, yeah, when I made a | 15:20:44 |
| 12 | statement that -- metaphorically, I might add, to put | 15:20:47 |
| 13 | the Koran down and come out with your hands out -- up | 15:20:52 |
| 14 | at the time, that's going to rankle some people just | 15:20:58 |
| 15 | like Mike Huckabee's statements a few days ago with | 15:21:00 |
| 16 | regard to women and not depending on the government | 15:21:04 |
| 17 | dole, you know, so -- | 15:21:06 |
| 18 | Q    I guess the point is you -- you know that | 15:21:09 |
| 19 | there are plenty of people out there who have bad | 15:21:10 |
| 20 | opinions of you, correct?  Isn't that correct? | 15:21:14 |
| 21 | A    Well, I'll let the facts speak for -- there | 15:21:16 |
| 22 | are people that don't like me for sure, and there are | 15:21:19 |
| 23 | a lot of people that love me for what I do.  So why | 15:21:22 |
| 24 | don't you look for that too?  That happens to be a | 15:21:24 |
| 25 | left wing web site that spends its time attacking | 15:21:26 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 124

```
 1    conservatives.                                    15:21:31

 2        Q    All right.  And the first page also has a  15:21:32

 3    couple articles about you suing Judicial Watch.   15:21:34

 4    Here's -- I keep losing the stickers.             15:21:38

 5              (Defendant's Deposition Exhibit 23 was  15:21:42

 6    marked for identification and was attached to the 15:21:42

 7    deposition transcript.)                           15:21:43

 8    BY MR. KRESS:                                      15:21:43

 9        Q    I'll show you another article.  It's marked  15:21:43

10    as Defendant's Exhibit 23.  It's on a web site called  15:21:48

11    ConWebWatch.                                       15:21:53

12        A    Yeah, Conservative Watch.                15:21:56

13        Q    The heading is "Larry Klayman, Failed    15:21:58

14    Lawyer," correct?                                  15:22:01

15        A    That's what the heading is.  I think they  15:22:02

16    may want to rewrite that after the NSA victory.   15:22:04

17        Q    Okay.  It references the fact that you sued  15:22:07

18    your own mother, --                               15:22:08

19        A    I'm being a little facetious.            15:22:08

20        Q    -- correct?                               15:22:10

21        A    Yes, I sued my own mother to protect my  15:22:10

22    grandmother who --                                15:22:13

23        Q    All right.                                15:22:14

24        A    Let me finish.  I'm allowed to explain.  15:22:14

25        Q    You can finish.  Yeah.                    15:22:14
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 125

1        A     Who -- my mother had dementia and my       15:22:17

2     stepfather had undue influence over my mother.  He    15:22:20

3     took my grandmother's money, all she had in life,     15:22:25

4     about $80,000, and then had a do-not-resuscitate order  15:22:28

5     put on her chart after she broke her hip that she      15:22:34

6     should just simply die.  So I made efforts to get my   15:22:35

7     grandmother's money back and to get the                15:22:36

8     do-not-resuscitate order off her charts, and because   15:22:40

9     my mother was next of kin I had to name her in a       15:22:42

10    lawsuit, and that's what that's about.                 15:22:45

11          So yeah, the left and others don't like me      15:22:46

12    are going to say that.  That was something that was    15:22:48

13    invented by the Clinton administration, Larry Klayman, 15:22:51

14    the guy who sued his own mother.                       15:22:54

15       Q     Mm-hmm.                                       15:22:57

16       A     But that's not a fair representation of why  15:22:57

17    I stood there for my grandmother.                      15:22:57

18       Q     Okay.  And this article appears to be posted 15:22:58

19    on August 9, 2012, and if you look at the last         15:22:59

20    paragraph on the first page it says, "Not only is      15:23:02

21    Klayman a sue-happy lawyer, he's also been on the      15:23:05

22    defendant end of legal actions as well.  Earlier this  15:23:08

23    year, Klayman was indicted for failure to pay child    15:23:10

24    support.  Needless to say, this descended into a legal 15:23:13

25    morass," et cetera.                                    15:23:20

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 126

```
 1            But here, even after Orly Taitz's web site,        15:23:23

 2    this person is reporting accurately that you were          15:23:25

 3    indicted, correct?                                         15:23:28

 4       A    Well, I don't believe he's reporting              15:23:28

 5    accurately at all because --                               15:23:31

 6       Q    Well, he didn't say you were convicted, did       15:23:32

 7    he?                                                        15:23:34

 8       A    I don't know.  I haven't read the article.        15:23:34

 9       Q    All right.  Well, it's right there in front       15:23:36

10    of you.                                                    15:23:38

11       A    The article speaks for itself.                    15:23:38

12       Q    All right.                                        15:23:38

13       A    There's no reason for this.  These are           15:23:40

14    people who are out there that are vicious, and I would     15:23:42

15    suspect they also attack Judicial Watch because           15:23:45

16    they're conservative, and this is what they do for fun    15:23:47

17    and profit, and -- you know, here's the problem here.     15:23:50

18    Any time you're raising my kids, by Judicial Watch        15:23:52

19    raising the issue of child support, they're also          15:23:56

20    linking it, in effect, to the false allegations that      15:23:59

21    were made that I sexually abused my children.  It's a     15:24:02

22    double-edged sword.  It takes people into that area,      15:24:07

23    and this guy's using that to try to harm my               15:24:11

24    reputation.                                                15:24:14

25       Q    Well --                                           15:24:14
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 127

```
 1        A    I don't think there's anything worse than    15:24:15
 2   being accused unfairly of abusing your own kids.       15:24:17
 3        Q    Well, but you were -- it wasn't Judicial     15:24:21
 4   Watch who accused you of abusing your kids.            15:24:22
 5        A    I don't know that.  We just heard testimony  15:24:23
 6   this morning that Fitton was in contact with my former 15:24:26
 7   wife.                                                  15:24:30
 8        Q    Wouldn't it --                               15:24:30
 9        A    I believe that he and my former wife have    15:24:30
10   been working together to hurt me.                      15:24:33
11        Q    Well, you --                                 15:24:33
12        A    It serves their interest.  Enemy of my enemy 15:24:35
13   is my friend.                                          15:24:38
14        Q    Do you have any evidence that they're        15:24:39
15   working together?                                      15:24:40
16        A    I got it this morning.                       15:24:41
17        Q    That they talked to each other?              15:24:43
18        A    Why would they talk to each other?           15:24:45
19        Q    Well, maybe because a lawyer would call them 15:24:48
20   and say, hey, Larry Klayman owes us a bunch of money,  15:24:49
21   do you have any idea how we could -- what he's doing   15:24:52
22   now?  Wouldn't that be reasonable for a lawyer to do?  15:24:54
23        A    Let me tell you, you wouldn't let -- Fitton  15:24:56
24   didn't want to answer questions, okay, he didn't       15:24:57
25   even -- neither did Orfanedes or Farrell.  You know,   15:24:58
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 128

| | |
|---|---|
| 1 | they decided on their own they weren't going to answer | 15:25:03 |
| 2 | questions that I asked them that were legitimate | 15:25:05 |
| 3 | questions, but the fact is that this has been a | 15:25:08 |
| 4 | constant pattern throughout the last 10 years of using | 15:25:10 |
| 5 | whatever means they could to try to hurt me, keep me | 15:25:13 |
| 6 | down, because they think I'm a competitor, -- | 15:25:16 |
| 7 | Q    Did -- | 15:25:16 |
| 8 | A    -- and they think that somehow they're | 15:25:18 |
| 9 | living in my shadow, okay, and if you look at the | 15:25:21 |
| 10 | totality of it -- | 15:25:24 |
| 11 | Q    That's your opinion, right? | 15:25:26 |
| 12 | A    We'll let -- we'll let the court and the | 15:25:27 |
| 13 | jury decide that. | 15:25:29 |
| 14 | Q    Didn't the magistrate determine -- and I -- | 15:25:29 |
| 15 | you know, and I don't really -- this isn't a topic I | 15:25:33 |
| 16 | necessarily want to talk about, but you brought it up. | 15:25:36 |
| 17 | Didn't the magistrate enter a finding that you had | 15:25:39 |
| 18 | inappropriately touched your children, the magistrate | 15:25:42 |
| 19 | in Ohio, -- | 15:25:46 |
| 20 | A    He also made a -- | 15:25:46 |
| 21 | Q    -- yes or no, did he? | 15:25:47 |
| 22 | A    I don't know the exact wording, but that's | 15:25:49 |
| 23 | generally, correct, and I have a lawsuit against that | 15:25:53 |
| 24 | magistrate. | 15:25:56 |
| 25 | Q    Right. | 15:25:57 |

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 129

```
 1        A    Okay, and I'm not going to let that one go     15:25:57
 2   either, and if you look at the record, and you're free    15:25:59
 3   to do so, in that case -- I mean, it's a 93 page          15:26:02
 4   decision.                                                 15:26:06
 5        Q    This is your complaint anyways.  I've looked    15:26:09
 6   at it.                                                    15:26:11
 7        A    Okay.  He made a number of very provocative     15:26:11
 8   remarks about me.  He doesn't -- obviously didn't like    15:26:15
 9   me.  I am -- for whatever you may think of me, I have     15:26:17
10   some different views in life for someone who's Jewish.    15:26:22
11   I also believe in Jesus Christ.  He didn't seem to        15:26:26
12   like that very much.                                      15:26:31
13        Q    All right.                                      15:26:31
14        A    And there were -- and he's Jewish and he's      15:26:32
15   liberal, and for whatever reason, he did what he did,     15:26:33
16   okay.  But he also made a finding in that -- in that      15:26:37
17   case that I didn't have any sexual gratification from     15:26:42
18   this, which means I didn't sexually abuse my kids.        15:26:45
19   And even my wife's lawyer had to admit that to the        15:26:48
20   court.  So I was not found to have sexually abused my     15:26:51
21   kids, but it's all over the place.                        15:26:55
22        Q    And that's -- okay.  And while you have         15:26:56
23   suspicions, you have no evidence that that allegation     15:26:58
24   of sexual abuse was linked to Judicial Watch?             15:27:01
25        A    It may have been.                               15:27:03
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 130

```
 1       Q    But you have no evidence?                    15:27:04

 2       A    Well, given the pattern the way they were --  15:27:06

 3       Q    Do you have any evidence?                    15:27:06

 4       A    -- messing around with Stephanie Luck and    15:27:08

 5   everybody else, you know.                             15:27:11

 6       Q    Do you have any evidence, and if so where is 15:27:12

 7   it?                                                   15:27:14

 8       A    Well, it's -- it's called a strong           15:27:14

 9   presumption or an inference is that when Mr. Fitton is 15:27:16

10   in communication with my former wife, one has to      15:27:19

11   conclude that they're up to no good.                  15:27:23

12       Q    All right.  So isn't that defamation?        15:27:25

13       A    What?                                        15:27:27

14       Q    You're saying -- you're coming up false      15:27:28

15   conclusions about --                                  15:27:31

16       A    Well, you're asking me in the context of a   15:27:32

17   legal proceeding.  I don't go out there saying that in 15:27:34

18   public.                                               15:27:36

19       Q    All right.                                   15:27:36

20       A    You asked me.                                15:27:37

21       Q    Do you have any evidence, and if so where is 15:27:37

22   it, that Judicial Watch planted any seeds even about  15:27:41

23   you sexually abusing your children?                   15:27:43

24       A    I think that Tom Fitton is capable of        15:27:45

25   anything, --                                          15:27:50
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 131

```
 1      Q    Okay.                                       15:27:50

 2      A    -- and these two guys here, and I'm very    15:27:50

 3  disappointed, and that's why I do get upset, you know,   15:27:52

 4  is that, you know, Paul was with me a very long time    15:27:56

 5  and -- particularly Paul and, you know, he should not   15:27:59

 6  just go along with what Fitton wants to do.  It's not   15:28:04

 7  the right thing to do.  But Fitton has felt            15:28:08

 8  threatened.  He wanted to be a big shot.               15:28:11

 9      Q    Where's your evidence?                       15:28:12

10      A    And somehow he always feels like he's living  15:28:14

11  under my shadow and he wants to hurt me.               15:28:17

12      Q    Where's your evidence that Judicial Watch    15:28:19

13  had anything to do with the allegations, the findings  15:28:20

14  of a court and the findings of a Court of Appeals that  15:28:23

15  you inappropriately touched your children?             15:28:26

16      A    Well, I couldn't -- he wouldn't answer any   15:28:28

17  questions.                                             15:28:30

18      Q    So you don't have any evidence?              15:28:30

19      A    I have a -- a --                              15:28:31

20      Q    You have a suspicion?                        15:28:32

21      A    I have a suspicion.                           15:28:33

22      Q    Okay, let's leave it at that.  But the Court  15:28:34

23  of Appeals did affirm the decision which found that    15:28:37

24  you had sexually or inappropriately touched your       15:28:39

25  children, correct?                                     15:28:43
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 132

```
 1      A    They did, and I'm still pursuing this       15:28:43

 2    matter, okay.                                       15:28:46

 3      Q    Okay.  So someone --                         15:28:46

 4      A    And there's -- there's new evidence out      15:28:47

 5    there right now that suggests -- or at least I'm going  15:28:50

 6    to use to have that judgment vacated.                15:28:52

 7      Q    You're going to try?                          15:28:54

 8      A    Yeah.                                          15:28:56

 9      Q    Not necessarily going to win though, right?  15:28:56

10      A    Hey, I'm in the process.                      15:28:58

11      Q    Okay.                                         15:28:58

12      A    In the legal system, who knows.               15:29:01

13      Q    Who knows.  But you did sue --                15:29:03

14      A    I'm confident.                                15:29:03

15      Q    You did sue that magistrate who entered that 15:29:05

16    finding, correct?                                    15:29:07

17      A    I did.                                         15:29:09

18      Q    And you sued him in Florida, didn't you?      15:29:09

19      A    I did.                                         15:29:11

20      Q    Why did you sue him in Florida?               15:29:12

21      A    Because that's where I reside.                15:29:13

22      Q    Was the case dismissed in Florida?            15:29:14

23      A    It was dismissed a couple days ago, and it    15:29:16

24    was a magistrate's R&R.  I'm going to challenge that 15:29:20

25    with the judge.                                      15:29:23
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 133

| | | |
|---|---|---|
| 1 | Q    And they dismissed it for lack of | 15:29:24 |
| 2 | jurisdiction? | 15:29:26 |
| 3 | A    I don't know.  I haven't read it yet. | 15:29:26 |
| 4 | Q    Okay. | 15:29:26 |
| 5 | A    I've been preoccupied. | 15:29:29 |
| 6 | Q    All right. | 15:29:29 |
| 7 | A    And I have a right of appeal in that. | 15:29:30 |
| 8 | Q    I'm sorry? | 15:29:32 |
| 9 | A    I have a right of appeal. | 15:29:33 |
| 10 | Q    Okay.  Why did you choose -- | 15:29:34 |
| 11 | A    It's tough to sue a judge, you know that. | 15:29:34 |
| 12 | He wasn't a judge.  He's a magistrate.  Under | 15:29:37 |
| 13 | Cleveland family court he's -- he's not even a | 15:29:40 |
| 14 | judicial officer. | 15:29:44 |
| 15 | Q    Why did you sue Judicial Watch in this case | 15:29:44 |
| 16 | in south Florida? | 15:29:46 |
| 17 | A    Because that's a community that I'm well | 15:29:47 |
| 18 | known.  It's a community where I spend of lot of time. | 15:29:49 |
| 19 | That's a community where I resided.  That's the | 15:29:53 |
| 20 | community where I began my law practice.  I ran for | 15:29:55 |
| 21 | the Senate in Florida. | 15:29:57 |
| 22 | Q    You ran for the Senate in what?  2003 or | 15:29:59 |
| 23 | '04?  2004? | 15:30:04 |
| 24 | A    Between 2003 and 2004. | 15:30:05 |
| 25 | Q    And you ran on the Republican primary ballot | 15:30:08 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 134

| | | | |
|---|---|---|---|
| 1 | | -- in the Republican primary? | 15:30:11 |
| 2 | A | I did. | 15:30:13 |
| 3 | Q | What percentage of the vote did you get? | 15:30:18 |
| 4 | A | I don't know the percentage at the end. | 15:30:19 |
| 5 | | Some people said 1 percent, but within 2 weeks of the | 15:30:21 |
| 6 | | election I was only 6 points behind. | 15:30:25 |
| 7 | Q | Okay, but -- | 15:30:25 |
| 8 | A | Mel Martinez, who was supported by the Bush | 15:30:28 |
| 9 | | campaign -- what happens in an election, is that | 15:30:31 |
| 10 | | everything gets sucked -- the air gets sucked out of a | 15:30:34 |
| 11 | | primary where people break in favor of who's going to | 15:30:37 |
| 12 | | win, and the Bush machine came out there.  But I was | 15:30:41 |
| 13 | | very close within 2 weeks. | 15:30:44 |
| 14 | Q | But in the end you were second to last? | 15:30:46 |
| 15 | A | In -- in the end I didn't win and I didn't | 15:30:48 |
| 16 | | do terribly well. | 15:30:50 |
| 17 | Q | You didn't do -- okay. | 15:30:50 |
| 18 | A | I didn't really have any money -- | 15:30:52 |
| 19 | Q | All right. | 15:30:52 |
| 20 | A | -- and you can buy my book.  It explains it. | 15:30:53 |
| 21 | Q | What's your book called? | 15:30:57 |
| 22 | A | Whores -- | 15:30:59 |
| 23 | Q | Okay. | 15:30:59 |
| 24 | A | -- Why and How I Came to Fight the | 15:31:01 |
| 25 | | Establishment. | 15:31:06 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 135

```
 1       Q    All right.  So you see yourself as a person        15:31:07

 2  who fights the establishment, correct?                       15:31:09

 3       A    I see myself as a person who tries to fight        15:31:11

 4  for justice.                                                 15:31:13

 5       Q    All right.  I'm going to show you what's           15:31:14

 6  been marked as Defendant's Exhibit 24.                       15:31:22

 7            (Defendant's Deposition Exhibit 24 was             15:31:25

 8  marked for identification and was attached to the            15:31:25

 9  deposition transcript.)                                      15:31:26

10  BY MR. KRESS:                                                15:31:26

11       Q    And ask you to look at this and ask me --          15:31:26

12  let me know if you recognize it.                             15:31:30

13       A    Yeah, I recognize it.                              15:31:49

14       Q    What is it?                                        15:31:50

15       A    It's a memorandum opinion with regard to my        15:31:51

16  case against Judicial Watch.                                 15:31:55

17       Q    And this is -- it's a different case pending       15:31:56

18  in the District of Columbia, correct?                        15:31:58

19       A    Right.                                             15:31:59

20       Q    In this case, the -- the judge essentially        15:32:00

21  entered a partial summary judgment in favor of               15:32:01

22  Judicial Watch and against you for $69,358.48?               15:32:05

23       A    That's correct.  That's correct.                   15:32:08

24       Q    All right.  I understand --                        15:32:09

25       A    And I'm still contesting that.  The case is        15:32:12
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 136

| | |
|---|---|
| 1    not over. | 15:32:15 |
| 2         Q    So it's not a final -- | 15:32:15 |
| 3         A    No, and, in fact, you know, I have sought to | 15:32:16 |
| 4    disqualify that judge, Kollar-Kotelly.  I have matters | 15:32:20 |
| 5    up in front of the appellate courts on that, and, you | 15:32:25 |
| 6    know, it's a long story with regard to Kotelly, but | 15:32:29 |
| 7    she's not one of the favorites of the conservative | 15:32:31 |
| 8    community. | 15:32:36 |
| 9         Q    Is this lawsuit here, the case that I'm | 15:32:37 |
| 10    representing, is it just in retaliation for these | 15:32:39 |
| 11    other lawsuits in which Judicial Watch is obtaining | 15:32:42 |
| 12    monetary judgments against you? | 15:32:44 |
| 13         A    I don't understand the question. | 15:32:45 |
| 14         Q    Did you -- did you just file this case, the | 15:32:46 |
| 15    case that I'm defending, to harass Judicial Watch? | 15:32:48 |
| 16         A    No.  But, you know, you're questioning -- | 15:32:52 |
| 17    see, I'm answering questions.  Fitton won't answer | 15:32:55 |
| 18    questions.  This is another case I'm not answering | 15:32:58 |
| 19    questions.  So I don't know how you're asking me | 15:33:01 |
| 20    questions when you're instructing him not to answer | 15:33:07 |
| 21    when I asked him questions. | 15:33:09 |
| 22         Q    There's attorney-client privilege at issue. | 15:33:10 |
| 23         A    But -- no, I didn't.  I was seeking to | 15:33:12 |
| 24    enforce my rights under my severance agreement with | 15:33:13 |
| 25    them, okay, which I have a legitimate right to do, -- | 15:33:16 |

LARRY ELLIOT KLAYMAN − 1/29/2014

Page 137

```
 1       Q    Mm−hmm.                                      15:33:16

 2       A    −− and there are several issues that remain 15:33:20

 3  active in that regard, and −− and this is another     15:33:22

 4  aspect of things, is that if I'm successful           15:33:28

 5  ultimately −− and I'm going to have to go through the 15:33:31

 6  appellate process to straighten things out on this    15:33:33

 7  case thanks to Kotelly, and it's not the only         15:33:36

 8  client −− only case where she has taken action that I 15:33:40

 9  believe was inappropriate that I've been involved     15:33:43

10  with, but if I win, there is a −− it is the law of the 15:33:45

11  case that I can rescind the severance agreement and   15:33:48

12  regain control of Judicial Watch, and that's why      15:33:51

13  they're so −− so frightened.                          15:33:54

14       Q    Well, so far you're losing, though, right?  15:33:55

15       A    I wouldn't say that.  Not until the fat lady 15:33:58

16  sings do you lose, you lose, and there are judges −−  15:34:00

17  that's why we founded Judicial −− I founded Judicial  15:34:04

18  Watch in 1994, is that the judiciary is very uneven in 15:34:06

19  terms of quality, and a lot of the judges are very −− 15:34:11

20  they wear their politics on their sleeve and it hap−  15:34:14

21  −− just so happens that Kotelly's husband was a −− was 15:34:18

22  a lawyer on behalf of the Clinton Administration, and 15:34:20

23  she was appointed by Bill Clinton, and I was a big    15:34:23

24  advocate against Bill Clinton.                        15:34:26

25            And I have reason to believe −− and I made  15:34:29
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 138

```
 1    that allegation and she retaliated against me in part      15:34:30
 2    because of that.  That's -- that's unfortunately a         15:34:34
 3    reality here in Washington that people are very            15:34:40
 4    political, particularly judges.                            15:34:43
 5        Q    You sued Judge Kollar-Kotelly, correct?           15:34:44
 6        A    I did.                                            15:34:47
 7        Q    Is that case still pending or is it               15:34:47
 8    resolved?                                                  15:34:49
 9        A    No, it's -- it's running through the              15:34:50
10    appellate courts.                                          15:34:51
11                 (Defendant's Deposition Exhibit 25 was        15:34:53
12    marked for identification and was attached to the          15:34:53
13    deposition transcript.)                                    15:34:53
14    BY MR. KRESS:                                              15:34:53
15        Q    All right.  I'm going to show you what's          15:34:53
16    been marked as Defendant's Exhibit 25.  It's a             15:34:54
17    decision from United States District Court for the         15:34:57
18    Southern District of New York, --                          15:35:01
19        A    Mm-hmm.                                           15:35:01
20        Q    -- and there's a series of cases that I just      15:35:07
21    want to ask you about.  This -- this court refers to       15:35:11
22    the case of Daly versus Far Eastern Shipping in which      15:35:15
23    the court cited your bizarre behavior.  Do you --          15:35:20
24        A    We'll --                                          15:35:20
25        Q    -- acknowledge that --                            15:35:26
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 139

```
 1      A    We'll let what the court said speak for        15:35:27

 2    itself.  I'm not going to answer questions as to      15:35:29

 3    so-called bizarre behavior.                           15:35:32

 4      Q    Were you cited for bizarre behavior?           15:35:34

 5      A    I don't know.  Show me what I was cited for.   15:35:36

 6      Q    Well, it's -- it's apparently a reported       15:35:38

 7    decision.                                             15:35:41

 8      A    Well, let me -- where are you going?  Tell     15:35:42

 9    me what you want to do and I'll give you a narrative  15:35:44

10    response if you want.                                 15:35:47

11      Q    I'm not -- I'm not looking for a narrative     15:35:47

12    response.                                             15:35:49

13      A    Okay.                                          15:35:49

14      Q    In the next case, which actually Judicial      15:35:49

15    Watch versus Department of Justice, it said that you  15:35:52

16    had abused the discovery process, and the next one    15:35:55

17    also, Alexander versus FBI, again said you abused the 15:36:01

18    discovery process.  Were you found to have abused the 15:36:07

19    discovery processes in those cases?                   15:36:10

20      A    Well, I've been a lawyer for thirty -- going   15:36:12

21    on 38 years -- 37 years, okay, and in the course of 37 15:36:14

22    years I've tangled with judges, yeah.                 15:36:18

23      Q    Have they filed --                             15:36:20

24      A    And that's why I started Judicial Watch, by    15:36:21

25    the way.                                              15:36:23
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 140

```
 1       Q    Have they found that you abused the          15:36:23

 2   discovery process?                                    15:36:25

 3       A    Some have.                                   15:36:26

 4       Q    Okay.                                        15:36:27

 5       A    I might add the one that you're referring to 15:36:27

 6   is a judge that holds me in very high regard,         15:36:30

 7   Alexander versus FBI, Judge Royce C. Lamberth is      15:36:34

 8   accredited for making a lot of the rulings that made  15:36:40

 9   Judicial Watch what it is today.  So --               15:36:43

10       Q    The next --                                  15:36:43

11       A    Let me finish.                               15:36:43

12       Q    Go ahead.                                    15:36:43

13       A    If you want to try to disparage me here, I   15:36:44

14   have a chance to -- to respond.  Is it when you -- you 15:36:48

15   know, when you play hardball, sometimes you have to be 15:36:50

16   prepared to get hit with a pitch, and not all these   15:36:52

17   judges, you know, do things because -- for the right  15:36:56

18   reasons, and that's why I started Judicial Watch.  You 15:36:59

19   know, you can get my book and read it.  So I'm not in  15:37:02

20   any way defensive about it.                           15:37:05

21            Yes, I have locked horns with judges as --   15:37:07

22   as people like Johnny Cochran and Marcia Clark did    15:37:11

23   where they were sanctioned four or five times during  15:37:15

24   the O.J. Simpson case, or it's like playing ice       15:37:18

25   hockey, okay.  Sometimes,you know, you have to high   15:37:22
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 141

```
 1   stick the opponent.  Sometimes you don't mean to do        15:37:24
 2   it, but it happens and you sit in the penalty box for      15:37:26
 3   a while.                                                   15:37:29
 4       Q    So -- so you don't mind fighting with            15:37:29
 5   people?                                                    15:37:32
 6       A    For a cause I will fight for people with a       15:37:32
 7   judge who is being unjust.  I will -- I will take a        15:37:34
 8   strong stand, and I've always done that, and I've put     15:37:36
 9   my head on the train tracks for -- so to speak for        15:37:40
10   clients where I felt judges were abusing them.  The       15:37:42
11   judge that was the catalyst for starting Judicial         15:37:45
12   Watch at the end was Judge William D. Keller in the       15:37:49
13   central district of California, and he was making         15:37:51
14   bigoted remarks about my Taiwanese client, my Jewish      15:37:52
15   importer client, and his retailer who were gay, okay,     15:37:58
16   and, you know, I stood up to that judge.                  15:38:02
17           And that's one of the orders that you're         15:38:05
18   talking about here in this -- in this opinion, and I      15:38:07
19   stood up to him and I didn't back down, and that was      15:38:10
20   the catalyst that caused me to start Judicial Watch.      15:38:14
21   That's what put me over the edge.  You know, to this      15:38:17
22   day in a strange, bizarre way, I thank Judge Keller in    15:38:19
23   a way because this was my calling.                        15:38:24
24       Q    So you -- there's also references here to       15:38:26
25   these cases, --                                           15:38:28
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 142

| | | |
|---|---|---|
| 1 | A    Mm-hmm. | 15:38:28 |
| 2 | Q    -- and we won't go through them all, where | 15:38:29 |
| 3 | courts have cited you, right or wrong -- these are | 15:38:32 |
| 4 | judge's opinions -- | 15:38:35 |
| 5 | A    Right. | 15:38:37 |
| 6 | Q    -- for often highly inappropriate behavior, | 15:38:38 |
| 7 | bizarre behavior, undignified conduct, frivolous | 15:38:42 |
| 8 | conduct, so right or wrong, judges have issued these | 15:38:46 |
| 9 | opinions about you? | 15:38:49 |
| 10 | A    Let me say this -- this is a judge here | 15:38:50 |
| 11 | Deborah Batts.  She's characterizing what these cases | 15:38:53 |
| 12 | say.  Deborah Batts was an appointee of either Bill | 15:38:56 |
| 13 | Clinton or Barack Obama, I don't remember, okay. | 15:38:59 |
| 14 | She's a Democrat appointee.  Democrats have perceived | 15:39:02 |
| 15 | me as going against them sometimes.  People tend to -- | 15:39:06 |
| 16 | to believe that conservatives are homophobic, okay. | 15:39:13 |
| 17 | Deborah Batts is a transgender | 15:39:20 |
| 18 | African-American woman first appointed to the bench, | 15:39:24 |
| 19 | and she obviously didn't like me very much, and | 15:39:28 |
| 20 | perhaps she assumed, because I'm a conservative, that | 15:39:30 |
| 21 | somehow, you know, whatever. | 15:39:33 |
| 22 | Q    Okay.  And I -- I understand you may have | 15:39:37 |
| 23 | justifications for these things, but the court said | 15:39:41 |
| 24 | those things about you, right? | 15:39:45 |
| 25 | A    They speak for themselves. | 15:39:46 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 143

```
 1      Q    All right.                                    15:39:48

 2      A    And -- and I wear them -- I obviously never   15:39:49

 3  want that to happen, but I wear it as a badge of honor  15:39:53

 4  because I'm someone who will stand up for what I       15:39:56

 5  believe even, and I won't back down even to a judge    15:39:59

 6  that is behaving unreasonably.  And I will stand up to  15:39:59

 7  them, and some don't like that.  And I stood up to     15:40:05

 8  Kotelly.                                               15:40:09

 9      Q    Okay.  What -- what's the status of that      15:40:10

10  case with Kotelly?  Where is it?                       15:40:11

11      A    There's a petition for rehearing pending      15:40:13

12  before the D.C. Circuit, and if I'm not successful I   15:40:15

13  will file a petition for writ with the Supreme Court.  15:40:19

14      Q    So there's been a Court of Appeals decision   15:40:21

15  adverse to you, correct?                               15:40:25

16      A    Thus far.                                     15:40:26

17      Q    Thus far, and you're still fighting it?       15:40:26

18      A    And judges tend to protect other judges.      15:40:28

19  And that's a reality that you deal with.  It's true in 15:40:32

20  the Loeb case too.  They tend to protect themselves.   15:40:34

21  They circle the wagons.                                15:40:37

22      Q    All right.  I want to show you --             15:40:37

23      A    That's why I started Judicial Watch.          15:40:42

24           (Defendant's Deposition Exhibit 26 was        15:40:43

25  marked for identification and was attached to the      15:40:43
```

Merrill Corporation - New York

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 144

```
 1    deposition transcript.)                              15:40:43

 2    BY MR. KRESS:                                         15:40:43

 3        Q    I want to show you your answers to          15:40:43

 4    interrogatories which are marked as Defendant's      15:40:46

 5    Exhibit 26.                                           15:40:46

 6        A    Okay.                                        15:40:46

 7        Q    When I asked you to identify the names of   15:40:48

 8    the people -- in Interrogatory No. 1 which is at the 15:40:50

 9    bottom of page 2, when I asked you to identify the   15:40:52

10    names and information of people known to have        15:40:55

11    information about the case, --                        15:40:59

12        A    Mm-hmm.                                      15:40:59

13        Q    -- you identified Orly Taitz, Constance     15:41:01

14    Ruffley, Thomas Fitton, Christopher Farrell, and Paul 15:41:04

15    Orfanedes, correct?                                   15:41:09

16        A    Correct.                                     15:41:09

17        Q    Those are the only people you identified?    15:41:10

18        A    Well, I said discovery will identify others. 15:41:12

19        Q    All right.  And these answers were -- were  15:41:16

20    served January 24th, correct, last -- last Friday?   15:41:18

21        A    Correct.                                     15:41:20

22        Q    Discovery closes 2 days from now, correct?  15:41:20

23        A    It does, but I actually suggested to you    15:41:23

24    that we extend the discovery deadline by agreement.  15:41:25

25        Q    Okay.                                        15:41:28
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 145

```
 1      A    So I wasn't trying to sandbag you in        15:41:29

 2   that, --                                            15:41:33

 3      Q    All right.                                  15:41:33

 4      A    -- okay, and it was your clients who didn't 15:41:33

 5   want to extend it.                                  15:41:35

 6      Q    All right.  Number five asked you --        15:41:36

 7      A    The offer -- the offer's still open, by the 15:41:38

 8   way.                                                15:41:40

 9      Q    Okay.  Number five asks you to state each   15:41:40

10   item of damage you claim, whether it's an affirmative 15:41:43

11   claim or setoff, et cetera, and you objected to that  15:41:46

12   and indicated that you would produce documents, and so 15:41:54

13   far the documents that you've produced to me are      15:42:00

14   limited in number.  They don't show these, you know,  15:42:06

15   hundreds of thousands of dollars that you allegedly   15:42:09

16   put into the Michael Voeltz case, correct?           15:42:11

17      A    Well, that's a compound question.            15:42:16

18      Q    All right.  What -- what evidence have you   15:42:18

19   presented to me of damages so far in terms of         15:42:20

20   documents?                                            15:42:22

21      A    I've presented evidence of --               15:42:26

22   notwithstanding what you've elicited here today from  15:42:28

23   me, I gave you documents relating to the amount of    15:42:31

24   money that I had actually billed with regard to the   15:42:35

25   Voeltz cases.                                         15:42:38
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 146

```
 1      Q    Okay, and I'll --                      15:42:39
 2      A    Okay.                                   15:42:41
 3      Q    And that was cut off at about $18,000,  15:42:42
 4  correct?                                         15:42:46
 5      A    No.  There was additional 16 or so that was  15:42:46
 6  billed on top of that.  You have the statement.  15:42:49
 7      Q    Okay.  All right.  Let me mark it then.  15:42:51
 8              (Defendant's Deposition Exhibit 27 was  15:42:53
 9  marked for identification and was attached to the  15:42:53
10  deposition transcript.)                          15:42:59
11  BY MR. KRESS:                                    15:42:59
12      Q    Showing you what's been marked as       15:43:02
13  Defendant's Exhibit 27 --                        15:43:03
14      A    Right.                                  15:43:05
15      Q    -- is this the statement you're referring  15:43:05
16  to?                                              15:43:07
17      A    As of July 23rd, 2012 there was an      15:43:07
18  additional $16,084.55 above and beyond what would have  15:43:10
19  been -- above and beyond what they paid me, --   15:43:14
20      Q    Okay.  So they --                       15:43:14
21      A    -- and I never got this.                15:43:17
22      Q    Okay.  So you billed them a certain amount.  15:43:18
23  You can't tell me exactly what that is -- or wait.  15:43:20
24  Let's -- let's break it down a little bit because I  15:43:24
25  think we can clarify it more.                    15:43:27
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 147

```
 1                    (Defendant's Deposition Exhibit 28 was      15:43:28

 2     marked for identification and was attached to the        15:43:28

 3     deposition transcript.)                                  15:43:29

 4     BY MR. KRESS:                                            15:43:29

 5          Q    It looks like Defendant's Exhibit 28 is a      15:43:29

 6     document that you sent which I think shows the amount    15:43:32

 7     that was paid, correct?  It looks like, we have          15:43:36

 8     already paid at least 9,000, 5,000 was sent via --       15:43:40

 9          A    As of that date.  That's what was             15:43:45

10     apparently --                                            15:43:47

11          Q    As of May 7th?                                 15:43:47

12          A    That's what George Miller claims was paid as   15:43:48

13     of that date.                                            15:43:51

14          Q    Did they -- did they pay more after that and   15:43:52

15     before what's reflected in Defendant's Exhibit 27?       15:43:54

16          A    I believe they did.                            15:43:58

17          Q    Okay.  And then you sent the bill, which is    15:43:59

18     reflected in Exhibit 27, which is for how much?          15:44:03

19          A    $16,084.55.                                    15:44:07

20          Q    Have you presented me any other evidence, in   15:44:10

21     terms of documents, of the monetary losses that you      15:44:12

22     claim?                                                   15:44:18

23          A    No.  These are the documents.                  15:44:18

24          Q    Okay.                                          15:44:19

25          A    In terms of the documents.  What I'm telling   15:44:25
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 148

```
 1    you is is that I put in a lot more time than that.        15:44:27

 2         Q    Can I see this just for one second?             15:44:30

 3         A    But I don't have documentation on that --       15:44:33

 4         Q    All right.                                      15:44:33

 5         A    -- time and expense.                            15:44:36

 6         Q    And the billing statement was actually for      15:44:37

 7    the Klayman Law Firm, correct?                            15:44:39

 8         A    Well, that's me.  It's attorney at law in       15:44:40

 9    effect for me.                                            15:44:42

10         Q    And its address is listed as 2020               15:44:43

11    Pennsylvania Avenue, Northwest, suite 345 in              15:44:46

12    Washington, D.C., correct?                                15:44:49

13         A    That's what I use as the mail drop address      15:44:50

14    here.                                                     15:44:52

15         Q    Is the Klayman Law Firm a Washington, D.C.      15:44:52

16    law firm?                                                 15:44:55

17         A    No.  It's -- that's just a proprietorship.      15:44:56

18         Q    Is it -- is it registered as a name             15:45:00

19    anywhere?                                                 15:45:02

20         A    Well, I mean, Klayman is a trademark at this    15:45:03

21    point of sorts.  It's a tradename, I'm --                 15:45:06

22         Q    All right.                                      15:45:06

23         A    But it's not incorporated, no.                  15:45:08

24         Q    Is there any legal entity known as Klayman      15:45:09

25    Law Firm?                                                 15:45:13
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 149

| | | | |
|---|---|---|---|
| 1 | A | No.  It's a d/b/a. | 15:45:13 |
| 2 | Q | It's a d/b/a? | 15:45:15 |
| 3 | A | Yeah. | 15:45:16 |
| 4 | Q | All right. | 15:45:16 |
| 5 | | MR. KRESS:  Let's take a break for a few | 15:45:39 |
| 6 | minutes so I can collect my thoughts. | | 15:45:41 |
| 7 | | THE VIDEOGRAPHER:  Going off the record. | 15:45:43 |
| 8 | The time is 3:45 p.m. | | 15:45:44 |
| 9 | | (Recess.) | 15:45:46 |
| 10 | | THE VIDEOGRAPHER:  Back on the record.  The | 15:57:52 |
| 11 | time is 3:57 p.m. | | 15:57:53 |
| 12 | BY MR. KRESS: | | 15:57:55 |
| 13 | Q | Mr. Klayman, who else have you sued for | 15:57:56 |
| 14 | damages to your reputation?  You sued Magistrate Loeb, | | 15:57:58 |
| 15 | correct? | | 15:58:04 |
| 16 | A | Who? | 15:58:05 |
| 17 | Q | Magistrate Loeb? | 15:58:06 |
| 18 | A | I'm -- this -- we're now at 3 hours.  I'm | 15:58:09 |
| 19 | terminating the deposition. | | 15:58:12 |
| 20 | Q | And I'm not agreeing to termination of the | 15:58:13 |
| 21 | deposition? | | 15:58:15 |
| 22 | A | I am, okay.  So the deposition's over. | 15:58:15 |
| 23 | Q | We had -- we had discussed -- | 15:58:17 |
| 24 | A | That was -- that was our agreement, okay. | 15:58:20 |
| 25 | Q | We had a -- | 15:58:22 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 150

| | |
|---|---|
| 1    A    Now, you took up a lot of time with a lot of | 15:58:22 |
| 2  needless questions that the -- pursuant to our | 15:58:25 |
| 3  agreement, the deposition is terminated as of now. | 15:58:28 |
| 4  That's my position.  Okay. | 15:58:31 |
| 5        MR. KRESS:  I'm not -- I am not agreeing to | 15:58:33 |
| 6  it, that's it. | 15:58:34 |
| 7        MR. KLAYMAN:  That's it.  It's 4 o'clock. | 15:58:36 |
| 8        THE VIDEOGRAPHER:  Your microphone, sir. | 15:58:39 |
| 9        MR. KLAYMAN:  It's 4 o'clock.  Going off the | 15:58:44 |
| 10  record. | 15:58:45 |
| 11        THE VIDEOGRAPHER:  I need to have both | 15:58:49 |
| 12  counsel agree. | 15:58:51 |
| 13        MR. KRESS:  I don't -- I -- well, I don't | 15:58:51 |
| 14  agree to the termination of the deposition. | 15:58:54 |
| 15        MR. KLAYMAN:  Well, that was our agreement. | 15:58:55 |
| 16  I've got it in writing. | 15:58:57 |
| 17        MR. KRESS:  We exchanged e-mails about that | 15:58:58 |
| 18  in general.  We had -- | 15:59:00 |
| 19        MR. KLAYMAN:  I was -- | 15:59:00 |
| 20        MR. KRESS:  Well, let me finish -- | 15:59:02 |
| 21        MR. KLAYMAN:  Off the record.  I'll make -- | 15:59:03 |
| 22  I'll make an objection on the record.  We had an | 15:59:05 |
| 23  agreement between us, and that was the agreement, | 15:59:07 |
| 24  okay.  I didn't even take 3 hours when I, you know, | 15:59:11 |
| 25  did Mr. Fitton and the others, okay, so you have to | 15:59:14 |

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 151

```
 1    live by your agreement so that it's terminated.        15:59:15

 2            MR. KRESS:  Are we still on the record?         15:59:17

 3            THE VIDEOGRAPHER:  Yes.                          15:59:19

 4            MR. KLAYMAN:  Yeah, and that's my position,      15:59:20

 5    and you want to put anything on the record, that's      15:59:22

 6    fine, but that's my position.                           15:59:23

 7            MR. KRESS:  And my -- Mr. Klayman, I know we     15:59:25

 8    discussed this.  I allowed you pretty wide latitude in  15:59:27

 9    questioning the Judicial Watch representatives.  We     15:59:31

10    also discussed the scope, and I think you went far      15:59:33

11    beyond the scope.                                        15:59:36

12            MR. KLAYMAN:  You didn't -- you didn't give     15:59:37

13    me any latitude at all.  Most of their questions        15:59:38

14    either they had no memory or they decided not to        15:59:41

15    answer questions.  So we can litigate all these         15:59:43

16    issues, but, as far as I'm concerned, it's over right   15:59:46

17    now.  We have an agreement.  It's 4 o'clock.  We        15:59:48

18    started at 1:00.                                         15:59:50

19            MR. KRESS:  We had breaks, some that you        15:59:51

20    requested.  You gave me a lot of long-winded answers.   15:59:53

21            MR. KLAYMAN:  I gave you what you asked for,    15:59:56

22    okay.  This is my position, period.  We're off the      15:59:58

23    record right now.                                        16:00:00

24            MR. KRESS:  And I do not agree.  We're          16:00:03

25    apparently -- I'll just state my objection to your      16:00:05
```

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 152

```
 1    terminating the deposition.  While I did have          16:00:08
 2    communications with Mr. Klayman about limiting the     16:00:12
 3    time of the deposition, I think that we've had a       16:00:14
 4    number of breaks.  We've had some that have been       16:00:17
 5    related to Mr. Klayman's request for breaks.  Oh, and  16:00:19
 6    we need the exhibits too before you leave.             16:00:25
 7           MR. KLAYMAN:  Okay.                             16:00:29
 8           MR. KRESS:  So I -- I do object.  I -- I        16:00:30
 9    believe that we should be granted more time to take    16:00:34
10    deposition testimony from you, and I'm --              16:00:37
11           MR. KLAYMAN:  This is our respective            16:00:43
12    positions.  I mean, I have issues with regard to not   16:00:45
13    answering questions, making unilateral decisions to    16:00:47
14    your clients that are not going to answer questions    16:00:50
15    that are relevant.  I have problems with your clients  16:00:52
16    spewing all over the record what they claim are bar    16:00:54
17    proceedings, which is a violation of bar rules.  I     16:00:57
18    didn't do that.  So there are a lot of issues out      16:00:59
19    there, and this is one of the issues, that we had an   16:01:01
20    agreement.  It's in writing.                           16:01:05
21           Deposition's terminated.                        16:01:07
22           MR. KRESS:  We're off the record.  We've        16:01:08
23    both stated our positions.                             16:01:10
24           THE VIDEOGRAPHER:  Here marks the end of        16:01:11
25    Volume 1, Tape No. 2 in the deposition of Larry        16:01:14
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 153

```
 1    Klayman.  Going off the record.  The time is 4:01 p.m.      16:01:17

 2                    (Signature having not been discussed,       16:01:20

 3    the deposition of Larry Elliot Klayman, Esquire was         16:01:20

 4    concluded at 4:01 p.m.)                                     16:03:57

 5                    (The following Acknowledgement of

 6    Deponent Page is included in the event at the

 7    WITNESS elects to read and sign his deposition

 8    transcript.)

 9                   ACKNOWLEDGMENT OF DEPONENT

10       I, _____, do hereby acknowledge

11    that I have read and examined the foregoing

12    testimony, and the same is a true, correct and

13    complete transcription of the testimony given by me,

14    and any corrections appear on the attached Errata

15    sheet signed by me.

16

17    _____       _____

18       (DATE)                      (SIGNATURE)

19

20

21

22

23

24

25
```

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 154

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2            I, Joan V. Cain, Court Reporter, the officer

 3    before whom the foregoing deposition was taken, do

 4    hereby certify that the foregoing transcript is a true

 5    and correct record of the testimony given; that said

 6    testimony was taken by me stenographically and

 7    thereafter reduced to typewriting under my direction

 8    and that I am neither counsel for, related to, nor

 9    employed by any of the parties to this case and have

10    no interest, financial or otherwise, in its outcome.

11            IN WITNESS WHEREOF, I have hereunto set my

12    hand and affixed my notarial seal this 7th day of

13    February 2014.

14

15    My commission expires:

16    June 14, 2014

17    _____

18    NOTARY PUBLIC IN AND FOR THE

19    DISTRICT OF COLUMBIA

20

21

22

23

24

25
```

LARRY ELLIOT KLAYMAN - 1/29/2014

**A**

**abandon**
108:22,22 110:21
111:6
**abandoned**
110:24
**abandons**
110:10
**able**
68:19 95:21 105:4
**absurd**
29:11
**abuse**
129:18,24
**abused**
126:21 129:20 139:16
139:17,18 140:1
**abusing**
115:16 127:2,4 130:23
141:10
**acceded**
112:18
**accepted**
58:6
**access**
48:2 51:17,18,20
**accredited**
140:8
**accurate**
35:4,13,21 36:4 44:18
96:17,20,21
**accurately**
126:2,5
**accused**
115:16 117:6 127:2,4
**accusing**
53:4
**acknowledge**
40:11 138:25 153:10
**Acknowledgement**
153:5
**ACKNOWLEDGM...**
153:9
**action**
73:6 104:18,21 137:8

**actions**
28:18 71:2 125:22
**active**
35:7 84:5 137:3
**activist**
9:12,13 70:11 84:4
**activities**
118:16,20,22
**actu**
64:14
**actual**
75:7 111:18
**ad**
42:11
**add**
35:5 39:5 67:21 69:16
71:18 74:19,21
123:12 140:5
**added**
119:23
**addition**
25:23 105:7 108:8
**additional**
146:5,18
**address**
54:6 100:14 101:8
148:10,13
**addressing**
104:7
**administration**
125:13 137:22
**administrator**
16:8 54:4 75:6
**admission**
66:10
**admit**
129:19
**admitted**
21:17,23 22:2
**adverse**
143:15
**advertisement**
20:14
**advice**
58:24

**advised**
23:23 36:12 40:15
**advisement**
101:17,20,22
**advocate**
137:24
**affair**
19:22 60:1
**affect**
10:17 64:25 118:15
**affidavit**
25:24
**affiliated**
19:11
**affirm**
131:23
**affirmative**
145:10
**affixed**
154:12
**African-American**
142:18
**ages**
31:9 49:23
**ago**
77:20 100:11 121:21
123:15 132:23
**agree**
20:1,6 33:18 36:10,13
48:8 53:9,17 57:9
63:12 66:5 69:24
70:2 79:21 91:5
94:23 95:9 111:3
113:21 150:12,14
151:24
**agreed**
57:8,11 58:2 89:3
106:24
**agreeing**
80:24 149:20 150:5
**agreement**
33:9 106:6,11,19
108:2 136:24 137:11
144:24 149:24 150:3
150:15,23,23 151:1

151:17 152:20
**ahead**
74:20 140:12
**air**
70:8 105:9 134:10
**Akim**
3:22 6:9
**Alexander**
139:17 140:7
**alimony**
46:11
**allegation**
129:23 138:1
**allegations**
126:20 131:13
**alleged**
52:14 57:17 60:3
63:19 76:24 87:24
**allegedly**
82:13 98:20 145:15
**alleging**
56:19
**allowed**
124:24 151:8
**all-around-purpose**
15:22
**altercation**
88:16
**amazing**
75:11 105:10
**Amendment**
52:25 95:3
**American**
108:24
**amount**
24:8 26:10 31:12 33:1
40:22 50:1 85:4
121:10 145:23
146:22 147:6
**amplify**
65:9
**analysis**
121:18
**Angeles**
17:10 31:7 32:4,5,10

32:16 49:20
**animus**
24:23 93:6,22
**answer**
7:12,23 21:12 36:20
38:22 53:23 61:11,12
64:9 95:5 97:7
127:24 128:1 131:16
136:17,20 139:2
151:15 152:14
**answered**
7:24 29:25
**answering**
121:9,9 136:17,18
152:13
**answers**
99:11 144:3,19 151:20
**answer's**
30:8
**antidepressant**
115:22
**anybody**
44:24 52:8 71:5 82:4
110:19
**anymore**
17:20 97:18
**anyways**
7:7 129:5
**apologize**
86:1
**apparent**
72:17 75:7
**apparently**
139:6 147:10 151:25
**appeal**
40:16 42:8 43:9 133:7
133:9
**Appeals**
131:14,23 143:14
**appear**
31:17 36:7 50:17
153:14
**appears**
45:15 48:6 49:6,9 50:5
60:1 85:16,18,20

87:23 88:8 103:15,20
105:24 106:3 113:1
125:18
**appellate**
34:9 136:5 137:6
138:10
**applauded**
54:2
**applied**
33:24
**apply**
33:10 96:9
**appointed**
137:23 142:18
**appointee**
142:12,14
**appreciate**
47:8 93:15
**approached**
22:25 54:3 69:9
**appropriate**
80:19,19
**April**
66:18
**area**
17:13 126:22
**argue**
122:10
**argument**
50:24
**arguments**
59:8
**Arizona**
84:7
**arraigned**
37:1,11 78:25
**arraignment**
31:12 36:2,6,7,12,19
50:1 77:11,19 79:20
**arrest**
45:19,21 46:3 48:9
111:1
**arrested**
45:25 59:5
**article**

10:8 11:9,12,14 18:6
19:2,9,18 20:12,18
23:5 24:20 26:16,19
31:4 35:11 36:11
54:12,20,25 55:4
58:16,16 59:17,19,21
61:20 62:7 68:9 77:9
77:17,19 79:14,18
82:7,9 83:25 88:23
91:15,19,21,22 92:7
92:11,13,21,24 104:1
104:2,19 114:3 116:2
116:13,13,23 117:18
117:18 122:24 124:9
125:18 126:8,11
**articles**
124:3
**article2legal**
76:18
**article2SuperPAC-...**
19:8
**asked**
10:20 12:9 16:17
53:23 64:9,11 88:16
94:6 120:9 128:2
130:20 136:21 144:7
144:9 145:6 151:21
**asking**
12:4 20:14 52:4
101:25 120:23
130:16 136:19
**asks**
145:9
**aspect**
137:4
**associate**
22:4,6
**assume**
7:24 28:12,16 67:17
98:10
**assumed**
142:20
**assuming**
7:5 26:12 28:14
**assumption**

26:18,20 27:6 30:4,6,7
**assumptions**
44:22 80:11
**attached**
4:7 5:2 39:12 41:7
45:7 46:17 47:19
48:23 83:8,9,11
85:13 87:19 88:4
103:11 104:11
105:21 112:22 124:6
135:8 138:12 143:25
146:9 147:2 153:14
**attack**
126:15
**attacked**
84:9 104:2
**attacking**
123:25
**attempt**
80:22
**attempted**
13:9
**attempting**
20:19 78:1 105:13
**attention**
8:15 10:8 117:19
**attorney**
3:5 16:18 17:10 48:3
57:15 68:6 95:23
104:25 148:8
**attorney-client**
136:22
**attributed**
53:16,25
**attrition**
16:14
**audio**
94:12
**August**
31:11 35:20 49:25
125:19
**authority**
75:7
**autographed**
30:21

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 3

**available**
82:24
**Avenue**
3:7 100:12 148:11
**avoid**
13:7,18
**aware**
20:18,20,25 21:3
45:20 62:19 69:14
83:11 120:22

**B**

**B**
4:6 5:1
**back**
42:13 49:12 53:12,22
55:21 62:2 66:17
67:22 71:23 72:1
73:21 99:4 117:8,17
125:7 141:19 143:5
149:10
**backed**
71:19
**background**
8:5
**bad**
17:15 91:13 116:8
123:19
**badge**
143:3
**ballot**
133:25
**bar**
56:13,14,24 58:12
112:12,14 152:16,17
**Barack**
64:20 142:13
**Barnett**
8:24 9:5 19:11 20:21
27:20 82:15 85:17,21
88:9,21 89:7,18
92:14 103:19
**based**
30:12 42:17 63:6,11
80:13,14

**basically**
16:15 70:20 74:14
86:6 100:19
**basis**
58:24
**basket**
58:25
**Bates**
61:7 62:7
**Batts**
5:13 142:11,12,17
**Beach**
3:17 100:13
**beans**
68:3
**bears**
87:1
**bed**
60:12
**began**
133:20
**beginning**
36:11 99:5
**begins**
6:2
**behalf**
3:3,12 6:19 25:24
28:14,16 59:8 65:16
74:17 78:10 84:18
137:22
**behaving**
143:6
**behavior**
138:23 139:3,4 142:6
142:7
**belief**
60:19 65:4
**believe**
11:16 13:11 18:14
27:16 46:24,25 52:25
60:18 78:9 84:7,25
86:11,13,15,16 89:21
90:9,25 103:18 108:7
116:11 126:4 127:9
129:11 137:9,25

142:16 143:5 147:16
152:9
**believed**
86:9
**Belize**
59:13
**bench**
142:18
**best**
74:13
**betray**
118:10
**better**
19:4 21:20 45:5,5
97:23 114:8
**beyond**
146:18,19 151:11
**big**
64:23,24 131:8 137:23
**bigger**
60:2,3
**bigoted**
141:14
**bill**
105:14 106:17 108:3
137:23,24 142:12
147:17
**billed**
106:25 107:20 145:24
146:6,22
**billing**
5:17 108:13 148:6
**bills**
104:22
**birth**
65:5
**birther**
22:22,22,24 54:11
69:8,10,11,15,16,20
69:25 70:1
**birthers**
91:12 113:20
**bit**
22:16 55:14 146:24
**bizarre**

138:23 139:3,4 141:22
142:7
**black**
68:3
**blame**
74:22
**Bloodless**
63:24 64:7
**bold**
19:24
**bono**
110:5
**book**
29:8 30:13,14,15,17
30:23,25 31:2 134:20
134:21 140:19
**born**
65:13
**bottom**
103:20 107:25 144:9
**box**
100:19 141:2
**break**
8:3,4 61:9,23 93:16
98:23 134:11 146:24
149:5
**breaks**
151:19 152:4,5
**bring**
91:21 119:1
**Britain**
53:7
**broke**
125:5
**brought**
8:15 10:7 69:6 88:17
91:19,22,23 128:16
**bunch**
127:20
**burden**
83:6
**Bush**
86:21 102:4 134:8,12
**business**
29:15

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 4

**buy**
134:20

---

**C**

**C**
3:1 4:1 5:1 6:1 140:7
**Cain**
1:25 2:10 6:19 154:2
**calculation**
120:14
**California**
9:1,7 14:17 18:14
20:16 21:7,9,14,18
21:24 22:8 23:24
31:7 32:5,6,13,16
49:21 60:23 76:22
99:23 102:19,21
141:13
**call**
11:2 34:14 42:9,10
91:12 127:19
**called**
9:24 10:11,14 11:7
75:22 78:1 87:9
111:23,24 122:20
124:10 130:8 134:21
**calling**
141:23
**calls**
15:17 38:21
**campaign**
134:9
**candidacy**
64:20
**candidate**
11:15,18
**candidates**
65:12
**candy**
116:7
**capable**
130:24
**capacity**
8:20 24:21 70:3
108:24

**capias**
4:13,16 45:15,16,18
45:19 48:6,9,11
**card**
54:3
**care**
42:21,24 59:15 67:24
98:2
**cared**
118:10
**career**
22:18 60:23
**carefully**
80:7
**cars**
105:9
**case**
1:5 6:6 21:5,6,8 22:5
33:7,11 37:24,24
54:21 56:20 57:18
58:25 62:9 65:20
67:7 71:24 80:16
83:18 93:5 105:3
106:15 108:8 109:1
109:17 110:9,13
115:5 119:17 129:3
129:17 132:22
133:15 135:16,17,20
135:25 136:9,14,15
136:18 137:7,8,11
138:7,22 139:14
140:24 143:10,20
144:11 145:16 154:9
**cases**
20:16 22:22,25 27:15
54:11 60:25 65:18,19
69:8,10,12,15,17,18
69:20,25 70:1 71:17
71:18 76:21 108:9,13
114:24 118:25
121:13 138:20
139:19 141:25
142:11 145:25
**catalyst**
141:11,20

**cause**
89:14 105:7 141:6
**caused**
141:20
**CC**
85:21
**CCI**
18:12
**CCIR**
18:12,13 19:7
**central**
141:13
**certain**
120:3 121:5 146:22
**certainly**
22:21 39:5 44:13 51:5
75:9
**certificate**
65:6 154:1
**certify**
154:4
**cesspool**
98:18
**cetera**
125:25 145:11
**Chain**
5:9,18
**chairman**
29:4
**challenge**
19:13 42:7 64:19,20
75:24 132:24
**chance**
30:24 140:14
**change**
33:1 119:1
**changed**
100:6
**changing**
89:24
**characterizing**
142:11
**chart**
125:5
**charts**

**125:8**
**check**
87:8,10
**checked**
44:17
**child**
20:1 24:8,12 26:10
33:16,16 35:23 37:25
40:4,13 41:16,22,25
43:7 44:5 46:9,10,13
47:3,13 51:5 52:17
52:20,23 55:7 65:24
65:24 66:5,11 67:25
77:8 91:16 92:9,15
92:22 93:1 95:24
96:13 97:4,11 125:23
126:19
**children**
31:9 33:2,4,12 35:25
47:14 49:22 115:16
116:24 117:6 126:21
128:18 130:23
131:15,25
**choice**
42:14,16
**choose**
133:10
**chose**
111:8 112:7
**Chris**
118:7
**Christ**
129:11
**Christopher**
144:14
**circle**
143:21
**circles**
38:25
**Circuit**
143:12
**circumstance**
94:22 116:9
**circumstances**
33:17 57:13,15

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 5

cited
138:23 139:4,5 142:3
citizen
103:4
citizens
65:14 100:7,8
civil
40:20 41:19 95:25
claim
87:7,7 145:10,11
147:22 152:16
claimed
102:4
claiming
20:15 95:16 101:2
103:25 115:4 119:15
claims
25:25 147:12
Clarification
76:17
clarify
36:24 62:4 89:18
97:14 146:25
Clark
140:22
clear
7:9 37:21 62:10 79:10
88:18 120:21
clearly
94:1
Cleveland
42:6,9 43:17 44:1 48:1
48:4 98:12,15,17,19
133:13
clever
80:6,6
client
27:15 59:2 84:12
110:11,21 111:4
112:10 137:8 141:14
141:15
clients
65:8,19 74:12 103:24
105:7 119:2 141:10
145:4 152:14,15

Clinton
125:13 137:22,23,24
142:13
close
15:23 79:12 109:1
134:13
closely
85:19
closes
122:9 144:22
close-knit
113:22
CNN
70:8,9
Coalition
18:14
Coast
14:6 15:4
Cochran
140:22
coin
52:6
collect
149:6
collection
68:5 113:1
Collins
100:12
Columbia
2:12 135:18 154:19
combination
103:18
come
11:17 13:15 14:10
26:14 30:12 67:6,8
81:15 116:23 123:13
coming
19:17 130:14
comment
36:24 37:1 53:21 56:4
69:6 76:24 89:9
109:19
comments
31:16 53:16 63:17,18
63:22,25 64:3,4,13

64:15
commission
154:15
committed
104:24
Common
40:2
commotion
93:15
communi
12:16
communicate
69:1
communication
130:10
communications
12:2 152:2
community
60:16,20,22 133:17,18
133:19,20 136:8
compensate
105:5
competence
38:4
competition
23:19
competitive
29:12 69:1
competitiveness
29:7
competitor
28:24 69:24 70:1,4,5
70:10,18 128:6
complaint
56:13,14,23,24 58:13
58:14 83:9,12 129:5
complete
153:13
composite
106:3
compound
36:20 117:2,4 145:17
compounded
117:25
concept

108:23
concern
19:14 24:22 69:17
concerned
10:16 23:19 24:6
113:19 151:16
concerning
8:21
conclude
28:22 130:11
concluded
34:4 153:4
conclusion
26:14 27:24 30:12
34:3 50:10 67:8
96:16,24
conclusions
28:4 130:15
conduct
142:7,8
conferred
27:25 40:17
conferring
27:3
confident
132:14
confirm
12:20 13:1
confirmed
11:19 13:3 25:21
conjunction
30:1 118:11
connected
10:2
Connie
12:21 13:25 14:13,15
14:20,21 16:2,5
20:10,11 25:4,10,12
25:22,24 26:13,21
27:4,9 30:2 39:5
51:19 52:10 53:16,25
55:25 60:7 79:11,12
conscious
52:22
consequence

LARRY ELLIOT KLAYMAN - 1/29/2014

46:5
**consequently**
14:15 17:21 37:20
42:14 52:10 92:5
**conservative**
14:14 122:25 124:12
126:16 136:7 142:20
**conservatives**
124:1 142:16
**consider**
68:17 70:18 84:23
**considered**
102:8
**considers**
98:17
**consist**
53:17
**consistent**
36:25
**consistently**
109:18
**Constance**
54:4 74:22,24 144:13
**constant**
118:1 128:4
**Constitutional**
104:18,21
**contact**
13:11 43:15 73:14
127:6
**contacted**
72:14
**contacting**
68:11 69:5 72:19
**contempt**
4:9,11 38:15,20 40:4
40:12,16,19,20,20,22
40:23 41:2,15,17,19
41:21,24 42:4,8,15
43:9,11 44:12 46:6,8
52:19
**contest**
40:19
**contesting**
135:25

**context**
27:8 30:10 42:5 70:10
82:5 91:25 96:10
130:16
**contexts**
82:22
**continuance**
36:8
**continue**
99:8 118:19
**continued**
66:12 89:4
**contract**
111:15,18,19 112:6,14
112:16
**contradicted**
24:18
**contradictions**
36:14
**contribution**
87:6
**control**
137:12
**controlling**
111:14
**controversial**
65:10 93:9
**controversy**
68:22
**conversation**
25:16 54:16,18,19
68:20 91:8
**conversations**
71:4 113:16
**convict**
38:7 39:6 64:5,13,16
80:9 92:6
**convicted**
24:7,16 26:9,12 27:10
36:18,25 37:10,15,21
38:10 45:4 52:7,9
53:4 55:7 64:5,13
75:20 77:8,15 78:18
78:23,24 79:4,5,6,9
79:11,13 81:5,23

82:1,11,13 89:19
91:25 92:5 93:5
97:15 98:3 114:4,10
126:6
**conviction**
19:25 38:16,20 54:24
63:19,21 76:24 78:15
**ConWebWatch**
124:11
**Conwebwatch.com**
5:11
**copies**
82:25 83:5 121:12
**copy**
30:21 85:10 106:8
122:6
**Coral**
101:11
**correct**
10:8,9 11:8 12:5 21:19
22:13 23:25 24:3,4
24:11,17 26:16 27:7
27:17,18 30:4 32:4
32:11,23 33:20 34:5
34:6,9,10,12,18,24
35:8,16 37:11 40:5,6
40:14 41:16,22,23
43:7,12,13,16 44:7
46:8 47:10 49:7,10
49:17 50:2,8 51:7,21
52:3,17,18,20,21,23
52:24 54:25 56:11,12
56:16,25 57:1,5
58:19 59:18 60:4
61:4,18 63:19 65:1
66:19,22 67:13,16
72:24 73:1,6,15
74:14 75:15,21 76:1
76:5,12,24 78:1,2,6,9
78:17 80:12,23 81:7
85:17,25 86:7,8,14
87:2 91:6,20 96:8,14
96:20 106:17,18
107:5 108:4 109:20
111:16 113:5 114:4

120:10 123:20,20
124:14,20 126:3
128:23 131:25
132:16 135:2,18,23
135:23 138:5 143:15
144:15,16,20,21,22
145:16 146:4 147:7
148:7,12 149:15
153:12 154:5
**corrected**
73:5 74:12 76:11
77:21 97:21
**correcting**
79:3 97:22 98:1
**correction**
73:3 76:4,4 77:15 78:6
80:22,25 81:10
**corrections**
153:14
**correctly**
77:22,24
**correspondence**
58:12 72:3 74:16
84:25 94:18
**corrupt**
42:7 98:10,20
**corruption**
98:18
**counsel**
6:12,25 7:17 29:3 36:8
36:23 40:15,17 42:18
48:15 50:25 57:20
68:15 93:16 94:14
150:12 154:8
**counseling**
115:7,10
**counted**
102:25
**countries**
37:17 53:8
**country**
37:7,13,17,17 38:12
59:13 69:17 81:12,17
95:20 102:22 113:23
116:21 119:2

**counts**
31:7 32:17,19,20
49:21 77:10,14 81:22
**County**
4:18 9:1 17:10 32:23
33:8 40:3 45:22
51:25 63:7
**Coup**
63:24 64:7
**couple**
68:12 77:20 116:14
122:9 124:3 132:23
**course**
67:14 106:15 139:21
**court**
1:1 2:10 4:10,12 6:5
6:18 17:14 31:10
32:22 33:11,18,21,22
33:23,24 34:8,8,9,11
35:2,12 38:15,20
40:2,4,12,24 41:2,15
41:17,21,21,24 42:4
42:9 43:6,15 44:12
45:22 46:8,8 49:24
51:16 52:19 55:22
56:15 58:7 96:24
98:9,11,17,20 105:8
128:12 129:20
131:14,14,22 133:13
138:17,21,23 139:1
142:23 143:13,14
154:2
**courts**
42:6 65:2 136:5
138:10 142:3
**Crazy**
122:21
**create**
121:4
**creates**
89:1 118:13
**crime**
27:11 37:22 52:8,9
53:4 55:7 75:21
82:13 98:3,6

**criminal**
31:8 32:17,19,21,22
33:22 40:22 49:21
51:16 56:20 57:16
77:10,14 78:16 81:22
95:24
**criticize**
17:15
**crooks**
122:21
**Cruz**
65:14
**custody**
46:15
**cut**
108:7 110:25 146:3
**cutting**
123:7,8
**Cuyahoga**
4:18 32:23 40:3 45:22
51:25 63:7
**Cymbalta**
115:17,19

---
## D

**D**
5:1 6:1 141:12
**daily**
118:15,16
**Daly**
138:22
**damage**
65:19,20 145:10
**damages**
119:16 120:10,23,24
121:3,11,16 145:19
149:14
**damaging**
91:9
**date**
6:7 40:7,8,8 41:18
47:12 51:8 66:20
67:12 117:7 147:9,13
153:18
**dated**

**47:10 49:6 106:5**
113:2
**dates**
73:13
**day**
25:5 26:4 57:14 73:19
141:22 154:12
**days**
72:6,18 77:20 80:22
122:9 123:15 132:23
144:22
**day-to-day**
15:10,13
**deadline**
144:24
**deal**
60:2,3 64:23,24 89:6,8
119:4,5,5,6 143:19
**Dealer**
98:14,22
**dealing**
80:15 90:12
**deals**
58:17 59:17,22
**Dear**
106:10
**Deborah**
142:11,12,17
**December**
48:7
**decide**
128:13
**decided**
40:18,18 44:16,18
117:15 128:1 151:14
**deciding**
46:5
**decision**
5:13 42:25 43:6,8
52:22 80:19 95:22
129:4 131:23 138:17
139:7 143:14
**decisions**
152:13
**deep**

**91:8**
**defamation**
87:24 130:12
**defame**
44:16 53:3 86:13
**defamed**
86:7,10,15,16
**defaming**
88:14
**default**
16:16
**defendant**
1:8 3:12 6:25 125:22
**Defendant's**
4:8 5:3,15 39:11,15
41:5,6,11 45:6,11
46:16,20 47:18,23
48:22 49:1,12 52:1
62:13 68:4 85:12
87:18 88:3 103:10
104:10 105:20
112:21 124:5,10
135:6,7 138:11,16
143:24 144:4 146:8
146:13 147:1,5,15
**defending**
136:15
**defense**
33:15 42:15,15
**defensive**
28:24 140:20
**deficient**
122:13
**definitive**
67:12
**degree**
97:16
**demanded**
57:21
**Demands**
122:22
**dementia**
125:1
**Democrat**
142:14

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 8

**Democrats**
142:14
**demonstrably**
92:2
**denied**
34:17 35:24 46:14
**deny**
42:19 75:8
**Department**
139:15
**dependents**
48:8
**depending**
123:16
**Depends**
42:5
**Deponent**
153:6,9
**depose**
19:3 23:13 25:11
**deposed**
12:13,15
**deposition**
1:11 2:1 4:8 5:3 6:3,9
   7:5 12:24 29:17
   39:11,13 41:6,8 45:6
   45:8 46:16,18 47:18
   47:20 48:22,24 60:9
   67:18 71:4,6 82:18
   85:12,14 87:18,20
   88:3,5 97:24 99:6
   103:10,12 104:10,12
   105:20,22 112:21,23
   124:5,7 135:7,9
   138:11,13 143:24
   144:1 146:8,10 147:1
   147:3 149:19,21
   150:3,14 152:1,3,10
   152:25 153:3,7 154:3
**depositions**
29:5
**deposition's**
149:22 152:21
**deputy**
17:9

**descended**
125:24
**designed**
115:20
**despite**
28:25
**destroy**
65:17 94:13,14
**detail**
24:11 39:23
**determine**
119:9,13,24 128:14
**devoted**
109:17
**die**
125:6
**difference**
25:19 38:9,14,19 39:6
**different**
70:4,19 76:7 80:3
   101:4 110:19 129:10
   135:17
**differently**
88:22
**difficult**
57:10 89:17 107:12
**difficulties**
58:10
**dig**
81:1
**digging**
79:2
**Dina**
3:23
**dinner**
68:3
**direct**
69:3
**directed**
45:16
**direction**
154:7
**directly**
17:24 23:2 50:21 64:1
   64:1 68:10

**directors**
28:19 29:5 60:10
   68:21 95:15
**disagree**
79:24
**disappointed**
131:3
**disconcerting**
93:17
**discovery**
83:20 103:22 120:10
   120:23 122:9,11,11
   122:12 139:16,18,19
   140:2 144:18,22,24
**discretionary**
34:16,17
**discuss**
12:15 13:17
**discussed**
113:3 149:23 151:8,10
   153:2
**discussion**
22:23 54:9
**discussions**
9:23 27:24 98:22
**dismissal**
66:6
**dismissed**
48:19 65:25 66:2
   67:10,13 132:22,23
   133:1
**disparage**
70:9 93:7 140:13
**dispute**
33:10 47:16 48:10
   61:4,18 112:2 116:25
**disputes**
29:2,3,3
**disqualify**
136:4
**disrespectful**
94:4
**disrupt**
93:19
**dissing**

**distinction**
23:7,11
**distracted**
37:15
**distracting**
119:3
**distress**
119:8
**distress**
115:4 118:13,14 119:9
**district**
1:1,2 2:11 6:5,6 17:9
   135:18 138:17,18
   141:13 154:19
**disturbing**
118:17
**divide**
102:20
**Division**
40:2
**divorced**
33:8
**dkress@schwedpa.c...**
3:19
**docket**
43:22 44:11,14 67:16
   67:18
**dockets**
67:8
**doctor**
118:18
**doctors**
116:6
**document**
20:5 23:18 28:11
   39:21 40:25 41:3
   45:12,14 46:21,23
   47:15 49:2 51:13
   55:1,9,11 57:13 60:5
   62:5,10,16 64:18
   105:24 111:18 147:6
**documentation**
85:5 148:3
**documents**
12:1 25:23 48:2 50:3,9
   50:23 60:9 63:23

67:2 68:6 73:8 85:9
90:14 120:24 121:4
122:6 145:12,13,20
145:23 147:21,23,25
**doing**
9:20 15:18 17:15,16
17:20 20:24 30:1
79:15 113:21 127:21
**dole**
123:17
**dollar**
105:8
**dollars**
119:20,22 121:2
145:15
**domestic**
31:10 33:23 34:7 35:2
35:12 40:2 45:21
49:23
**donate**
79:14
**donated**
55:24
**donor**
44:4
**donors**
24:6,19 27:11 97:2,8
98:5 104:17
**double-edged**
126:22
**doubt**
17:3
**doubts**
89:1
**Doug**
6:14 7:4
**DOUGLAS**
3:13
**do-not-resuscitate**
125:4,8
**drabs**
107:13
**draft**
103:20
**draws**

103:8
**dribs**
107:13
**Driscoll**
68:7,10,15,17 69:2,6
72:14,19 73:14,25
74:1,8 75:2
**drop**
100:20 148:13
**dry**
75:12 110:25 111:5
**dubious**
17:2,5
**due**
33:16 70:15
**duly**
6:23
**duty**
83:14,15,20
**D.C**
1:12 2:7 3:8 6:11
102:21 143:12
148:12,15
**d/b/a**
149:1,2

--------- E ---------

**E**
1:4 3:1,1 4:1,6 5:1,1
6:1,4
**earlier**
103:25 125:22
**easier**
43:17
**easily**
43:23 83:3
**Eastern**
138:22
**easy**
43:20
**eat**
105:6 120:18 122:4
**edge**
123:7,8 141:21
**educated**

37:18 38:13
**effect**
48:18 89:14 110:4
126:20 148:9
**effective**
44:15
**effort**
67:9
**efforts**
8:19 9:18 118:1 125:6
**either**
21:14 129:2 142:12
151:14
**elderly**
17:1
**election**
134:6,9
**elects**
153:7
**elicited**
145:22
**eligibility**
8:21 27:15 62:9 75:24
84:5 91:11 113:19
**Elliot**
1:11 2:1 4:3 6:22
153:3
**else's**
28:3 42:13
**emotional**
115:4,12 116:12 118:2
118:13,14 119:9
**employed**
154:9
**employee**
75:11
**employees**
83:22
**employment**
9:9
**enemy**
127:12,12
**enforce**
136:24
**enrichment**

111:24
**enter**
128:17
**entered**
132:15 135:21
**entering**
76:20
**entire**
65:1 110:23 115:8
**entitled**
76:17
**entity**
19:12 21:2 148:24
**entry**
4:9,11 40:1 41:14
**equally**
83:16
**equipment**
15:14
**equivalent**
111:19 112:15
**Ernie**
16:18,19,20 17:7,9,14
**Ernie's**
17:19
**Errata**
153:14
**error**
77:6,13,16 78:1,3,4
79:17,21
**Esquire**
1:11 2:2 3:4,13 4:3
6:22 153:3
**essential**
106:12
**essentially**
135:20
**establish**
121:15
**establishment**
134:25 135:2
**esteemed**
104:17
**estimate**
109:20

et
125:25 145:11
ethics
97:23
evade
13:18
evading
13:12
event
54:19 56:9 60:12
153:6
events
15:18 60:8
everybody
42:13 110:15,16,17,18
130:5
evidence
81:11 120:10 121:2
127:14 129:23 130:1
130:3,6,21 131:9,12
131:18 132:4 145:18
145:21 147:20
exact
66:20 71:16 85:4
117:7 128:22
exactly
146:23
EXAMINATION
4:3 6:25
examined
6:23 153:11
example
93:21
exchange
66:6 87:23
exchanged
68:6 150:17
exchanges
73:21
excoriating
12:5
excruciating
39:23
excuse
55:13 73:23

exhibit
4:9,11,13,15,16,18,20
4:22,24 5:4,5,7,9,10
5:12,13,14,17,18 8:6
8:14 18:8 39:11,16
41:5,6,11 45:6,11
46:16,21 47:18,23,23
48:22 49:2,12,15,17
49:19 50:6 52:1,15
53:12 55:16 61:7
62:13,17 63:15,16
68:5 73:9,11 76:15
85:12,16 87:18,22
88:3,7 103:7,10,14
104:10,14,15 105:19
105:20 106:3,4
111:10,13 112:21,25
124:5,10 135:6,7
138:11,16 143:24
144:5 146:8,13 147:1
147:5,15,18
exhibits
4:8 5:3 73:8 152:6
existent
19:21
expect
98:7,8
expectation
66:16
expected
81:14
expense
108:14 148:5
expenses
105:8 120:3,3
experience
30:12 80:13,14,15
experiences
30:18
expert
121:19,23
experts
121:21
expires
154:15

explain
124:24
explaining
15:17
explains
134:20
exposure
95:24
extend
144:24 145:5
extent
10:21 13:14 26:1
extra
106:8
extremely
70:14
eyes
70:5 77:1
e-mail
3:10,19 4:20,22,24 5:5
5:7,9,18 12:16 20:13
54:13 57:23 73:20
85:24 87:22,23 88:8
106:4,22 111:17,18
e-mailed
68:10
e-mails
12:7 68:6 73:13 113:1
113:13 150:17

---

**F**

Fabre
87:9,16
facetious
124:19
fact
13:3,8 25:22 29:12
42:17 48:9 50:18
57:12 62:20 63:8
78:14 80:16,18 88:20
111:11 113:14
124:17 128:3 136:3
facts
29:19,20 92:1 123:21
failed

56:19 124:13
failure
20:1 40:4,13 41:16,21
41:25 46:9 47:13
51:5 52:16,20 58:18
58:18 60:3,4 65:24
91:16 92:9,14,22,25
96:13 97:4,10 125:23
fair
7:25 38:24 46:12
125:16
Fairfax
33:8
fairly
65:3 105:5
false
52:12 58:20 65:6 92:1
92:2 104:9 118:11
126:20 130:14
falsehood
91:22
fame
17:11 110:12,16,20
familiar
8:11,13 39:19 41:11
family
42:6,9 98:9,11,17
133:13
famous
17:11
far
77:22 83:23 105:4
137:14 138:22
143:16,17 145:13,19
151:10,16
Farrell
70:17 118:7 127:25
144:14
fast
13:14
fat
137:15
father
102:4
fault

112:8,9,10
**favor**
134:11 135:21
**favorable**
15:25
**favorites**
136:7
**FBI**
54:8 139:17 140:7
**February**
8:8 11:2 16:6 20:14
21:23 22:12 31:13,25
36:3,5,13 44:10 49:6
50:2 51:6,9 52:13
58:16 67:20 73:14
77:12,17,20,21 79:18
86:5 94:25 95:10
96:12 100:24 106:5
114:3 154:13
**feel**
28:24 29:7,12
**feels**
131:10
**fees**
62:8 106:25 112:4
**feet**
13:14
**felony**
97:16,16,16
**felt**
81:2 131:7 141:10
**fifth**
97:16
**fight**
35:9 134:24 135:3
141:6
**fighting**
35:8,9 141:4 143:17
**fights**
135:2
**figuratively**
59:3
**figure**
95:17
**figures**

115:1
**file**
21:5,6,8 51:22 72:3
85:2 87:6 99:12,14
99:19,21,22 106:13
106:20 136:14
143:13
**filed**
20:17 23:9 25:23
34:13,25 46:14 55:19
55:20 56:17 58:13
71:10,18 84:22
120:16 121:13
139:23
**filing**
38:1 40:8,9
**final**
136:2
**finally**
23:7
**financial**
43:1,2 58:10 65:20
154:10
**find**
11:10 25:11 44:6
**finder**
80:16,18
**finding**
38:15,19 41:15,17,18
42:3,3 57:5 128:17
129:16 132:16
**findings**
131:13,14
**fine**
86:2 87:14 151:6
**finish**
124:24,25 140:11
150:20
**firm**
106:6 148:7,15,16,25
**first**
5:15 8:10,13 9:20 11:6
14:7 18:7 19:23 20:9
21:2 28:21 29:9
42:10,11 52:25 55:2

61:7,12 77:5 80:23
95:3 106:4,23 117:5
122:18,19,20 124:2
125:20 142:18
**fit**
50:25
**Fitton**
69:10 70:7 71:8 118:6
127:6,23 130:9,24
131:6,7 136:17
144:14 150:25
**Fitton's**
70:13
**five**
71:15 140:23 145:6,9
**Florida**
1:2 3:17 6:6 8:21 9:24
19:13 20:16 32:8
56:15 58:7 72:11
81:18 85:3 87:8
94:15 98:13,19 99:17
99:24,25 100:2,7,13
101:1,7 102:11,21,24
103:3,4,5,8 104:24
106:13,20 108:9
113:4,8 132:18,20,22
133:16,21
**fluid**
67:5
**focus**
24:16,18,19 29:18
45:13
**focused**
118:24,25
**focusing**
20:23
**follow**
84:17
**following**
23:2 55:15 153:5
**follows**
6:24
**force**
48:18
**foregoing**

153:11 154:3,4
**forget**
14:9 16:18 34:14
**forgive**
92:18
**form**
109:8
**formal**
106:11 111:14,15
**former**
35:24 42:24 59:2
67:25 127:6,9 130:10
**forth**
73:21 91:21,22,23
**forward**
81:15 108:9
**found**
13:10 33:20 37:22
40:3,12 41:21,24
44:11 46:7 52:19
63:1 68:9 73:17
74:21 75:10 129:20
131:23 139:18 140:1
**founded**
29:1 137:17,17
**founder**
28:25 29:2 70:13
105:1
**founding**
29:9
**four**
53:18 54:24 63:17
64:12,14 71:13
140:23
**frankly**
17:2 94:16 95:23
**free**
29:16 129:2
**Freedom**
105:2
**freight**
105:10
**frequency**
102:12
**frequently**

101:7 102:7,10
**Friday**
144:20
**friend**
14:14 127:13
**friends**
14:3
**frightened**
137:13
**frivolous**
142:7
**front**
49:13 126:9 136:5
**fruition**
67:6
**full**
54:25 81:21 113:4,7
**fully**
80:8
**fun**
126:16
**fund**
76:18 104:18,21
**funding**
8:19 9:18 84:18
   111:16
**fundraising**
19:21 59:25
**funds**
108:6
**further**
73:5 80:25
**future**
33:10
**FWIW**
55:18
**F-a-b-r-e**
87:17

_____ G _____

**G**
2:6 6:1,10
**Gables**
101:11
**Garcetti**

17:10,11
**Gardens**
3:17
**Gary**
84:1,2 90:19 91:15
**gathered**
19:1
**gay**
141:15
**general**
29:3 122:15 150:18
**generally**
39:19 51:17 70:11,16
   102:14 114:22
   128:23
**gentleman**
17:1
**George**
4:24 5:5,8 8:16,17,18
   8:25 9:19 10:2,7
   11:1,7 12:4 19:10
   20:20 22:25 27:20,21
   82:7,15 84:16,17
   85:17,21 86:21 88:8
   88:12,15,16,19 89:5
   90:12 92:8 94:18
   96:3 102:4 103:19
   104:16 106:4,10,23
   107:18 113:2,3,17
   119:5 147:12
**getting**
58:12 66:16
**Gil**
17:10,11
**Gilbert**
48:2,3
**give**
7:6 14:4 37:25 38:21
   39:2 40:14 53:23
   58:24 64:9 68:2
   82:18 103:21 104:5
   108:2 116:6 120:14
   121:13 139:9 151:12
**given**
28:18 130:2 153:13

154:5
**giving**
35:7
**glasses**
116:14
**go**
11:12 18:6 20:8 25:1
   26:3 29:17 31:4,22
   40:15 42:8,14 43:8
   46:6 49:12 53:12,12
   55:15 60:8 63:15
   68:2 70:6 73:12
   74:20 85:5,10 93:11
   101:1,7 102:3,11,13
   105:18 108:21 113:4
   118:17 129:1 130:17
   131:6 137:5 140:12
   142:2
**goal**
72:12
**goes**
31:6 32:15 35:1,19
   55:5 65:17 106:16
   111:13
**going**
7:6,17 12:24 14:12
   15:9 19:15 22:9
   24:10 25:11 29:14
   39:22 44:19,19 57:10
   60:23 61:24 63:15
   67:7 68:4 76:3 79:9
   79:13,15 82:1,11
   84:24,25 86:3,24
   96:15,23 97:17,25
   99:1,9 108:9,21,22
   108:24 110:21
   114:23,25 117:17,25
   119:13 121:6,18
   122:4 123:9,10,14
   125:12 128:1 129:1
   132:5,7,9,24 134:11
   135:5 137:5 138:15
   139:2,8,20 142:15
   149:7 150:9 152:14
   153:1

**good**
16:1 17:16 75:18 77:1
   117:16 122:14,18
   130:11
**Google**
62:22 122:17
**gotten**
70:15 72:18
**government**
123:16
**Graham**
3:22 6:9
**grand**
100:7,8
**grandmother**
124:22 125:17
**grandmother's**
125:3,7
**granted**
152:9
**gratification**
129:17
**Great**
53:7
**group**
8:18,23 20:12 54:12
   106:13,20 111:16
   112:4 113:22
**guardian**
42:11
**guess**
12:8 14:25 15:1 85:7
   87:12 104:15 105:25
   108:1 123:18
**guest**
18:22
**guilty**
37:7,22 81:13 95:19
**guy**
125:14
**guys**
113:14 131:2
**guy's**
126:23

## H

**H**
4:6 5:1
**hac**
21:10 22:2,10
**half**
102:23
**halfway**
20:8
**hand**
58:24 154:12
**handed**
116:6
**handle**
22:4
**handled**
21:15
**handling**
48:1
**hands**
75:5 123:13
**hang**
75:11 111:4
**hap**
137:20
**happen**
50:16 98:11,12 143:3
**happened**
28:21 62:23 65:23
  111:2
**happens**
123:24 134:9 137:21
  141:2
**happy**
7:16 81:6,8
**harass**
136:15
**hard**
23:6 105:8
**hardball**
140:15
**harm**
24:19 27:5,14 70:20
  71:1 80:3 82:6,7
  98:2 118:2 126:23

**harmed**
96:7
**harmful**
96:2,3,4,5 97:20
**Hartman**
33:7,8,11,11
**hat**
7:18,18
**hate**
123:3,5
**hates**
123:4
**hats**
7:17 55:13
**head**
9:4 85:4 114:23 141:9
**heading**
19:23 20:3,4,7 122:21
  124:13,15
**headquarters**
54:6
**health**
115:8 117:23
**hear**
64:10 122:2
**heard**
11:5,7 25:10 29:4
  43:10 54:10 127:5
**hearings**
31:9 35:2,12 49:23
**heck**
108:12
**held**
2:2 31:9 35:2 49:23
**help**
18:13 60:8 76:10
  117:21
**helped**
42:22
**helps**
70:21
**hereunto**
154:11
**hey**
94:18 127:20 132:10

**high**
114:25,25 140:6,25
**highly**
42:7 142:6
**hip**
42:12 125:5
**hire**
111:9
**hired**
14:15 15:2,9 17:8,12
  118:7
**history**
28:18
**hit**
99:10 140:16
**hockey**
140:25
**hold**
58:24 65:4
**holds**
140:6
**home**
102:8
**homophobic**
142:16
**honestly**
69:18
**honor**
143:3
**honored**
55:21
**hope**
22:14,15 64:22
**hoping**
93:25
**horns**
140:21
**hotel**
102:5
**hotels**
105:8
**hour**
106:17 107:1,2
**hourly**
107:1

**hours**
20:16 21:4 109:12,16
  109:19 149:18
  150:24
**house**
42:21 111:1 122:22
**Houston**
102:5
**How's**
87:7
**Huckabee's**
123:15
**Humm**
56:17 57:16 58:17,21
  58:21 59:14,16,18,23
  61:4,18 62:9 76:22
  110:22 111:3
**hundred**
119:19,21
**hundreds**
121:2 145:15
**hung**
110:25
**hurt**
24:23 28:1 54:17
  68:25 118:10 120:20
  127:10 128:5 131:11
**hurts**
118:12
**husband**
33:13 137:21
**hypothetical**
38:21 52:4 96:9

## I

**ice**
140:24
**idea**
117:16 127:21
**identical**
49:16 50:15
**identification**
39:12 41:7 45:7 46:17
  47:19 48:23 85:13
  87:19 88:4 103:11

104:11 105:21
112:22 124:6 135:8
138:12 143:25 146:9
147:2
**identified**
60:9 144:13,17
**identify**
6:12 73:13 120:23
121:20 144:7,9,18
**II**
19:9,18 20:12,18
24:20 54:12,20 61:20
62:7 79:14 82:8
104:1,2,19
**illegal**
57:18
**illegally**
34:2 57:18
**immediately**
72:5 73:16,17 97:21
**immigrants**
57:18
**Immigration**
18:15
**impacts**
93:4
**impair**
118:21
**impede**
27:14
**implication**
78:15,16 82:1
**imply**
96:2
**important**
96:8 110:18
**importer**
141:15
**impossible**
105:17
**impression**
13:8 75:9 98:21 114:9
**improper**
96:1
**improperly**

34:2
**inaccurate**
35:15 56:23
**inappropriate**
137:9 142:6
**inappropriately**
128:18 131:15,24
**inception**
72:14
**incestuous**
98:10
**included**
153:6
**income**
99:14,18
**inconsistent**
37:3,4,6
**incorporated**
6:4 148:23
**incorrect**
32:9 76:13
**indemnity**
87:7
**indicate**
13:5,6
**indicated**
145:12
**indicates**
11:14
**indicating**
39:9
**indict**
39:7 92:6
**indicted**
31:7 32:16,18,21
36:18 38:10 47:13
49:21 52:16 53:8
59:12 63:10 77:10,13
77:19 79:20 81:21
89:19 91:16,24 92:8
92:14,22,25 93:5
94:25 95:1,20 96:13
97:4,10 98:6 125:23
126:3
**indictment**

4:15 19:25 46:24 48:7
48:12,12,14 51:4,4
51:12 62:14,20 63:9
65:23 66:6 67:9 92:4
**indictments**
47:1 63:9
**individual**
15:22 38:22
**individuals**
8:19 31:5,14 104:16
**inference**
130:9
**influence**
125:2
**information**
27:11 31:5 52:2 54:15
66:24 144:10,11
**inherent**
36:14
**inherently**
98:9
**initially**
67:6
**initiate**
54:17
**initiated**
54:9,16,18 73:14
**innocent**
37:7 81:13 95:19
**insofar**
37:6
**installment**
58:11
**instance**
36:17 55:15
**instructing**
136:20
**instruction**
7:6
**instructions**
7:7
**insufficient**
65:6
**intend**
67:21

**intended**
21:16
**intent**
24:19 29:7 96:1 103:3
**intention**
7:9 72:19
**interest**
64:21 74:13 96:5,6
98:1 104:17 127:12
154:10
**interested**
12:23 44:4
**internet**
10:8 49:10 62:21
63:11 72:6,7,8 75:13
75:14 80:23 81:16,19
82:19 83:1,14,15,21
83:21,22,25 84:14
87:2
**interpretation**
82:3
**interrogatories**
5:16 121:10 144:4
**Interrogatory**
144:8
**intervened**
70:8
**interviewed**
14:17,20
**invented**
125:13
**investigator**
84:8
**invited**
60:11
**involved**
22:1,22,24 23:3 25:17
54:11 137:9
**issue**
12:13,14 58:17 59:17
63:8 65:10,11 66:13
67:4,5 72:20 76:20
94:3 126:19 136:22
**issued**
45:15 47:2 48:7,9

LARRY ELLIOT KLAYMAN - 1/29/2014

51:25 62:20 142:8
**issues**
33:22 43:9 44:5 115:8
115:12 116:12 137:2
151:16 152:12,18,19
**item**
145:10

_____
**J**

**J**
3:13
**jail**
59:6
**James**
3:23 61:9
**January**
1:13 6:7 47:10 144:20
**jealous**
70:14
**jeez**
37:9
**Jesus**
129:11
**Jewish**
129:10,14 141:14
**Joan**
1:25 2:10 6:19 154:2
**job**
1:23 16:6 17:15,16,19
121:15
**Joe**
84:8
**Jog**
3:16
**Johnny**
140:22
**Joins**
122:22
**joking**
22:16,20 59:3
**judge**
5:13 37:24 132:25
133:11,12 135:20
136:4 138:5 140:6,7
141:7,11,12,16,22

142:10 143:5
**judges**
17:12,14,18 42:10
137:16,19 138:4
139:22 140:17,21
141:10 142:8 143:18
143:18
**judge's**
142:4
**judgment**
4:9,11 34:22 40:1
41:14 87:5 96:16
132:6 135:21
**judgments**
136:12
**judicial**
1:7 6:4,14 14:5,19
15:11,24 16:3,6,14
16:23 17:3,12,17,17
17:20 24:3 28:15,17
28:19,19,20,23 29:1
29:10,14 30:2,18
38:3 44:24 54:2,5,8
54:18 60:10,11 62:6
65:17 68:11,15,21
69:7,14,23,25 70:12
70:16,25 71:5,11
74:23 75:10 78:11
80:2,2 86:12 87:6
95:15 97:21 105:1
111:2 112:10 113:12
118:1 123:4,8 124:3
126:15,18 127:3
129:24 130:22
131:12 133:14,15
135:16,22 136:11,15
137:12,17,17 139:14
139:24 140:9,18
141:11,20 143:23
151:9
**judiciary**
38:4 137:18
**July**
146:17
**jump**

8:4
**June**
41:19 113:2 154:16
**jurisdiction**
133:2
**jury**
83:18 97:1 100:7,9
119:9,13 128:13
**justice**
94:20 96:1 135:4
139:15
**justifications**
142:23
**JW**
61:7

_____
**K**

**KAHLE**
3:14
**keep**
29:13 70:8 108:25
109:14,23 111:11
118:24 120:2 124:4
128:5
**keeping**
109:14,22 110:7
**keeps**
33:12 78:11
**Keller**
141:12,22
**kept**
106:15 109:4,16,24
**kids**
35:10 42:20,20 43:4
46:14 57:11 67:24
95:22 126:18 127:2,4
129:18,21
**kill**
93:11
**kin**
125:9
**kind**
15:20 106:7 110:10
120:4
**Klayman**

1:4,11 2:1 3:4,5 4:3,13
4:15,16,20,22 5:7 6:3
6:4,16,16,22 7:3,4,18
19:21 23:9,24 29:16
31:6,24 32:16 49:20
54:10 55:20,21 57:24
59:25 61:3,8,17
76:18 77:6,7,13
78:16 79:16 80:12
81:12,21 95:1 97:10
97:17 99:6,8 104:25
106:6,23 114:10
116:16 122:18,22
124:13 125:13,21,23
127:20 148:7,15,20
148:24 149:13 150:7
150:9,15,19,21 151:4
151:7,12,21 152:2,7
152:11 153:1,3
**Klayman's**
79:13 152:5
**Kleinman**
40:15 95:23
**knew**
19:15 22:13 42:24
45:4 52:11 92:16,19
94:24 120:6
**know**
7:5 8:3 9:3,8,10,23
10:20,24,25 11:3,4
13:12,13,25 14:2,3,3
14:21 15:7,20 16:5,9
16:13,13,22 17:1,8
17:19,23,24 18:13,17
18:18,19,20,23 19:4
19:5,6,17 22:17
23:10,17,18 24:6,20
25:1,3,6,9,15,18 26:2
26:3 27:1 28:7 29:8
29:23,24 30:22 31:14
31:18,18,19 35:18,22
35:23 37:12,19 38:2
38:12,12,14,19,25
39:1 43:25 44:1,2,3
44:23 47:7 49:11

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 16

50:9,11,12,13,14,16
50:20,21 51:11 52:11
53:6 55:11,17,25
56:2,3,4,8,22 58:9
59:11 60:6,6,7,16,20
60:22 61:19 63:17
65:7 66:4 68:19 69:9
69:13 70:3,6,13,19
71:12 72:9,15 75:11
78:18 80:5,9 82:22
84:15 87:5 88:17,19
88:20 89:13,14 91:9
91:13,15 92:8,14,16
92:19,19,21,23,25
93:2,4,11 94:16,21
95:21,25 97:2,8,8,23
97:25,25 98:2,13,16
98:19 101:23 102:4,7
102:14 103:3,5,17,25
104:3,8 107:6 108:20
108:23,25 110:14,14
110:20 111:23,25
113:11,14,16,17,17
114:22,23,25 116:6,7
118:2 119:1,7,21
120:16,18 121:20
122:19,25 123:9,17
123:18 126:8,17
127:5,25 128:15,22
130:5 131:3,4,5
133:3,11 134:4
135:12 136:3,6,16,19
139:5 140:15,17,19
140:25 141:16,21
142:21 145:14
150:24 151:7

**knowledge**
17:6 18:24 23:15
29:20

**knowledgeable**
104:24

**known**
22:12 45:5 69:7
133:18 144:10
148:24

**knows**
27:21 39:6 70:9
132:12,13

**Kollar-Kotelly**
136:4 138:5

**Koran**
122:23 123:13

**Kotelly**
136:6 137:7 143:8,10

**Kotelly's**
137:21

**Kress**
3:13,14 4:4 6:14,14
7:1,4 39:8,14 41:10
45:9 46:19 47:21
48:25 54:22 61:11,15
61:22 62:11 81:16
85:15 87:21 88:6
93:24 94:7 99:7
103:6,13 104:13
105:23 112:24 124:8
135:10 138:14 144:2
146:11 147:4 149:5
149:12 150:5,13,17
150:20 151:2,7,19,24
152:8,22

## L

**lack**
38:3 133:1

**Laconis**
84:1,2,3 90:19

**LAD**
2:4

**lady**
137:15

**laid**
74:22

**Lamberth**
140:7

**landlord**
101:14 102:1

**large**
24:8 26:9 58:15,15
59:16,22 87:4

**Larry**
1:4,11 2:1 3:4,5 4:3,13
4:15,16,20,22 5:7 6:3
6:4,16,22 7:3,18
19:21 23:9,23 31:6
31:24 32:15 49:20
54:10 59:25 76:18
78:16 81:11 95:1
97:10 99:6 104:25
105:1 106:23 119:7
122:17,21 124:13
125:13 127:20
152:25 153:3

**latitude**
151:8,13

**law**
3:5 19:22 21:17,24
33:9,25 53:3 57:13
87:8 97:18 106:6
118:4 133:20 137:10
148:7,8,15,16,25

**lawsuit**
8:21 25:24 60:1 84:18
84:22 85:3 96:8
125:10 128:23 136:9

**lawsuits**
71:10 136:11

**lawyer**
7:18 8:20 10:18 21:13
21:14 22:8,18 24:22
47:25 57:22,23 65:18
83:15 93:7,11 98:3
111:9 114:24 124:14
125:21 127:19,22
129:19 137:22
139:20

**lawyers**
42:9

**lay**
121:23,24

**Leading**
75:23

**leave**
71:22 111:4 131:22
152:6

**left**
16:3,14 28:20 29:13
68:21 71:5 72:6
123:25 125:11

**legal**
6:19 35:6 37:19 38:1,8
39:7 42:25 45:3
58:24 60:23 62:8
65:19 95:22 96:16,23
104:22 106:11
125:22,24 130:17
132:12 148:24

**legalese**
55:14

**legality**
122:10

**legally**
42:17

**legitimate**
128:2 136:25

**leklayman@gmail.c...**
3:10

**letter**
5:4 73:25 85:16,18,23
86:5 88:11,12 103:15
104:15

**letters**
86:4

**let's**
8:4,5 11:12 31:4,22
53:12,12,22 63:15,24
64:6,8 84:16 105:18
105:18 122:2 131:22
146:24,24 149:5

**level**
106:15

**liability**
74:13

**liars**
122:21

**liasing**
15:16

**libel**
53:5

**liberal**

LARRY ELLIOT KLAYMAN – 1/29/2014

129:15

**license**
57:13 97:18 98:4

**licensed**
23:24

**life**
71:20 110:24 115:8
  125:3 129:10

**light**
91:19

**liked**
68:23

**likes**
110:16,16,17

**limitations**
53:2

**limited**
145:14

**limiting**
152:2

**line**
69:3 106:24

**lines**
20:10 53:18,24 54:24

**link**
55:16 77:9,17,18

**linked**
129:24

**linking**
126:20

**lion**
116:21,21

**listed**
148:10

**litems**
42:11

**litigate**
65:2 66:12 151:15

**litigated**
42:16 48:19

**litigation**
22:2 24:7,11 68:14
  107:20 120:9

**little**
22:16 55:14 78:10

124:19 146:24

**live**
8:25 9:6 42:21 60:21
  100:21,23 151:1

**lived**
102:1

**lives**
9:1,7,8

**living**
100:24 128:9 131:10

**locked**
140:21

**Loeb**
143:20 149:14,17

**long**
12:24 13:15 22:18
  62:24,25 101:3
  102:13 131:4 136:6

**longer**
16:23 24:2 102:15
  104:20

**long-winded**
151:20

**look**
10:11 39:23 40:7 41:4
  49:15 53:22 59:24
  61:1 64:14 67:7
  76:14 85:19,20,25
  99:10 106:7,7 116:5
  120:15 123:24
  125:19 128:9 129:2
  135:11

**looked**
26:13 64:15 67:17
  129:5

**looking**
73:2 76:25 119:25
  120:3 139:11

**looks**
23:18 45:14 73:20
  147:5,7

**loose**
110:25

**Los**
17:10 31:6 32:4,5,9,16

49:20

**lose**
97:17 137:16,16

**loses**
98:3

**losing**
124:4 137:14

**losses**
147:21

**lost**
119:16

**lot**
7:6 15:17 22:17 29:4
  29:17 42:22 53:24
  54:15 58:9,21 59:14
  59:16 70:18 79:7
  95:14 101:1,4 108:12
  108:13,14 114:22
  115:3 119:8,9 120:17
  120:17 122:5 123:23
  133:18 137:19 140:8
  148:1 150:1,1 151:20
  152:18

**louder**
71:2 94:11

**love**
37:17 42:20 123:1,2
  123:23

**Luck**
130:4

**lying**
61:2,8,16

**L-a-c-o-n-i-s**
84:4

---

## M

**machine**
134:12

**magistrate**
128:14,17,18,24
  132:15 133:12
  149:14,17

**magistrate's**
132:24

**Mahboobian**

22:7

**mail**
100:18,20 148:13

**making**
15:14,15 44:21 50:4
  52:10 58:10 59:8
  60:2,3 77:15 118:11
  140:8 141:13 152:13

**malice**
29:7 53:6 95:15,16,17

**malicious**
24:23 28:18 65:21

**man**
55:24

**manage**
14:11 15:10

**manager**
14:16 15:3,4 75:6

**March**
45:23 73:25

**Marcia**
140:22

**Marco**
65:14

**Marino**
14:16 15:25 44:15

**marital**
33:9 115:9

**mark**
146:7

**marked**
39:12,15 41:7 45:7,10
  46:17,20 47:19,22
  48:23 49:1 61:7
  85:13 87:19 88:4
  103:11 104:11
  105:21 112:22,25
  124:6,9 135:6,8
  138:12,16 143:25
  144:4 146:9,12 147:2

**marks**
99:5 152:24

**marrying**
57:17

**Martinez**

134:8

**match**
16:1 23:7 50:10

**materially**
92:2

**matter**
6:3 42:4 43:1,18 46:2
46:5 48:18,19 51:1,1
58:1,1,12 59:11
64:21,25 67:5 76:23
79:13 122:7 132:2

**matters**
48:1 81:3,4 84:5 136:4

**matter's**
51:22

**mavens**
91:11

**meals**
105:9

**mean**
15:12 22:16 31:16
38:25 43:2 45:13
50:9 51:14 53:19
60:9,18 66:4 72:24
89:14 95:2 101:21
102:10 118:14,17,21
119:3 120:2 129:3
141:1 148:20 152:12

**meaning**
20:11 23:5 38:7

**means**
28:12 37:16 51:14
78:21 79:6,10 80:9
82:11 128:5 129:18

**meant**
23:10,11 30:1 37:21
59:3 99:21

**mediation**
58:1

**medical**
117:19,22

**medication**
115:20 116:16 117:10

**medications**
115:12,14,23 116:1,11

**meeting**
18:25

**Mel**
134:8

**Melee**
122:22

**member**
9:15 54:2 68:11

**memorandum**
5:12 135:15

**memory**
91:8 114:21 151:14

**mental**
115:8,12 116:12
117:22

**mention**
63:21 76:24

**mentioned**
16:17 69:22

**merely**
18:22

**Merrill**
2:4 6:19

**meruit**
111:24

**messenger**
93:12 94:14

**messing**
130:4

**met**
23:7

**metaphorically**
123:12

**Mia**
102:11

**Miami**
57:17 100:1,13,14,24
101:2,9 102:2,3,4,7

**Michael**
8:20 92:24 96:4
104:23 107:20
108:22 119:2 145:16

**microphone**
150:8

**Mike**

84:8,12 92:20 123:15

**Miller**
4:24 5:5,8 8:16,17,18
8:25 10:7 11:7 19:10
20:20 27:20,21 82:7
82:15 84:16,17 85:17
85:21 88:8,19 89:5
92:8 94:18 96:3
103:19 104:16 106:5
106:23 107:18 113:2
113:17 147:12

**Miller's**
11:1

**mind**
23:17 37:12 93:15
118:25 141:4

**minds**
89:2

**mind's**
115:3

**minute**
48:21

**minutes**
149:6

**Miracles**
50:16

**missing**
64:15 73:21

**mitigating**
57:12,15

**Mm-hmm**
10:19 12:25 14:24
16:25 36:1 49:14
50:22 76:16 78:13
108:11,15 111:22
120:1 125:15 137:1
138:19 142:1 144:12

**molesting**
116:24 117:6

**moment**
11:1

**monetary**
119:16 136:12 147:21

**money**
10:17 19:12,16 20:13

20:21 21:4 24:21
28:2 33:1,3 34:4
43:3 54:12,21 55:24
57:21 66:13 67:21
70:22 84:20 90:2,13
104:22 105:13
106:16 108:20
113:18 119:14
120:17 122:4 125:3,7
127:20 134:18
145:24

**moneys**
62:8 112:3

**monitor**
6:8

**monitoring**
17:12

**month**
100:5 102:12

**months**
115:19 116:6

**morass**
125:25

**morning**
70:6 85:9 127:6,16

**mother**
124:18,21 125:1,2,9
125:14

**motion**
34:21

**motivation**
27:13 95:13

**move**
21:9,10 100:3

**moved**
100:1,5 101:4 102:9

**moving**
58:8

**Multiple**
4:25 5:6

---

**N**

**N**
3:1 4:1,1 5:1,1 6:1

**name**

7:2 8:24 14:9,9
16:18 31:20 38:22
47:5,7 54:3 82:17
83:23 101:15,16,25
125:9 148:18
**named**
8:16
**names**
42:10,11 82:14 83:23
144:7,10
**name's**
7:4
**narrative**
14:5 30:11 40:14
139:9,11
**narrow**
39:1
**Natalia**
56:17 57:15 58:17,20
58:21 59:14,16,17,22
61:4,17 62:9 76:22
110:22 111:3
**nation**
65:1
**natural**
65:13
**nature**
18:25
**Naveed**
22:7
**near**
55:23 105:17
**nearly**
105:6
**necessarily**
67:4 128:16 132:9
**need**
7:6 8:2 13:1 20:15,17
39:4,18 47:7 94:17
105:11 106:13,14
113:3 121:22,22
150:11 152:6
**needed**
14:11 15:9 76:4 97:20
**needless**

125:24 150:2
**needs**
74:11,12
**negative**
98:5
**neither**
127:25 154:8
**never**
11:4,19 22:24 23:6
26:11,14 33:22 37:25
38:1 42:19 48:11,12
48:17 52:7 57:11
59:5 67:25 68:19,21
72:8 78:24 92:12,12
110:23 111:17 112:5
114:7 143:2 146:21
**new**
6:20 132:4 138:18
**newspaper**
98:15
**nice**
110:15
**non**
19:21 77:8
**nonserious**
46:4
**nonsupport**
32:19,21 48:8
**non-existent**
59:25
**non-support**
31:8 32:17 49:22
77:11,14 81:22
**normal**
118:19,22
**Norris**
16:19,20
**North**
3:16
**Northwest**
2:6 3:7 6:10 148:11
**notarial**
154:12
**Notary**
2:11 154:18

**note**
47:9
**Notice**
2:10
**notwithstanding**
65:20 79:10 145:22
**NSA**
124:16
**number**
13:9 31:5,14 54:20,20
57:12 68:14,17 70:4
71:16 72:6 76:6,19
76:19,20,21,22 77:4
79:15 80:3 109:12
113:18 114:24 129:7
145:6,9,14 152:4

---

**O**

**O**
4:1 5:1 6:1
**Obama**
8:22 19:13 64:20
75:24 84:19 85:3
122:22 142:13
**Obama's**
23:7 65:5
**object**
152:8
**objected**
145:11
**objection**
7:21 36:23 150:22
151:25
**Objections**
5:15
**obligated**
108:8
**obtain**
43:15
**obtaining**
136:11
**obvious**
23:21 24:19
**obviously**
44:18 67:3 129:8

142:19 143:2
**Ocala**
100:2,3,7 101:5 102:9
**occasions**
13:9
**occurred**
26:4
**offense**
110:14
**offer**
145:7
**offered**
111:11
**offer's**
145:7
**office**
14:6,7,8,11,16,16 15:2
15:4,15 16:8,15,16
17:22 44:16 54:4
63:8 75:6,6 100:19
**officer**
133:14 154:2
**offices**
2:2 44:25
**official**
15:3,6 16:5
**officially**
11:19
**oh**
11:23 63:20 77:2
85:22,25 152:5
**Ohio**
24:7,11 32:23 33:18
33:23,24 34:11 40:3
41:20,25 50:8 77:13
81:22 96:14 98:12,15
128:19
**okay**
7:8 8:2,7,23 9:5,21
10:5,23 11:6,9,12,13
11:21 12:1,3,12,22
13:2,20 14:20 16:2,9
17:25 19:5,7 20:8,22
21:11 22:1,9,17 23:1
23:20 26:5 27:1,22

LARRY ELLIOT KLAYMAN - 1/29/2014

28:8 30:9,20 31:20
31:22,22 32:2,4,9,15
32:22 33:20 34:1,20
34:23 35:23 36:1,10
36:22 37:8 39:17,25
40:11,17,23 41:9,20
43:5,19,25 44:3,10
45:20,25 46:12 48:16
48:20 50:4,17,23
53:7,14,24 54:16,17
54:23 55:4,11 56:3
56:23 57:9 58:3 59:5
59:7,15 60:12,15
61:6,22 62:23,25
63:3,14 64:23,25
65:4 66:8,15 67:5,11
67:19 68:16 70:13
71:10 72:8 73:2,7,18
74:15,25 75:3 78:8
78:12,20 79:2,7,24
80:14 82:2 83:10
85:8 86:3 88:1,13
90:3 91:2,19 92:5,20
93:6 95:7,8,13 96:19
96:25 97:19 100:21
102:2,7,10,23 103:24
104:6,22 105:11,15
106:9 107:17,19
108:5,6 109:2,9,10
109:14 110:1,6,15,18
111:20 112:4 116:10
117:9 118:1,5,8
120:12,16 121:7
123:7,11 124:17
125:18 127:24 128:9
129:1,7,16,22 131:1
131:22 132:2,3,11
133:4,10 134:7,17,23
136:25 139:13,21
140:4,25 141:15
142:13,16,22 143:9
144:6,25 145:4,9
146:1,2,7,20,22
147:17,24 149:22,24
150:4,24,25 151:22

152:7
**old**
14:21 31:24,25
**once**
10:4 18:3 72:7 74:6
102:12
**one-on-one**
25:15
**online**
43:22
**open**
5:4 88:11 103:15
145:7
**operations**
15:10,13
**operative**
92:5
**operator**
6:9
**opinion**
5:12 39:2,3 128:11
135:15 141:18
**opinions**
123:20 142:4,9
**opponent**
141:1
**opportunity**
19:3 89:10 122:8
**opposed**
68:11
**opposite**
33:20
**order**
43:6 125:4,8
**ordered**
4:13,16 15:16 55:22
**orders**
43:11 141:17
**ordinary**
107:1
**Orfanedes**
3:24 70:16 93:14,19
118:4 127:25 144:15
**organization**
15:23 19:10 39:7

97:23
**organized**
18:21
**organizing**
15:18,19
**Orlando**
57:19,20,23 59:9,10
111:8
**Orly**
4:21,23 5:4 8:8 10:24
10:25 11:3,4,15,21
12:10 13:6,13 16:7
18:10,21 20:9,11
22:12 23:5 25:4,9,12
25:21 26:1,16,18,24
26:25 27:21,24 28:10
28:12 29:20 31:15
44:8 50:5,17 52:11
54:15,17 56:1 60:2,7
60:10 66:21,25 75:14
75:21 76:1,5,9,11
77:25 78:5 79:25
82:12 84:9 86:6,13
86:16 87:24 88:11,19
88:22 89:8,15,25
90:8,15,20 92:7,11
92:13,20,24 96:11
97:3,9 103:15 104:4
105:17 107:14
113:23 116:2,12,13
117:17,18 126:1
144:13
**outcome**
154:10
**outrageous**
10:15 90:23 91:5
118:15
**outright**
81:11
**outside**
71:3
**overhear**
25:7
**overtook**
58:13

**owe**
33:3 34:4
**owed**
32:25 66:10 112:3
**owes**
31:8 49:22 77:11
127:20
**owing**
33:17
**o'clock**
150:7,9 151:17
**O.J**
17:11 140:24

---

**P**

**P**
3:1,1 6:1
**PAC**
19:9,18 20:12,18
24:20 54:12,21 61:21
62:7 79:14 82:8
104:1,2,19
**pack**
107:25
**page**
4:3,8 5:3 18:7 31:24
36:2,2 39:24 49:17
50:5 53:19 55:2,5,5
55:16,16 61:1,8
85:20 106:22 122:20
124:2 125:20 129:3
144:9 153:6
**pages**
1:24 122:19
**paid**
35:23 42:21 56:20
58:19 61:3,8,17
65:21 66:9,9,16 85:2
107:6 109:2,21 112:8
112:11 120:7 121:6
146:19 147:7,8,12
**Palm**
3:17
**Pam**
10:2

LARRY ELLIOT KLAYMAN - 1/29/2014

Page 21

**Pamela**
8:24 9:5,22 12:4 19:11
  20:20 27:20 82:15
  85:17,21 88:9,21
  89:6,18 92:13,16
  103:19 119:4
**paragraph**
18:7 20:9 23:23 49:15
  49:17,19 50:5,18
  54:25 61:1,6 76:23
  76:25 78:8 107:4
  125:20
**paragraphs**
36:15
**paralegal**
44:15
**part**
8:18 16:21 17:18
  23:25 24:14 45:14
  51:15 59:16,22 86:5
  87:4 138:1
**partial**
135:21
**participate**
9:22
**participating**
76:21
**particularly**
27:21 98:12 131:5
  138:4
**parties**
154:9
**party**
9:4,15,17
**part's**
32:9
**pattern**
128:4 130:2
**Paul**
3:24 110:24 118:3
  131:4,5 144:14
**pay**
10:17 20:1 24:21 28:2
  40:4,13 41:16,22,25
  43:4,7 46:9 47:13

51:5 52:17,20,22
  55:21 57:24 58:2,18
  62:8 65:24 66:5 89:2
  89:3,11 90:13 91:16
  92:9,15,22 93:1
  96:13 97:4,11 104:22
  105:13 107:4,8,10
  108:18 113:14
  125:23 147:14
**paying**
24:8 26:9 40:22 43:3
  46:13 55:7 95:24
  107:12
**payment**
31:11 33:15 35:20
  49:25 77:8
**payments**
58:11
**pejorative**
94:3
**pejoratively**
113:20
**penalty**
141:2
**pending**
34:23 135:17 138:7
  143:11
**Pennsylvania**
3:7 148:11
**people**
9:19 17:14 25:16
  31:18 37:13,18 38:8
  38:9,11,12,14,17,19
  39:1 50:10 51:16
  53:9 54:1 57:17
  63:17 70:12 72:9
  75:10 80:7,8,9,15
  83:21,24 84:7 95:12
  95:19 96:3,12 98:10
  98:13,19 103:8
  108:24 113:19 118:9
  119:6 123:1,2,3,5,10
  123:14,19,22,23
  126:14,22 134:5,11
  138:3 140:22 141:5,6

142:15 144:8,10,17
**people's**
63:9 89:1
**perceived**
142:14
**percent**
134:5
**percentage**
134:3,4
**perception**
69:23
**performance**
93:20
**period**
33:13 57:10 74:2
  118:6 151:22
**person**
9:23 14:21 26:15 28:5
  84:23 89:6 96:7
  110:10,15 126:2
  135:1,3
**personal**
17:6 29:20
**personally**
48:16
**person's**
52:25
**Peter**
110:24
**petition**
34:13,14 46:15 143:11
  143:13
**phrase**
68:20
**phrases**
24:22
**picked**
59:14 62:21 84:14
  94:12
**piece-by-piece**
31:22
**pilot**
17:13
**pitch**
140:16

**place**
6:10 18:25 32:12,14
  100:18 129:21
**places**
76:7 102:22
**Plain**
98:14,21
**plaintiff**
1:5 3:3 104:23,24
**Plaintiff's**
5:14 8:6 52:15 68:5
  76:14
**plane**
105:8
**planned**
64:20
**planning**
21:6,8
**planted**
130:22
**play**
43:4 140:15
**played**
97:22
**playing**
140:24
**pleadings**
119:25 120:16 121:13
**Pleas**
40:2
**please**
6:12,20 7:2,11 41:5
**plenty**
123:19
**pocket**
42:12 119:14
**point**
7:10 14:4,22 19:11
  35:23,24 44:8 48:13
  50:4 59:7 81:16
  83:18 89:3,6 90:16
  94:12 104:18 108:5
  109:15,22,24 110:4,7
  114:16 116:17 120:3
  121:5,19 123:18

148:21
**pointed**
70:5
**points**
76:19 134:6
**political**
138:4
**politics**
137:20
**poor**
11:25 58:22
**poorly**
12:9
**popularity**
110:13
**portion**
36:11 58:15
**portions**
62:5
**position**
48:15 150:4 151:4,6
  151:22
**positions**
123:1 152:12,23
**possible**
51:23
**possibly**
19:14 47:1 114:15
**post**
77:5 100:19
**posted**
20:13 75:14,21 77:17
  125:18
**posting**
8:9,14 10:15 11:22
  12:17 80:23 82:13
  87:2 93:3
**pounding**
78:12
**poured**
105:4
**powerful**
97:20
**practice**
21:17,24 133:20

**praise**
17:16
**precedent**
33:12
**predicate**
92:4
**preoccupied**
133:5
**prepare**
106:10,11
**prepared**
108:16 140:16
**PRESENT**
3:21
**presentation**
18:12,20,22 19:7 54:1
**presented**
145:19,21 147:20
**presently**
115:24
**President**
8:22 65:5,13 123:10
**Presidential**
65:12
**press**
4:18 49:5 50:7 51:10
  51:25 62:13,19 63:5
  63:8
**prestige**
29:15
**presumption**
130:9
**pretended**
97:24
**pretty**
13:14 102:20 151:8
**prevarication**
29:4
**prevented**
31:1
**primarily**
17:9
**primary**
11:16 133:25 134:1,11
**principle**

43:1 84:24
**print**
53:18
**printed**
56:11
**Printout**
5:10
**prior**
57:22
**prison**
58:23
**private**
8:19,20 10:18 24:21
  51:12 70:3 108:24
**privately**
105:3
**privilege**
136:22
**pro**
3:3 6:17 7:17 21:10
  22:2,10 76:20 110:4
**probably**
14:25 31:17 47:24
  117:8
**probative**
26:3
**problem**
65:9 126:17
**problems**
114:21 152:15
**proceeding**
57:16 93:8 130:17
**proceedings**
35:6 38:1 42:23
  152:17
**process**
13:7,9,10,12 23:8
  132:10 137:6 139:16
  139:18 140:2
**processes**
86:24 139:19
**produce**
109:7,13 120:24
  145:12
**produced**

12:1,8 56:11 82:23
  109:10,11 120:25
  121:2 145:13
**product**
86:19,20,22,23,25
  103:23,24,24
**professional**
117:21,23
**professionally**
9:3
**profile**
70:21
**profit**
126:17
**project**
17:13
**promise**
55:21
**proof**
83:7
**proprietorship**
148:17
**prosecutor**
4:18 52:1
**prosecutor's**
63:7
**protect**
124:21 143:18,20
**protest**
66:9
**proud**
60:11
**prove**
83:18
**proven**
37:7 81:13 95:19
**provide**
56:19
**provided**
33:9
**provocative**
129:7
**public**
2:11 26:6,7,8,13,24
  28:9 29:22 43:11,18

44:2,6 50:18 51:1,6
51:15,16,22 52:3,5,5
52:7,8 57:2 59:11
64:21 67:7 70:15
95:17 96:5,6 115:1
130:18 154:1,18
**publication**
49:10 66:21
**publications**
84:15
**publicly**
44:16 82:25
**publish**
26:6,23
**published**
26:22 56:5 77:20
104:4 105:16
**publishing**
26:7 28:9,14,16 29:22
**pull**
50:18
**pulled**
50:7
**purged**
40:21
**purposes**
83:19
**pursuant**
2:10 150:2
**pursue**
69:8,9 94:15,20 110:8
**pursuing**
34:19,21 35:5 37:23
38:1 69:25 96:7
132:1
**put**
12:5 24:22 47:5 63:5
68:23 108:25 109:19
111:17 112:18
119:24 122:22
123:12 125:5 141:8
141:21 145:16 148:1
151:5
**putting**
118:12

**P.A**
3:14
**p.m**
1:14 6:8 61:25 62:3
99:2,6 149:8,11
153:1,4

_____

**Q**

**qualify**
65:13
**quality**
38:4 137:19
**quantum**
111:24
**quasi-contract**
111:21
**question**
7:11,12,13,23 8:10
11:25 12:8 25:13
27:10 36:16,20 38:23
49:18 53:23 58:9,22
61:2,8,12,16 62:15
63:25 64:12 69:7
75:16,18 87:13 95:5
95:13 97:7,14 116:10
117:4 136:13 145:17
**questioning**
14:10 136:16 151:9
**questions**
7:10 16:17 29:18
87:14 99:10 117:1
127:24 128:2,3
131:17 136:17,18,19
136:20,21 139:2
150:2 151:13,15
152:13,14
**quickly**
21:4,5 61:10
**quite**
18:1 63:4 118:16

_____

**R**

**R**
3:1 6:1
**raise**
19:15 20:15,19,21

21:3 43:9 70:21
84:20 90:1,13 104:21
105:13
**raises**
76:19
**raising**
10:17 19:12 24:21
28:2 54:21 62:8
70:22 113:18 126:18
126:19
**ran**
133:20,22,25
**rankle**
123:14
**rate**
14:8 107:1
**reach**
50:10 65:11
**reached**
27:25 33:22
**react**
123:10
**read**
16:10,11 30:5,7,8,9
37:8 52:8 55:19 56:6
57:8 63:18 64:8
67:19 77:4,5,22,24
80:7 81:20 84:17
86:3 88:22 90:20
98:14 105:11 113:23
114:2,5 126:8 133:3
140:19 153:7,11
**reading**
19:1 82:4 98:21
**reads**
37:13
**real**
90:9 91:7
**reality**
110:19 123:7 138:3
143:19
**realize**
20:23 63:5
**really**
8:5 11:2 15:20 19:14

29:19 59:15 61:10
75:17 89:5,6 90:4
100:21 113:18
128:15 134:18
**reason**
8:3 17:21 38:2 52:11
68:24 69:5 72:15
79:1 93:4 126:13
129:15 137:25
**reasonable**
14:8 127:22
**reasons**
43:1,2 68:12 101:4
140:18
**receive**
100:18
**received**
40:9
**reception**
54:1
**Recess**
62:1 99:3 149:9
**Recipients**
4:25 5:6
**recognize**
39:21 45:11 46:21
47:23 49:2 135:12,13
**recognized**
110:16
**recollect**
35:17 42:1 71:12
90:16 107:7 117:7
**recommended**
14:13
**record**
7:2 8:1 21:21 26:6,7,8
26:13,24 28:9 29:22
42:2,19 43:18 46:25
47:6,7 50:19 51:2,6
51:15,16 52:3,5,6,7,8
57:2 59:12 61:24
62:2 64:8 77:4 86:4
94:8 99:1,4 120:21
129:2 149:7,10
150:10,21,22 151:2,5

151:23 152:16,22
153:1 154:5
**recorded**
26:2
**recording**
26:20
**records**
35:22 43:12,21 44:2,6
107:19 109:5,6,14,16
109:22,23 110:7
**redact**
47:6
**reduced**
107:1 154:7
**refer**
62:7,9
**reference**
19:24 54:23 55:10
63:19 104:1
**references**
14:18 18:10 35:11
78:14 124:17 141:24
**referred**
62:14 113:20
**referring**
26:24 29:21,23 31:15
43:19 61:3,14,17,20
62:6 140:5 146:15
**refers**
19:20 20:9 47:2 56:13
59:24 138:21
**reflected**
8:14 50:6 52:1,15
147:15,18
**reflects**
85:1
**Reform**
18:15
**refund**
57:21
**refunded**
66:14
**regain**
137:12
**regard**

37:24 46:10,11 50:25
62:6 95:14 119:16
123:16 135:15 136:6
137:3 140:6 145:24
152:12
**regarding**
76:18 120:24
**Regardless**
59:15
**regards**
77:5
**regional**
54:5
**registered**
148:18
**regular**
58:23
**rehearing**
143:11
**related**
62:20 63:8 64:1 90:14
152:5 154:8
**relating**
145:23
**relations**
31:10 33:23 34:7 35:2
35:12 40:3 45:21
49:24
**release**
4:19 49:5 50:7 51:10
51:25 62:13,19 63:5
63:8
**relevant**
104:5 152:15
**religiously**
113:24 114:2,6
**relying**
28:3,6
**remain**
137:2
**remainder**
19:20
**remark**
93:22
**remarkable**

74:22
**remarked**
91:7
**remarks**
129:8 141:14
**remember**
25:25 26:1 29:1,5
32:20 35:14 36:5
47:24 62:12 63:2
66:20,23 67:1 71:16
74:7,9 82:17,17
101:15 114:15,17,18
114:19,19 142:13
**rent**
15:25 32:14 101:12
**rented**
14:8
**rephrase**
7:13
**replenishing**
106:16
**reported**
1:25 139:6
**reporter**
2:11 6:18,20 154:2
**REPORTER-NOT...**
154:1
**reporting**
126:2,4
**represent**
6:13 8:20 93:8
**representation**
125:16
**representations**
44:9
**representatives**
151:9
**represented**
16:7 57:16
**representing**
6:14,16 27:14 65:18
111:11 136:10
**reprimand**
57:8,9,25 58:6,14
**Republican**

65:12 133:25 134:1
**republicans**
65:11 93:10
**republish**
72:9
**republished**
76:6 82:21 84:15
**reputation**
82:7 122:15,18 126:24
149:14
**request**
105:1 152:5
**requested**
151:20
**require**
112:14
**required**
43:6
**rescind**
137:11
**research**
45:3 63:6
**researched**
13:13 44:11 65:7
**reserve**
73:5
**reside**
99:24,25 132:21
**resided**
101:9,10 133:19
**residence**
100:6,15,16 101:2,4
102:5
**resident**
32:7
**residing**
100:1
**resolve**
72:2,20
**resolved**
72:5,13,24 74:11
138:8
**resources**
105:4
**respect**

47:13 110:17
**respectful**
68:20 93:23
**respective**
152:11
**respond**
140:14
**response**
14:5 30:11 62:5 65:9
139:10,12
**Responses**
5:14
**responsibility**
75:4 87:1
**responsible**
15:11
**rest**
55:4
**result**
56:5 94:19 116:2
117:18
**resulted**
46:14
**retailer**
141:15
**retainer**
56:21 58:19 60:4
106:25 107:5 108:3,6
113:4,7
**retaliated**
138:1
**retaliation**
136:10
**retention**
106:6,11,14
**retired**
16:24
**reverberates**
72:7
**reverberating**
81:17
**review**
34:16 35:22 39:22
42:1
**revisions**

88:10
**rewrite**
124:16
**rice**
68:3
**Rich**
74:11
**rid**
58:4
**right**
8:4,6 9:17 10:7 12:7
12:14 13:5,25 14:9
15:21 16:12 18:6,9
18:16,24 20:25 21:16
22:9,11,19 23:4,22
23:22 24:24 30:24
31:1,2,4 32:25 34:20
35:1,11,15 37:5,9
38:18 41:2,4 42:3
43:24,24 44:21 46:7
51:20,24 53:3,6,10
56:7 57:6 58:6,15
59:4 60:17,24 61:22
62:12 63:14 64:3,19
64:23 66:1 67:22,23
69:19 71:14 72:4
73:4,24 74:3 75:13
75:19,25 76:3,8 77:2
77:9,18,25 78:25
79:3,8,17,19 80:21
82:10 83:10,23 84:22
86:20 87:4 88:18,21
89:12,23 91:4 94:21
94:25 95:2,3,10,12
96:11,12,19,22 97:13
99:8,22,25 100:22
101:6,25 102:6 103:2
105:18 107:7 108:1
108:19 109:11
110:12,15 111:7
112:1,6,17,20 113:10
114:15 115:2,11,23
117:5,12,17 118:23
120:8,15 121:9,19,24
122:2,14 123:3 124:2

124:23 126:9,9,12
128:11,25 129:13
130:12,19 131:7
132:5,9 133:6,7,9
134:19 135:1,5,19,24
136:25 137:14
138:15 140:17 142:3
142:5,8,24 143:1,22
144:19 145:3,6,18
146:7,14 148:4,22
149:4 151:16,23
**rights**
53:1 73:5 94:15
136:24
**Road**
3:16
**Roger**
40:15
**role**
97:22
**room**
71:4
**rooms**
71:6
**Royce**
140:7
**Rubio**
65:14
**Ruff**
44:23
**Ruffley**
12:21 13:3,25 14:13
14:15,20,21,23 15:16
16:2 20:10,12 23:23
25:4,10,12,22,24
26:13,21 27:4,9 30:2
36:11 39:5 44:13,22
44:24 45:2 51:19
52:10 53:16,25 54:4
55:25 60:7 65:16
74:23,24 77:7,16
78:3,11 79:11,12
80:2 81:14 86:10
113:11 118:12
144:14

**Ruffley's**
16:5 78:3
**rule**
83:4 87:9,16
**rules**
112:12,14 152:17
**rulings**
140:8
**run**
15:23 106:12
**running**
11:15,18 14:6 15:14
45:1 138:9
**runs**
16:16
**R&R**
132:24

---

S

---

**S**
3:1 4:1,6 5:1 6:1
**Safari**
116:22
**Sam**
9:24 10:3 82:16 88:9
90:5,15 92:18,19
119:6
**San**
14:16 15:25 44:15
**sanctioned**
57:7 140:23
**sandbag**
145:1
**satellite**
14:7
**saw**
12:7 44:11 63:11 77:6
82:12,15,16,16 83:24
89:10 91:4 122:19
**saying**
23:6 26:15 53:8 54:22
56:1,1 60:10 79:4
80:25 93:9 94:18
97:17 113:13 130:14
130:17

says
17:17 18:11 20:11
  23:5 26:5,23 28:8
  31:24 32:25 36:2,17
  37:9,10 40:9,25 41:3
  47:11,15 49:20 53:25
  61:2 77:5 79:17
  81:21 103:19 104:17
  104:22 106:10,24
  113:3,6 125:20
schedule
36:6
scheduled
31:12 36:2,13,19 50:1
  77:12,19 79:20
school
118:4
SCHWED
3:14
scope
151:10,11
scratching
42:12
se
3:3 6:17 7:17 53:5
seal
154:12
search
83:14,15,20,21,22
searched
11:9 44:14 122:17
second
18:7 54:25 63:16
  85:20 134:14 148:2
see
27:12 43:4,23 44:17
  50:24 52:9 55:2,9
  63:16 65:8 66:12
  72:2 73:4 94:17
  95:21 101:1 107:23
  108:1 113:18 118:17
  122:24 135:1,3
  136:17 148:2
seeds
130:22

seeing
62:12
seek
36:8 117:19,21
seeking
20:21 136:23
seen
14:22 41:12 60:14
  62:16 82:19,20,21
  114:3
self-aggrandizement
70:24
self-evident
77:16 79:18,22
sell
23:6
Senate
11:16 133:21,22
send
17:13 88:12 90:11,14
sense
37:11 70:23
sent
11:23 20:13 31:5
  54:13 73:25 86:5
  88:9 147:6,8,17
sentence
20:10 23:4 25:2 26:5
  36:1 61:7
separate
47:1
September
40:9,12
series
138:20
serious
42:4 46:2,4
serve
13:16 38:5
served
48:11,12,14,17,17
  120:22 144:20
server
13:11
serves

44:15 127:12
service
13:7,9,12,18
services
56:20
serving
7:16 105:9
set
5:16 154:11
setoff
145:11
settle
58:1 66:4
settled
58:14 66:1,3
settling
67:5
severance
136:24 137:11
sexual
129:17,24
sexually
115:16 116:24 117:6
  126:21 129:18,20
  130:23 131:24
shadow
128:9 131:11
sheet
43:22 153:15
Sheppard
90:5
Sheriff
84:8
she'd
59:5
shied
93:10 97:2,9
Shipping
138:22
shocked
11:11 93:3
SHORTHAND
154:1
shortly
34:25 100:10

shot
131:8
shoulder
106:7
show
12:2 39:15 46:20 49:1
  53:5 73:8,9 83:7
  95:16 112:25 121:17
  124:9 135:5 138:15
  139:5 143:22 144:3
  145:14
showing
24:23 45:10 47:22
  146:12
shows
73:9,11 74:16 93:6,6
  95:17 147:6
shy
97:6
sic
97:15
side
52:6 94:19
sign
153:7
Signature
153:2,18
signed
153:15
significance
103:22
Simonton
1:7
simply
28:7 29:11 125:6
Simpson
17:11 140:24
sings
137:16
siphon
29:15
sir
150:8
sit
141:2

LARRY ELLIOT KLAYMAN – 1/29/2014

site
8:9,14 10:12,16 11:20
11:22 12:6,17 19:2
20:14 31:17 50:6
55:17 56:10 74:18
75:13,14,21,22,24
76:1,5,10,12 81:15
89:25 90:8,15,20
91:10 104:4,8 105:17
107:14 113:15,23
122:20 123:25
124:10 126:1
sites
114:1
six
71:15
skilled
44:14
skipped
59:12
sleeve
137:20
smoothly
29:18
soliciting
20:13 54:12
Solutions
6:20
somebody
15:9 21:10
someday
66:17
something's
72:7
Sometimes,you
140:25
somewhat
51:18
sophisticated
51:18,19
sorry
12:16 61:9 68:5 106:6
117:3 133:8
sorts
148:21

sought
68:22 115:7,9 136:3
sound
7:25 18:16
sounds
22:11,13 107:4
south
133:16
southern
1:2 6:5 9:7 138:18
so-called
88:10 91:11 139:3
space
14:8
speak
8:1 10:3 30:25 38:11
38:17 50:3,23 53:10
60:5 63:23 67:2 71:2
89:13 91:3 95:3,10
95:12 123:21 139:1
141:9 142:25
speaker
18:22
speaks
20:5 28:11 41:1 55:1,9
55:11 59:19,21 64:6
78:8 114:13 126:11
specific
25:3 38:22 87:13
90:10 99:10,11
specifically
31:19 45:13 47:25
56:22 63:21 64:4
71:1 89:24
speech
15:19
speeches
15:19
spell
9:25 84:2
spend
53:15 102:19,23
133:18
spending
103:4

spends
123:25
spent
15:16 121:17
spewing
152:16
spoke
12:14 13:20
spoken
10:4 12:9 13:23 16:2
staff
43:20
stand
141:8 143:4,6
start
8:5 51:2 75:17 76:9
100:8 141:20
started
9:22 38:2 43:25 100:6
109:14 118:4 139:24
140:18 143:23
151:18
starting
141:11
state
6:13 7:2 23:17 35:1,19
64:4 77:13 81:22
99:14,18,19,22 103:4
121:10 145:9 151:25
stated
77:7,10,18 79:19 91:5
152:23
statement
5:17 23:25 24:5 45:4
49:16 52:10,12,14
72:25 73:3 75:1,20
79:10 81:20 97:19
107:21 108:16 109:8
109:12,24 111:4
118:14 123:12 146:6
146:15 148:6
statements
64:2 118:11 123:15
statement's
24:3

States
1:1 6:5 69:21 72:10
138:17
status
143:9
stay
102:3,13 106:1
steak
68:2
stealing
70:7
stenographers
105:9
stenographically
154:6
stepfather
125:2
Stephanie
130:4
Sterrett
9:24,25 82:16 88:9
90:6,7
stick
74:14,17 141:1
stickers
39:8 124:4
stood
54:1 125:17 141:16,19
143:7
stop
38:1 54:14 94:6
stopped
116:8 117:16
stories
82:21
story
30:24 136:6
straighten
137:6
strange
141:22
strategic
43:8
strategy
42:18

**stratergy**
86:21
**Street**
2:6 6:10 101:11
**strike**
51:2 78:7
**strong**
38:7 123:1 130:8
141:8
**stuff**
22:17 116:7,8,18
**subject**
106:5
**subprime**
105:6
**Subsequently**
21:1
**substance**
12:16,17 25:20
**substantial**
33:13 74:12
**substantive**
18:7 20:9 71:4
**successful**
66:13 137:4 143:12
**sucked**
134:10,10
**sue**
86:18,25 88:15 112:4
112:7 132:13,15,20
133:11,15
**sued**
88:19 112:5 124:17,21
125:14 132:18 138:5
149:13,14
**sue-happy**
125:21
**suggested**
144:23
**suggests**
27:12 132:5
**suing**
55:12 124:3
**suit**
19:22 55:19,20 72:3

88:17 106:13,20
111:16
**suite**
2:5 3:6,15 100:12
148:11
**summary**
135:21
**Super**
19:9,18 20:12,18
24:20 54:12,21 61:20
62:7 79:14 82:8
**supplies**
15:15
**support**
20:1 24:9,12 26:10
33:16,16 35:24 37:25
40:4,13 41:16,22,25
42:20 43:7 44:5 46:9
46:10,13 47:13 51:5
52:17,20,23 55:7
65:24 66:5,11 67:25
77:9 79:15 91:17
92:9,15,22 93:1
95:24 96:13 97:5,11
125:24 126:19
**supported**
15:24 134:8
**supporters**
15:16,18
**supportive**
14:18
**Supreme**
34:11 56:15 58:7
143:13
**sure**
9:16 10:6 15:14,15
21:22 45:1 61:11
69:22 98:24 107:23
122:20 123:22
**surprise**
13:15 38:18 71:14
**Surrender**
122:23
**suspect**
94:11 126:15

**suspended**
57:14
**suspicion**
131:20,21
**suspicions**
129:23
**swear**
6:20
**sword**
126:22
**sworn**
6:23
**system**
37:19 38:8 96:1 98:9
98:11 132:12
**S-t-e-r-r-e-t**
10:1

---

**T**

**T**
4:1,1,6 5:1,1
**Taitz**
4:21,23 5:4 8:8 10:24
10:25 11:3,4,15,21
12:10 13:6,13 16:7
18:10,21 19:4 20:9
20:11 22:12 23:5,13
25:4,9,12,21 26:1,16
26:19,24,25 27:21,24
28:10,13 29:20 31:15
44:8 50:17 52:11
54:15 56:1 60:2,7,10
66:21,25 77:25 78:5
79:25 80:1 81:14
84:9 85:23 86:6,13
86:16 87:24 88:11,22
89:8,15 92:7,11,13
92:24 96:11 97:3,9
103:16 113:12
116:12,13 117:17,18
144:13
**Taitz's**
50:6 75:14,21 76:1,5,9
76:12 82:12 89:25
90:8,15,20 92:21

104:4,8 105:17
107:14 113:23 116:2
126:1
**Taiwanese**
141:14
**take**
8:2,4 10:11 21:11
26:17 39:8,18,23
40:16 41:4 42:8 61:9
61:19,19,22 63:24
64:6 68:1 69:11 73:5
76:14 78:17 82:9
90:25 93:16 94:3
98:23 101:17,20,21
105:12 106:1 110:14
115:18 116:1,4,9
117:9,13 123:1 141:7
149:5 150:24 152:9
**taken**
42:21,24 67:24 115:11
115:14 137:8 154:3,6
**takes**
118:22 126:22
**talk**
11:23 33:14 68:18
69:3 74:1 84:16
90:10 92:17 93:16,18
123:6 127:18 128:16
**talked**
9:20 11:21 18:1,2,4
25:21 75:9 127:17
**talking**
11:24 33:21 42:6
83:14 93:17 94:5,9
104:3,23 111:25
141:18
**tandem**
27:4 60:19
**tangled**
139:22
**Tape**
99:5 152:25
**tax**
99:17,18,19
**taxes**

LARRY ELLIOT KLAYMAN – 1/29/2014

Page 29

99:12,14,19,22
**Tea**
9:4,15
**team**
23:7
**teamed**
104:25
**tear**
77:3
**Ted**
65:14
**Telephone**
3:9,18
**tell**
7:12 10:13 29:16
　30:24 57:3 77:23
　89:23 96:12 97:6
　98:8 102:14 127:23
　139:8 146:23
**telling**
28:7 79:25 86:6
　120:15 121:5 122:5
　147:25
**tells**
29:6
**tend**
142:15 143:18,20
**tenor**
107:3
**terminated**
150:3 151:1 152:21
**terminating**
149:19 152:1
**termination**
149:20 150:14
**terms**
11:24 25:20 27:9
　65:20 70:23 106:12
　119:15 137:19
　145:19 147:21,25
**terribly**
134:16
**Terry**
48:1,3
**testified**

69:10 114:5
**testify**
6:23 93:13 114:6
　121:19
**testifying**
94:5
**testimony**
17:2 28:25 72:18,22
　95:14 118:6 127:5
　152:10 153:12,13
　154:5,6
**Texas**
102:5
**thank**
39:10 64:17 87:11
　141:22
**thanks**
98:25 105:16 113:11
　137:7
**theater**
29:11
**theory**
60:13
**thing**
57:22 89:15 94:21
　111:23,24 118:3
　119:25 120:4 131:7
**things**
12:21 13:4 25:22 45:3
　58:5 70:19,22 71:19
　84:13 91:5 98:10
　104:3,7 114:19,23
　115:3 137:4,6 140:17
　142:23,24
**thing's**
81:17
**think**
10:1 18:5 27:3 39:4
　45:22 47:1 49:5,13
　59:22 60:13 63:20
　64:24 70:6,12,14
　71:8,8 74:16 79:24
　80:1 83:8,17 85:19
　89:1,10 90:18 91:1,7
　91:8 92:10 94:8

97:12 100:10 101:10
　110:22 119:11,11
　122:11 124:15 127:1
　128:6,8 129:9 130:24
　146:25 147:6 151:10
　152:3
**thirty**
139:20
**Thomas**
144:14
**thought**
29:14 72:15 86:24
　90:23 91:13,13 93:24
　104:4
**thoughts**
149:6
**thousand**
119:19,22
**thousands**
121:2 145:15
**threat**
68:25 69:1
**threatened**
131:8
**three**
13:24 71:13 76:22
　80:2 83:24 108:9,10
**thunder**
70:7
**Thx**
113:5
**tickets**
105:8
**time**
6:8 7:19 10:25 11:22
　13:16 14:4,12 15:17
　16:3,21 21:9 22:7,18
　25:18 26:8 28:21
　31:21 32:6 33:4,13
　39:18 40:12,21 42:22
　44:8 47:25 52:16
　53:15 55:20 57:11
　58:10 61:25 62:3,23
　63:10 67:19 71:8,9
　79:13 80:20 83:1

99:2,6 101:2,3
　102:19,21,24 103:5
　107:12 108:17 109:4
　114:19,20 115:7,15
　116:14,15,17 117:11
　118:7,22,24 119:8,24
　120:2 123:14,25
　126:18 131:4 133:18
　148:1,5 149:8,11
　150:1 152:3,9 153:1
**times**
13:23 41:20,25 71:7
　74:5 114:23 140:23
**tireless**
23:8,12
**title**
15:6 16:6 18:11 19:20
　59:24,24
**today**
6:9,18 42:2 43:15
　62:17 69:10 77:21
　106:11 140:9 145:22
**Today's**
6:7
**told**
10:11,21,24 20:11
　23:5 24:2 27:19 54:7
　54:10,11 74:14 75:2
　82:12 83:24 90:1
　95:23 107:15,17
　114:11,14
**Tom**
118:6 130:24
**top**
146:6
**topic**
128:15
**total**
27:8 53:17
**totality**
128:10
**touch**
116:18
**touched**
128:18 131:15,24

**tough**
133:11
**Toyota**
64:11
**track**
69:16
**tracks**
141:9
**trademark**
148:20
**tradename**
148:21
**train**
141:9
**trained**
45:2
**transcript**
4:7 5:2 39:13 41:8
   45:8 46:18 47:20
   48:24 85:14 87:20
   88:5 103:12 104:12
   105:22 112:23 124:7
   135:9 138:13 144:1
   146:10 147:3 153:8
   154:4
**transcription**
153:13
**transcripts**
105:9
**transferred**
57:19 59:9,10 111:8
**transgender**
142:17
**travel**
38:25 120:3
**travelled**
44:25
**treat**
88:21 115:21
**treated**
110:17
**trial**
120:14
**trial-level**
34:8

**tried**
29:13 68:25 81:7
   118:21
**tries**
65:17 135:3
**true**
10:21 11:17 23:25
   24:3,14 32:18 78:22
   81:24,25,25 103:23
   110:21 118:12 119:7
   143:19 153:12 154:4
**trust**
118:9
**trusted**
55:23 118:7
**truth**
53:10,11 79:25 91:20
   91:22,23 95:4,11,13
**truthfully**
7:25
**try**
7:13 18:13 27:5,14
   60:8 70:20 82:6
   85:10 99:9,10 104:21
   118:10 126:23 128:5
   132:7 140:13
**trying**
13:7,11,18 21:3 73:6
   78:5,9,10 82:16
   90:13 93:6,7,13,18
   94:13,14,15,19,20
   105:12 118:23 119:1
   145:1
**turning**
68:4
**TV**
70:6,7
**twenty**
111:10
**twice**
10:4 18:3 44:12 52:20
   74:6
**two**
7:17 13:24 27:13 28:1
   28:22 31:7,8,9 32:17

32:18,20 33:1,2,3
35:1,12,14,17 41:20
47:1,14 49:21,22,23
55:13 68:17 72:18
76:21 77:14 80:1
81:22 92:1,1 108:9
109:1 117:1 131:2
**two-page**
105:24
**two-person**
9:17
**type**
105:7 117:22
**typewriting**
154:7

---

**U**

**U**
5:1
**ultimate**
57:5
**ultimately**
33:24 48:20 73:24
   76:11 108:10 117:12
   137:5
**umpteen**
69:20
**unclear**
21:21
**underlined**
19:24
**underneath**
77:18 79:19
**understand**
7:11,13,21 11:17
   16:20 21:1 36:16
   37:14,15 38:8,9
   45:16 49:18 62:15
   63:7 75:16 76:2 80:8
   80:9 118:3 135:24
   136:13 142:22
**understandable**
7:10
**understanding**
16:22 23:11

**understood**
7:20,20,23,24 11:20
   75:25 104:19
**undignified**
142:7
**undue**
125:2
**unethical**
94:16 96:7
**uneven**
137:18
**unfairly**
127:2
**unfortunately**
37:16,16 68:18 138:2
**unilateral**
152:13
**United**
1:1 6:5 69:21 72:10
   138:17
**unjust**
111:23 141:7
**unjustly**
95:20
**unnecessary**
94:3 95:18
**unreasonably**
143:6
**unsophisticated**
37:14
**update**
19:8
**upset**
131:3
**up-front**
106:14
**UROC**
14:11 60:12
**use**
37:20 38:6 64:4,16
   79:1 100:14 132:6
   148:13
**U.S**
11:15

**V**

**v**
1:6,25 2:10 33:7,11
154:2
**vacate**
34:21
**vacated**
132:6
**valid**
48:11
**various**
84:14 104:16
**vehicle**
20:23 104:21
**Ventura**
9:1
**verbally**
12:9
**verbatim**
50:7
**versus**
6:4 138:22 139:15,17
140:7
**vice**
21:10 22:3,10
**vicious**
126:14
**victim**
112:13
**victory**
124:16
**video**
6:8,8,9
**Videographer**
3:22 6:2,18 61:24 62:2
99:1,4 149:7,10
150:8,11 151:3
152:24
**Videotape**
6:2
**Videotaped**
1:11 2:1
**view**
34:2,18 46:2,4,5 66:8
68:25 98:5 122:13

**viewed**
15:8 28:23 89:24
91:11
**viewing**
69:23
**views**
129:10
**violate**
43:6
**violation**
152:17
**Virginia**
33:8,9 46:8
**visit**
33:14 58:23
**Voeltz**
8:21 84:12,19 92:25
96:4 104:23 107:20
108:22 119:2,3,16
145:16,25
**voice**
6:12
**Volume**
99:5 152:25
**voluntary**
31:11 35:19 49:25
**vote**
134:3

**W**

**wagons**
143:21
**wait**
80:18 146:23
**wall**
71:19,23 72:1
**want**
8:5 29:17,19 39:1 47:6
55:19 59:10 64:10
70:20 71:1 72:3,16
73:12,13 81:10 82:14
83:18 85:6 87:8,10
87:12,14 88:1 89:2
91:12 97:7 99:9
106:1 113:14 118:3

121:12,14 122:6
124:16 127:24
128:16 138:21 139:9
139:10 140:13 143:3
143:22 144:3 145:5
151:5
**wanted**
12:20 14:6 21:5 22:1
43:14 44:3 51:21
54:17 71:20 72:2,5
72:13,13 73:4 88:12
110:8,8 131:8
**wants**
65:11 110:18 131:6,11
**warm**
54:1
**warrant**
45:19,21 46:3
**washing**
75:5
**Washington**
1:12 2:7 3:8 6:11
102:21 138:3 148:12
148:15
**wasn't**
25:8 27:10 29:11 52:9
75:18 79:4 93:25
108:21,22 109:21
112:7,8,11 116:18
118:23 120:6 121:5
127:3 133:12 145:1
**watch**
1:7 6:4,15 14:5,19
15:11,24 16:3,6,14
16:23 17:3,14,17,17
17:20 24:3 28:15,17
28:19,19,20,23 29:1
29:10,14 30:2,18
38:3 44:24 54:2,5,8
54:18 60:10,11 62:7
65:17 68:11,15,21
69:7,14,23 70:1,12
70:16,25 71:5,11
74:23 75:10 78:11
80:3 86:12 87:6

95:15 97:21 105:1,2
111:2 112:11 113:12
123:4,9 124:3,12
126:15,18 127:4
129:24 130:22
131:12 133:15
135:16,22 136:11,15
137:12,18 139:15,24
140:9,18 141:12,20
143:23 151:9
**watching**
17:18
**Watch's**
118:1
**way**
17:6 19:6 21:14 27:1
29:25 30:3,5,7,8,9
42:7 44:18 56:3 67:1
70:3 80:6 81:1,16
83:13 130:2 139:25
140:20 141:22,23
145:8
**ways**
70:4,19 80:4
**wear**
7:17 137:20 143:2,3
**wearing**
55:13
**weather**
103:9
**web**
8:9,14 10:12,16 11:20
11:22 12:6,17 19:1
31:17 50:6 55:17
56:10 74:18 75:21,22
75:24 76:1,5,9,12
81:15 89:25 90:8,15
90:20 91:10 104:4,8
105:17 107:14
113:15,23 114:1
123:25 124:10 126:1
**Website**
5:10
**Wednesday**
1:13

LARRY ELLIOT KLAYMAN - 1/29/2014

**week**
13:21 20:17 102:15
**weeks**
121:21 134:5,13
**went**
16:24 34:7,11 58:1
  59:13 95:14 113:8
  151:10
**weren't**
14:12 81:6,6 128:1
**West**
14:6 15:4
**western**
54:5
**we'll**
8:1,3 23:13 47:6,9
  80:18,18 85:7 99:8
  110:1 128:12,12
  138:24 139:1
**we're**
25:11 31:23,23 79:15
  94:18,19,20 120:21
  121:18 149:18
  151:22,24 152:22
**we've**
27:11 72:18 120:9
  152:3,4,22
**whatever's**
24:20
**whatsoever**
117:22
**WHEREOF**
154:11
**whisper**
94:1
**whispering**
93:24 94:9
**White**
122:22
**Whores**
134:22
**Why'd**
57:9
**wide**
151:8

**widely**
91:11
**wife**
33:12 35:24 42:24
  67:25 127:7,9 130:10
**wife's**
129:19
**William**
141:12
**willing**
65:2
**win**
132:9 134:12,15
  137:10
**wine**
116:14
**wing**
123:25
**wise**
93:22
**wish**
118:23,24
**witness**
6:21 7:18 61:13 62:4
  93:13,21 94:2 121:23
  121:24 153:7 154:11
**woman**
8:24 14:9,13,18 15:24
  142:18
**women**
123:16
**word**
24:16,18 37:21 38:7
  39:6 64:5,13,16 79:1
  80:9 92:5 110:21
  114:11
**wording**
128:22
**words**
25:3,7,10 71:2
**work**
23:8,12 54:7 58:19,20
  58:21 59:14,16 60:4
  78:10 86:19,20,22,23
  86:25 89:4 103:23,23

103:24 105:6 108:13
  118:16 120:17 122:5
**worked**
27:23 42:18 44:23
  54:8
**working**
16:23 17:3,7,7 21:2
  27:4 28:1,22 29:9
  80:3 104:20 127:10
  127:15
**works**
16:20 24:2,25 39:7
  81:16
**world**
72:11 81:18 94:24
**World's**
75:23
**worried**
55:24
**worse**
81:3,4 114:7,12 127:1
**worst**
84:13
**worth**
55:18 119:10,12
**wouldn't**
57:24 71:22 94:1 98:5
  98:6 102:20,25 111:2
  116:8,18 127:8,22,23
  131:16 137:15
**wrap**
99:9
**writ**
143:13
**write**
30:13,14,15,17
**writing**
26:16 29:8 31:2
  112:18 150:16
  152:20
**written**
15:7 25:6 26:2 30:23
  60:19 111:14,15
  112:14,16 120:22
**wrong**

54:22 81:11,12 142:3
  142:8
**wrote**
23:6 26:19 57:23 77:7
  85:23 93:25 103:17
**Wyoming**
16:24

---

**X**

**x**
1:3,9 4:6 5:1

---

**Y**

**yeah**
9:14 12:20 15:5 32:1
  32:14,21 34:13 39:4
  41:12 44:2 47:3,5
  48:5 51:15 55:3
  56:18 57:4 60:14,18
  63:13 66:2 68:8 71:9
  71:25 72:23 73:10
  74:9 75:4,19 76:2,9
  84:13 86:15,17 87:17
  90:21 99:13,15
  100:20 101:13 102:3
  106:21 108:5 109:6
  110:2 114:5 120:11
  123:4,6,11 124:12,25
  125:11 132:8 135:13
  139:22 149:3 151:4
**year**
99:12 100:4,11 125:23
**years**
14:23 23:7,12 29:9
  31:24,25 45:2 54:9
  118:4,5 128:4 139:21
  139:21,22
**yesterday's**
18:11 19:7
**York**
6:20 138:18

---

**Z**

**Zullo**
84:8 92:20

**$**

**$1,014.26**
31:12 50:1
**$16,084.55**
146:18 147:19
**$18,000**
106:14,24 107:4 108:3
146:3
**$25,000**
19:21 20:15,15,19
55:23 56:21 58:18,19
59:25
**$300,000**
109:1
**$395**
106:17,25
**$5,000**
58:2
**$600**
107:1
**$69,358.48**
135:22
**$78,000**
33:1
**$78,861.76**
31:8 49:22 77:11
**$80,000**
125:4

**0**

**04**
133:23

**1**

**1**
1:24 6:3 49:15,19 99:5
134:5 144:8 152:25
**1,800**
108:2
**1:00**
151:18
**10**
4:9 14:23 20:14 39:11
39:16 128:4
**100**

3:15
**103**
5:4
**104**
5:5
**105**
5:7
**11**
4:11 31:9 33:2 41:5,6
41:11 49:23 118:5
**112**
5:9
**11410**
3:16
**12**
4:13 45:6,11
**12:58**
1:14 6:8
**124**
5:10
**13**
4:15 46:16,21
**13-20610-CIV**
6:6
**13-20610-CIV-ALT...**
1:6
**1325**
2:6 6:10
**135**
5:12
**138**
5:13
**14**
4:16 31:9 33:2 47:18
47:23,23 49:23
154:16
**143**
5:14
**146**
5:17
**147**
5:18
**15**
4:18 48:22 49:2,15,19
52:1 62:13,17

**154**
1:24
**16**
4:20 85:12,16 146:5
**17**
4:22 87:18,22
**18**
4:24 88:3,7 108:7
109:3,4,14
**18,000**
107:9
**19**
5:4 103:10,14
**1994**
137:18

**2**

**2**
8:6,14 18:8 36:2 49:12
49:17,17 50:5,6
52:15 53:13 61:25
63:15,16 77:10 99:5
115:19 116:5 118:4
134:5,13 144:9,22
152:25
**2/22/10**
4:14
**2/24/12**
4:23
**2/26/12**
4:21,25
**2/3/12**
4:19
**2/8/12**
5:8
**2:09**
62:3
**2:48**
99:2
**2:57**
99:6
**20**
5:5 104:10,14,15
**200**
2:5

**20005**
2:7
**20006**
3:8
**2003**
16:3 18:2 133:22,24
**2004**
133:23,24
**2007**
117:8
**2009**
31:10 35:3 40:10,13
49:24
**2009-2010**
35:13
**2010**
31:10 35:3 45:23
49:24
**2011**
31:11 35:20 41:19
49:25
**2012**
8:8 11:2 16:6 18:4
21:23 22:13 31:13,25
36:3,13 44:10 47:10
48:7 49:6 50:2 51:6
51:9 52:14 58:16
66:18 73:15 77:12,17
77:20,21 79:18 86:5
94:25 95:10 96:12
106:5 113:3 114:3
125:19 146:17
**2013**
100:25
**2014**
1:13 6:7 154:13,16
**202**
2:8
**2020**
3:7 148:10
**21**
5:7 105:19,20 106:3
111:13
**22**
5:9 112:21,25

LARRY ELLIOT KLAYMAN - 1/29/2014

**22nd**
51:6,9 52:13 58:16
94:25 95:10
**22-244142**
1:23
**23**
5:10 8:8 11:2 22:12
77:17,20 79:18 96:12
124:5,10
**23rd**
51:6,9 58:16 67:20
73:14 146:17
**24**
5:12 86:5 135:6,7
**24th**
40:9 41:19 47:10
144:20
**25**
5:13 138:11,16
**26**
5:14 77:21 114:3
143:24 144:5
**27**
5:17 146:8,13 147:15
147:18
**28**
5:18 147:1,5
**29**
1:13
**29th**
6:7

--------
**3**
--------
**3**
49:6 55:16 61:2,6,7
62:7 68:5 73:11
80:22 121:21 149:18
150:24
**3/16/12**
4:17
**3:45**
149:8
**3:57**
149:11
**30**

31:11 35:20 49:25
83:22
**310**
3:9
**331**
100:12
**33418**
3:17
**34th**
101:10
**345**
3:6 148:11
**37**
139:21,21
**38**
139:21
**39**
4:9

--------
**4**
--------
**4**
23:7,12 76:15,23,25
77:4 121:21 150:7,9
151:17
**4:01**
153:1,4
**41**
4:11
**45**
4:13
**46**
4:15
**47**
4:16
**48**
4:18

--------
**5**
--------
**5th**
73:25
**5,000**
147:8
**5/7/12**
5:18
**561**
3:18

**59**
32:1
**595-0800**
3:9

--------
**6**
--------
**6**
4:4 134:6
**6/23/10**
4:12
**6/7/12**
5:6,9
**60**
31:6,24,25 32:3,16
49:20
**6538**
100:12
**68**
14:25
**694-0070**
3:18

--------
**7**
--------
**7**
31:13 36:3,13 48:7
50:2 77:12 113:2
**7th**
36:5 147:11 154:12
**7/20/09**
4:10
**70**
14:25

--------
**8**
--------
**8**
106:5
**85**
4:20
**861-3410**
2:8
**87**
4:22
**88**
4:24

--------
**9**
--------

**9**
73:9 125:19
**9,000**
147:8
**93**
129:3
**96**
20:16 21:4

Case 1:13-cv-20610-CMA   Document 79-1   Entered on FLSD Docket 02/28/2014   Page 191 of
258
Case 1:13-cv-20610-CMA   Document 39-4   Entered on FLSD Docket 12/09/2013   Page 2 of 6

**COURT OF COMMON PLEAS
DIVISION OF DOMESTIC RELATIONS
CUYAHOGA COUNTY, OHIO**

LARRY ELLIOT KLAYMAN      :      **Case No: DR07 316840**

       Petitioner            :      **Judge: DIANE M. PALOS**

     - vs. -             :

STEPHANIE ANN DELUCA      :      **JUDGMENT ENTRY**

       Respondent          :

     This matter came on for hearing on July 20, 2009, before Magistrate Timothy R. Brown upon Respondent'sMotion For Contempt Support (Post-decree) #259350, Respondent'sMotion For Contempt Support (Post-decree) #273344, Respondent'sMotion For Attorney Fees #273345, Respondent'sMotion For Attorney Fees #277027 and Respondent'sMotion For Contempt Support (Post-decree) #277835. Appearances were made by Roger L. Kleinman (Attorney For Plaintiff), Stephanie Ann Deluca, Respondent, Suzanne M. Jambe (Attorney For Defendant) and James H. Rollinson (Attorney For Defendant). The Court Reporter was Karen S. Lamendola.

     The Court adopts the Magistrate's Decision filed **July 28, 2009**, in its entirety.

     **IT IS HEREBY ORDERED:**

     **PETITIONER'S OBJECTIONS FILED AUGUST 11, 2009 TO THE MAGISTRATE'S DECISION FILED JULY 28, 2009 ARE HEREBY OVERRULED AND THE DECISION OF THE MAGISTRATE APPROVED.**

     **RESPONDENT'S OBJECTIONS FILED AUGUST 21, 2009 TO THE MAGISTRATE'S DECISION FILED JULY 28, 2009 ARE HEREBY OVERRULED AND THE DECISION OF THE MAGISTRATE APPROVED.**

     **IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that the Obligor, **LARRY ELLIOT KLAYMAN**, is in contempt of Court. The Court finds that the **Obligor, LARRY ELLIOT KLAYMAN**, is in arrears in the amount of $31,393.00 (including attorney fees) computed as of July 20th, 2009 which is owed **Obligee, Stephanie Ann Deluca**, her assignee(s), and/or the Cuyahoga Support Enforcement Agency (CSEA) and is **reduced to judgment upon which execution may issue**. This sum includes all previously accrued support arrears and processing charges, and supercedes all prior determinations. The **Obligor, LARRY ELLIOT KLAYMAN**, has been credited with all support payments, including direct/waived payments. The arrearage reflects adjustments to processing charge arrears due to direct/waived payments since those payments were not processed by the CSEA.



DEFENDANT'S
EXHIBIT
_10_
_1/29/14_ JC

The Obligor, **LARRY ELLIOT KLAYMAN**, is hereby sentenced for said contempt to **THIRTY** (30) days in jail, or in the alternative, to perform not less than 200 hours of community service in lieu of actual incarceration, which service shall be performed at the direction of Court Community Service and be subject to the Court's review.  The community service shall be completed within 210 days from the date the Obligor, **LARRY ELLIOT KLAYMAN**, reports to Court Community Service. However, the Obligor, **LARRY ELLIOT KLAYMAN's** sentence will be purged provided that the Obligor, **LARRY ELLIOT KLAYMAN**, pays $**3,200.00** through the CSEA within 30 days of the journalization of this order.  This purge payment is in addition to any obligation to pay current support and arrearage payments, which may be due.

All support shall be paid through the Ohio Child Support Payment Central (OCSPC), P.O. Box 182372, Columbus, Ohio 43218-2372.  Any payments not made through OCSPC shall not be considered as payment of support. Cash payments may be made at the Cuyahoga County Treasurer's Office, County Administration Building, 1st Floor – Cashier, 1219 Ontario Street, Cleveland, Ohio 44113. All payments shall include the following: Obligor's name, Social Security Number, SETS case number, and Domestic Relations Court case number.  Checks and money orders must be payable to Ohio Child Support Payment Central.

In the event the Obligor, **LARRY ELLIOT KLAYMAN**, does not purge his contempt, he is hereby ordered to report, during regular Court business hours (8:30-11:30 A.M. and 1:30-3:30 P.M), to the Court Community Service Liaison in Room 306 (Third Floor) in the Old Courthouse, One Lakeside Avenue, no later than forty (40) days after the journalization of this order, to perform his community service, subject to immediate release upon later compliance.  Upon the failure to purge, the failure to complete his community service within the time specified, or if terminated by Court Community Service, the Court, upon the filing of an affidavit of the Obligee, Stephanie Ann Deluca, or the CSEA with an attached certified copy of CSEA/OCSPC payment records and the filing of an affidavit of the Court Community Service Liaison, shall issue a capias for the Obligor, Larry Elliot Klayman, to serve the jail sentence ordered above.  Said affidavit(s) shall be filed within one (1) year of the journalization of this order.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that, in the event that the Obligor, **LARRY ELLIOT KLAYMAN**, is sentenced to perform community service and reports for said performance, the Obligor, **LARRY ELLIOT KLAYMAN**, shall pay the sum of seventy dollars ($70.00) directly to Court Community Service for administrative costs.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that in addition to the above sentence and civil purge, the Obligor, **LARRY ELLIOT KLAYMAN**, shall do the following:

1) Continue to pay $1,836.00 per month, which includes 2% processing charge, as current support for the remaining minor children Lance, Isabelle ($900.00 per month per child not including 2% processing charge);

2) Pay an additional $360.00 per month toward the arrearage until the arrearage is paid in full or until further order of Court. Processing charges shall not be collected on the arrearage payment since the above arrearage includes all accrued processing charges.

**Total monthly support order is $2,196.00.**

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED:** that this Court reserves jurisdiction to address the issue of unpaid medical expenses.

H865_TP.DOC  (8/2006)                                  2

All support under this order shall be withheld or deducted from the income or assets of the **Obligor, LARRY ELLIOT KLAYMAN,** pursuant to a withholding or deduction notice or appropriate order issued in accordance with Chapters 3119., 3123., and 3125. of the Revised Code or a withdrawal directive issued pursuant to sections 3123.24 to 3123.38 of the Revised Code and shall be forwarded to the **Obligee, STEPHANIE ANN DELUCA,** in accordance with Chapters 3119., 3121., 3123., and 3125.of the Revised Code.

To secure the support obligation, the Court further finds that:   (check appropriate box)

Until the income source begins withholding in the appropriate amount, the Obligor shall make payments (check or money order payable to OCSPC) directly to Ohio Child Support Payment Central (OCSPC).

☒   Obligor's income source is not attachable; that Obligor has the ability to post a cash bond and therefore an order to post bond in the amount of $3,672.00 which sum includes 2% processing charge, should issue.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Obligor, **LARRY ELLIOT KLAYMAN** immediately notify CSEA, in writing, of the commencement of, or any change in employment (including self-employment). Receipt of additional income/monies or termination of benefits. **Obligor, LARRY ELLIOT KLAYMAN** shall include a description of the nature of the income and the name, business address and telephone number of any income source. **Obligor, LARRY ELLIOT KLAYMAN,** shall immediately notify CSEA of any change in the status of an account from which support is being deducted or the opening of a new account with any financial institution alone with the name, business address and account number(s).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Obligor, **LARRY ELLIOT KLAYMAN, and Obligee, STEPHANIE ANN DELUCA,** comply with the request of the CSEA or the Court to provide information regarding their health insurance benefits, federal income tax return from the previous year, all pay stubs within the preceding six (6) months, all other records evidencing the receipt of any other salary, wages or compensation within the preceding six (6) months. Said records include, but are not limited to, proof of unemployment status, financial institution accounts and any benefits (i.e., unemployment, sub pay, sick leave, Workers Compensation, severance pay, retirement, disability, annuities, Social Security and Veteran's Administration benefits).

Either party's failure to provide any earnings/benefits information pursuant to this order, or failure to comply with the foregoing order of notification shall be considered contempt of Court, punishable by a fine and/or jail sentence. Attorney fees and Court costs may then be assessed against the party held in contempt.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the **residential parent and legal custodian of the children** immediately notify the Cuyahoga Support Enforcement Agency (CSEA) of any reason for which the support order should terminate, including but not limited to, the child's attaining the age of majority (age 18) if the child no longer attends an accredited high school on a full-time basis; the child ceases to continuously attend an accredited high school on a full-time basis after attaining the age of majority; the child's death, marriage, emancipation, enlistment in the Armed Services, deportation; or change of legal custody of the child.

H865_TP.DOC  (8/2006)                                         3

The following information is provided by the parties for the use of the Cuyahoga Support Enforcement Agency (CSEA) in accordance with §3121.24 of the Ohio Revised Code:

**OBLIGEE:**   NAME:    Stephanie Ann Deluca
                 RESIDENCE ADDRESS:    2898 Kerwick Road
                                        Cleveland, Oh  44118-0000

                 MAILING ADDRESS:    2898 Kerwick Road
                                        Cleveland, Oh  44118-0000

                 SOCIAL SECURITY NO.:
                 DATE OF BIRTH:    11/30/1966
                 DRIVERS LICENSE NO.:

**OBLIGOR:**   NAME:    Larry Elliot Klayman
                  RESIDENCE ADDRESS:    3415 Sw 24th Street
                                         Miami, Fl  33145-0000

                 MAILING ADDRESS:    3415 Sw 24th Street
                                       Miami, Fl  33145-0000

                 SOCIAL SECURITY NO.:
                 DATE OF BIRTH:    07/20/1951
                 DRIVERS LICENSE NO.:

**EACH PARTY TO THIS SUPPORT ORDER MUST NOTIFY THE CHILD SUPPORT ENFORCEMENT AGENCY IN WRITING OF HIS OR HER CURRENT MAILING ADDRESS, CURRENT RESIDENCE ADDRESS, CURRENT RESIDENCE TELEPHONE NUMBER, CURRENT DRIVER'S LICENSE NUMBER, AND OF ANY CHANGES IN THAT INFORMATION. EACH PARTY MUST NOTIFY THE AGENCY OF ALL CHANGES UNTIL FURTHER NOTICE FROM THE COURT OR AGENCY, WHICHEVER ISSUED THE SUPPORT ORDER. IF YOU ARE THE OBLIGOR UNDER A CHILD SUPPORT ORDER AND YOU FAIL TO MAKE THE REQUIRED NOTIFICATIONS, YOU MAY BE FINED UP TO $50 FOR A FIRST OFFENSE, $100 FOR A SECOND OFFENSE, AND $500 FOR EACH SUBSEQUENT OFFENSE. IF YOU ARE AN OBLIGOR OR OBLIGEE UNDER ANY SUPPORT ORDER ISSUED BY A COURT AND YOU WILLFULLY FAIL TO GIVE THE REQUIRED NOTICES, YOU MAY BE FOUND IN CONTEMPT OF COURT AND BE SUBJECTED TO FINES UP TO $1,000 AND IMPRISONMENT FOR NOT MORE THAN 90 DAYS. IF YOU ARE AN OBLIGOR AND YOU FAIL TO GIVE THE REQUIRED NOTICES, YOU MAY RECEIVE NOTICE OF THE FOLLOWING ENFORCEMENT ACTIONS AGAINST YOU: IMPOSITION OF LIENS AGAINST YOUR PROPERTY; LOSS OF YOUR PROFESSIONAL OR OCCUPATIONAL LICENSE, DRIVER'S LICENSE, OR RECREATIONAL LICENSE; WITHHOLDING FROM YOUR INCOME; ACCESS RESTRICTION AND DEDUCTION FROM YOUR ACCOUNTS IN FINANCIAL INSTITUTIONS; AND ANY OTHER ACTION PERMITTED BY LAW TO OBTAIN MONEY FROM YOU TO SATISFY YOUR SUPPORT OBLIGATION.**

H865_TP.DOC (8/2006)           4

Case 1:13-cv-20610-CMA   Document 39-4   Entered on FLSD Docket 12/05/2013   Page 6 of 6

Failure to comply with this order can result in a contempt action as provided in Ohio Revised Code Section 2705.05, the penalty for which may be imprisonment for not more than thirty (30) days in jail and/or fine of not more than $250.00 for the first offense, sixty (60) days in jail and/or $500.00 fine for the second offense, and up to $1,000.00 fine and/or ninety (90) days in jail for third or subsequent offenses.

Costs adjudged against Petitioner.

**JUDGE DIANE M. PALOS**

pap

cc:   Roger L. Kleinman, Esq.
      Attorney for Petitioner

      Suzanne M. Jambe, Esq.
      Attorney for Respondent

RECEIVED FOR FILING

SEP 2 4 2009

GERALD E. FUERST, CLERK
By _____ Deputy

THE STATE OF OHIO } SS.
Cuyahoga County

I, THE CLERK OF THE COURT OF COMMON PLEAS WITHIN AND FOR SAID COUNTY

CUYAHOGA COUNTY CLERK OF COURTS

By _____, Deputy

H865_TP.DOC  (8/2006)                    5

OCT 0 7 2013

# COURT OF COMMON PLEAS
## DIVISION OF DOMESTIC RELATIONS
## CUYAHOGA COUNTY, OHIO

**LARRY ELLIOT KLAYMAN**  :  **Case No: DR07 316840**

      **Petitioner**  :  **Judge: DIANE M. PALOS**

      - vs. -  :

**STEPHANIE ANN LUCK**  :  **JUDGMENT ENTRY**

      **Respondent**  :

    This matter came on for hearing on June 23, 2010, before Magistrate Serpil Ergun upon Respondent's Motion To Show Cause For Continued Non-Payment of Child Support (#289099) and Motion For Attorney Fees (#289100) filed October 15, 2009; Petitioner's Motion To Withdraw Capias (#291722) filed December 8, 2009; and the Guardian Ad Litem's Motion For Guardian Ad Litem Fees (#292173) filed December 10, 2009. Present were Attorney William Whitaker on behalf of the Petitioner, Respondent, and Attorney Suzanne Jambe on behalf of the Respondent. Petitioner and the Guardian Ad Litem Jennifer Malensyk failed to appear.

    The Court adopts the Magistrate's Decision filed **July 2, 2010**, in its entirety.

**IT IS HEREBY ORDERED:**

**AFTER CONSIDERING THE MAGISTRATE'S DECISION FILED
JULY 2, 2010, PLEADINGS, EXHIBITS AND IN THE ABSENCE
OF A TRANSCRIPT, PETITIONER'S OBJECTIONS FILED
JULY 16, 2010 ARE HEREBY OVERRULED AND THE DECISION
OF THE MAGISTRATE ADOPTED WITHOUT MODIFICATION.**

    Petitioner's Motion To Withdraw Capias (#291722) filed December 8, 2009 is DISMISSED without prejudice.

    The Guardian Ad Litem's Motion For Guardian Ad Litem Fees (#292173) filed December 10, 2009 is DISMISSED without prejudice.

    Respondent's Motion To Show Cause For Continued Non-Payment of Child Support (#289099) filed October 15, 2009 is GRANTED.

    Petitioner/Obligor Larry Klayman is in contempt of Court for failing to comply with this Court's support order journalized September 24, 2009, as well as the divorce decree registered in this Court by order journalized August 28, 2007.

DEFENDANT'S
EXHIBIT
11
1/29/14 JL

Petitioner is in arrears in the amount of $47,600.90 as of May 31, 2010, which is owed the Respondent/Obligee Stephanie DeLuca f/k/a Stephanie Klayman, Respondent's assignee(s), and the Child Support Enforcement Agency (CSEA). This sum includes all previously accrued support arrears and processing charges, and supercedes all prior determinations. Petitioner also owes Respondent $5,950.00 for tuition expended for the children for the 2009-2010 and 2010-2011 school years.

This is Petitioner's second offense in this Court for nonpayment of support.

**Petitioner is hereby sentenced for said contempt to sixty (60) days in jail. However, the Petitioner's sentence will be suspended and the contempt will be purged PROVIDED that Petitioner pays $10,000.00 through the CSEA within 30 days of the journalization of this order. This purge payment is in addition to any obligation to pay current support and arrearage payments that may be due.**

**All support shall be paid through Ohio Child Support Payment Central (OCSPC), P.O. Box 182372, Columbus, Ohio 43218-2372.** Any payments not made through OCSPC shall not be considered as payment of support. Checks or money orders shall be made payable to "OCSPC". Cash payments to OCSPC may be made at the Cuyahoga County Treasurer's Office, County Administration Building, 1st Floor – Cashier, 1219 Ontario Street, Cleveland, Ohio 44113. All payments shall include the following: Obligor's name, Social Security Number, SETS case number, and Domestic Relations Court case number.

**In the event Petitioner does not purge the contempt, the Court, upon the filing of an affidavit of the Respondent Stephanie DeLuca or the CSEA with an attached certified copy of CSEA/OCSPC payment records, shall issue a capias for Petitioner Larry Klayman to serve the jail sentence ordered above. Said affidavit shall be filed within one (1) year of the journalization of this order.**

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that in addition to the above sentence and civil purge, Petitioner shall do the following:

1) Continue to pay $1,836.00 per month, which includes 2% processing charge, as current support for the minor children Isabelle Natalie Klayman (DOB 12/15/1997) and Lance William Klayman (DOB 11-14-1999) ($900.00 per month per child not including 2% processing charge);

2) Pay an additional $360.00 per month toward the arrearage until the arrearage is paid in full or until further order of Court. Processing charges shall not be collected on the arrearage payment since the above arrearage includes all accrued processing charges.

**Total monthly obligation is $2,196.00.**

All support under this order shall be withheld or deducted from the income or assets of the obligor pursuant to a withholding or deduction notice or appropriate order issued in

accordance with Chapters 3119., 3121., 3123., and 3125. of the Revised Code or a withdrawal directive issued pursuant to sections 3123.24 to 3123.38 of the Revised Code and shall be forwarded.

The prior order to post bond dated September 24, 2009 shall remain in full force and effect.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Obligor immediately notify the CSEA, in writing, of any change in employment (including self-employment), receipt of additional income/monies or termination of benefits. The Obligor shall include a description of the nature of the employment and the name, business address and telephone number of any employer. The Obligor shall immediately notify the CSEA of any change in the status of an account from which support is being deducted or the opening of a new account with any financial institution.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the **Child Support Obligor and the Child Support Obligee** shall comply with the request of the CSEA in advance of an administrative review of a support order to provide the following: copy of federal income tax return from the previous year, copy of all pay stubs within the preceding six (6) months, copy of all other records evidencing the receipt of any other salary, wages or compensation within the preceding six (6) months, and, if the Obligor is a member of the uniformed services and on active military duty, a copy of the Obligor's Internal Revenue Service Form W-2, "Wage and Tax Statement," and a copy of a statement detailing the Obligor's earnings and leave with the uniformed services. The **Child Support Obligor and the Child Support Obligee** shall also provide a list of available group health insurance and health care policies, contracts and plans, and their costs, the current health insurance or health care policy, contract, or plan under which the Obligee and/or Obligor is/are enrolled, and their costs, including any Tricare program offered by the United States Department of Defense available to the Obligee, and any other information necessary to properly review the child support order.

Either party's failure to provide any earnings/benefits information pursuant to this order, or failure to comply with the foregoing order of notification shall be considered contempt of Court, punishable by a fine and/or jail sentence.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the **residential parent and legal custodian of the child(ren)** immediately shall notify, and the obligor under a child support order may notify, the CSEA of any reason for which the child support order should terminate, including but not limited to the child's death, marriage, emancipation (age 18 or high school completion/termination), enlistment in the Armed Services, deportation, or change of legal custody. A willful failure to notify the CSEA is contempt of court.

The following information is provided for the use of the CSEA in accordance with §3121.24 and §3121.30 of the Ohio Revised Code:

H865_TP.DOC (8/2006)                                              3

**OBLIGEE:** NAME:            Stephanie Ann Luck
          RESIDENCE ADDRESS:     2598 Kerwick Road
                                          Cleveland, Oh  44118-0000

          MAILING ADDRESS:        2598 Kerwick Road
                                          Cleveland, Oh  44118-0000

          SOCIAL SECURITY NO.:
          DATE OF BIRTH:           11/30/1966
          DRIVERS LICENSE NO.:

**OBLIGOR:** NAME:            Larry Elliot Klayman
          RESIDENCE ADDRESS:     P.O. Box 2788
                                          Washington, Dc  20013-0000

          MAILING ADDRESS:        P.O. Box 2788
                                        Washington, Dc  20013-0000

          SOCIAL SECURITY NO.:
          DATE OF BIRTH:           07/20/1951
          DRIVERS LICENSE NO.:

Attorney fees and court costs may be assessed against the party held in contempt.

The parties affected by the support order shall inform the CSEA of any change of name or other change of conditions that may affect the administration of the order. Willful failure to inform the CSEA of the above information and any changes is contempt of court.

**EACH PARTY TO THIS SUPPORT ORDER MUST NOTIFY THE CHILD SUPPORT ENFORCEMENT AGENCY IN WRITING OF HIS OR HER CURRENT MAILING ADDRESS, CURRENT RESIDENCE ADDRESS, CURRENT RESIDENCE TELEPHONE NUMBER, CURRENT DRIVER'S LICENSE NUMBER, AND OF ANY CHANGES IN THAT INFORMATION. EACH PARTY MUST NOTIFY THE AGENCY OF ALL CHANGES UNTIL FURTHER NOTICE FROM THE COURT OR AGENCY, WHICHEVER ISSUED THE SUPPORT ORDER.  IF YOU ARE THE OBLIGOR UNDER A CHILD SUPPORT ORDER AND YOU FAIL TO MAKE THE REQUIRED NOTIFICATIONS, YOU MAY BE FINED UP TO $50 FOR A FIRST OFFENSE, $100 FOR A SECOND OFFENSE, AND $500 FOR EACH SUBSEQUENT OFFENSE. IF YOU ARE AN OBLIGOR OR OBLIGEE UNDER ANY SUPPORT ORDER ISSUED BY A COURT AND YOU WILLFULLY FAIL TO GIVE THE REQUIRED NOTICES, YOU MAY BE FOUND IN CONTEMPT OF COURT AND BE SUBJECTED TO FINES UP TO $1,000 AND IMPRISONMENT FOR NOT MORE THAN 90 DAYS.**

**IF YOU ARE AN OBLIGOR AND YOU FAIL TO GIVE THE REQUIRED NOTICES, YOU MAY NOT RECEIVE NOTICE OF THE FOLLOWING ENFORCEMENT ACTIONS AGAINST YOU: IMPOSITION OF LIENS AGAINST YOUR PROPERTY; LOSS OF YOUR PROFESSIONAL OR OCCUPATIONAL LICENSE, DRIVER'S LICENSE, OR RECREATIONAL LICENSE; WITHHOLDING FROM YOUR INCOME; ACCESS RESTRICTION AND DEDUCTION FROM YOUR**

**ACCOUNTS IN FINANCIAL INSTITUTIONS; AND ANY OTHER ACTION PERMITTED BY LAW TO OBTAIN MONEY FROM YOU TO SATISFY YOUR SUPPORT OBLIGATION.**

Failure to comply with this support order can result in a contempt action; and, as provided in Ohio Revised Code §2705.05, the penalty for which may be imprisonment for not more than thirty (30) days in jail and/or fine of not more than $250.00 for a first offense, not more than sixty (60) days in jail and/or fine of not more than $500.00 for a second offense, and not more than ninety (90) days in jail and/or not more than $1,000.00 fine for a third or subsequent offense.

All orders not modified herein shall remain in full force and effect.

Respondent's Motion For Attorney Fees (#289100) filed October 15, 2009 is GRANTED. Petitioner shall pay $2,500.00 toward the Respondent's attorney fees as additional spousal support for which judgment is rendered and execution may issue.

Petitioner shall pay all costs of this action.

Costs adjudged as provided in the above entry.

_____
**JUDGE DIANE M. PALOS**

pap

cc:     Roger L. Kleinman, Esq.
        Attorney for Petitioner

        Suzanne M. Jambe, Esq.
        Attorney for Respondent

        Jennifer L. Malensek, Esq.
        Guardian ad Litem

**RECEIVED FOR FILING**

**JUN 2 4 2011**

GERALD E. FUERST, CLERK
BY _____ DEP.

THE STATE OF OHIO }
Cuyahoga County } SS.

I, THE CLERK OF THE COURT OF COMMON PLEAS WITHIN AND FOR SAID COUNTY,

HEREBY CERTIFY ...
TAKEN AND ...
... 
WITNE...
DAY OF...
CUYAHOGA COUNTY CLERK OF COURTS
By _____ Deputy

H865_TP.DOC (8/2006)

5

Case No: DR07 316840 : D & A

LARRY ELLIOT KLAYMAN vs. STEPHANIE ANN LUCK

Date: 02/22/2010 : Judge: DIANE M. PALOS

---

CAPIAS ORDERED FOR PLAINTIFF
NAME: LARRY ELLIOT KLAYMAN
ADDRESS: SEE ATTACHED
HOLD IN CUSTODY AND BRING BEFORE THIS COURT WITHOUT DELAY.

**COURT COSTS ADJUDGED AGAINST: LARRY ELLIOT KLAYMAN**

JUDGE DIANE M. PALOS
Court of Common Pleas
Division of Domestic Relations

ATTORNEY FOR DEFENDANT: SUZANNE M. JAMBE

REC'D FOR FILING                                    DEPUTY

GERALD E. FUERST
Clerk of Courts

RECEIVED FOR FILING
MAR 16 2010
GERALD E. FUERST, CLERK
By _____ Deputy

DR-H702 (06/2006)



DEFENDANT'S
EXHIBIT
12
1/29/14

## Cuyahoga County Court of Common Pleas
### Criminal Court Division

| State of Ohio, | | A True Bill Indictment For |
|---|---|---|
| | Plaintiff | Criminal Nonsupport - F5 |
| vs. | | §2919.21(B) |
| Larry Klayman, | | |
| | Defendant | 1 Additional Count(s) |

| Date s of Offense (on or about) | The Term Of | Case Number |
|---|---|---|
| 09/25/2009 to 09/24/2011 | January of 2012 | 558506-12-CR |

| The State of Ohio, } ss. | CR12558506-A | 72137676 |
|---|---|---|
| Cuyahoga County | ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ | |

| **Count One** | **Criminal Nonsupport - F5** §2919.21(B) |
|---|---|
| **Defendants** | Larry Klayman |
| **Date of Offense** | On or about September 25, 2009 to September 24, 2011 |

*The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County aforesaid, on their oaths, IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OHIO, do find and present, that the above named Defendant(s), on or about the date of the offense set forth above, in the County of Cuyahoga, unlawfully*

did recklessly fail to provide support as established by a court order to Isabelle, whom, by court order or decree, Larry Klayman was legally obligated to support.

FURTHERMORE, the offender failed to provide support for a total accumulated period of twenty-six weeks out of one hundred four consecutive weeks.

*The offense is contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio.*

RECEIVED FOR FILING

JAN 2 4 2012

GERALD E. FUERST

BY _____ DEP.

_Michael P. Killa_
Foreperson of the Grand Jury

_Bill Mason_
Prosecuting Attorney

Page 1 of 2



DEFENDANT'S
EXHIBIT
13
1/29/14 TC

Cuyahoga County Court of Common Pleas

A True Bill Indictment

| | |
|---|---|
| **Count Two** | **Criminal Nonsupport - F5**<br>§2919.21(B) |
| **Defendants** | Larry Klayman |
| **Date of Offense** | On or about September 25, 2009 to September 24, 2011 |

*The grand jurors, on their oaths, further find that the Defendant(s) unlawfully*

did recklessly fail to provide support as established by a court order to Lance, whom, by court order or decree, Larry Klayman was legally obligated to support.

FURTHERMORE, the offender failed to provide support for a total accumulated period of twenty-six weeks out of one hundred four consecutive weeks.

*The offense is contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio.*

_Michael P. Killa_
Foreperson of the Grand Jury

_Bill Mason_
Prosecuting Attorney

72928764

CAPIAS on INDICTMENT (TRIAL)          CASE #   CR-12-  558506          ITN #

ISSUE DATE: 03/16/2012

THE STATE OF OHIO vs:
LARRY  KLAYMAN
2220 AVENUE OF THE STARS UNIT 402
LOS ANGELES, CA 90067-0000

THE STATE OF OHIO
CUYAHOGA COUNTY
COURT OF COMMON PLEAS

DOB: 07/20/1951
LID #:                              OCA #:
NCIC #:                             SO #:
SEX: M                              RACE: WHITE
OTHER PD #: STATE OF OHIO

JUDGE ARRAIGNMENT ROOM

TO THE SHERIFF OF CUYAHOGA COUNTY, OR LOCAL POLICE DEPARMENT WITHIN SAID STATE

An Indictment has been filed in the Cuyahoga County Court of Common Pleas charging the defendant name on
This warrant with:
   **2919.21 B** NONSUPPORT OF DEPENDENTS; **2919.21 B** NONSUPPORT OF DEPENDENTS

You are ordered to arrest said defendant, if he is found in your jurisdiction and bring him before the Court
without unnecessary delay.



**Witness, GERALD E. FUERST**, Clerk of our said Court, at the Court House
in the City of Cleveland, the 16th Day of March, A.D. 2012

**GERALD E. FUERST**, Clerk
By: GLENDA CARNEY, Deputy Clerk

**RECEIPT OF WARRANT**
Warrant received on _____ at _____ By
                                          CUYAHOGA COUNTY SHERIFF DEPT., Sheriff

| **SHERIFF FEES** | | |
|---|---|---|
| Sheriff & Return | $ _____ | **RETURN OF EXECUTED WARRANT** |
| | | I executed this warrant on _____ at ____ o'clock __M., |
| | | and pursuant to its command on _____ |
| Arrest | $ _____ | arrested and now have the defendant in my custody. |
| Conveyance | $ _____ | **RETURN OF UNEXECUTED WARRANT** |
| | | I returned this warrant on _____ at ____ o'clock __M., |
| Mileage | $ _____ | but was unable to do so because |
| Total | $ _____ | |

Executing Officer _____

THE STATE OF OHIO
Cuyahoga County   SS.   I, GERALD E. FUERST, CLERK OF
                        THE COURT OF COMMON PLEAS
                        WITHIN AND FOR SAID COUNTY,
HEREBY CERTIFY THAT THE ABOVE AND FOREGOING IS TRULY
TAKEN AND COPIED FROM THE ORIGINAL
NOW ON FILE IN MY OFFICE.
WITNESS MY HAND AND SEAL OF SAID COURT THIS 20
DAY OF March A.D. 20 12
                        GERALD E. FUERST, Clerk
By _____ Deputy

379093
CMSR6024                          Page 1 of 1

DEFENDANT'S
EXHIBIT
14
1/29/14 JL
PENGAD 800-631-6989

9/17/13
News



**Archive.is**
webpage capture

Saved from `http://www.prosecutormason.com/mnc.aspx?type=News&mcid=782`   [ search ]   7 Sep 2012 17:12:58
no other snapshots from this url
All snapshots from host www.prosecutormason.com

[ Text ] [ Image ]

download .zip    report abuse    **PIN THIS PAGE:**    other

cuyahoga county prosecutor

**Prosecutor's Office**

court watch    sexual offender search    deadbeat parent search    foreclosure search

Home
About Bill Mason
Press Releases
From the Desk of Bill Mason
Hot Topics
Resources
Ohio ICAC
Ohio Internet Crimes Against Children
  ICAC Task Force Video
Photo Gallery
Contact Us

**Units**

Adult Criminal
  Grand Jury
  Major Trial
  General Felony
  Community Based Prosecution
  Major Drug Offenders
  Economic Crime
  Appeals
  Cold Case Unit
Juvenile Justice
General Civil Division
Child Support Enforcement
Children and Family Services
Real Estate Tax Foreclosure

**Search**

[ Search ]

### News

**Fifteen Defendants Indicted for Owing $410,404.55 in Child Support**
02/03/2012

FOR IMMEDIATE RELEASE
February 3, 2012

Fifteen Defendants Indicted for Owing $410,404.55 in Child Support

Larry Klayman Indicted for Owing $78,861.76

CLEVELAND – Cuyahoga County Prosecutor Bill Mason announced that fifteen defendants were indicted for failure to pay child support. These fifteen defendants owe a combined $410,404.55 in child support. The charge of criminal non-support is a fifth degree felony which carries a maximum sentence of one year in prison. These indictments are a result of a joint investigative effort by the Cuyahoga County Child Support Enforcement Agency (CSEA) and the Cuyahoga County Prosecutor's Office.

1. Larry Klayman, 60, of Los Angeles, California, was indicted on two (2) counts of criminal non-support. He owes $78,861.76 for his two children ages 11 and 14. Two hearings were held in Domestic Relations Court between 2009 and 2010. The last voluntary payment was made on August 30, 2011, in the amount of $1,014.26.  Arraignment is scheduled for February 7, 2012.

2. James Morris, 45, of Bedford, was indicted on six (6) counts of criminal non-support. He owes $66,557.75 for his three children ages 12, 14, and 17. Three hearings were held in Domestic

Email  Print

Archives: From [ 6/28/2012 ]  To [ 8/21/2012 ]  [ View ]

| Date ▼ | Title |
|---|---|
| 08/21/2012 | Cleveland Police Officer Gregory Jones Indicted for Rape |
| 08/21/2012 | Five Defendants Indicted for Owing $129,469.23 in Child Support Arrears |
| 07/24/2012 | The Stow Police Department Joins the Ohio Internet Crimes Against Children (ICAC) |
| 06/28/2012 | Duane Gibson Found Guilty For Kidnapping a 58-Year-Old Male |
| 06/28/2012 | Duane Gibson Found Guilty For Kidnapping a 58-Year-Old Male |
| 06/28/2012 | Duane Gibson Found Guilty For Kidnapping a 58-Year-Old Male |

Code Amber - AMBER - Alert

CUYAHOGA COUNTY PROSECUTOR'S OFFICE
Justice Center Bld. Floor 8th and 9th | 1200 Ontario Street, Cleveland, OH-44113
Phone: 216.443.7800 | Fax: 216.698.2270

Privacy Policy | Terms of Use

archive.is/S1Gh#

DEFENDANT'S
EXHIBIT
15
1/29/14 JC
PENGAD 800-631-6989

1/1



Dina James <daj142182@gmail.com>

# Fwd: Defamation, False Light, Invasion of Privacy, False Advertising, Tortious Interference with Business Relations and Other Causes of Action
1 message

**Larry Klayman** <leklayman@gmail.com>                                      Tue, Jan 28, 2014 at 9:22 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Fri, Feb 24, 2012 at 4:22 PM
Subject: Defamation, False Light, Invasion of Privacy, False Advertising, Tortious Interference with
Business Relations and Other Causes of Action
To: orly.taitz@gmail.com

Dear Ms. Taitz:

My clients, which include George Miller and Pamela Barnett, recently contacted you to put you on notice
that your website, published to the world, contained and continues to contain false and defamatory material
concerning my clients and me, among other potential causes of action, including but not limited to the tort
of false light, invasion of privacy, tortious interference with business relations, false advertising and other
potential causes of action.

My clients suggested that it would be in your best interests to have your lawyer contact me, as the ongoing
false and misleading material continues to be published by you. Each minute this continues, and we have
electronic and other copies of what you have published thus far, ongoing severe harm results and
increases to my clients and me.

Specifically, and without limitation, you have stated that my clients in effect are defrauding the public over
raising funds for eligibility challenges and that I have been convicted of a crime, have not done work on the
project, and that I cannot participate in cases in California by entering pro per or working with my
colleague, who is licensed in California.

Your motivation is transparent, as you obviously see competition from us and indeed you have apparently
expressed your intention to be involved in a lawsuit challenging Obama's eligibility in Florida. You false
and defamatory representations thus also amount to false advertising under the Lanham Act and common
law.

I have not heard from your lawyer or anyone on your behalf since my clients contacted you.

Accordingly, if these false and defamatory materials on your website are not removed immediately, and
you do not agree to cease and desist from further tortious acts against us, you, and those conspiring and
acting in concert with you (including not limited to Connie Ruffley), will be held legally accountable, in your
personal and other legal capacities, for these tortious acts.

if you wish to discuss this prior our having to take legal action, your lawyer or you may call my cell phone at
310 595-0800 within the next 48 hours. Otherwise, we will proceed accordingly for to remedy the large
damage you and your accomplices have caused.

Larry Klayman

DEFENDANT'S
EXHIBIT
16
FBN/GAD 800-631-6989
1/29/14 JC

cc: George Miller
    Pamela Barnett



Dina James <daj142182@gmail.com>

## Fwd: Defamation, False Light, Invasion of Privacy, False Advertising and Other Torts
1 message

**Larry Klayman** <leklayman@gmail.com>                                    Tue, Jan 28, 2014 at 3:50 PM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>


---------- Forwarded message ----------
From: **Orly Taitz** <orly.taitz@gmail.com>
Date: Sun, Feb 26, 2012 at 9:45 AM
Subject: Re: Defamation, False Light, Invasion of Privacy, False Advertising and Other Torts
To: Larry Klayman <leklayman@gmail.com>


I did not get any e-mail from you.
I only heard from George Miller and told him, that if there is anthing wrong or defamatory in my post, please provide me information, what specifically is incorrect and defamatory and I will publish a correction
thank you

On Sun, Feb 26, 2012 at 9:39 AM, Larry Klayman <leklayman@gmail.com> wrote:
> Ms. Taitz:
>
> You continue to publish offending material about my clients and me. You have caused great damage
> and continue to cause great damage to us.
>
> As discussed my email of last Friday, we look forward to hearing from you today, as we gave you 48
> hours to respond.
>
> Please govern yourself accordingly.
>
> Larry Klayman



--
Dr Orly TaitzESQ
29839 Santa Margarita pkwy, ste 100
Rancho Santa Margarita, CA 92688
ph 949-683-5411  fax949-766-7603
orlytaitzesq.com



DEFENDANT'S
EXHIBIT
17
1/29/14 JL



Dina James <daj142182@gmail.com>

## Fwd: On Orly Taitz Attacks on us.
1 message

**Larry Klayman** <leklayman@gmail.com>                Tue, Jan 28, 2014 at 3:43 PM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: <microcapmaven@aol.com>
Date: Sun, Feb 26, 2012 at 1:37 PM
Subject: On Orly Taitz Attacks on us.
To: leklayman@gmail.com, pb_realestate@yahoo.com, sams@bestselfusa.com

**suggested revised text for open letter on Taitz offensive:**

Recent, utterly absurd multiple bombastic attacks by Orly Taitz on Larry Klayman, Esq., Obama State Ballot Challenge, Article II SuperPAC, Obama Release Your Records, Gulagbound, Steady Drip Blog, have quietly vanished from the *"World's Leading Obama Eligibility Challenge Web Site."*

Does that tell you anything?
~~~~

**We should still send her a detailed letter on specific offenses and remedies, since damage has already been inflicted?**

**Regards,**
**George Miller**
*http://venturacountyteaparty.com*
*http://Obamaballotchallenge.com*
*http:Constitutionalreset.com*
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~



DEFENDANT'S
EXHIBIT
18
1/29/14 JC

**An Open Letter to Orly Taitz, re: Defamatory Statements** (Draft v5) 2-26-12

Ms. Taitz:

As we previously stated, you have made multiple defamatory statements about Larry Klayman and some supporters, including us, causing severe harm. We supported you for years, because you were about the only game in town, after Apuzzo and Donofrio concluded that the federal courts would not hear any argument, no matter how logical, how grounded in fact and law.

Now, there are many ballot challenges granted instant "standing" and new attorneys are joining the fight. Obama State Ballot Challenge has helped to focus attention on the challenges and facilitate activity. We do not appreciate your non-productive infighting with other patriots in the movement. In fact, you are actively and maliciously attempting to hurt our efforts, in a manner nearly indistinguishable from that of the "Obama" forces. We know that they are enjoying sitting back and watching you do their work for them.

We had stayed quiet and counseled others not to get involved in the fray with you. George tried speaking to you twice earlier and again on 1/23/12, but, you would not even allow him to complete a sentence without interrupting. But, you have crossed into libelous action, so it has come to this and now we must reluctantly speak out. It's bad enough that you routinely attack movement patriots, but now you are damaging the efforts of one of the finest attorneys in the nation. And that is unacceptable. Unlike others you have bulldozed, we will not be so passive, especially since you have ignored letters from our attorney.

You have little or no idea what you are even talking about, flinging around allegations, slyly implying misconduct and did not make a competent, good faith effort to ascertain the truth. In any case, it is none of your business how we conduct our campaigns, since we are complying with all laws and answer any legitimate questions to donors and patriot allies. We are writing this only to document your offenses and inform the public of what is really going on.

It is obvious that you feel threatened, are jealous of any other activity in the eligibility movement, are fearful of any "competition" and believe that a dollar contributed anywhere else but to you is a dollar stolen from you.

We specifically reference some of your inflammatory, defamatory, misleading and fallacious blog postings. It is quite clear that you have an "agenda" to discredit Mr. Klayman and us. Our response to the postings is below and we have also marked up some of them in Appendix A:

DEFENDANT'S
EXHIBIT
19
1/29/14

- It seems as though we committed the unforgivable sin of helping to raise money for the Hatfield/Swensson Atlanta challenge and publicity/education activities. After that, you, who we were on excellent terms with, became an even worse enemy than "Obama." More recently, we started fundraising for Larry Klayman's planned work.  The attacks only increased.

- All of your absurd "concerns" and inaccurate statements could have been avoided, simply by calling and asking before recklessly writing in your blog. Your failure to exercise due diligence prior to posting falsehoods, incomplete and one- sided information, has resulted in creating a highly misleading impression that we are dishonest, possibly taking money and failing to use it as advertised—all untrue. You  also dredged up and presented only negative statements about Larry Klayman, including various defamatory statements which hold him in a false light.  For instance, Klayman's PA law license expired. He has not done any work there in two decades. He was not subjected to any disciplinary actions there. He has not been convicted of any crime and can enter cases in California pro hac vice, as you know.

- Article II PAC is not involved in collecting money for legal defense. Pamela Barnett and George Miller are no longer with Article II SuperPAC or Article II Legal Defense Fund, but we maintain a strategic alliance, since we have closely aligned goals, but different approaches and activities.

- Pamela Barnett, George Miller and Sam Sewell have never taken a penny from Article II PAC, Article II Legal Fund, or any other similar fundraising efforts. We have only paid in.  I'm not aware that others you have named have taken any money either, except for a few who had legitimate expense reimbursements for travel, living and assigned activities, you know, like you take.  I am informed by the Treasurer that none of that came out of the legal fund.


- ObamaBallotChallenge.com has not collected any money at all, although we have heavily promoted multiple such campaigns for others, such as Kerchner, Swensson/Hatfield, Klayman, Arpaio, you, etc.

---

- **Klayman has never been associated with the Article II SuperPAC, but we were/are still using the Article II Legal Defense Fund to raise money for his ballot challenge efforts.**

- **Article II Legal Defense Fund will be sending funds to Klayman.**

- **RE: Taitz statement:** The question is: who is lying? Was Klayman paid or not? If he was paid, than he needs to refund the donors, as he did not file law suits as he was supposed to.
  **No one is lying except you- or at least badly misleading unsuspecting readers of your blog. Klayman received only partial payment of his $25K retainer, but only after he had already started work on his own initiative, without the promised retainer. He should be praised, not vilified.**

- **We have raised funds from other sources. We have not yet received any funds from Article II Legal Defense fund.**

- **The 96 hour deadline you spoke of was in our initial ads, which was in fact required to enable us to engage Klayman in sufficient time to file an initial complaint. We didn't raise the full amount in time, but were successful in getting him to graciously start some work anyway,  the same day that a citizen filed a complaint, who has subsequently worked with Larry to begin modifying it to incorporate improvements.  Klayman is planning strategy, researching statutes and looking for appropriate jurisdictions to file additional complaints in.**

- **For you to make a leap of logic that we are somehow defrauding donors, because Klayman wasn't able to research, write and file a complaint in the four or so hours he worked before a citizen complaint was filed on 2/16 without his input-- is beyond ridiculous, but quite typical of your communications style and "logic.".**

- **Klayman does not have a CA license is largely irrelevant and seems designed to imply that he cannot mount any efforts here in CA. As you know, he can enter cases in California pro hac vice, and lawyers that practice nationally do so on a routine basis. No one can be licenses in all 50 states and that is why all courts allow attorneys to enter cases pro hac vice.**

- Larry, the founder of Judicial Watch, has stated publicly that he left it to run for a Florida U.S. Senate seat. At least he had the good sense to focus on one thing. Running for the Senate, if seriously, is a full-time job.

- We have already explained Klayman's response to the child support issue, grounded in law and fact, unlike your one sided presentation, which inaccurately portrayed him as a deadbeat Dad. You did not give Klayman or us any chance to respond to your misleading assertions about him and others before that on other matters, repeatedly since January. You routinely censor our postings on your site, so we have ceased trying.

- Klayman has never been convicted of anything. He has not had a license suspended or revoked. He is following the law.

- It is interesting that "Constance Ruffley" of Judicial Watch went out of her way to attend your presentation, switching topics to comment on Klayman's involvement in the "birther" suits and his personal life (which is none of her or your business), since Judicial Watch completely blew us off when we approached them about helping. You seem to place a lot of weight on words of an office clerk with an agenda.

- The fact that multiple Article II Legal Fund ads run on ObamaBallotChallenge.com and an Obama Ballot Challenge ad runs on Art2 SuperPAc does not mean that we are each members of the other. We left to focus on the Ballot Challenges, while Article II SuperPAC will focus mainly on education and publicity on….. Article II issues.  So, there is obviously potential synergy, but different missions.

- Your seemingly obsessive interest in Klayman is fascinating.  It seems that you are focused on attacking Klayman and impeding his mission, when you should instead be focused on building the movement and cooperating.

- What results have you achieved in four years of taking OPM (Other peoples' money)?  All these misstatements, if not lies, or deliberate shading of the truth, are at the very least the result of your fact-finding

---

incompetence, or a deliberate attempt to mislead your readers, not a good attribute in an attorney.

- We can't tell people who to support, but will only say that there are now multiple attorneys working on cases, mostly ballot challenges. We advise our readers to check their track records, qualifications and achievements before making their choices.  It is not Larry's fault that we only started working with him recently and haven't raised the agreed upon money yet. This is more attributable to a late start and justifiable disappointment of people in the legal process, especially after the initial Georgia defeat and others before that.

- Now, we must deal with an attorney (you) seemingly intent upon sabotaging the efforts of a genuine American patriot and outstanding achiever, instead of warmly welcoming him and cooperating. The Larry Klayman projects are in progress. Same is true of the Kerchner, Hatfield/Swensson and Irion efforts. And yours. The more the merrier.  You know we also promoted you vigorously, but find that far more difficult now, when you keep attacking us and others.

- You need to quickly make amends by not only deleting all inaccurate and misleading material, but by posting on your blog and sending full and unqualified retractions out immediately to all of your lists. As our attorney wrote you, you have caused *ongoing and severe harm*.   So it would behoove you and be in your best interests to commence corrective actions immediately, rather than compounding and extending your offenses.  Our group has nothing to apologize for, except not raising money fast enough. We are open for business and <u>on</u> the cases!

Regards,


Pamela Barnett, Director


George Miller, Communications


ObamaBallotChallenge.com

## Appendix A

**We have commented on some specific passages in Orly Taitz blog postings, below. We see that after removing all of your recent offensive postings this morning (2/26), you later replaced them with more garbage. We will not even address the latest one, except to say that you are in no position to be making any demands. We meet all legal requirements and answer questions of donors and allied patriots. Why don't you try answering the same questions and further explain why you have been taking donors' money for four years, with no accounting, no results, incurred multiple sanctions, displayed incompetence and have shown no results—ZERO?**

## UPDATE ON ARTICLE2SUPERPAC

*Posted on* | February 25, 2012 | 2 Comments

I have more important things to do, than waste my time with Article2superpac handful of bloggers,

***\* Response: Since you started this whole mess with us, you have no one to blame but yourself. We were helping you, until you started attacking us.***

however, they issued a big statement accusing me, while I provided 2 simple facts, which cannot be refuted by anyone.

They advertised on many bloggers, that attorney  Larry  Klayman agreed to represent clients in 2 state:s in CA and FL. They stated that Klayman will be a counsel in a case, which was filed pro se  by Pamela Barnett, Ed Noonen,   Gary Wilmott, George Miller. None of these people are licensed in CA  as an attorney.

Article2Superpac advertises on it's website, that Garry Wilmott is a JD, but  I previously wrote that he never passed the bar exam and he is not a licensed attorney.

Recently I pointed out a simple fact, that Larry Klayman is not licensed to practice law in the state of California. This is a true and correct statement. Anyone can go on the website of the CA Bar and verify those facts.

***\* Response: Also irrelevant. The Klayman Law Firm has a CA licensed attorney, which will facilitate a pro se arrangement.  What is your point?***

Additionally  solicitations were sent, they  had a logo of the Article2Superpac  asking people to donate $25,000 for attorney Larry Klayman to file those 2 cases in Florida and California to be filed within 1 week by February 17 deadline. Many of those solicitations stated "it is now or never". I pointed out that there were no law suits filed by attorney Larry Klayman by February 17, as promised. This is a true and correct statement, that cannot be disputed by anyone.

***\* Response: Suits were filed as "placeholders" to meet deadlines. Klayman will take them over, file amendments and possibly more suits.***

Article2superpac issued a clarification, that the donations made for those 2 law suits, that were supposed to be filed by February 17 by

attorney Klayman, will be refunded.

***Response: They said no such thing. You should improve your reading comprehension. Helen offering a refund upon request is not the same thing as saying they are refunding all of the monies. In any case, Helen does not set policy for our projects.***

This is a step in the right direction. They are still attacking me, saying that the refund will be done out; of goodness of their heart, however this offer of refund came as a result of my article with true simple facts, which wee exposed by me

a. that attorney Klayman is not licensed in California

b. that he did not file the 2 lawsuits by the deadline of February 17.

Article2superpac also clarified, that the money, that people donated for law suits did not go to the pac, but to their legal fund. What they are saying, is that they, as a superpac, donate only to education and this is reported and expenditures are disclosed. What you donate to lawsuits, goes to their offshoot Article2superpac legal fund. Apparently there is no disclosure in regards to their legal fund. They did not disclose, who is on the board of this article2 legal fund, how much of the $25,000 was actually received, who got this money and what did this person/persons do with it. I got a phone call from George Miller, who stated that attorney Klayman was not paid, because they did not collect nearly $25,000, that attorney Larry Klayman demanded as a precondition of a deposit for filing any eligibility lawsuits. George Miller did not disclose to me, how much was collected for those law suits and what was done with this money.

***Response: You were so busy running your mouth and interrupting Mr. Miller, that he could not even finish a sentence. If you had actually LISTENED, you would have learned that no money had been yet received from the PAC, but we have received some funding from other sources. It is really none of your business. If you would focus on your own job, instead of everyone else's, maybe you would actually accomplish something. Maybe you should go back to drilling teeth.***

Lastly, a number of individuals, who are on the board of the article2Superpac or people who promote Article2Superpac and work with them wrote highly defamatory statements about me. Those statements were made in writing and sent via mass e-mails by Helen Tansey, director of Article@Superpac, Dean Haskins, who is advertising Art2Superpac and worked with Tansey in GA and others.

***Response: There are only three people listed as PAC members on the site. Why are you lumping in all those other names. Can't you read?***

This was done, even though I did over 90% of the work in eligibility cases for the last 4 years. At the same time they were advertising the most limited cases, which are based only on the fact, that Obama's father was not a US citizen. Those cases were brought by attorneys Hatfield, Irion, and by people, who are not licensed attorneys, like Barnett, Wilmott, Miller and a couple of others. My point is, that if a judge says, that he follows a precedent of Wong Kim Ark, all of these lawsuits will be in the toilet immediately, as there is nothing else there. If I were Obama, I would love to have all lawsuits limited to that, as those are the easiest to throw out of court.

My lawsuits are based on multiple factors, which include Obama's use of a forged birth certificate, stolen Social Secrity number, last name, which is not legally his. . The fathers's citizenship is only one aspect.

What I am saying, is that if you are supporting my work and donating to my work, you are supporting cases, which have much more meat, than all of the cases promoted by Article2Superpac and their legal fund, that with me you are donating to the work of a licensed attorney, who has a track record of nearly 4 years of a true devotion and 24/7/365 work for this cause.

*** Response: We were actually in the Klayman strategy meetings and know that you are incorrect, since document/identity fraud are included in the strategy.  You embarrass yourself every time you make unwarranted assumptions and draw erroneous conclusions.**

# MY YESTERDAY'S PRESENTATION TO CCIR AND UPDATE ON ARTICLE2SUPERPAC-LARRY KLAYMAN $25,000 FUNDRAISING FOR NON-EXISTENT LAW SUIT AFFAIR

*** Response: A prejudicial headline, if we ever saw one**

**Posted on** | February 23, 2012 | 1 Comment

Article2superpac $25000 solicitation for Larry Klayman

Screen shot $25,000 solicitation for Larry Klayman lawsuits, February 10, 2012

Yesterday I gave a 2hour presentation of my platform as a candidate for the US Senate. The presentation was given to some 100 CA voters  in the Women's club of  Garden Grove.  I was told, that a representative of the Judicial Watch drove for over an hour from San Marino to hear me speak and talk to me. I got a very warm reception, after my presentation people stood up and applauded. This member of the judicial watch approached me and gave me her card. Her name is Constance Ruffle and she is an office administrator for the Judicial  Watch in their Western Regional Headquarters at 2540 Huntington  Dr., San Marino. She told me, that she used to work for the FBI and that she worked for the Judicial Watch for many years.  She actually initiated the discussion about Larry Klayman and told me that she heard that he is involved in birthed cases. I told her that this group, article2superpac was soliciting money, that they sent an e-mail and posted on their site an advertisement on February 10, asking for $25,000, claiming that they need to raise $25,000 in 96 hours, as the cases in Florida and California need to be filed within a week. I told her, that it was a hard sell, they wrote it is now or never, saying finally Obama's team met their match, disusing 4 years of my tireless work in the process, and in the end nothing was filed by Larry Klayman. It is not clear what happened to all of the money that was raised, who got it.

*** Response: We did need it by then to start the case on time, which you could have learned by asking.  And you don't do a "hard sell?"**

Ms. Ruffle actually advised me that Larry Klayman is not licensed in California, she told me that he no longer works with the Judicial Watch and that donors should know about litigation in Ohio, where he was convicted just recentlty of not paying large amount in child support. She provided a lot of other information. I will publish only, what is a public record. I am not publishing anything, that is not in public record.

*** Response: So, you eagerly publish what an office clerk says, without attempting
to interview the subject for a balanced view or otherwise develop a full picture?
Seems like you might have an "agenda" here.**

A number of individuals sent me this information:

Larry Klayman, 60, of Los Angeles, California, was indicted on two (2) counts of criminal non-support. He owes $78,861.76 for his two children ages 11 and 14. Two hearings were held in Domestic Relations Court between 2009 and 2010. The last voluntary payment was made on August 30, 2011, in the amount of $1,014.26. Arraignment is scheduled for February 7, 2012.

http://www.politicalforum.com/current-events/232994-breaking-democrat-files-ballot-challenge-objection-against-obama-florida-2.html

*** Response: Again, you might want to first learn ALL of the facts, since this is not
the whole story by a long stretch.**

FWIW, you might want to read this suit (below) filed against Kayman...from the time this suit was filed against Klayman (2007), he has not honored his promise to pay back what the court ordered, even though it was nowhere near the $25,000 he was trusted with. I would be worried too, if I had donated money to this man.

*** Response: All legal obligations were met.**

IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR, Supreme Court Case

No.

Complainant,vs. No. 2011-70,621(11A)

LARRY ELLIOT KLAYMAN,

Respondent.

COMPLAINT

3. On or about November 11, 2007, Natalia Humm ("Humm") filed a grievance against Respondent (Larry Klayman) alleging that he had had failed to provide services in her criminal case after she paid him a $25,000 retainer.

http://www.floridabar.org/DIVADM/ME/MPDisAct.nsf/DISACTVIEW/261D0D4E01FD99C8852578FC00812578/$FILE/246220_12.PDF

Yesterday I got an e-mail from Pamela Barnett titled: "Larry Klayman did not get nearly his retainer". When Barnett wrote that Klayman did not get nearly his retainer, it means, that he got something. Barnett did not disclose, what did he get. What does it mean? According to the solicitation by a pack of bloggers in this article2Superpac, all of these bloggers were heavily soliciting a total of $25,000. Nobody knows, how much did they actually raise. Additionally, Barnett claims, that she and George Miller are no longer connected with the article2superpac, however the Article2superpac and solicitation for donations for article2superpac is located at the top of the blog, ObamaBallotChallenge which is administered by Barnett and Miller. The link http://www.art2superpac.com/floridaballot.html shows the actual article. The PDF and screenshot are at the top of the page.

*** Response: As we previously stated, running an ad doesn't mean being part of the
organization where the ad is run.**

"Not nearly his retainer" can be $15,000 out of $25,000, it can be$10,000. Bottom line, nobody knows, how much Klayman actually got. The question is, why was he paid anything, if he did not file the law suits, as he was supposed to?

***\* Response: Retainers are ordinarily paid BEFORE the services are rendered.***

Later I got an e-mail from Tony Dolz, who is not on the board of the Article2Superpac, but who is in contact with a number of the board members of this PAC, who stated, that he had a discussion with George Miller, who is on the board of the Article2superpac, who runs a blog ObamaBallotChallenge together with Barnett. According to Dolz, Miller stated, that Klayman was not paid anything.

***\* Response: Miller told Dolz that the Article II Legal Defense Fund had paid nothing (to date), not that Klayman was paid nothing.***

The question is: who is lying? Was Klayman paid or not? If he was paid, than he needs to refund the donors, as he did not file law suits as he was supposed to. If the bloggers raised money and did not pay Klayman, the bloggers need to refund the money to the donors. The press release, that was issued by Article2Superpac on February 10, 2012 clearly stated, that the donors are asked to donate $25,000 to pay Larry Klayman, that they have 96 hours to raise this large sum of money.

***\* Response: That was a target we established to get Larry involved in time to file the first suit. He will now modify a citizen suit, which met the deadline and later file others, linked to different events.***

The article also stated that the law suits are supposed to be filed within 1 week. It is now or never(see the article above). So, there were clear parameters: this pack of bloggers was soliciting from the public a large sum of money specifically to pay attorney Larry Klayman: $25,000 to file 2 law suits in FL and CA within a week, by February 17,2012. Those law suits were never filed and the public should be refunded all of the money that was donated for this specific purpose. All of the bloggers, who ran this solicitation, need to provide accounting for the public, how much money did they raise in total and where did this money go. Actually, donors can report this to their District Attorneys. If the public donated for specific purpose and did not get the benefit, the public was defrauded and this is a criminal matter. People went to prison for things like that.

***\* Response: That's humorous. Because we missed a deadline, we should cancel the project? If that was the law, most projects, including yours, would be canceled. And we're "criminals" for that? Headed for prison, yet? LOL!***

There are 5 board members of this Article2superpac:

1. Helen Tansey-blogger, president of the Article2SuperPAC

2. Garry Wilmott, blogger GiveUSLiberty1776

3. Bob Nelson-blogger, runs ORYR (ObamaReleaseYourRecords) or BirtherReport (I got information, that Bob Nelson is a pseudonym for Richard Garoutte, but I am not sure yet)

4. George Miller runs blog ObamaBallotChallenge together with Pamela Barnett (another supporter claims, that Pamela Barnett is on the board instead of George Miller, but I have no confirmation of that)

5. Kevin Powell, a cameraman, I don't know, what blog does he run

Additionally several other bloggers were running solicitation of this Article@superpac on their blogs, among them

Dean Haskins, blogger "BirtherSummit"

Sam Sewell blogger 'steady drip", Charles Kerchner and a few others.

All of these people are supposed to refund the public all of the money,

***\* Response: Says who? Someone who has shown no results in 4 years?***

that they raised for these law suits that were supposed to be filed by Larry Klayman by the February 17, 2012 deadline, as those law suits were never filed. The public never got the benefit of the what they paid for.

This is the reason, why I stated before, that if you want to donate to the work of a specific attorney, donate directly and you know, where the money is going. When you donate to a gang of bloggers, claiming that the money is going to attorneys for legal expenses, you have no idea where the donations are going. Additionally, with PACs like these you have no idea, what will be in those law suits.

*Response: Total, irresponsible speculation on your part. We personally interviewed Klayman and he is committed to also pursue document fraud. Once again, you are making unsupported, totally unjustified, statements. In any case, the Irion and Hatfield cases also serve a useful purpose, are simpler and more efficient to pursue. Let them have at it. Try managing your own cases instead.*

We saw, that this whole pack of bloggers lately supported the law suits and ballot challenges, that have the most limited cases, based only on only Minor v Happersett interpretation of the Natural Born Citizen, these are very limited challenges. Most of their cases challenge Obama only based on his father's citizenship, they stipulate, they agree that Obama has a valid birth certificate and a valid Social Security number. Why there is such an effort and such a push behind weakest cases, with no evidence of wrongdoing, cases, which are the easiest to throw out of court? Who is pulling the strings? Who is manipulating this whole team?

*Response: What "team" are you referring to? There are several. Our team works together, Orly. No one is manipulating us.*

🔲 Share / Save 🔲 💛 🔁 ≑

**Category:** Events, HOT ITEMS!, LINKS, Latest News, Legal Actions, Supporting Documentation

# I RECEIVED AN E-MAIL FROM PAMELA BARNETT, WHO STATED THAT ATTORNEY LARRY KLAYMAN IS NO LONGER ASSOCIATED WITH ARTICLE2 SUPERPAC.

**Posted on** | February 22, 2012 | 2 Comments

If article 2Superpac and their article2legal fund are not connected with attorney Larry Klayman, they are not connected with me, who are they collecting money for and how much?

*Response: Klayman was never connected with Article II SuperPAC, but he will be receiving funds via the Article II Legal Defense Fund, which many are starting to promote. We take the Art2 mission very seriously, as you should.*

# ARTICLE 2SUPERPAC WAS RAISING $25,000 FOR LARRY KLAYMAN. DID ANYONE SEE ANY OBAMA ELECTION

## CHALLENGE LAW SUITS FILED IN COURTS BY ATTORNEY LARRY KLAYMAN?

**Posted on** | February 22, 2012 | No Comments

I want to see the actual pleadings, signed by Larry Klayman and filed in courts in Florida and California,  for which they paid $25,000. If no case was filed by attorney Larry Klayman, than donors were defrauded.

*\* Response: We addressed this nonsense above.*

# Gmail

Dina James <daj142182@gmail.com>

## Fwd: Voeltz v Obama-- Florida Ballot Challenge Hearing-- thank you and more ...
1 message

**Larry Klayman** <leklayman@gmail.com>                          Tue, Jan 28, 2014 at 9:11 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: <microcapmaven@aol.com>
Date: Thu, Jun 7, 2012 at 11:00 AM
Subject: Re: Voeltz v Obama-- Florida Ballot Challenge Hearing-- thank you and more ...
To: microcapmaven@aol.com

**To our esteemed donors to Constitutional Action Fund:**

**First, we apologize for sending a mass emailing. We simply don't have the manpower to do personalized letters and all funds are used for legal expenses and public education.**

**We thank you very much for supporting the case to date.  We FINALLY have a hearing on June 18. We could not have done this without you. Read more below. That's the good news. Bad news is that we are still short of funding. Even if you don't want to contribute again, we ask that you request friends, family and associates to do so and spread the word. These lawsuits are nearly the the last legal redress we have, since Congress refuses to act, the FBI ignores our complaints and the Secret Service protects, rather than arrests, the usurper in the White House.**

**Regarding our Obama Ballot Challenge hearing in Florida-- Voeltz v. Obama.  This is a very important case, with a hearing on natural born Citizenship in Tallahassee on June 18. Judge Terry Lewis is the same judge who ordered a stop to ballot counting in FL in 2000, in the Gore v Bush case, which our attorney, Larry Klayman, founder of Judicial Watch, also worked on. Mike Voeltz is a very knowledgeable, committed plaintiff, who filed the original complaint and later teamed up with attorney Larry Klayman, at our request.  Larry is the Founder of Judicial Watch, now with Freedom Watch. He took this case on privately and has poured in far more of his own resources than we are able to fairly compensate him for. But, he does have to eat and does nearly all of his work for subprime "cause" type clients like us.  In addition, there are hard dollar expenses for court, plane tickets, hotels, cars, meals, stenographers, serving, transcripts, air freight-- it's amazing.**

**Larry told me today that he is conferring with multiple attorneys on the natural born Citizenship issue and has also requested testimony from the Maricopa**

DEFENDANT'S
EXHIBIT
20
1/29/14 Jz

PENGAD 800-631-6989

County, AZ Cold Case Posse investigating Obama's eligibility (so far, no luck).
There are other experts to use and the reports made available by the Posse, too.

We desperately need funds for past due payments and solicit any assistance
available. Please ask friends and associates to help.

Would appreciate any help at this point, We are still short about $5K plus at least
$3K for expenses (more if we can get more witnesses) to take us through the
hearing. Doesn't sound like much, but it would make all the difference in the world.
It's amazing that George Zimmerman can raise over $100,000 on his web site, but
we struggle to finance one of the most important cases in the nation. Win or lose,
there will likely be an appeal. We want to keep this case alive, along with a few
others, to keep the pressure on, by heading to the Supreme Court.

More about the case on our sister site, which Capt. Pamela Barnett and I
run: http://obamaballotchallenge.com/category/ballot-news-blog/florida

http://obamaballotchallenge.com/gop-softball-election-fraud-and-acorn-have-you-scared-
obama-will-be-in-the-white-house-another-4-years

Case fund: https://secure.piryx.com/donate/rLxEJ8qe/ConstitutionActionFund/Klayman

http://ConstitutionActionFund.org

Please call with any questions: 805-807-5119. This is a voice mail and we'll get
back as soon as we can.

Note: funds sent to Larry Klayman's current organization are NOT applied to this
case, but are for other, also worthy causes.

Would you please act today, as this is urgent.

Thanks,
George Miller
http://ConstitutionActionFund.org
http://obamaballotchallenge.com



**HELP WITH OBAMA ELIGIBILITY LEGAL BATTLES**

We find it encouraging that public surveys show more and more agreement that Obama may be ineligible
and more high profile public figures are joining us: Sheriff Joe Arpaio, Lord Christopher Monckton, Donald
Trump (again) and Michael Savage are examples. Win or lose, we are helping to focus attention on
"Obama's" murky past, ineligibility, toxic policies and associates, helping to assure he will be far away from

the White House when all is said and done. We also help keep the door open for potential nullification of everything he ever signed, while pretending to be President.

If you will permit your name to be used, cited as a donor and/or to publicize a statement from you, let us know. Some of you already have. We are also attempting to contact donors to the prior fund used and those who sent money before we had any fund at all.



Dina James <daj142182@gmail.com>

## Fwd: Retention Agreement with Klayman Law Firm
2 messages

---

**Larry Klayman** <leklayman@gmail.com>                              Tue, Jan 28, 2014 at 8:59 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Wed, Feb 8, 2012 at 9:44 AM
Subject: Retention Agreement with Klayman Law Firm
To: "George J. Miller" <gmiller@facilitatorgroup.net>

Dear George:

I will prepare a more formal legal retention agreement today, but here are the essential terms that you can run by the group.

To file suit in Florida will need an up front retainer of 18 K, which will need to be kept at this level throughout the course of the case by replenishing it monthly. I will bill for out of pocket disbursements and expenses, and my hourly rate will be $395 per hour, which is reduced from my usual minimum rate of $600 per hour. Statements will issue on the first of each month and be payable on receipt.

If the group decides to file in California as well, the retainer will be 25K, replenished on the same terms, for both legal actions.

I will not bill for the time that I put in trying to help the group raise funds, and I will rent my direct mail list to the group at market rates to help facilitate fundraising. I will also intervene with WorldNetDaily and Response Unlimited to get the group the best deal possible. As you know, I am close with Joseph Farah, represent him and Jerome Corsi in a related suit against Esquire magazine, and have a number of contacts elsewhere that will prove helpful.

If we promote this correctly, it should be easy to raise the monies needed to pursue our legal objectives. Frankly, we have no choice but to pursue this strategy, as the nation is on its knees and headed down for the count. No Republican can currently beat Obama, not even Romney, who took it on the chin yesterday. Neither he, Santorum or Gingrich are likely to succeed. Our only hope is to legally remove Obama, whatever the odds, with God's grace.

Please let me know who will be the signatories to the legal representation agreement and I will draw it up and send it today.

Sincerely,

Larry

---

**Larry Klayman** <leklayman@gmail.com>                              Tue, Jan 28, 2014 at 9:00 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>



DEFENDANT'S
EXHIBIT
21
11/29/14

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Thu, Aug 9, 2012 at 3:39 PM
Subject: Fwd: Retention Agreement with Klayman Law Firm
To: "George J. Miller" <microcapmaven@aol.com>, Pamela Barnett <pamelabarnett@mail.com>, Sam
Sewell <sams@bestselfusa.com>
Cc: Naveed Mahboobian <nmahboobian@gmail.com>


This is what you all agreed to.The 18K was just a retainer and fees
were to bill at $395.oo per hour, reduced from my ordinary hourly rate
of $600 per hour.

The series of emails which followed from you all acknowledges this
agreement. In addition, when I agreed to file suit, Pamela and George
assured me, in the presence of witnesses, that I would be fully paid
for our work.

That there is no formal written contract is not controlling. There is
written evidence of our agreement in the form of emails and you owe
the monies under the legal doctrines of promissory estoppel, quantum
meruit and unjust enrichment, as well as breach of contract. A
contract can be oral as well as written.

I was pleased to hear George commit to paying what is outstanding, as
we would hope to avoid suit.

I spoke with George yesterday, and he is to give me today confirmation
that the billed amount will be paid down installments and that at
least $1200 was to be sent today. Also, this confirms that an
additional $415.00 dollars is to be added to the expenses, as I paid
out of my pocket what was outstanding to Transmedia Group.

Thank you for your immediate cooperation and courtesy.

Larry Klayman
[Quoted text hidden]



Dina James <daj142182@gmail.com>

## Fwd: Payment
2 messages

---

**Larry Klayman** <leklayman@gmail.com>                    Tue, Jan 28, 2014 at 9:08 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: <leklayman@gmail.com>
Date: Thu, Jun 7, 2012 at 8:28 AM
Subject: Payment
To: "George J. Miller" <microcapmaven@aol.com>

George:

As discussed we need to have our full retainer at least before I go to Florida. Thx
Sent from my Verizon Wireless BlackBerry

---

**Larry Klayman** <leklayman@gmail.com>                    Tue, Jan 28, 2014 at 9:08 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Fri, Jun 8, 2012 at 9:35 AM
Subject: Re: Payment
To: microcapmaven@aol.com
Cc: Pamela Barnett <pamelabarnett@mail.com>

Thats fine but I need the rest before I get on the plane. Expenses
alone are alot and we are putting in alot of time. Its been many
months so we need to get current now. Thx

On Fri, Jun 8, 2012 at 9:26 AM,  <microcapmaven@aol.com> wrote:
> we're down to $3600 after check Sam just sent.
>
> Regards,
> George Miller
> http://venturacountyteaparty.com
> http://obamaballotchallenge.com
> ~~~~~~~~~~~~~~~~~~~~~~~~~~~
>
>
> -----Original Message-----
> From: leklayman <leklayman@gmail.com>
> To: George J. Miller <microcapmaven@aol.com>
> Sent: Thu, Jun 7, 2012 8:28 am
> Subject: Payment
>



DEFENDANT'S
EXHIBIT
22
1/29/14 JC
PENGAD 800-631-6989

> George:
>
> As discussed we need to have our full retainer at least before I go to
> Florida.
> Thx
> Sent from my Verizon Wireless BlackBerry

**A 12 Gauge Won't Save You**

Discover What Federal Agents & The Army Don't Want You To Know
www.CloseCombatTraining.com                   AdChoices ▷



conwebwatch                                                      Story

Home   ConWebBlog   Archive   About   Primer   Letters   Links   Shop

# Larry Klayman, Failed Lawyer

WorldNetDaily's favorite lawyer loves filing lawsuits, which lately
have been even more unsuccessful than usual.

**By Terry Krepel**
Posted 8/9/2012

Send this page to:

Enter Address Here

Send this page!

---

Larry Klayman made his name as a right-wing lawyer by using **millions of
dollars in funding** from Richard Mellon Scaife to file dozens of nuisance
lawsuits against the Clinton administration through his group, Judicial
Watch. (When Klayman tried filing lawsuits against the Bush
administration, however, the ConWeb buddies who fawned over his anti-
Clinton activism wanted **nothing to do with him**.) At the same time,
Klayman was **suing his mother**.

Klayman left Judicial Watch to run for a Senate seat in Florida, in which he
**finished seventh** in an eight-person Republican primary despite (or,
perhaps, because of) an **endorsement** by WorldNetDaily's Joseph Farah.

Klayman then formed a Judicial Watch-esque group, **Freedom Watch**,
while also **suing** Judicial Watch. The bad blood between Klayman and
Judicial Watch continues; in a recent **column**, Klayman complained that a
new book by current Judicial Watch chief Tom Fitton "chronicles my
achievements at Judicial Watch but appears to attribute them to Fitton
himself, who is not a lawyer and never appeared in court to advocate any
case. ... Indeed, my name appears nowhere in the book, even in the index."
Klayman, of course, has **intimated legal action** against Fitton over the
book.



Not only is Klayman a sue-happy lawyer, he's also been
on the defendant end of legal action as well. Earlier this
year, Klayman was **indicted** for failure to pay child
support. Needless to say, this descended into a legal
morass; an Ohio appellate court **noted** last month that
Klayman had apparently engaged in "inappropriate
behavior" with his children -- something he has not
denied -- that he "repeatedly invok[ed] his Fifth



SHARE

Ads @ ConWebWatch

*Advertise at ConWebWatch!*

DEFENDANT'S
EXHIBIT
23
1/29/12



Larry Klayman

Amendment rights, about whether he inappropriately touched the children," and that "Klayman would not even answer the simple question regarding what he thought inappropriate touching was." The court upheld a lower court's ruling that Klayman be ordered to pay $325,000 of his ex-wife's legal costs.

And last November, Klayman was **reprimanded** by the Florida bar for taking a $25,000 payment from a woman to represent her in a criminal case but failing to do any legal work for her. After he was ordered to return $5,000 of the money as agreed to in mediation, he failed to keep up the payments. Klayman claimed that his "financial situation continues to be dire." (He claims that he has since repaid the money.) Further, Klayman's license to practice law in Pennsylvania is **under administrative suspension.**

In short, Klayman is a hot mess of a lawyer. Yet he continues to file lawsuits -- with WND as a major client -- which are swiftly tossed out of court. Let's look at a few recent cases.

## WND v. White House Correspondents Association

In 2010, WND threw a fit because the White House Correspondents Association wouldn't sell it the number of tickets it demanded in order to promote Les Kinsolving's nepotistic, WND-published bio (written by Kinsolving's daughter). At first, WND tried to intimidate the WHCA into giving it the tickets it wanted -- **claiming** that it was "doing the bidding of the Obama administration in trying to belittle, exclude and irreparably harm a leading Internet news outlet, WorldNetDaily, which has carried commentary critical of the president." Then, Klayman and WND filed a **$10 million lawsuit** against the WHCA claiming "harm to its business and other relationships" because of the WHCA's refusal to accede to its demands.

One curious thing about the WND story announcing the lawsuit: It never reported in which court the suit was filed. We've since learned it was the District of Columbia Superior Court.

Another curious thing: That story was pretty much the last anyone heard about the lawsuit from WND, aside from Klayman's **threat** to add the White House as a defendant. That's because the suit was dismissed almost immediately.

According to DC Superior Court **records** (case No. 2010-CA-002364), Klayman filed the case on April 13, 2010. On May 3, 2010, the WHCA filed a motion for dismissal, which was granted on June 22. The case was slapped down just over two months after its filing.

Adding insult to injury, the copy of the order sent to Klayman's office was returned was returned to the court because it was "Not Deliverable as Addressed, Unable to Forward." No wonder WND didn't want to talk about it anymore.

**The latest from**





- **WND's Kupelian Lies About Obama, Military Voting**
  WorldNetDaily managing editor David Kupelian uses an Aug. 9 column to claim that President Obama's re-election campaign is trying...
- **CNS' Jeffrey Tries to Heather An Archbishop**
  The Media Research Center's practice of Heathering -- berating and shunning conservatives who fail to march in total lockstep...
- **NEW ARTICLE: Larry Klayman, Failed Lawyer**
  WorldNetDaily's favorite lawyer loves filing lawsuits, which lately have been even more unsuccessful than usual. Read more >>





Even a year later, WND and Klayman didn't want to talk about it. When ConWebWatch queried Klayman during his and WND's **dog-and-pony show** announcing its lawsuit against Esquire as to why he didn't further pursue that lawsuit, Klayman brusquely replied: "Well, first of all, we decided not to pursue that. But the issue here is this case, not that case, so if you want to relive that case, we'll do that some other time."



## WND v. Esquire

WND was absolutely livid about a May 2011 Esquire **parody blog post** claiming that WND is pulling Jerome Corsi's then-newly-released anti-Obama birther book "Where's the Birth Certificate?" out of stores because, according to a made-up quote from Farah, "this book has become problematic, and contains what I now believe to be factual inaccuracies." Lest anyone miss the parody aspect, the post also stated that Corsi also wrote a book called "Capricorn One: NASA, JFK, and the Great 'Moon Landing' Cover-Up" -- a reference to the **similarly themed movie.**

A May 18, 2011, WND **article** assailed the blog post as "a completely fabricated news story" that prompting editor Joseph Farah to descend even further into conspiracy mode by blaming the Obama White House for it. Here is an actual quote from Farah: "This has all the earmarkings of a White House dirty trick – but, of course, only the Nixon administration was capable of dirty tricks like that, according to our watchdog media."

Farah seemed to have missed another parody aspect of Esquire's post: the real Joseph Farah would never have done something so reasonable as to withdraw Corsi's book -- there was birther money to be reaped, after all.

Nevertheless, Farah threatened to sue Esquire. And sue he did, represented once again by Klayman. The lawsuit was announced in a June 30, 2011, **dog-and-pony show** in a rented room at the National Press Club in Washington where participants in the presser outnumbered the reporters. Also in attendance were Corsi and self-proclaimed image expert Mara Zebest, both of whom spent their time on a tangental effort to demonstrate that Obama's birth certificate is fake, which had nothing whatsoever to do with the lawsuit.

As has become all too familiar for Klayman, his case got laughed out of court. WND let Klayman rant about it in a June 4 **article**, declaring the dismissal "significantly flawed and intellectually dishonest." Curiously missing from the article: the key evidence the judge used to dismiss the lawsuit.

As **the ruling states,** Farah "immediately recognized" that the Esquire article was satire -- telling the Daily Caller that the post was "a very poorly executed parody." -- until it became "inconvenient" for him to do so. The judge added: "Political satire can be, and often is, uncomfortable to its targets, but that does not render it any less satiric or any less an expression on a topic of public concern."

That Klayman refused to address the key substantive part of the ruling while

ranting about how horrible the ruling is shows you what kind of lawyer he is
-- that is to say, not a good one.

## Bradlee Dean v. Rachel Maddow

A July 26, 2011, WND **article** by Bob Unruh announced another Klayman
legal venture: suing MSNBC host Rachel Maddow for $50 million on behalf
of a Minnesota preacher named Bradlee Dean, whom he claims Maddow
defamed by selectively editing a rant by Dean to suggest that he favors the
execution of gays.

Unruh falsely suggested that Maddow ignored a disclaimer by Dean that he
does not support the killing of gays; in fact, Maddow **specifically said**
after airing the Dean clip: "Mr. Bradlee with two e's later clarified that he
didn't really mean to sanction murder of gay people. He said, 'We have
never and will never call for the execution of homosexuals.' Which is nice."

Unruh, of course, did not disclose his employer's conflict of interest by
noting that Klayman is currently representing WND. He also ignored Dean's
long history of anti-gay rhetoric (perhaps because WND himself is so anti-
gay that its employees believe a ludicrous statement like Dean's claim that
"On average, [homosexuals] molest 117 people before they're found out" is
documented fact); instead, Unruh serves as public relations agent for
Bradlee and his ministry,You Can Run But You Cannot Hide International.

Unruh devoted a **second article** to the lawsuit the next day, focusing on
Klayman and Dean's claim that Maddow was "trying to undercut the
presidential campaign of U.S. Rep. Michele Bachmann, R-Minn., and to do
that attacked those with whom she has associated." In fact, only one of the
two segments that mentioned Dean also mentioned Bachmann, and that
was to note that the two would be sharing a stage at a "tea party nominating
convention."

As has been a running theme, Klayman's lawsuit was essentially laughed out
of court. You wouldn't know that by the way Klayman and his PR agents at
WND spun it though:

Unruh used a July 10 WND **article** to obfuscate the facts of the dismissal,
leading instead with Dean and his attorney, Larry Klayman, "asking that the
judge in the case be removed because of her biased comments." It's not until
after he rehashes the case in a biased manner favorable to Dean --
specifically, the 20th paragraph -- that Unruh gets around to reporting the
big news in Dean's lawsuit: that the judge in question had ordered Dean to
pay around $24,000 in legal fees to Maddow before she would permit
Klayman's request to move the case from District of Columbia court to
federal court in order to get around Maddow citing the District's anti-
SLAPP laws in her defense.

Unruh uncritically repeated Dean and Klayman's claim that Maddow's
"defense work would be equally applicable in the new filing in federal
court," without explaining how a federal court can address legal fees for
another lawsuit filed and withdrawn in another jurisdiction. Also, given that



**amazon**.com
and you're done.

Justice
Michael J. Sandel
New $10.20

A People's History
of the United Sta...
Howard Zinn
New $12.25

Nickel and Dimed
Barbara
Ehrenreich...
New $10.20

The Tipping Point
Malcolm Gladwell
New $10.87

Persepolis
Marjane Satrapi
New $8.53

The 48 Laws of
Power
Robert Greene
New $14.96

Privacy Information

Dean and Klayman are admitting they're moving their lawsuit to federal court specifically to avoid the District's anti-SLAPP laws, Maddow's defense work could not directly be used since a different set of laws would apply.

Unruh also uncritically -- and selectively -- repeated Dean's complaints about the judge's alleged "biased comments," which included the laughable complaint that the judge "stated in her order that defendants lawyers are 'distinguished,'" while not applying that description on Klayman. Unruh appears not to have considered the concept that Klayman's legal work, especially of late, is not "distinguished" at all -- or, more to the point, it's distinguished only by its record of failure. (And we haven't even gotten to his own status as a lawbreaker for **refusing to pay child support**.)

Unruh also cited Dean's complaint of the judge's "mockery of Klayman's health issues," which according to the affidavit consisted of a broken leg that prevented him from traveling from California to the District of Columbia.

It seems like Dean has a case against Klayman for inadequate (or incompetent) representation. If Klayman's office is in D.C., why is he living in California?

Unruh failed to mention that Dean, in his affidavit, personally attacked the judge, calling her a "woman scorned." Insulting the judge is hardly the best way to successfully argue your case -- something Unruh seemed to recognize by not reporting it.

It's also a sign of Klayman's apparent incompetence as a lawyer that he thinks Dean's insult is acceptable to enter as evidence. No wonder he can't win a case.

### Voeltz v. Obama

Klayman is the lawyer for Michael Voeltz, a Florida man who issued a legal challenge to Obama's name appearing on the ballot in Florida because, according to a May 16 WND **article** on the lawsuit, "There is credible evidence indicating that this electronically produced birth certificate is entirely fraudulent or otherwise altered." The article quotes Klayman as being totally down with the birther conspiracists: "The eligibility of defendant Obama must be dealt with now. Plaintiff Voeltz, and the rest of the electors in the state of Florida, must be assured that if they cast their votes for defendant Obama in the general election that their votes will not be in vain."

Klayman's main argument in the Voeltz case was that Florida's Democratic presidential primary (which wasn't actually held) had "elected and nominated" Obama as Florida's nominee for president and, thus, he has been opened up for challenges to his "eligibility." But as the Obama Conspiracy blog **points out**, Florida state law considers a primary winner to be a "candidate for nomination," not actually nominated, and there is no eligibility requirement in a preference primary, thus giving Klayman no legal basis upon which to sue.

Unsurprisingly, the judge **dismissed the case**. Also unsurprisingly, WND gave Klayman a platform to **complain about it**:

> "The decision issued today by Judge Terry Lewis was poorly reasoned and written," Klayman asserts. "It goes against prior Florida Supreme Court precedent in particular, thus making our chances on appeal great. ... In any event, Plaintiff Micheal Voeltz filed a new complaint today for declaratory relief, which will, in addition to his appeal, now proceed forward. In short, we remain confidant that if the Florida courts ultimately decide to obey their own election law, we will prevail in the end."

> Specifically, Klayman objected first to Lewis' assertion that Obama's nomination is a matter for the Democrats' national convention and not subject to Florida law.

> "He basically said that a presidential candidate can never be nominated under Florida law, ever, and that's just wrong," Klayman said. "He made our appeal relatively easy, because he flies in the face of the Florida statute and also a Florida Supreme Court case. There's nothing on which for him to come to this conclusion. The law is clear here that Obama was nominated for office."

Despite the judge dismissing the lawsuit with prejudice, Klayman announced plans to appeal.

* * *

Klayman has been batting zero in court for quite some time now. You'd think that would give his clients -- especially WND -- pause regarding his competence as a lawyer. Apparently not.

home | letters | archive | about | primer | links | shop
This site © Copyright 2000-2012 Terry Krepel

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN,

    Plaintiff/Counter-Defendant,

    v.

JUDICIAL WATCH, INC., *et al.*,

    Defendants/Counter-Plaintiffs.

Civil Action No. 06-670 (CKK)

**MEMORANDUM OPINION**
(October 14, 2009)

    This Memorandum Opinion addresses the discrete issue held in abeyance by the Court's

June 25, 2009 Memorandum Opinion: the amount of unpaid expenses owed by Plaintiff, Larry

Klayman, to Defendant Judicial Watch, Inc. (hereinafter "JW"), pursuant to paragraph 10 of the

Severance Agreement signed between the two parties.  Klayman filed the above-captioned lawsuit

against Defendants[1] alleging a variety of claims, including breach of contract, violation of the

Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B), and defamation.   Defendants JW and Fitton in

turn filed a Counterclaim against Klayman, which, as amended, sets forth 11 causes of action

against Klayman, including breach of contract, indemnification, trademark infringement, unfair

competition, and cybersquatting.

    In its June 25, 2009 Memorandum Opinion, the Court, *inter alia*, granted-in-part but held

in abeyance-in-part JW's [270] motion for summary judgment with respect to Count One of its

Amended Counterclaim, in which JW alleges that Klayman breached paragraph 10 of the

---

[1] In addition to JW, Klayman named as Defendants in this action Thomas J. Fitton,
President of JW; Paul J. Orfanedes, Secretary and a Director of JW; and Christopher J. Farrell, a
Director of JW.


DEFENDANT'S
EXHIBIT
24
1/29/14
PENGAD 800-631-6989

Severance Agreement by failing to reimburse JW for personal costs and expenses incurred by Klayman during his employment. *See Klayman v. Judicial Watch, Inc.*, Civ. Act. No. 06-670, Mem. Op. (D.D.C. Jun. 25, 2009), Docket No. [319], at 71-77. More specifically, the Court granted JW's motion insofar as it related to Klayman's liability for breach of contract based on unpaid expenses, but held the motion in abeyance insofar as it related to JW's request for a determination of damages. *Id.* at 77.

In particular, JW had urged the Court to find Klayman liable for $85,242.03 — an amount which included both the unpaid expenses Klayman owed JW and the accrued interest JW claimed it was owed with respect to those unpaid expenses. JW, however, failed at that time to establish that it was legally entitled to prejudgment interest. Accordingly, the Court decided to "defer consideration of JW's request for prejudgment interest until after all liability issues have been resolved." *Id.* Moreover, because JW had not provided the Court with a sufficiently detailed breakdown of the total amount of damages requested, such that the Court could determine which portion of the request was attributable solely to the unreimbursed personal expenses, the Court was unable to make a finding as to the amount for which JW had shown Klayman was liable — *i.e.*, the unpaid expenses. *Id.* at 76-77. The Court therefore held in abeyance JW's motion with respect to the amount of unpaid expenses owed by Klayman pending submission by JW of "a detailed accounting, with supporting documentation, of the amount of unpaid expenses owed by Klayman — *without interest* — so that the Court can determine the appropriate amount of actual damages to award." *Id.* at 77 (emphasis in original). JW has since provided the Court with the supplemental accounting information as required. *See* JW's Supp. Br., Docket No. [321]. In addition, notwithstanding the Court's decision to defer consideration of JW's request for

2

prejudgment interest until after all liability issues are resolved, JW has once again raised its claim for prejudgment interest. *See generally id.*

Upon thorough consideration of the parties' supplemental submissions as well as attachments thereto, the relevant case law and record of this case as a whole, the Court finds that Klayman is liable to JW for $69,358.48 in unpaid expenses in breach of the Severance Agreement and therefore shall GRANT JW's [270] motion for summary judgment, as supplemented, insofar as it seeks monetary damages (excluding interest) in the amount of $69,358.48. To the extent, however, that JW has moved for reconsideration of the Court's previous decision to defer consideration of JW's request for prejudgment interest until after liability has been resolved as to all remaining claims and counterclaims, the Court shall DENY JW's request, for the reasons set forth below.

**DISCUSSION**

The factual background of this case is extensively discussed in this Court's June 25, 2009 Memorandum Opinion regarding the parties' cross-motions for summary judgment. *See Klayman v. Judicial Watch, Inc.,* Civ. Act. No. 06-670, Mem. Op. (D.D.C. Jun. 25, 2009), Docket No. [319] (hereinafter "June 25, 2009 Mem. Op."). The Court shall not now repeat that discussion, but assumes familiarity with it and expressly incorporates it herein. Having previously concluded that Klayman is liable for breach of contract based on unpaid expenses he owed to JW pursuant to paragraph 10 of the Severance Agreement, *see id.* at 71-77, the Court addresses only the question of damages resulting from this breach of contract.

In its June 25, 2009 Memorandum Opinion, the Court found Klayman liable for all unpaid expenses claimed by Defendants and listed in Invoice Nos. 1-47 and 49-52, which are attached as

3

Exhibit 13 to the Second Declaration of Susan E. Prytherch submitted in support of JW's motion

for summary judgment. *See* Docket No. [265-2]. The Court, however, was unable to determine

the specific amount of unpaid expenses owed by Klayman because JW had not provided the Court

with a sufficiently detailed breakdown of the expenses owed. *See* June 25, 2009 Mem. Op. at 71-

77. JW has now provided the Court with the Third Declaration of Susan E. Prytherch, which

provides the required breakdown and establishes that Klayman owes JW a total of $69,358.48 in

unpaid expenses pursuant to paragraph 10 of the Severance Agreement. JW's Supp. Br., Ex. 2

(Third Declaration of Susan E. Prytherch) (hereinafter "Third Prytherch Decl.").

     Specifically, attached to Ms. Prytherch's Third Declaration is a spreadsheet, prepared by

Ms. Prytherch, that individually lists all of the unpaid expenses owed by Klayman and addressed

in Invoices Nos. 1-47 and 49-52. *See id.*, Att. 1 (Spreadsheet Exhibit). The spreadsheet

references each invoice by number, provides a brief description of the nature of the expense, and

identifies the date of the invoice, the invoice amount, any adjustment, the adjusted total, any

payment made by Klayman, and the amount outstanding, without interest. Third Prytherch Decl. ¶

4; *see also id.* at ¶¶ 5-10 (explaining references on spreadsheet in detail). As set forth in the final

row of the spreadsheet, Ms. Prytherch has determined that Klayman owes JW $69,358.48 in

unpaid expenses. *See id.*, Att. 1 (Spreadsheet Exhibit). Having thoroughly reviewed Ms.

Prytherch's third declaration, the attached spreadsheet, and Invoices No. 1-47 and 49-52, the Court

concludes that JW has now sufficiently demonstrated that Klayman owes JW unpaid expenses

totaling $69,358.48 and that JW is entitled to monetary damages in that amount (excluding

interest). JW's motion for summary judgment, as supplemented, is therefore GRANTED insofar

as it seeks an award of damages (excluding interest) in the amount of $69,358.48.

4

To the extent, however, that JW also requests the Court to reconsider its previous decision to defer a determination with respect to the amount of prejudgment interest due JW, the Court, in exercising its discretion, declines to do so. As was made clear in the Court's June 25, 2009 Memorandum Opinion, JW was directed to file supplemental briefing solely addressing "the amount of unpaid expenses owed by Klayman—*without interest.*" June 25, 2009 Mem. Op. at 77 (emphasis in original). The Court further stated that it would "defer consideration of JW's request for prejudgment interest until after all liability issues have been resolved." *Id.* Nonetheless, JW has — in direct violation of the Court's June 25, 2009 Memorandum Opinion — re-raised its claim for prejudgment interest in its supplemental briefing, and has done so without acknowledging that it was precluded from addressing this issue in its supplemental filing.[2]

Regardless, the Court finds that JW has not proffered any additional argument that warrants reconsideration of the previous decision reserving consideration of the issue of prejudgment interest until after liability has been resolved as to all remaining issues. To the

---

[2] The Court notes that, given JW's inclusion of this argument — one that was not contemplated by the Court's June 25, 2009 Order and accompanying Memorandum Opinion — it issued a minute order providing Klayman an opportunity to respond to JW's request for prejudgment interest. The Court found that, "[a]lthough the time for such a response has now passed, . . . [it] shall nonetheless permit Plaintiff, who is representing himself *pro se*, additional time to respond to the substantive arguments raised in JW's filing relating to its request for prejudgment interest." 8/31/09 Min. Order. Klayman was specifically advised that any such response was limited "only to the issue of prejudgment interest." *Id.* Klayman subsequently filed a response to JW's supplement briefing, as permitted. *See* Pl.'s Resp., Docket No. [323]. His response, however, entirely failed to address JW's claim for prejudgment interest and is therefore entirely irrelevant to the Court's discussion below. Rather, Klayman's response focused instead on the Court's previous decision striking Klayman's untimely opposition and response statement with respect to Defendants' motions for summary judgment. *See id.* The Court has exhaustively addressed Klayman's unfounded and unsupported objections to its decision to strike his untimely pleadings and shall not revisit that decision herein, other than to note that Klayman has raised no new grounds or legal argument in his response that would justify reconsideration of the Court's prior decision. *See, e.g.,* June 25, 2009 Mem. Op. at 8-11.

contrary, case law counsels in favor of deferring this issue until all claims and counterclaims have been resolved. *See Giant Food, Inc. v. Jack I. Bender & Sons*, 399 A.2d 1293, 1302-03 (D.C. 1979) (adopting the "interest on the net balance" approach for determining prejudgment interest under D.C. Code § 15-108, which requires consideration of any relevant offsetting claims in calculating the amount of prejudgment interest due); *see also District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 733 (D.C. 2003) (applying the "interest on the net balance" approach to determining the appropriate amount of prejudgment interest due). Accordingly, the Court DENIES JW's request to reconsider its previous decision deferring consideration of the issue of prejudgment interest. The Court shall revisit this issue, as may be appropriate, once all remaining liability issues have been resolved.

## CONCLUSION

For the reasons set forth above, the Court shall GRANT JW's [270] motion for summary judgment, as supplemented, with respect to Count One of JW's Amended Counterclaim, insofar as JW seeks monetary damages (excluding interest) in the amount of $69,358.48. However, to the extent that JW has moved for reconsideration of the Court's previous decision to defer consideration of JW's request for prejudgment interest until after liability has been resolved as to all remaining claims and counterclaims, the Court shall DENY JW's request. The Court shall revisit the issue of prejudgment interest as may be appropriate once liability has been finally determined. An appropriate Order accompanies this Memorandum Opinion.

Date: October 14, 2009

                                       /s/
                                     COLLEEN KOLLAR-KOTELLY
                                     United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

    Plaintiff/Counter-Defendant,

    v.

JUDICIAL WATCH, INC., *et al.*,

    Defendants/Counter-Plaintiffs.

Civil Action No. 06-670 (CKK)

### ORDER
(October 14, 2009)

Based on the reasoning set forth in an accompanying memorandum opinion, it is, this

14th day of October, 2009, hereby

**ORDERED** that JW's [270] Motion for Summary Judgment, as supplemented, is

GRANTED with respect to Count One of the Amended Counterclaim, insofar as it seeks

monetary damages (excluding interest) in the amount of $69,358.48 for unpaid expenses owed by

Klayman to JW pursuant to paragraph 10 of the Severance Agreement; and it is further

**ORDERED** that JW's request for reconsideration of the Court's previous decision to

defer consideration of JW's request for prejudgment interest until after liability has been resolved

as to all remaining claims and counterclaims is DENIED. The Court shall revisit the issue of

prejudgment interest as may be appropriate once liability has been finally determined.

    **SO ORDERED.**

                                    /s/
                                COLLEEN KOLLAR-KOTELLY
                                United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
JARED PAUL STERN,

                    Plaintiff,

          -against-

NEWS CORPORATION,

                    Defendant.
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/15/09

08 Civ. 7624 (DAB)
ORDER

DEBORAH A. BATTS, United States District Judge.

The above referenced case was transferred to this Court from the Southern District of Florida on August 28, 2008. The Court's multiple attempts to set up a Rule 16 conference were frustrated by Plaintiff's counsel's lack of response. The parties were scheduled for a Rule 16 conference on Friday, May 8, 2009. Plaintiff's purported counsel Larry Klayman, Esq. called the Court on May 7, 2009 requesting to participate in the conference by telephone in Florida because his secretary was about to have a baby. The Court adjourned the conference to this Friday, May 15, 2009. The Court also inquired as to the admission status of Mr. Klayman to the bar of the Southern District of New York.

The Court subsequently learned that Plaintiff's counsel is not admitted to the Southern District of New York, nor has he filed a pro hac vice application. The Court received a letter dated May 12, 2009 from Defense counsel, containing substantial information including citations from the New York Supreme Court, the Southern District of New York, the Second Circuit, and other Federal Courts around the country, from which the Court concludes that, were Mr. Klayman to file a motion pro hac vice, it would not be granted. Daly v. Far Eastern Shipping Co., 238 F.Supp.2d 1231 (W.D. Wash. 2003) (citing Klayman's

DEFENDANT'S
EXHIBIT
25
1/29/14JC
PENGAD 800-631-6989

"bizarre" behavior); <u>Judicial Watch of Florida, Inc. v. U.S. Dep't of Justice</u>, 159 F.Supp.2d 763 (D.D.C. 2001) (stating that Klayman made misrepresentations to the court and "abused" the discovery process); <u>Alexander v. FBI</u>, 186 F.R.D. 188 (D.D.C. 1999) (stating that Klayman made misrepresntations to the court and "abused" the discovery process); <u>MacDraw, Inc. v. CIT Group Eqip. Financing, Inc.</u>, 994 F.Supp. 447 (S.D.N.Y. 1997) (citing Klayman's "undignified conduct"), <u>aff'd</u>, 138 F.3d 33 (2d Cir. 1998); <u>Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.</u>, 1997 WL 243233 (D.D.C. May 7, 1997) (noting Klayman's "often highly inappropriate behavior"), <u>aff'd in part and rev'd in part</u>, 146 F.3d 983 (D.D.C. 1998); <u>Baldwin Hardware Corp. v. Franku Enterprise Corp.</u>, 78 F.3d 550 (Fed. Cir. 1996) (finding Klayman's behavior so abhorrent that the judge barred Klayman from ever appearing before him again); <u>Wire Rope Importers' Ass'n v. United States, 18 C.I.T.</u> 478, 1994 WL 235620 (U.S. Ct. Of Int'l Trade, May 26, 1994) (sanctioning Klayman for his "frivolous" conduct).

Accordingly, within 60 days of the date of this Order, the Plaintiff Jared Paul Stern shall engage other counsel who either are admitted to practice in the Southern District of New York or qualify to be admitted <u>pro hac vice</u>, or shall inform the Court that he has elected to proceed <u>pro se</u> in this matter. Failure to comply with this Order, upon proper motion by Defendant, shall result in the dismissal of this case for failure to prosecute.

SO ORDERED.

Dated:    New York, New York
          May 13, 2009

                                        *Deborah A. Batts*
                                        Deborah A. Batts
                                        United States District Judge

# IN UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-20610-CIV-ALTONAGA/Simonton

LARRY KLAYMAN,

        Plaintiff,

v.

JUDICIAL WATCH, et. al.

        Defendants.

_____/

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33, Plaintiff hereby responds to Defendant's

First Set of Interrogatories.

## GENERAL OBJECTIONS

1. Plaintiff objects to each instruction, definition, document request, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Plaintiff objects to each document request and interrogatory that is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to each document request to the extent that it calls for production of a privilege log for internal documents of Plaintiff. A request for such a log is unreasonable and unduly burdensome in light of the work product doctrine, attorney client privilege, and other privileges protecting such internal documents from discovery.

4. Plaintiff objects to each instruction, definition, document request, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work product doctrine, or any other

1


DEFENDANT'S
EXHIBIT
26
11/29/14 DL

applicable privilege. Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

5. Plaintiff objects to each instruction, definition, document request, and interrogatory as overbroad and unduly burdensome to the extent it seeks documents or information that are readily or more accessible to Defendant from Defendant's own files, from documents or information in Defendant's possession, or from documents or information that Defendant previously produced to Plaintiff and vice versa. Responding to such requests and interrogatories would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests and interrogatory is substantially the same or less for Defendant as for Plaintiff.

6. Defendant's document requests and interrogatory call for the production of documents and information that were produced to the Plaintiff by other entities and that may contain confidential, proprietary, or trade secret information and are also objectionable on that basis.

7. To the extent any of Defendant's document requests or its interrogatories seek documents or answers that include expert material, including but not limited to survey materials, Plaintiff objects to any such requests and interrogatories as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

8. Plaintiff incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Plaintiff does not waive its right to amend its responses.


## RESPONSES AND OBJECTIONS


1. Please provide the name, address, telephone number, place of employment and job title of any person who has, clams to have or whom you believe may have knowledge or information pertaining to any fact alleged in the pleadings (as defined in the Federal Rule of Civil Procedure 7(a)) filed in this action, or any fact underlying the subject matter of this action.

   Response:

   Orly Taitz
   Attorney/ Dentist

2

29839 Santa Margarita Pkwy, Ste 100
Rancho Santa Margarita CA, 92688
(949) 766-7687

Constance Ruffley
2540 Huntington Drive,
San Marino, CA 91108
1-888-593-8442

Thomas Fitton
President, Judicial Watch
425 Third Street SW, Suite 800
Washington, DC 20024
1-888-593-8442

Christopher Farrell
Director of Research and Investigation, Judicial Watch
425 Third Street SW, Suite 800
Washington, DC 20024
1-888-593-8442

Paul Orfanedes
Director of Litigation, Board of Directors Secretary & Treasurer, Judicial Watch
425 Third Street SW, Suite 800
Washington, DC 20024
1-888-593-8442

Discovery will identify others.

2.  Please state the specific nature and substance of the knowledge that you believe the

person(s) identified in your response to interrogatory no. 1 may have.

Response: Ms. Ruffley and Ms. Taitz have knowledge of the conversation that took place between them regarding Plaintiff Klayman in or around February 22, 2012, while attending an event. Mr. Fitton, Mr. Orfanedes, and Mr. Farrell have knowledge of Judicial Watch's directions and instructions to Ms. Ruffley regarding statements intended to harm Plaintiff Klayman and his reputation in front of Mr. Taitz and to current and potential donors. They also have knowledge of Plaintiff Klayman's requests to correct these false and misleading statements with subsequent publications and actions, which Judicial Watch refused to do, thus ratifying at a minimum what Ruffley said and had published on Judicial Watch's behalf and will actual and apparent authority to do so.

3.  Please provide the name of each person whom you may use as an expert witness at trial.

Response: None at this time. Any such experts have not yet been decided upon.

4. Please state in detail the substance of the opinions to be provided by each person whom you may use as an expert witness at trial.

Response: See above. None at this time.

5. Please state each item of damage that you claim, whether as an affirmative claim or as a setoff, and include in your answer: the count or defense to which the item of damage relates; the category into which each item of damage falls, i.e. general damages, special or consequential damages (such as lost profits), interest, and any other relevant categories; the factual basis for each item of damages; and an explanation of how you computed each item of damages, including any mathematical formula used.

Response:

Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which would be unreasonably broad, burdensome, and/or oppressive.

Subject to and without waiving the objections, any such relevant documents in the possession, custody, or control of Plaintiff will be produced at a mutually agreeable time and place for inspection and copying subject to a confidential protective order.

Any such relevant answer to this interrogatory is more suited to a narrative response at Plaintiff's deposition.

6. Please identify each document (including electronically stored information) pertaining to each item of damages stated in your response to interrogatory no. 5 above.

Response:

Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which would be unreasonably broad, burdensome, and/or oppressive.

Subject to and without waiving the objections, any such relevant documents in the possession, custody, or control of Plaintiff will be produced at a mutually agreeable time and place for inspection and copying subject to a confidential protective order.

7. Identify and describe all efforts you have undertaken to mitigate any damages you allege

   you sustained as a result of the acts or omissions of Defendant.

   Response:

   Such a response is subject to a narrative response which Plaintiff will provide upon oral examination at deposition. See also the above responses to Defendant's interrogatories.

8. Identify by name and address all individuals that you contend heard Constance Ruffley

   speak the alleged statement that you have been "convicted" of a crime of not paying a

   large amount of child support, as alleged in Paragraph 12 of the Amended Complaint.

   Response:

   Orly Taitz
   29839 Santa Margarita Pkwy, Ste 100
   Rancho Santa Margarita CA, 92688

   Constance Ruffley
   2540 Huntington Drive,
   San Marino, CA 91108

   Discovery will uncover further individuals who heard the conversation between Dr. Taitz and Ms. Ruffley.

9. If you contend that the alleged statement referenced in the preceding interrogatory and

   Paragraph 12 of your Amended Complaint was published anywhere other than "The

   World's leading Obama Eligibility Website" of Dr. Orly Taitz, identify and describe each

   such publication.

   Response:

   Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which would be unreasonably broad, burdensome, and/or oppressive.

   Plaintiff objects to the request insofar as it calls for information or documents, the production of which are not relevant to the subject matter of the pending action, and are not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to this request insofar as it seeks information which is publicly available or otherwise equally available and/or uniquely or equally available from third parties.

Notwithstanding, the publications were stated all over the internet, for example:

http://www.birtherreport.com/2012/02/obama-ballot-challenge-2012-responds-to.html

http://freerepublic.com/focus/f-bloggers/2852171/replies?c=48

http://ohforgoodnesssake.com/?p=21940

These are just a few examples, many of which have been referenced in prior pleadings.

10. Fully describe the manner in which you were harmed by the alleged statement, as described in Paragraph 12 of the Amended Complaint.

Response: Plaintiff was damaged in the following ways, including but not limited to: lost earnings and capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, ostracization, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory and actual damages, as well as loss of reputation in his trade and professional and personally, and punitive damages, in an amount to be determined at trial.

11. Have any of your former spouses accused you of failing to pay child support? If so, describe each such accusation, including the date, the name and address of the former spouse, and a description of all documents related to the accusation.

Response:

Yes, and these documents are available in the court's records in case *Klayman v. Luck*, number DR 07 316840 in the Court Of Common Pleas, Domestic Relations Division, Cuyahoga County, Ohio. This is the only former spouse who has had children with Plaintiff. Defendant already has these documents in its possession, custoday and control.

12. Has any person filed any motions, pleadings, complaints or other documents in a court

accusing you of failure to pay child support? If so, for each instance state the name of the

filer, the date, the name of the court, and the type of motion, pleading, complaint or other

document.

Response:

Plaintiff objects to the request insofar as it calls for information or documents, the
production of which would be unreasonably broad, burdensome, and/or oppressive and
not relevant.

Notwithstanding the objection, yes, and these documents are available in the court's
records in case *Klayman v. Luck*, number DR 07 316840 in the Court Of Common Pleas,
Domestic Relations Division, Cuyahoga County, Ohio.

Defendant already has any such documents in its custody, possession and control.

13. Have you ever been found to be in contempt of court for failure to pay child support,

regardless of whether the contempt was later purged? If so, state the name of the court

and the date of the contempt filing.

Response:

Yes, and these documents are available in the court's records in case *Klayman v. Luck*,
number DR 07 316840 in the Court Of Common Pleas, Domestic Relations Division,
Cuyahoga County, Ohio. This interrogatory is not relevant in any event.

Defendant already has these documents in its custody, possession and control.

14. Have you ever purged a finding of contempt of court that was related to alleged failure to

pay child support? If so, for each instance describe what you did or paid to purge the

finding of contempt of court?

Response:

7

Yes, and these documents are available in the court's records in case *Klayman v. Luck*, number DR 07 316840 in the Court Of Common Pleas, Domestic Relations Division, Cuyahoga County, Ohio.

15. Did you sue Orly Taitz for publishing that you had been convicted of a crime for not

paying a large amount of child support? If not, why not?

Response: Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which are not relevant to the subject matter of the pending action, and are not reasonably calculated to lead to the discovery of admissible evidence. This information is publicly available in any event and is also work product.

16. Describe and identify all terms of the contractual agreement between you and Michael

Voeltz, referenced in Paragraph 26 of you Amended Complaint, or in the alternative

produce copies of the contractual agreement(s).

Response: Plaintiff objects to the interrogatory insofar as it calls for information or which is subject to the attorney-client privilege or any other privilege or protection.

17. Identify and describe all lawsuits filed by you as counsel for Michael Voeltz against

Barack Hussein Obama by stating the name of the court, the case number, and the

outcome of the litigation.

Response:

Circuit Court of the Second Judicial Circuit in and for Leon County, Florida:

*Voeltz v. Obama, et. al.*, Case No.: 2012CA00467 - Dismissed with prejudice.

*Voeltz v. Obama, et. al.*, Case No.: 2012 CA 02063 - Dismissed with prejudice.

*Voeltz v. Obama, et. al.*, Case No.: 2012 CA 003857 - Dismissed with prejudice.

Florida District Court Of Appeal, First District:

*Voeltz v. Obama, et. al.,* Case No.: 1D12-3489 (1st DCA) - Appeal dismissed.

*Voeltz v. Obama, et. al.,* Case No.: 1D13-83 (1st DCA) - Decision pending before the 1st DCA.

8

Florida Supreme Court:

*Voeltz v. Obama, et. al.,* Case No.: SC13-560 (FL Supreme Court) - Petition denied.

18. State the address for you places of residence for the last ten years and identify the dates

you resided at each address.

Response: Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which are not relevant to the subject matter of the pending action, and are not reasonably calculated to lead to the discovery of admissible evidence. It is also not relevant.

19. Identify by name, address, and telephone number each individual who read Orly Taitz's

internet publication referenced in Paragraph 13 of your Amended Complaint.

Response: Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which would be unreasonably broad, burdensome, and/or oppressive.

Plaintiff further objects to the interrogatory insofar as Plaintiff lacks the knowledge at this tine of the exact identities and information of each individual who read Orly's Taitz's internet publication. However, Ms.Taitz is subject to being deposed and more information will be forthcoming. Her website also claims a wide readership throughout the nation.

20. With respect each person indentified in the Answer to interrogatory No. 19, describe how

the reading of the publication altered that person's opinion of you.

Response:

Plaintiff objects to the interrogatory insofar as it calls for information or documents, the production of which would be unreasonably broad, burdensome, and/or oppressive.

Plaintiff objects to the interrogatory on the grounds that the interrogatory is vague, uncertain, amorphous, and indefinite.

9

Plaintiff further objects to the interrogatory insofar as Plaintiff lacks the knowledge of the identities and information of each individual at this time who read Orly's Taitz's internet publication.

21. Fully describe all medical and/or mental health treatment you received for the emotional

distress that you allege you suffered as a result of the acts or omissions of the defendants,

including but not limited to, the names, and addresses of the medical and/or mental

healthcare providers and the dates of treatment.

Response: Plaintiff objects to the interrogatory insofar as it calls for information or which is subject to the physician-patient privilege or any other privilege or protection including but not limited to work product.

Dated: January 24, 2014

/s/ Larry Klayman
Larry Klayman

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 24, 2014, the foregoing Responses and Objections to Defendant's Interrogatories (Case No. 1:13-cv-20610) was served on all counsel of record or pro se parties on the attached Service List in the manner specified.

*/s/ Larry Klayman*
LARRY KLAYMAN

Plaintiff Pro Se

## SERVICE LIST

**Douglas James Kress**
Schwed Kahle & Jenks, P.A.
11410 North Jog Road
Suite 100
Palm Beach Gardens, FL 33418
561-694-0070
Fax: 561-694-0057
Email: dkress@schwedpa.com

VIA E-MAIL and U.S. MAIL

11

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 345, Washington, DC 20006-1811 ⊗   Telephone: (310) 595-0800 ⊗   leklayman@gmail.com

July 23, 2012

BILLING STATEMENT

FOR SERVICES RENDERED to George Miller, Pamela Barnett, Sam Sewell, ObamaBallotChallenge.com, Article II Super PAC, and the Constitution Action Fund from June 19, 2012 to the present, including but not limited to research and preparation and service of process of new complaint for declaratory relief, legal research and preparation and filing of 24 page proposed order with factual and legal citations for Judge Terry Lewis, review of proposed order of the Defendants, preparation of second amended complaint and review of motion to strike and response, preparation for and hearing on leave to file second amended complaint before Judge Terry Lewis, review of Judge Terry Lewis' decision and strategy discussions and other communications with clients and preparation of memorandum on how to appeal directly to Florida Supreme Court, preparation and filing of notice of appeal, notice of filing transcript, preparation and filing of opposition to defendants' motion to strike, preparation and dissemination of two press releases regarding Judge Lewis' decision and notice of appeal, communications with media, and related matters :

37 hours x $150 per hour for Naveed Mahboobian, Esq. and Ryan Patterson, Esq..........$5,550.00

16.5 hours x $395 per hour for Larry Klayman, Esq. (reduced from normal billing rate of $600 per hour)..................................................................................................................$6,517.50

Itemized Expenses (Attached)..........................................................................................$4,017.05

Total = $16,084.55


DEFENDANT'S
EXHIBIT
27
1/29/14

1

14

# Gmail
by Google

Dina James <daj142182@gmail.com>

## Fwd: Voeltz v. Obama et. al - Florida Ballot Challenge
1 message

**Larry Klayman** <leklayman@gmail.com>                    Tue, Jan 28, 2014 at 9:14 AM
To: Dina James <daj142182@gmail.com>, leklayman <leklayman@gmail.com>

---------- Forwarded message ----------
From: <microcapmaven@aol.com>
Date: Mon, May 7, 2012 at 10:06 PM
Subject: Re: Voeltz v. Obama et. al - Florida Ballot Challenge
To: leklayman@gmail.com

**We have already paid at least $9K**

**- $5000 was sent via Sam directly to you.**
**- $3300 was sent from our collections when we had the Article II PAC**
**- $1000 was sent to you from Constitutional Action Fund.com, Inc**
**- An unknown amount was sent directly from people given your address and bank**
**number while we were trying to get      ConstitutionActionFund.com, Inc started.**
**How much more did you receive directly?**

**That would leave $9K or less to go, according to my math. Where did I go wrong?**

**Regards,**
**George Miller**
**http://venturacountyteaparty.com**
**http://obamaballotchallenge.com**
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

-----Original Message-----
From: Larry Klayman <leklayman@gmail.com>
To: George J. Miller <microcapmaven@aol.com>
Sent: Mon, May 7, 2012 8:43 pm
Subject: Voeltz v. Obama et. al - Florida Ballot Challenge

George, Sam and Pamela:

This confirms that I will take this through the hearing on defendants' motion to dismiss if you pay the
agreed retainer, in full, of 18K, before the hearing. You agreed to pay about 3K this week with more coming
next week. The remainder of the retainer at this point in time is 11K.

Thank you for your cooperation.

Best,

Larry Klayman



DEFENDANT'S
EXHIBIT
28
1/29/14