```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                       CASE NO. 13-20610-CIV
 3


 4
     LARRY E. KLAYMAN,                 Miami, Florida
 5
               Plaintiff,              May 30, 2014
 6
         vs.                           2:06 p.m. to 4:21 p.m.
 7
     JUDICIAL WATCH, INC.,             Courtroom 12-2
 8
               Defendant.              (Pages 1 to 91)
 9

10                     JURY TRIAL EXCERPT - DAY 2
              BEFORE THE HONORABLE CECILIA M. ALTONAGA,
11                   UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13    FOR THE PLAINTIFF:     LARRY E. KLAYMAN, ESQ.
                             The Klayman Law Firm
14                           3415 SW 24th Street
                             Miami, Florida 33145
15                           (305) 447-1091
                             leklayman@gmail.com
16

17    FOR THE DEFENDANT:     DOUGLAS J. KRESS, ESQ.
                             DOUGLAS A. KAHLE, ESQ.
18                           Schwed Kahle & Kress, P.A.
                             14110 North Jog Road, Suite 100
19                           Palm Beach Gardens, Florida 33418
                             (561) 694-0070
20                           dkress@schwedpa.com
                             dkahle@schwedpa.com
21

22    REPORTED BY:           STEPHANIE A. McCARN, RPR
                             Official Court Reporter
23                           400 North Miami Avenue
                             Twelfth Floor
24                           Miami, Florida 33128
                             (305) 523-5518
25                           Stephanie_McCarn@flsd.uscourts.gov
```

# I N D E X

## WITNESSES

**WITNESSES FOR THE PLAINTIFF:**

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Orly Taitz | 3 | 58 | | |

**WITNESSES FOR THE DEFENDANT:**

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| | -- | -- | -- | -- |

| EXHIBITS MARKED & ADMITTED IN EVIDENCE | MARKED | ADMITTED |
|---|---|---|
| Plaintiff's Exhibit No.1 | 5 | |
| Defendant's Exhibit No. 6 | 44 | |
| Joint Exhibit No. 7 | | 79 |
| Joint Exhibit No. 8 | | 79 |

## MISCELLANEOUS

| | Page |
|---|---|
| Proceedings....................................... | 3 |
| Court Reporter's Certificate...................... | 80 |

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

```
 1        (The following proceedings excerpt was held at 2:06 p.m.)

 2        THE COURT:  Please raise your right hand.

 3                        (Time 2:06 p.m.)

 4                        ORLY TAITZ,

 5   a witness for Plaintiff testified as follows:

 6            THE WITNESS:  Yes.

 7            THE COURT:  Please be seated.

 8            THE WITNESS:  Thank you.

 9                     DIRECT EXAMINATION

10   BY MR. KLAYMAN:

11   Q.  Would you please state your name, Ms. Taitz.

12   A.  Orly Taitz.

13   Q.  When were you born?

14   A.  1960.

15   Q.  Can you run us through your educational background?

16   A.  I'm both a licensed attorney and a licensed doctor of

17   dental surgery.

18   Q.  You are a highly educated person, correct?

19   A.  I have two doctor's (sic) degrees.

20   Q.  And your English is very good; is it not?

21   A.  I think it is okay.  I speak with a accent.  I wasn't --

22   clearly, I wasn't born in this country but yes.

23   Q.  You understand English?

24   A.  Yes, of course.

25   Q.  Did there come a point in time when you attended an event
```

1  by the California Voters Women's Club of Garden Grove?

2  A.  Yes, sir, I did.

3  Q.  And was that on or about February 23, 2012?

4  A.  No, February 22nd.

5  Q.  22nd, okay.  And at that event an individual by the name of

6  Constance Ruffley represented to you that she was there on

7  behalf of Judicial Watch, correct?

8  A.  She did not state that.

9      MR. KRESS:  Objection, leading.

10      THE COURT:  Sustained.

11      MR. KLAYMAN:  She is adverse, Your Honor.

12      THE COURT:  Please approach.

13   (Sidebar outside the presence of the jury:)

14      MR. KLAYMAN:  Your Honor, I am calling her but she is

15  an adverse witness.  She's the one who published the

16  declaration of the statements against me.

17      THE COURT:  I understand.  Is she here from

18  California?

19      MR. KLAYMAN:  Yes.

20      THE COURT:  Was she subpoenaed?

21      MR. KLAYMAN:  No, she is here voluntarily.

22      THE COURT:  How is she an adverse witness?  You didn't

23  sue her, I mean.

24      MR. KLAYMAN:  I will ask it another way if you like.

25   (Sidebar concluded and the following occurred:)

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1   BY MR. KLAYMAN:

2   Q.   Ms. Taitz, at that meeting did you approach Constance

3   Ruffley or did she approach you?

4   A.   I was approached by Barbara Coe, the organizer of the

5   event, who after I gave my speech to the voters, she approached

6   me, together with Ms. Ruffley.   She introduced her as somebody

7   who worked for the Judicial Watch but she did not state that

8   she is there on behalf of the Judicial Watch.

9   Q.   I am going to turn your attention to -- you remember

10  publishing on your web site, the world's leading eligibility

11  challenge web site, Ms. Ruffley's statements that she made to

12  you that day?

13  A.   Yes.

14  Q.   I will turn your attention to Exhibit 1.

15       (Plaintiff's Exhibit No. 1 was marked for identification.)

16          THE WITNESS:   I have with me the state -- my -- I

17  printed it out so I have it here.

18  BY MR. KLAYMAN:

19  Q.   That's fine.   Let's go with the actual court exhibit.

20  A.   Yes.

21  Q.   Bear with me.   Thank you very much.

22          MR. KLAYMAN:   Let the record reflect this is a blowup

23  of Exhibit 1.

24  BY MR. KLAYMAN:

25  Q.   Can you recognize -- strike that.

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1     After you spoke with Constance Ruffley, you posted

2  Exhibit 1 on your web site; is that true?

3  A.  Yes.

4  Q.  Okay.  And is there anything in Exhibit 1 with regard to

5  what Constance Ruffley told you that you didn't believe to be

6  true at the time?

7  A.  No.

8  Q.  Okay.  So what you -- what you published in Exhibit 1 was

9  an accurate statement of what Constance Ruffley had told you?

10  A.  Yes.

11  Q.  And I am going to abbreviate here just to move things along

12  quickly.  You stated, "Yesterday I gave a two-hour presentation

13  of my platform as a candidate for the U.S. Senate.  The

14  preparation was given to some 100 California voters in the

15  Women's Club of Garden Grove.  I was told that a representative

16  of the Judicial Watch drove for over an hour from San Marino to

17  hear me speak and talk to me.  I got a very warm reception.

18  After my presentation, people stood up and applauded.  The

19  member of the Judicial Watch approached me."

20     Is that an accurate statement, The member of the Judicial

21  Watch approached me?

22  A.  Yes.

23  Q.  Was that Ms. Constance Ruffley?

24  A.  Yes, she approached me together with the organizer Barbara

25  Coe, yes.

1   Q.   And Ms. Ruffley gave you her card?

2   A.   Yes.

3   Q.   Her name is Constance Ruffley and she is an office

4   administrator for the Judicial Watch, that's what Ms. Ruffley

5   told you?

6   A.   Yes.

7   Q.   In their western regional headquarters at 2540 Huntington

8   Drive, San Marino.  "She told me that she used to work for the

9   FBI."  Did -- is that an accurate statement?

10  A.   Yes.

11  Q.   Did she work for the FBI?

12  A.   Yes, that's what she told me.  I don't have any way of

13  verifying, but that's what she told me.

14  Q.   And that she worked for the Judicial Watch for many years,

15  she told you that?

16  A.   Yes.

17  Q.   You then write, "She actually initiated the discussion

18  about Larry Klayman."  Is that an accurate statement?

19  A.   Yes.

20  Q.   "And she told me that she had heard that he was involved in

21  birther cases."  Is that an accurate statement?

22  A.   Yes.

23  Q.   "I told her that this group, Article II Super PAC was

24  soliciting money, that they sent an E-mail and posted on their

25  cite an advertisement on February 10th, asking for $25,000."

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1   Is that an accurate statement?

2   A.   Yes.

3   Q.   "Claiming that they need to rise $25,000 in 96 hours as the

4   cases in Florida and California need to be filed within the

5   week."  Is that an accurate statement?

6   A.   Yes.

7   Q.   "I told her that it was a hard sell.  They wrote it -- they

8   wrote, 'It is now or never,' finally saying Obama's team met

9   their match.  Dissing four years of my tireless work in the

10  process and in the end nothing was filed by Larry Klayman."

11  That an accurate statement?

12  A.   Yes.

13  Q.   And then going down to the next paragraph.  "Ms. Ruffley

14  actually advised me that Larry Klayman is not licensed in

15  California."  Is that an accurate statement?

16  A.   You missed one sentence, though.  You missed, "It is --

17  Q.   I'm going ask you about that but I want to just get to this

18  right now.

19  A.   Okay.

20  Q.   "Ms. Ruffley actually advised me that Larry Klayman is not

21  licensed in California."  Is that an accurate statement?

22  A.   Yes.

23  Q.   "She told me that he no longer worked with the Judicial

24  Watch and that donors should know about litigation in Ohio

25  where he was convicted just recently of not paying large amount

1   in child support."

2       Is that an accurate statement?

3   A.  Yes.

4   Q.  "She provided a lot of other information.  I will publish

5   only what is public record.  I am not publishing anything that

6   is not public record."  Is that an accurate statement?

7   A.  Yes.

8   Q.  During that conversation with Ms. Ruffley, did she tell you

9   that -- anything about a Florida matter involving Natalia Humm

10  and my representation of her?

11  A.  No.

12  Q.  She did tell you, however, that I was not licensed in

13  California?

14  A.  Yes.

15  Q.  Now, you are aware that my not being licensed in California

16  would not preclude me from entering a case there, correct,

17  under *pro hac vice*?

18  A.  It will preclude you from becoming an attorney on a case.

19  And if you wanted to be part of a case in California, actually

20  those donors had to find a California attorney who would file a

21  case in California and would file a motion with a judge asking

22  the judge to add Mr. Klayman as an additional attorney on the

23  case.  And the judge may or may not allow it.

24      I have seen cases where judges allowed attorneys from out

25  of state to join cases and I have seen cases where judges did

1    not allow attorneys to join.  They review the whole history of

2    an attorney.  They review if attorney had any sanctions, any

3    actions against him by the bar of another state.  So,

4    actually -- I'm sorry, Mr. Klayman, but I actually wrote in

5    this article that this is something that had to be disclosed

6    when the bloggers were soliciting donations for you to file a

7    case in California because they had to explain to the public

8    that you cannot file a case in California, that it had to be

9    filed by somebody else and there was a question if the judge

10   would allow you to join another attorney.

11   Q.  But you don't know one way or the other whether I would be

12   admitted in California, do you?

13   A.  I know that you are not admitted.

14   Q.  Under *pro hac vice* for that particular case, you didn't

15   know whether I would be admitted or not, did you?

16   A.  I know that you could not file a case for sure.

17   Q.  Calls for a yes or no.

18   A.  I -- I just answered.

19   Q.  You are saying, what you basically testified to is that I

20   could be admitted if the judge let me in, correct?

21   A.  If the judge would allow another California attorney who

22   filed the case to bring you as an additional --

23   Q.  Right.

24   A.  -- attorney.

25   Q.  And are you aware that I have California lawyers working

1   with me as associates?

2   A.   I -- no, I don't know who are your associates but I have

3   seen a case in Arizona where you tried to join and the judge

4   did not allow it.

5   Q.   I am not asking about that.   I am asking, are you aware

6   that I have lawyers working with me who are California lawyers?

7   A.   I don't know who is working with you.

8   Q.   You didn't know one way or another?

9   A.   I don't know.

10          THE COURT:   Don't interrupt the witness.

11          MR. KLAYMAN:   Okay.

12          THE COURT:   Only one can speak at a time.

13          MR. KLAYMAN:   Okay.

14   BY MR. KLAYMAN:

15   Q.   Now, with regard to the issue of my being convicted of a

16   crime and giving the information to donors, that's something

17   Ms. Ruffley told you, correct?

18   A.   Well, she didn't say that you were convicted of a crime.

19   She said, from what I understand, this is not considered to be

20   a crime.   I believe this -- I believe -- I looked up the case

21   and I believe it's considered to be misdemeanor in Ohio but, at

22   any rate, she just told me that you were convicted of

23   nonpayment of child support.

24   Q.   Now, you are a lawyer, correct?

25   A.   Yes.

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1    Q.   The word "convicted" deals with a criminal matter; does it

2    not?

3    A.   Criminal matter but not necessarily a crime.

4    Q.   Well, criminal matter is a crime; is it not, Ms. Taitz?

5    A.   There are crimes and there are misdemeanors.

6    Q.   If you are convicted, it's a crime.

7    A.   For example, you have --

8    Q.   It calls for a yes or no.

9         THE COURT:  Please, only one of you can speak at a

10   time.

11        MR. KLAYMAN:  Okay.

12        THE WITNESS:  I do not agree with your statement,

13   Mr. Klayman.  I believe that sometimes people are convicted of

14   misdemeanors or when you look at their traffic records, they

15   would say "convictions" but none of those are crimes.  Those,

16   actually, not just misdemeanors, some of them are infractions

17   which is even lower than the misdemeanor, so no --

18   BY MR. KLAYMAN:

19   Q.   Misdemeanor is not a crime; you are saying that?

20   A.   What I am saying that there are crimes than -- that -- than

21   the lower level in misdemeanors and a level which is even lower

22   would be infraction.  And when you look at your, for example,

23   at your record from DMV, they will write "convictions" but none

24   of those or usually are crimes.  Those infractions which are

25   the lowest convictions and then there are misdemeanors which

```
 1    are higher and extremely rarely would there be a crime.

 2              MR. KLAYMAN:  Nonresponsive.  Move to strike, Your

 3    Honor.

 4              THE COURT:  Denied.

 5    BY MR. KLAYMAN:

 6    Q.  Misdemeanor is a crime; is it not, Ms. Taitz?  You are a

 7    lawyer.

 8    A.  I believe it's asked and answered.

 9    Q.  No, I am asking it again because you didn't answer the

10    question.  A misdemeanor is a crime?

11              MR. KRESS:  I will object.  It has been asked and

12    answered.  And it's also calling for a legal conclusion.

13              MR. KLAYMAN:  She is a lawyer.

14              THE COURT:  She is not testifying as an attorney or a

15    legal expert.

16              MR. KLAYMAN:  Yeah, but she's just -- she gave the

17    impression that a misdemeanor --

18              THE COURT:  She has given her opinion.

19              MR. KLAYMAN:  Yeah.

20              THE COURT:  She has answered the question a couple of

21    times.

22              MR. KLAYMAN:  Is a misdemeanor a crime or not; can I

23    ask that question, Your Honor?

24              MR. KRESS:  I will object.  It's been asked and --

25              THE COURT:  If you know, Ms. Taitz.
```

```
 1          THE WITNESS:  I answered twice.  In my opinion, when

 2   misdemeanor -- well, it's not considered to be a crime.  It's

 3   considered to be a lower violation than a crime and that's why

 4   we do have divisions.  We have infractions.  We have next level

 5   which is higher than infraction: misdemeanors.  And the highest

 6   level is a crime.

 7          So what I am saying that when Ms. Ruffley said that

 8   Mr. Klayman was convicted of nonpayment of child support, I did

 9   not know what level is it considered in the state of Ohio.  And

10   from what I read -- I did read the opinion of Your Honor and

11   from what I understand in Ohio, it is not considered to be a

12   crime.

13          MR. KLAYMAN:  Objection, Your Honor.

14          THE COURT:  I'm sorry, you asked the question.

15          MR. KLAYMAN:  Well, I am talking about her talking and

16   characterizing your opinion, I think that's inappropriate.

17          THE WITNESS:  I am not characterizing, I am quoting.

18   BY MR. KLAYMAN:

19   Q.  We have a motion.

20      You are aware that the statement that Ms. Ruffley made to

21   you that you just testified was accurate --

22   A.  Yes.

23   Q.  -- you didn't differentiate between misdemeanor and felony,

24   correct?

25   A.  No, but what -- but you misrepresented what she said.  She
```

1   said that you were convicted of nonpayment of child support and

2   you misrepresented it by saying she said that you were

3   convicted of a crime.  And I said, No, she did not say that.

4   She said that you were convicted of nonpayment of child support

5   and Your Honor wrote an opinion when she said -- when she

6   stated that in Ohio it's -- it's a misdemeanor, it is not a

7   crime.

8   Q.  Ms. Taitz, that's not my question.  You don't know what

9   Ms. Ruffley was referring to, whether it was a misdemeanor or a

10  felony when she made that statement that you published on your

11  web site.

12  A.  And I didn't say that it was a felony.

13  Q.  Yes or no?  Yes or no?

14  A.  I did not -- I did not know what she meant and I wrote what

15  she said.

16  Q.  Right.  And she didn't differentiate between misdemeanor

17  and felony, did she?

18  A.  She did not.  And --

19  Q.  So the reader could have thought it was a felony, correct?

20          MR. KRESS:  Objection.

21          THE COURT:  Please.  Do we need to take a break so I

22  instruct both of you about one speaking at one time only,

23  Mr. Klayman?

24          MR. KLAYMAN:  No, Your Honor.

25          THE COURT:  Or have I made myself clear?

1          MR. KLAYMAN:  You have made yourself clear.

2          THE COURT:  All right.  Let that be the last time.

3    Question, pause, answer, pause.  Question, pause, answer,

4    pause.  Are we clear?

5          MR. KLAYMAN:  Yes.

6    BY MR. KLAYMAN:

7    Q.  From what you published and Ms. Ruffley said, the reader

8    would not know whether I was convicted of a misdemeanor or a

9    felony, correct?

10          MR. KRESS:  Objection, calls for speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  I do not know what was her thinking.  I

13    do not know what's the thinking of people who read it.  I just

14    wrote what she stated.  She stated that you were convicted of

15    nonpayment of child support, that's all.

16    BY MR. KLAYMAN:

17    Q.  Yeah.

18       Now, after you published that statement, I asked you to

19    correct the statement, didn't I?

20    A.  Yes, and I did immediately.

21    Q.  Okay.  You did three days later, correct?

22    A.  That -- right -- when you contacted me, I believe the same

23    day or next day, you didn't contact me on the 23rd.  I believe

24    you contacted me on the 25th and I corrected it on the 26th.

25    It was very quickly that I wrote a second article where I

1    corrected this that Mr. Klayman has contacted me and he said

2    that he was indicted but he was not convicted yet.  And I wrote

3    on my web site that I was contacted by Mr. Klayman and he said

4    that he was indicted, he was not convicted yet.

5    Q.  I never told you that I was not convicted yet, did I?

6    A.  Yes, that's exactly what you told me, that you were not

7    convicted yet.

8    Q.  I used the word "yet"?

9    A.  That's what I remember -- that's what I remember that, I

10   cannot tell if you used the word "yet."

11   Q.  So you are making that up yourself.

12   A.  Mr. Klayman has contacted me.  From what I recall, he

13   stated that he was indicted but he was not convicted yet;

14   that's what I remember, that's what I posted.

15   Q.  You realize you are under oath?

16   A.  Yes, I am.

17   Q.  No one from Judicial Watch ever contacted you to tell you

18   to correct that statement, did they?

19   A.  Not as far as I remember.

20   Q.  And before you published Ms. Ruffley's statement that I was

21   convicted for nonpaying child support, no one had ever told you

22   I was convicted of anything, correct?  She is the first person

23   who said that?

24   A.  Yes.

25   Q.  Ms. Taitz, I am going to show you a document which has been

 1    marked and admitted into evidence as Joint Exhibit 17.

 2         (Joint Exhibit No. 17 was marked for identification.)

 3         Do you recognize that?  That's an E-mail from me to you.

 4    A.  I don't see anything on my screen.  It's empty.  Now, I do.

 5    Yes.

 6    Q.  Do you remember receiving that E-mail?

 7    A.  Yes.

 8    Q.  On February 24th?

 9    A.  I don't know which day it was, February 24th --

10    Q.  It's February 24th.

11    A.  24th in the afternoon, yes.

12    Q.  Done on the 24th.  And in this E-mail I am asking you to

13    correct what Ms. Ruffley told you --

14    A.  Um-hmm.

15    Q.  -- that I had been convicted of nonpayment of child support

16    and the information should be given to donors, correct?

17    A.  Yes.

18    Q.  And that occurred just one day after the publication, which

19    is Exhibit 1, correct?

20    A.  Yes, it happened on the 24th and I believe the correction

21    came, I think, on the morning of the 26th.  On the 25th, I

22    checked what you said.  You sent this to me in the afternoon of

23    the 24th.

24    Q.  Yeah, but the publication was on the 23rd, correct?

25    A.  The publication was on the 23rd, you have sent this E-mail

```
 1    on the -- Mr. Klayman sent this E-mail on the 24th -- and in

 2    the afternoon -- and, I believe, I was out of town.  From what

 3    I recall, I was at the Republican party convention.  And when I

 4    arrived home, which was, I believe, on the 25th -- I don't

 5    recall was it the 25th or 26th but as I arrived home and I

 6    checked everything, I posted right away a correction which was

 7    on the 26th.  So within one day of the E-mail, I have posted

 8    the correction.

 9    Q.  Well, the E-mail was dated the 24th; was it not?

10    A.  Yes, the E-mail was on the 24th and I also remember that

11    you called me and I was -- and I told you on the phone that I

12    am out of town, that my husband and I are at a convention and

13    when I will arrive back to Southern California, I will make

14    sure to post a correction, which I did.

15    Q.  In fact, I called you on the 23rd; did I not?

16    A.  I don't believe so.

17    Q.  Immediately, correct?

18    A.  I don't think so.

19    Q.  So when you just testified that it took four days for me to

20    contact you --

21    A.  I just.

22    Q.  You were lying -- you lied, weren't you?

23             THE COURT:  Ladies and gentlemen, we will take a nice

24    afternoon recess.  Please don't discuss the case.

25             COURT SECURITY OFFICER:  All rise.
```

1           (The jury exited the courtroom at 2:28 p.m.)

2               THE COURT:  I thought I had made myself clear.

3               MR. KLAYMAN:  Your Honor, if I talked over her, it was

4   inadvertent at the end.  I will be careful not to do that.  I

5   guess I am getting a little excited because it was not

6   truthful.

7               THE WITNESS:  May I respond?

8               THE COURT:  I just am trying to have a good record and

9   I am trying to make the life of my court reporter bearable for

10  her.  I asked more than once that each of you speak one at a

11  time; did I not?

12              MR. KLAYMAN:  I agree, Your Honor.

13              THE COURT:  How many times did I make that known?

14              MR. KLAYMAN:  I think you asked twice.

15              THE COURT:  Or three times.

16              MR. KLAYMAN:  Or three.  And I will be very careful.

17              THE COURT:  I don't care how excited you get,

18  Mr. Klayman.

19              MR. KLAYMAN:  I agree.

20              THE COURT:  It is inexcusable.

21              MR. KLAYMAN:  I will be --

22              THE COURT:  So let me take a break -- we are going to

23  take a break so everybody's blood pressure can come down,

24  including my own, and you will both mind my clear instruction

25  which is:  You ask a question, there is a pause, there is an

1    answer, there is a pause, you ask another question, there is a

2    pause, you answer, pause.  Are we clear?

3            MR. KLAYMAN:  I do, Your Honor.  Can I ask for an

4    instruction?  I think this is part of the problem and I do

5    apologize for doing that.  It was not intentional.  Would you

6    give Ms. Taitz an instruction to answer only the question and

7    not to go off in other directions which have nothing to do with

8    the question?

9            THE COURT:  She is allowed to give an explanation.

10   Every witness is allowed to answer.

11           MR. KLAYMAN:  No, I agree with that but she is going

12   far afield --

13           THE COURT:  And please don't interrupt me, as well.

14           MR. KLAYMAN:  I'm sorry.

15           THE COURT:  She is allowed to answer your question,

16   yes or no, and give an explanation.  If you don't like what --

17   the explanation she is giving --

18           MR. KLAYMAN:  Okay.  I apologize, Your Honor.

19           THE COURT:  -- that is not a basis for you to cut her

20   off mid-sentence.

21           So we are taking a break and I expect the remainder of

22   this examination to go as I have indicated.  Any questions?

23           MR. KLAYMAN:  No, Your Honor.

24           THE COURT:  Any questions, Ms. Taitz?

25           THE WITNESS:  No.

```
 1            THE COURT:  Thank you.

 2        (A recess was taken from 2:30 p.m. to 2:42 p.m.)

 3            THE COURT:  Let's bring the jury in, please.

 4            COURT SECURITY OFFICER:  All rise.

 5        (The jury entered the courtroom at 2:42 p.m.)

 6            THE COURT:  Everyone, please be seated.

 7   BY MR. KLAYMAN:

 8   Q.  Ms. Taitz, you previously testified that it took me four

 9   days to contact you to ask for a correction, right?

10   A.  No, I never said this.  Can the court reporter please read

11   what I said?  I did not say four days.  Four days?  I did not

12   say any specific number of days.  I stated that you did not

13   contact me right away, that when you contacted me, I made a

14   correction.  I did not say four days.

15   Q.  In fact, I contacted you immediately, correct?

16   A.  Well, it was not immediate.  I have talked to Ms. Ruffley

17   in the evening of the 22nd.  After our conversation, I went

18   home.  I wrote the article.  It was at night from the 22nd to

19   the 23rd and this E-mail came in the evening of the 24th, so it

20   was nearly full two days from the time I posted the article

21   until this E-mail arrived.  And I have talked to Mr. Klayman on

22   the phone and I told him, I will respond to your E-mail.

23        I don't know if the jury has seen this E-mail but the

24   E-mail is basically a threat.  It says, My clients Pamela

25   Barnett and Mr. Miller -- George Miller are going to sue you.
```

1   I am going to sue you.  You are posting incorrect information.

2   And I talked to Mr. Klayman on the phone.  I told him I am out

3   of town, I am at a convention with my husband.  The moment I

4   arrive home, I will post a correction.  So this E-mail came in

5   the evening of the 24th and from what I recall, the correction

6   was posted in the morning of the 26th, within one day since

7   Mr. Klayman has sent me this E-mail.

8       And I also talked to Ms. Barnett because the E-mail that

9   Mr. Klayman sent to me on the 24th starts by saying, Dear

10  Ms. Taitz, my clients, which include George Miller and Pamela

11  Barnett, recently contacted you to put you on notice that your

12  web site published to the world contained and continues to

13  contain false and defamatory material concerning my clients and

14  me.

15      So, first of all, I contacted them and actually Ms. Barnett

16  told me that Mr. Klayman is threatening to sue them because

17  they did not forward to him all the money that he believes they

18  collected.  And so I wanted to know what was defamatory about

19  them and there was nothing defamatory about his clients.

20      My -- the article that I posted dealt with the fact that

21  the bloggers, Mr. Miller, Ms. Barnett and a number of other

22  bloggers have posted -- have posted an advertisement on

23  February the 10th.  And in that advertisement, which was a very

24  intense sale, they were urging the public to donate money

25  within 96 hours -- four days, so that Mr. Klayman will file two

1   lawsuits in California and in Florida within one week.  And

2   they were saying -- and I actually have this advertisement that

3   they posted, so they were saying you have to donate all this

4   money now.  And all of those bloggers were pushing people:

5   Donate, donate, donate for Mr. Klayman.  And they said, Time is

6   of the essence.  They were saying you have to donate now

7   because he needs to file a lawsuit -- two lawsuits against

8   Barack Obama, one in Florida, one in California within one

9   week, which would have been February the 17th.

10      So I posted on my web site a true and correct statement

11   that, as of February 22nd, there were no lawsuits filed on

12   behalf of Mr. Klayman.  And, actually, I brought with me those

13   statements that I posted.  I said, Well, did anybody see those

14   lawsuits filed by Mr. Klayman on the 17th?  Nobody saw them.

15      I posted, again, Well, what happened to all the money that

16   all of the bloggers were collecting for Mr. Klayman?  How much

17   money was collected?  And what happened to all this money?

18   Then I posted another notation on the 22nd stating that I was

19   contacted by Ms. Barnett and she said that she and Mr. Miller

20   no longer work with this group of bloggers, Article II Super

21   PAC.

22      So there were two groups of people that were collecting

23   money.  They were saying that there will be transparency.

24   There was no transparency.  Nobody knew how much money was

25   collected.  And as a matter of fact, Ms. Barnett said that you

1    are threatening and you are still threatening to sue them.

2        So I -- when I received the E-mail from Mr. Klayman, first

3    of all, I checked what Mr. Klayman is saying and there are

4    multiple allegations in this E-mail, multiple threats, and the

5    only thing that I was able to find that there was one statement

6    by Ms. Ruffley that was erroneous.  She said, He was convicted

7    of nonpayment of child support.  In reality, actually, he was

8    found three times in criminal contempt of court of nonpayment

9    of child support in family court and he was indicted in

10   criminal court but he was not convicted in criminal court.

11       So I made a correction.  When I -- when I checked the

12   facts, I found there was only one fact that was incorrect and I

13   made a correction on the same blog.

14       But there -- this E-mail it's an extremely threatening

15   E-mail.  It threatened me with multiple lawsuits from multiple

16   individuals including Pamela Barnett, George Miller.  There was

17   no basis and I had to check what is he talking about.

18       He should -- Your Honor, should I read this E-mail that

19   Mr. Klayman --

20            THE COURT:  Why don't you wait for a question,

21   Ms. Taitz.

22            THE WITNESS:  Okay.  But that's -- what was happening.

23   I received from Mr. Klayman this E-mail.  I checked.  I

24   contacted Ms. Barnett.  I found out that it was just one

25   inconsistency and I found out Mr. Klayman was threatening them

1   just as he was threatening me.

2   BY MR. KLAYMAN:

3   Q.   You stated that you got this E-mail in the evening,

4   correct?

5   A.   I believe so.

6   Q.   In fact, you got it at 4:22 in the afternoon, correct?

7   A.   Well, 4:22 is afternoon, it's -- okay.

8   Q.   So it wasn't the evening?

9   A.   4:20 -- okay, it was at 4:22 in the afternoon.

10  Q.   Okay.  Ms. Taitz, you -- before Connie Ruffley ever said

11  what she said to you, you had brought a number of lawsuits

12  challenging the president's eligibility, correct?

13  A.   Yes.

14  Q.   Where had you brought those lawsuits?

15  A.   In multiple states.

16  Q.   In California?

17  A.   Yes.

18  Q.   What other states?

19  A.   I -- there were cases that I brought *pro se* and there were

20  cases that I brought where I received *pro hac vice* in other

21  states.

22  Q.   Okay.  And the reason that your web site is called the

23  world's leading eligibility web site is because you were

24  thought of as the primary person challenging the president's

25  eligibility, correct?

1    A.  It is no longer called this way.  It used to be called this

2    way.  I changed the name of my web site a while ago.  But, yes,

3    I was an attorney that brought a number of cases.  But, again,

4    I am looking at this E-mail that you sent and -- excuse me, one

5    second, I am trying to see.

6    Q.  It's up on the screen so everybody can see it, Ms. Taitz.

7    A.  For example, in your E-mail you are stating that,

8    specifically and without limitation, you have stated that my

9    clients, in effect, are defrauding the public of raising funds

10   for eligibility challenges.

11       I never said this.  And if the Court would allow me, I

12   would just read to the jury what I wrote.  I never said that

13   they are defrauding the public.  I said that they -- there were

14   specific parameters.  They said, We need to raise this money by

15   specific date, within four days, so that Mr. Klayman will file

16   a lawsuit by February 17th on that specific date.

17       And that did not happen.  Mr. Klayman did not file either

18   one of the lawsuits by February the 17th.  So, clearly, when

19   people were donating money for Mr. Klayman to represent those

20   plaintiffs -- to represent plaintiffs in Florida and in

21   California, the public knew that there were supposed to be

22   lawsuits by specific date and those lawsuits were not filed.

23   So I provided true and correct statement on that.

24       Further, you were saying -- "and that I have been convicted

25   of a crime."  I did not state that.  I stated that Mr. Klayman

1    was convicted of nonpayment of child support.  This is not a

2    crime and it's -- as I stated, it's a misdemeanor.

3         Further, he stated in his E-mail, "Have not done work on

4    the project."  I did not -- I did not accuse Mr. Klayman of not

5    doing work on the project.  In my E-mail, I posted a true and

6    correct statement from the Supreme Court of Florida, which an

7    article from the newspaper and a statement from the Supreme

8    Court of Florida where they -- it was written about a case

9    where a client has brought a complaint against Mr. Klayman

10   for -- where he collected the same amount, $25,000, she stated

11   the work was not done.  He was supposed to refund the money, he

12   didn't and Florida state bar has sued Mr. Klayman and he was

13   supposed to refund the money.  The case was in the Supreme

14   Court of Florida.

15        So I was not defaming him.  I was not just saying he -- as

16   he is stating in his E-mail, You accused me of not doing work.

17   I didn't accuse him.  I posted -- I posted on my web site a

18   printout from the Supreme Court of Florida.  And it says in the

19   Supreme Court of Florida, the Florida bar Supreme Court, case

20   number, complainant, against Larry Elliot Klayman, respondent

21   and complaint and it talks about specific case that was filed

22   by this Florida bar against Mr. Klayman.

23        So he was accusing me, he was threatening me, I'm going to

24   sue you, Barnett will sue you, Miller will sue you on all of

25   those charges because you are defaming me.  And I was not

1  defaming him.  I was -- I posted what the Florida bar filed

2  with the Supreme Court.  I posted information that the article

3  in regards to his nonpayment of child support, so I was not

4  doing anything defamatory.  I was providing facts.

5      Further, in his E-mail he was saying -- and that I cannot

6  participate in cases in California by entering *pro per* or

7  working with my colleague who is licensed in California.  I

8  never said this.  That was a lie.  I never said this.  I

9  provided, again, information.

10     I actually, if you look at your exhibits, I put -- in your

11  exhibit you have my post and you have here a link:  Article II

12  Super PAC, 25,000 solicitation for Larry Klayman.  And when you

13  click on it, this is what you get.  This is what those bloggers

14  were advertising.  And they stated that a case will be filed by

15  attorney Larry Klayman in Florida and in California and it

16  would be a case on behalf of -- excuse me -- on behalf of

17  specific clients.

18     And I have here, they are specifically stating -- I just

19  put a link to what the bloggers who were representing

20  Mr. Klayman were saying.  Excuse me.  It says here, We are

21  currently collecting for Florida case to be filed, counsel

22  Klayman; California, Barnett, Newman, et al., counsel Klayman

23  and other complaints.

24     So that's what I posted, their own advertisement where they

25  are saying two cases for counsel, Attorney Larry Klayman to

1   represent those clients in Florida and California.  I never

2   said what he is writing in his E-mail.  I never said that

3   Mr. Klayman cannot participate in cases in California by

4   entering *pro per* or working with my colleagues who is licensed

5   in California.

6       I never said this.  He was the one who was saying things

7   that were not true.  I simply put a link to what those bloggers

8   representing him stated and that was that he, as an attorney,

9   would be filing cases for clients in Florida and California.

10  Q.  Ms. Taitz, you are aware that I was entering -- strike

11  that.

12      You were aware that, for the first time, I was entering the

13  realm of challenging the eligibility of the president long

14  after you had brought all these cases?

15  A.  Yes.

16  Q.  And for that reason you felt very competitive with me,

17  correct?

18  A.  I did not feel competitive.  I provided the public true and

19  correct statements.  It was not competitiveness.  I provided

20  the public -- the actual -- the link to actual advertisement

21  that didn't come from me.  This is the advertisement that came

22  from a group of bloggers who were representing Mr. Klayman and

23  were collecting moneys from Mr. Klayman.

24      All I did, I told the public, Here is the link, click, look

25  at this advertisement.  And according to this advertisement, he

1    was supposed to file two lawsuits on behalf of clients in

2    Florida and California by February 17th.  There was no case

3    filed either in Florida and in California.  He is not licensed

4    in California.  True and correct statements.  No -- I was not

5    threatened.  I provided true and correct statements.

6    Q.  Are you done?

7    A.  Yes.

8    Q.  Look at Exhibit No. 1, first paragraph on the second page.

9    A.  I don't have it.

10   Q.  It is going to be up on the screen.

11        MR. KLAYMAN:  By the way, Your Honor, I move to strike

12   the entire last response that it was nonresponsive.

13   BY MR. KLAYMAN:

14   Q.  Reading the last sentence of the first paragraph on the

15   second page, "I told her -- "you meant Connie Ruffley, right?

16   A.  Excuse me, where is it?

17   Q.  Look at the first paragraph on the second page of

18   Exhibit 1.

19   A.  I have just one page.

20   Q.  It's up on the screen.

21        "I told her."

22   A.  Okay.  I see it.  Yes.

23   Q.  It's Connie Ruffley you are referring to.

24   A.  Okay.  "I told her."

25   Q.  "That it was a hard sell."

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1   A.   I told her, It was a hard sell.

2   Q.   Okay.

3   A.   They wrote, "It is now or never," saying, "Finally, Obama's

4   team has -- I don't see here -- has met their match, dissing

5   four years of my tireless work in the process.  And in the end,

6   nothing, nothing was filed by Larry Klayman.  It is not clear

7   what happened to all of -- I can't see here -- of the moneys

8   that was raised who got it."  Absolutely.

9   Q.   Okay, let's back up.  "Dissing four years of my tireless

10  work in the process."

11  A.   Yes.

12  Q.   You were very resentful that another lawyer was coming in

13  to bring cases challenging the eligibility of the president?

14  A.   No, I was not resentful.  As a matter of fact, I felt that

15  it was good to bring another lawyer who would have actually

16  done the work.  The issue was that they made this hard sell,

17  multiple individuals were pushing to raise money and the

18  lawsuits were not filed.  And based on what Ms. Ruffley told me

19  and then I checked with California bar, Mr. Klayman was not

20  even licensed in California.  And according to that

21  advertisement, he was supposed to file a lawsuit on behalf of

22  clients in California.

23      The advertisement did not say that they are looking for an

24  attorney in California to file lawsuits and then motion the

25  judge to add Mr. Klayman.  They were raising money specifically

1    stating Counsel Klayman for Barnett and Newman, those

2    plaintiffs in California.  And there had to be an explanation

3    to the public stating that Mr. Klayman is not licensed in

4    California and if he wanted to join cases, they needed to bring

5    an attorney licensed in California.

6    Q.  Now, Ms. Taitz, in order for you to bring your lawsuits,

7    you were raising money on your web site to pay for them,

8    correct?

9    A.  I did not raise money before bringing the lawsuits.  I

10   actually brought lawsuits -- I have done a lot of work pro bono

11   and I did put a PayPal button on my web site and I told the

12   public here, I have ongoing lawsuits and it would be greatly

13   appreciated if the public will help me pay the expenses in

14   ongoing lawsuits.

15       With Mr. Klayman it was different because it was a large

16   group of bloggers who had this advertisement asking for money

17   because they said there will be lawsuits filed by specific

18   date.  And the date came and went; lawsuits were not filed.

19       So it was a legitimate issue to bring to the public and to

20   the donors that this money was collected and -- from

21   Mr. Klayman and lawsuits were not filed.  And as a matter of

22   fact, I did not state that Mr. Klayman was the one who had the

23   money.  I said, There has to be an accounting to find out what

24   happened to the money, who got it.

25   Q.  So you were resentful that money donated to me for

1   eligibility lawsuits wasn't going to go to you, right?

2   A.   Absolutely not.   No.   Actually, I would like to have

3   another attorney join the case and be successful because if

4   there is an attorney who is successful in a specific field, it

5   helps other attorneys working in the field.   It's like, you

6   know, asbestos litigation when one attorney won and was

7   successful, then there is a precedent for other attorneys.

8        I simply brought a legitimate concern that so many people

9   were raising money and they were given specific parameters:

10  Two lawsuits will be filed in two states.   And they were not

11  filed.   I mean, that's -- was a legitimate concern, legitimate

12  statement and as far as I know, until now, nobody knows what

13  happened to all the money.

14       There was no accounting.   There was a blogger by name Helen

15  Tansey who had separate funds.   She said, Well, here is Article

16  II Super PAC legal defense fund and money will go to attorneys.

17  And here is Article II Super PAC fund for education on

18  eligibility of the president.   And here is another fund --

19  general fund, well, here are the three funds and you can donate

20  to either one of those funds.   And nobody knows how much money

21  was donated to either one of those funds.

22       And, as a matter of fact, I wrote, if I may, actually a day

23  before and I brought what I wrote on my web site a day before.

24  On February 22nd I wrote, "I received an E-mail from Pamela

25  Barnett, who stated that Attorney Larry Klayman is no longer

 1  associated with Article II Super PAC.  If Article II Super PAC,

 2  meaning this woman Helen Tansey, and their Article 2 legal fund

 3  are not connected with attorney Larry Klayman, they are not

 4  connected with me, who are they collecting money for and how

 5  much?"  So I brought a very important issue that would be

 6  important for the donors and for the public.

 7      If you were to donate money, wouldn't you want to know that

 8  a woman was collecting money supposedly for attorneys is not

 9  donating to -- to attorneys for our bringing lawsuits?  It is a

10  very legitimate case, a very legitimate matter.  And so the

11  gist of the article that I posted that Mr. Klayman is asking me

12  about had nothing to do with Ms. Ruffley and the error that she

13  made about his child support.

14      Most of the article had to do with bloggers.  It was posted

15  on the web site that dealt with legal actions that were

16  specific legal actions that were brought and I simply was

17  writing to the public and -- actually, it was a two-page

18  article where I was writing at length about all of those

19  different bloggers collecting the moneys and the public needing

20  to know what happened to all the money.  That was the main gist

21  of the article, not Mr. -- not the child support of

22  Mr. Klayman.

23  Q.  Ms. Taitz, as part of your activities in challenging the

24  eligibility of the president, you keep abreast of cases around

25  the country that have been filed, correct?

1    A.   Sometimes, not all of them.  Some cases I do, other cases I

2    don't.  There are other people who do that.  There are other

3    web sites where they actually keep track of all the cases.  I

4    do not do that.

5    Q.   But you obviously were interested as to whether I filed a

6    lawsuit in Florida or not on eligibility?

7    A.   Yes.

8    Q.   Okay.  And you kept track of whether I filed one and that's

9    why you claimed to have stated that I hadn't filed one, right?

10   A.   By the date that they -- that you were supposed to file it,

11   you did not file.  By the date that I posted the article, you

12   did not file.  Later on you joined an ongoing case that was

13   filed by a *pro se* plaintiff, you substituted but that was after

14   I wrote the article and brought to the attention of the public

15   that after all of those solicitations, the cases were not

16   filed.  So after the article, you filed a lawsuit, not before.

17   Q.   You are sure of that?

18   A.   Yes.

19   Q.   Okay.  I am going to show you what's been marked as

20   Exhibit 12, it's in evidence.

21        MR. KRESS:  This is Plaintiff's Exhibit 12?

22        MR. KLAYMAN:  Yes.

23   BY MR. KLAYMAN:

24   Q.   Ms. Taitz, Exhibit 12 is a docket sheet.

25   A.   Um-hmm, yes.

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1    Q.   Of the case that I filed in Florida?

2    A.   No, it wasn't filed by you.   It was filed by a *pro se*

3    plaintiff and you -- you joined the case at a later date.

4    Q.   That case was active, correct?

5    A.   It -- not by you.   You did not join the case,

6    Mr. Klayman -- you did not join the case when the article was

7    written.   You joined the case on March the 16th.

8    Q.   But the case was ongoing, right?

9    A.   Look, the case was brought by a *pro se* plaintiff, not by

10   Mr. Klayman.   Mr. Klayman had no affiliation with this case

11   until March the 16th.   As a matter of fact, on March -- on

12   February the 22nd -- on February the 22nd I wrote on my web

13   site, So far, the only challenge filed in Florida was a *pro se*

14   challenge filed by a voter.   Nothing was filed by Attorney

15   Klayman, even though it was announced that he would file and

16   moneys were solicited by Article II Super PAC and their legal

17   fund for Klayman to file challenges against Obama on the ballot

18   in Florida and California.   That was February 22nd.

19       So I wrote a true and correct statement that a *pro se* voter

20   filed a lawsuit, not Mr. Klayman, just a voter filed a lawsuit.

21   And, as a matter of fact, on February the 10th when they

22   started this advertising, that's what they were saying that it

23   is not good for *pro se* voters themselves to file lawsuits.

24   They were writing -- excuse me, one second.   This is the

25   advertisement by Mr. Klayman, "Once the ballots are printed in

1    all 50 states, it will be too late.  What would follow is a

2    rigged election and Eric Holder to rubber-stamp the results.

3    The best we can do then is rearguard vote challenge and battle

4    our way up the steps of the inauguration platform.

5         "We are not alone and we have an excellent opportunity to

6    succeed.  We are putting together an unbeatable legal team

7    headed by Larry Klayman.  He is taking our cases in his private

8    capacity -- that's how important it is to him he told us.  For

9    more than three decades, Mr. Klayman was forced to their knees

10   the most corrupt of businesses and politicians, including the

11   president Bill Clinton.

12        "Plaintiffs are lined up in Florida and California and some

13   complaints have already been drawn.  What we need for a victory

14   in court is your help to raise money needed to cover legal

15   expenses."

16        And they are further saying -- there is somewhere -- a

17   statement, actually, where they were saying that a person who

18   is bringing a case on his own behalf has a fool for a client,

19   which is a known statement.

20        So the whole point was -- of this advertisement that here

21   there are some cases that were already filed but were filed by

22   regular voters and we need to raise money so that an attorney

23   can substitute.

24        And so what you were trying to say, Mr. Klayman, that you

25   were -- that you already represented clients when I wrote my

 1   article, and that was absolutely not true.  You joined this

 2   case in Florida on March 16th, three weeks after I wrote this

 3   article.

 4   Q.  And you are aware that I -- you don't know how much work I

 5   was doing with Mr. Voeltz up to the point that I joined the

 6   case, do you?  You don't know?

 7   A.   Mr. Klayman.

 8   Q.  You don't know?

 9   A.  No, I don't know and that's not the issue here.  The issue

10   was for you to represent clients and you did not become an

11   attorney for Mr. Voeltz until March the 16th, three weeks after

12   the article.

13   Q.  Do you know how much work I have done for Mr. Voeltz since

14   I have entered the case?

15   A.   I know that on March the 16th, Mr. Klayman joined the case

16   for Mr. Voeltz.  He replaced Mr. Voeltz as a -- until March the

17   16th, four months, Mr. Voeltz was a *pro se* plaintiff; he

18   brought the case on his own behalf.  A month later, Mr. Klayman

19   has joined the case and what he did, he substituted for Mr.

20   Voeltz and he substituted his complaint.

21       The original complaint was filed by Mr. Voeltz, *pro se*.

22   And what was -- and actually what happened, this Mr. Voeltz was

23   a paralegal by profession, if I -- if I recall.  In his

24   complaint, he had two causes of action, one a declaratory

25   relief to declare that Mr. Obama is not eligible -- not

1  eligible because of the problems with his IDs because the

2  problems, social security number and so forth.

3      So he had two causes of action, one had declaratory relief

4  and the other was injunctive relief which would stop Mr. Obama

5  from being on the ballot.  And, actually, what happened when

6  Mr. Klayman has joined the case on March the 16th, he replaced

7  the original complaint by Mr. Voeltz with his complaint -- a

8  first amended complaint.  And I don't know why he decided in

9  his first amended complaint to remove an important cause of

10 action for injunctive relief.  And later on, I believe,

11 Mr. Klayman realized that he made a mistake and he filed a

12 motion with a judge asking the judge to allow him to file a

13 second amended complaint and put back the cause of action that

14 Mr. Voeltz had in his complaint to begin with and he took out

15 when he took over and the judge denied this request and the

16 case was dismissed.

17     So if anything, since Mr. Klayman joined the case on

18 March 16th, he did not help Mr. Voeltz, he made things worse.

19 Because for some reason he decided to take out an important

20 cause of action, then he tried to put it back, was not allowed

21 to the judge and subsequently the case was dismissed.  And

22 that's what I know about the case.

23 Q.  So you followed my activities with regard to representing

24 Mr. Voeltz?

25 A.  Yes, I saw -- I saw what happened there, yes.

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1    Q.  And you are aware that I filed three cases on behalf of

2    Mr. Voeltz, correct?

3    A.  As far as -- technically, it was not three cases.  What

4    happened, as I said, first of all Mr. Klayman has joined this

5    action by Mr. Voeltz, as I said, after I wrote the article and

6    after I highlighted the fact that the cases were not brought by

7    February 17th when they were supposed to be brought.  Actually,

8    Mr. Voeltz, himself, filed the case sometime February 15th.

9    And what happened there is Mr. Klayman has joined Mr. Voeltz

10   and it was the same case but he -- the judge stated that during

11   the primary election, Mr. Obama is not technically a nominee of

12   the party, so Mr. Klayman has refiled the case later on during

13   the general election.

14        So they were not different cases, it was pretty much the

15   same case.  But he refiled during general election and it was

16   dismissed again and he forwarded the same case to the court of

17   appeals.  So they were not technically three cases, it was the

18   same case but, as I said, it was refiled during the general

19   election, dismissed again and then it was forwarded to the

20   court of appeals.

21   Q.  There were three separate complaints filed, correct?

22   A.  It was -- it was the facts of the same case but, as I said,

23   when you refile it during the general election, yeah, you can

24   state it's a different complaint, but it was the same case that

25   was refiled later.

1   Q.  Having followed so closely my activities in Florida, you

2   are aware of how much work I did, that I did a lot of work,

3   right?

4   A.  Not to my knowledge.

5   Q.  Okay.  Well, let's put on the docket sheet of these cases.

6   I'm sure you know, given you followed it that closely.

7   A.  I did not follow you that closely but to my knowledge, it

8   was not that much work.  And I don't believe it even has

9   anything to do with the case at hand because this is -- we are

10  here in a lawsuit against Judicial Watch that has to do with a

11  statement which was made on February the 22nd.  You joined

12  Mr. Voeltz on March the 16th, three weeks later, so all the

13  work you have done with Mr. Voeltz has nothing to do with what

14  happened on February 22nd.

15  Q.  So are you saying that the only false statement in your

16  publication, in Exhibit 1, was what Ms. Ruffley told you?

17  A.  Yes.

18  Q.  That I was convicted for not paying child support?

19  A.  Yes.

20  Q.  That's the only false statement there?

21  A.  Yes.

22  Q.  But Ms. Ruffley made that false statement, correct?

23  A.  Yes.

24  Q.  And she was there on behalf of Judicial Watch, correct?

25  A.  No, I told you not.  I told you that she approached me, she

1    stated that she works for Judicial Watch.  She gave me her

2    business card but she did not state that she is on behalf of

3    the Judicial Watch.  I don't know, maybe she was, maybe she

4    wasn't but she never said, I'm here on behalf of the Judicial

5    Watch.  She never said that Judicial Watch told her to talk to

6    me.  I do not know that.  It may or may not be true.  I just do

7    not know that.

8    Q.  But she was there manning a table with materials that she

9    was handing out concerning Judicial Watch; do you remember

10   that?

11   A.  No, I don't and I told you that, Mr. Klayman.

12   Q.  You are aware that there are different types of crimes; are

13   you not?

14   A.  Yes.

15   Q.  Okay.  And one type of crime is a misdemeanor, correct?

16   A.  Yes.

17        MR. KRESS:  Objection, she is not testifying as a

18   legal expert.

19   BY MR. KLAYMAN:

20   Q.  And you don't know whether or not I was indicted for a

21   felony or a misdemeanor, do you?

22        MR. KRESS:  Objection.

23        THE COURT:  Overruled.

24        THE WITNESS:  I read the -- I read the decision by

25   Honorable Judge Altonaga where she stated that in the state of

```
 1    Ohio, nonpayment of child support is not a crime but a

 2    misdemeanor, so I am just relying on what the judge wrote in

 3    her ruling.

 4              MR. KLAYMAN:  Your Honor, I object to that and I ask

 5    you to strike her characterization of your opinion.

 6              THE COURT:  That response is stricken, ladies and

 7    gentlemen.

 8    BY MR. KLAYMAN:

 9    Q.  Turning your attention to Defendant's Exhibit 6.

10        (Defendant's Exhibit No. 6 was marked for identification.)

11    BY MR. KLAYMAN:

12    Q.  In your -- in Exhibit 1, which was your publication that we

13    have been talking about where Ms. Ruffley told you that I had

14    committed -- that I had been convicted for not paying child

15    support.

16    A.  Yes.

17    Q.  You made reference to the fact that you were only going to

18    publish what's in the public record, right?

19    A.  Yes.

20    Q.  Okay.  I turn your attention to Exhibit -- Defendant's

21    Exhibit 6.  This is a press release issued by the prosecutor in

22    Cleveland, Ohio.  You have seen this, haven't you?

23    A.  Yes, and I actually see that --

24    Q.  Yes or no?

25    A.  Yes.
```

1   Q.   Okay.   Let me read it to you so we can have a frame of

2   reference.   "Larry Klayman indicted for owing $78,861.78,

3   Cleveland.   Cuyahoga County prosecutor Bill Mason announced

4   that 15 defendants were indicted for failure to pay child

5   support."

6          MR. KRESS:   I am going to object, it speaks for

7   itself.

8   BY MR. KLAYMAN:

9   Q.   "These 15 defendants owe a combined $410,404.55 in child

10  support.   The charge of criminal nonsupport is a fifth-degree

11  felony which carries a maximum sentence of one year in prison."

12  You read that, didn't you?

13  A.   No.

14  Q.   You just said you read that, didn't you?

15  A.   No, I don't have this and I never saw it.   All I have is

16  what I received and what I posted on my web site.   I never seen

17  this full statement and I wrote on my web site a number of

18  individuals send me this information and they did not send to

19  me this top part.   The only thing that I had was actually an

20  excerpt from a publication called politicalforum.com and they

21  send me this and I wrote -- a number of individuals send me

22  this information -- "Larry Klayman, 60, of Los Angeles

23  California was indicted on two counts of criminal nonsupport.

24  He owes $78,861.76 for his two children, ages 11 and 14.   Two

25  hearings were held in domestic relations court between 2009 and

 1   2010.  The last voluntary payment was made on August 30, 2011,

 2   in the amount of $1,014.25.  Arraignment is scheduled for

 3   February 7, 2012."  So I wrote to the public, I received this

 4   from a number of individuals and I posted, this was an excerpt

 5   and the place from where it came I have never seen this full

 6   document.

 7   Q.  Ms. Ruffley, in Exhibit 1, second page, Paragraph 4.

 8          MR. KRESS:  Is this Plaintiff's Exhibit 1?

 9          MR. KLAYMAN:  Yes.

10   BY MR. KLAYMAN:

11   Q.  I am going to read you the portion in Exhibit 1,

12   Paragraph 4, Page 2.  Okay.  You write and you publish on your

13   web site, "Larry Klayman, 60, of Los Angeles, California, was

14   indicted on two counts of criminal nonsupport.  He owes

15   $78,861.76 for his two children, ages 11 and 14.  Two hearings

16   were held in domestic relations court between 2009 --

17          THE COURT REPORTER:  Please read slower, Mr. Klayman.

18          MR. KLAYMAN:  I will read it slowly, I apologize.

19   BY MR. KLAYMAN:

20   Q.  "Two hearings were held in domestic relations court between

21   2009 and 2010.  The last voluntary payment was made on

22   August 30, 2011, in the amount of $1,014.26.  Arraignment is

23   scheduled for February 7, 2012."

24       Now, you took that from the prosecutor's --

25   A.  No.

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1    Q.  -- press release?

2    A.  No, absolutely not.

3    Q.  Let me finish the question.  The judge has asked that I be

4    allowed to answer -- ask questions and then you have time to

5    answer.

6        You took that from Paragraph 2 of the -- Paragraph 1 of the

7    indictment of the Cleveland prosecutor that we have up on the

8    screen?

9    A.  Absolutely not, Mr. Klayman.  I have told you this that I

10   have never seen this document and you are telling things that

11   are totally not true.  I stated that I have received from a

12   number individuals this excerpt.  And this excerpt came from

13   http://www.politicalforum.com/current-events232994-breaking-

14   democrat-files-ballotchallengeobjection against Obama Florida.

15   This came from this article that somebody has sent to me that

16   spoke about the fact that you were, indeed -- that you were

17   indicted on two counts of criminal nonsupport and I have never

18   seen the document that you are showing here.  And you are

19   simply saying something that is not true; you are just making

20   up things.

21   Q.  In fact, before I even showed you the prosecutor's press

22   release, you testified before this Court under oath just a few

23   minutes before that you had seen the prosecutor's press

24   release, correct?

25   A.  No, you are lying.  I never said this.  Show me where I

 1  said it.  Please show.

 2  Q.  We will get a transcript.

 3  A.  We have -- Your Honor, can the court reporter please read

 4  what I said because this is the second time Mr. Klayman is

 5  telling things that are absolutely not true and he is accusing

 6  me and challenging my integrity.  I'm an attorney and I am

 7  asking the court reporter to read back what I said.  I have

 8  never said that I ever saw this prosecutor's press release.

 9  Never.  You just made up something and accuse me of telling no

10  truth when you are the one who are not telling the truth.

11      Your Honor, may the court reporter repeat to the jury what

12  I said so the jury can see that I never stated a word about the

13  prosecutor's press release and that just -- Mr. Klayman just

14  made it up?

15          THE COURT:  One can have a court reporter read back

16  testimony when it is clear what it is you are asking the court

17  reporter to read back.  We would have to sit here and watch

18  Ms. McCarn peruse pages and pages of your testimony which has

19  been quite lengthy to figure out what it is you want her to say

20  you didn't say.

21          All right.  Let's move on, please.

22          MR. KLAYMAN:  Yes.

23  BY MR. KLAYMAN:

24  Q.  I -- so the bottom line is this, the prosecutor's press

25  release said that I was indicted for a felony, correct?

1    A.   I have never seen it.   You just post it here.   Based on

2    what you provided me here, it says that it's a fifth-degree

3    felony; however, I don't know if Ms. Ruffley knew it's a fifth

4    degree felony.   I never knew that.   As I stated, a conviction

5    can be a crime, it can be a felony, it can be a misdemeanor, it

6    can be an infraction and this is the first time that I see this

7    document.

8    Q.   So you were -- it wasn't correct to say that I was indicted

9    for a misdemeanor, was it?

10   A.   I never said that you were indicted for a misdemeanor.

11   Again, you are making up things, Mr. Klayman.   When did I say

12   that you were indicted for misdemeanor?   I stated in -- here it

13   is, I stated that Ms. Ruffley actually advised me that

14   Mr. Klayman is not licensed in California.   She told me that he

15   no longer works for the Judicial Watch and that donors should

16   know about litigation in Ohio where he was convicted just

17   recently of nonpaying large amount in child support.   Period.

18        I never said it was a crime.   I never said it was a felony.

19   I never said it was a misdemeanor.   None of this.   I just said

20   nonpayment of child support.   I didn't -- and until now, I did

21   not know how specifically it is classified in the state of

22   Ohio.

23        Every state is different.   Right now Mr. Klayman showed me

24   something saying it is a fifth degree felony, which I had no

25   knowledge, I am not in the state of Ohio.   I know only what

1   Ms. Ruffley told me that it was nonpayment of child support.

2   Never -- there is nothing here saying that this is either a

3   felony or a misdemeanor and I never said this.

4   Q.   Summing up Exhibit 1, everything reported in Exhibit 1 on

5   your web site to the best of your knowledge is accurate;

6   correct?

7   A.   It was accurate as far as I knew.   Later on I found out

8   that Ms. Ruffley made an error, that she said that you were

9   convicted, and Mr. Klayman was not convicted of nonpayment of

10  child support.   He was indicted in criminal court, he was not

11  convicted.   He had three criminal contempts of court for

12  nonpayment of child support but he was not convicted in

13  criminal court.   And that was one thing that in this two-page

14  article that dealt with -- that dealt with the bloggers that

15  was one word that was incorrect and when I found out, I posted

16  a correction.   That was the only thing that was not correct.

17  And when I posted this article, I did not know that it was not

18  correct.

19  Q.   I am going to show you what has been marked as Plaintiff's

20  Exhibit 2, which in evidence.   Take your time to review that.

21  But the predicate question is this is another posting that you

22  made with your so-called correction, right?   On your web site?

23  A.   I did my correction February 26th.   I cannot see the whole

24  thing.   I see only part of it.

25  Q.   We are going to show you the whole thing.

```
 1    A.  It says, "I received an E-mail from attorney Larry

 2    Klayman."

 3            THE COURT:  I'm sorry, there is no pending question.

 4            THE WITNESS:  Okay.

 5    BY MR. KLAYMAN:

 6    Q.  Take a look at the entire document.

 7            MR. KLAYMAN:  May I approach, Your Honor, to show her

 8    the physical document?  It will make it faster.

 9            THE COURT:  Yes.

10            MR. KLAYMAN:  We can scroll it down so the jury can

11    see it, too.

12            Take your time to read it, Ms. Taitz.

13            THE WITNESS:  I need it a little bit larger.

14            THE COURT:  Just read it to yourself quietly.  We can

15    all read it.

16            THE WITNESS:  Make it a bit smaller, excuse me.  Can

17    you make it a little smaller?

18        (Witness complies.)

19        Okay.  I can go to the next page.

20        (Witness complies.)

21    BY MR. KLAYMAN:

22    Q.  Please tell us when you are finished reading it.

23    A.  Yes.

24    Q.  Third page.

25    A.  Where is the third page?
```

1  Q.  We are putting it up.

2  A.  Oh.  Actually, I don't see the end of the -- of the last

3  page, the last paragraph.

4  Q.  Okay.  Let her see Page 2 again, please.

5  A.  (Witness complies.)

6     Okay.  Yes, I finished, I think it is Page 2.  Is that

7  Page 3?

8  Q.  Look at Page 3, please.

9  A.  (Witness complies.)

10    Yes, okay.  Yeah.  So?

11  Q.  Okay, so Exhibit 2 is an accurate copy of what you posted

12  on your web site --

13  A.  I believe so.

14  Q.  -- on or about February 26, 2012, correct?

15  A.  Yes.

16  Q.  And as far as you are concerned there is nothing inaccurate

17  on this?

18  A.  I believe so.

19  Q.  Now, I turn your attention to Paragraph 4 on the second

20  page.

21  A.  Okay.

22  Q.  "I read the first post I made in regards to Mr. Klayman and

23  I saw that, indeed, there was an error."  That's accurate?

24  A.  Yes, yes.

25  Q.  "I wrote that Ms. Ruffley stated that Mr. Klayman was just

1   recently convicted of nonpayment of child support."  That's

2   accurate, correct?

3   A.  Yes.

4   Q.  "The link and the article right under it stated that he was

5   indicted in two counts of criminal nonsupport, that he owes

6   $78,861.76.  An arraignment was set for February 23rd, 2011"?

7   A.  Yes.

8   Q.  And then you wrote, "So there was an error."  Is that

9   correct?

10  A.  Yes.

11  Q.  And what you are referring to is Ms. Ruffley told you

12  something that wasn't true?

13  A.  Yes, she made an error.

14  Q.  Okay.  Then it says "Ms. Klayman -- Mr. Klayman was

15  indicted in the state of Ohio on two counts of criminal

16  nonsupport but he was not convicted yet."

17  A.  Yes.

18  Q.  That's what you wrote?

19  A.  Yes.  I said --

20  Q.  Now, you wrote I was not convicted yet.

21  A.  That's right.

22  Q.  Now, based on your experience, isn't one innocent until

23  proven guilty?

24  A.  That's right.

25  Q.  So you are telling the readers that I am going to be

1   convicted?

2   A.   No, I'm not.  I am saying he wasn't convicted yet, he was

3   only indicted.  And I think that the jury can make its own

4   decision.  I said an error was made.  Mr. Klayman was indicted

5   but he wasn't convicted yet and anybody can understand this

6   that there will be decision by a jury -- just like now, there

7   will be a decision of the jury and then we will see what

8   happens.

9   Q.   So, in effect, you really weren't correcting what I said,

10  you were actually making it worse?

11  A.   No, I didn't.  I think -- I believe this is something for

12  the jury to decide.  I made a correction.  I wrote, She stated

13  that he was convicted but here is the correction, he wasn't

14  convicted.  He was indicted, there was no conviction yet.  So

15  it means there may be a conviction, there may not be a

16  conviction.

17  Q.   So what you meant to tell the readers, the people that

18  donate to eligibility cases, because your web site is widely

19  viewed, is that I would ultimately be convicted?

20  A.   No.  No, I did not state that.  It's just --

21  Q.   And the reason -- I'm sorry, are you finished?  I don't

22  want to interrupt.

23  A.   I stated that an error was made because she state -- she

24  stated that Mr. Klayman was convicted.  Means somebody was

25  already convicted.  And I am saying no, he was not convicted

 1   yet.  He wasn't convicted in the case yet, he was just

 2   indicted.  And anybody understands, well, the person was

 3   indicted and that there will be decision by the jury.  And

 4   later on, from what I understand, two months later Mr. Klayman

 5   had settled -- you settled the matter with your ex-wife and she

 6   withdrew the complaint and the criminal case against you was

 7   withdrawn.  But -- and I made a correction that there was only

 8   indictment but not -- there was no conviction yet.  We don't

 9   know what will happen and that's specifically what it says, he

10   was indicted but there was no conviction yet.

11   Q.  You never spoke with my ex-wife, did you?

12   A.  No.

13   Q.  Okay.  And you never really researched the reason that the

14   indictment was dismissed, did you?

15   A.  As far as I understand --

16   Q.  I guess what -- excuse me, are you finished?  I don't want

17   to interrupt you.  Are you finished?

18   A.  No, from what I seen, quickly, there was a statement from

19   your ex-wife -- a statement or declaration from your ex-wife

20   that Judicial Watch has that there was no payment of child

21   support for a period of time.  And I don't know what was the

22   settlement at the end; I do not know that.

23   Q.  You, yourself, don't know?  Okay.

24       In fact, what you were trying to do, Ms. Taitz, because you

25   felt competitive with me on eligibility lawsuits, was to use

1    the false statement from Ms. Ruffley to harm me, correct?

2    A.   No, absolutely not, Mr. Klayman.

3    Q.   And to cut off contributions that were being raised by

4    George Miller and others to pay for my work?

5    A.   Absolutely not.  As a matter of fact, on the same web site

6    after I posted this article on February the 23rd, I posted,

7    actually, a comment from somebody by name Steven Struck.  And

8    actually it was an E-mail and I posted it on my web site,

9    Steven Struck to Orly Taitz.  Only I read two years ago and it

10   is part of the book, the name of the book by Mr. Klayman.

11   Klayman's book read -- a good book.  "Larry Klayman has zero to

12   do with Judicial Watch.  He actually sued the organization he

13   started.  He now runs Freedom Watch.  Larry is a good man and

14   honest.  The whole thing is beyond fishy."

15        So, actually, I posted -- after I posted this article, I

16   posted February 23, 2012, 11:24 a.m., actually, an E-mail from

17   somebody who is saying Larry Klayman is a good and honest man

18   so this is fishy.  Not only that, if you read the whole article

19   that I posted, most of the article had to do with the fact that

20   those multiple bloggers were collecting moneys.  And I was

21   writing, most of the article was that there has to be

22   accountability.  And, actually, I was writing the -- one

23   second.  I am trying to find it -- that the public needs to

24   donate to a specific -- not to multiple bloggers but to a

25   specific attorney.  One second.  Let me just find it.

```
 1        (Pause in proceedings.)

 2            MR. KLAYMAN:  Your Honor, if she is done, we don't

 3   have any more questions.

 4            THE COURT:  Let's move this along, please.  It's

 5   almost 4:00.  Is the witness coming back on Monday?

 6            THE WITNESS:  But, basically --

 7            THE COURT:  Is the witness coming back on Monday?

 8            MR. KLAYMAN:  No, I think we can finish today.

 9            THE COURT:  All right.  Let's try to move this along.

10            MR. KRESS:  If she is finished, then I will do a

11   cross.

12            THE WITNESS:  Basically, the main part of the article

13   was that there has to be accountability.  It is simply

14   unacceptable that there are multiple bloggers who are

15   collecting money and there was no accountability.  And I was

16   saying if you want to donate to Mr. Klayman, to his cases,

17   donate directly to Mr. Klayman and then there is

18   accountability.

19            When you donate to multiple bloggers and when you

20   read, you can actually -- I don't know if it is in evidence,

21   the whole article -- please read the whole article and you will

22   see that the whole article writes -- speaks mostly about

23   bloggers, a whole group of bloggers who are collecting moneys

24   and there is no accountability.  That was the main point of the

25   article.
```

1          And, actually, I believe that it would benefit

2     Mr. Klayman or anybody else that if they want to donate to his

3     case, he has his own foundation which is Freedom Watch, he has

4     a fund, Liberty Fund, where they donate to one place and there

5     is accountability.  Because with those bloggers, nobody know

6     how much the bloggers kept for themselves and how much they

7     gave to Mr. Klayman.

8          Please read this article.  You have it -- I believe

9     you have the whole article and you will see that I raised an

10    important issue of public concern that had to be raised.

11          MR. KLAYMAN:  No further questions until cross, Your

12    Honor.

13          MR. KRESS:  Your Honor, may I give the witness a copy

14    of the exhibit book, it might be easier for her to see it.

15          THE COURT:  Yes.

16                         CROSS-EXAMINATION

17    BY MR. KRESS:

18    Q.  Ms. Taitz, good afternoon.  My name is Doug Kress and I

19    represent Judicial Watch in this matter.  I am going to ask you

20    some questions.  I am going to walk you through some documents

21    and try to get done as quickly as possible because you probably

22    want to get back to California, I assume, correct?

23    A.  Yes.  Yes.

24    Q.  You flew out this morning?

25    A.  Actually, I flew red-eye.  I actually didn't sleep at night

1    and I am flying in the evening, flying back to California.

2    Q.   Okay.   And Mr. Klayman made arrangements for you to come

3    out here?

4    A.   Yes.

5    Q.   And how did he do that?

6    A.   He asked me to appear in court to testify as to what was

7    told -- what Ms. Ruffley told me and what I posted on my web

8    site.   So I came here to authenticate that what I wrote was

9    true, what was told to me.

10   Q.   And, Ms. Taitz, let me ask you just, first, a few questions

11   about that February 22nd meeting, because you have testified to

12   a lot of things and I don't want to repeat it.

13       This was a regularly scheduled meeting of the California

14   Coalition of --

15   A.   Immigration Reform, yes.

16   Q.   Yes, thank you.   And you were a speaker there one night,

17   correct?

18   A.   Yes.

19   Q.   And you were running for a U.S. Senate seat, I believe?

20   A.   Yes, yes.

21   Q.   And your opponent was there speaking, as well?

22   A.   There were a number of people speaking who ran for

23   different positions.   I came late, so I am not sure who else

24   spoke.

25   Q.   Okay.   But there were other speakers besides you?

1    A.   Yes.

2    Q.   Okay.  And so this wasn't an event solely for you,

3    obviously?

4    A.   Yes.

5    Q.   So after the meeting, Barbara Coe introduced you to Connie

6    Ruffley, correct?

7    A.   Yes, she approached me with Connie Ruffley.  She told me

8    Ms. Ruffley specifically drove because she wanted to talk to

9    me.

10   Q.   Did -- well, Barbara Coe told you that?

11   A.   Yes.

12   Q.   Okay.  Ms. Ruffley didn't tell you that?

13   A.   I don't think so.

14   Q.   Was this just an informal conversation between the two of

15   you, between you and Connie Ruffley?

16   A.   It was not a private conversation.  It was a conversation

17   where there were other people around us.  People -- you know,

18   Barbara Coe was standing next to us.  There were other people

19   around.  People were coming asking for autographs.  So it was a

20   conversation in a public forum.  It was not a private

21   conversation.

22   Q.   But it was not broadcast in any way, was it?  Like on a

23   microphone?

24   A.   No.

25   Q.   And this was after your speech, correct?

1   A.   Yes.

2   Q.   And it wasn't -- it wasn't a formal interview or anything

3   like that?

4   A.   No.

5   Q.   And so it was -- it was a casual conversation?

6   A.   Yes.

7   Q.   Okay.  And -- it may sound like a strange question to you

8   but were you all standing up somewhere talking?

9   A.   Yes, we were standing.

10  Q.   Okay.  No one was sitting behind a table or anything?

11  A.   No, we were standing.

12  Q.   Okay.  And this wasn't -- you had no plans to speak to

13  Connie Ruffley that night before you got there, did you?

14  A.   No.

15  Q.   I want to ask you a few questions about Exhibit 1.  You

16  have already testified to it but -- and this is not in that

17  book.  You have alluded to this but I just want to make sure

18  it's clear.  I can't get a very good focus here.  You mentioned

19  that just really a small part of this article deals with what

20  Connie Ruffley said, correct?

21  A.   Yes, yes.

22  Q.   And, I guess, the jury can read it for itself but if we --

23  if we look here -- let me try to focus a little better -- the

24  statement with the information that Connie gave you was

25  essentially this paragraph here where my pen is, correct?

1  A.  Yes.

2  Q.  And you say down below that, A number of people have sent

3  me this information?

4  A.  Yes.

5  Q.  And this is the information about the indictment.

6  A.  Yes.

7  Q.  So people other -- someone besides Connie Ruffley sent you

8  that?

9  A.  Yes.

10 Q.  And you actually included the site to where you got that

11 information?

12 A.  Yes.  Where the person who sent it to me got it.

13 Q.  Okay.

14 A.  Somebody sent me this.  I don't recall if it was E-mail or

15 comment on my web site, so I post it because it was yet another

16 source of information.

17 Q.  And it truly stated that Mr. Klayman had been indicted,

18 correct?

19 A.  Yes.

20 Q.  And, incidentally, I think you made it clear a number of

21 times but if we look at the statement that's attribute to --

22 attributed to Connie Ruffley, it says -- it refers to

23 litigation in Ohio where he was convicted just recently of not

24 paying a large amount in child support?

25 A.  Yes.

```
 1    Q.  So the information you got from Connie Ruffley didn't say

 2    anything about a crime one way or another, did it?

 3    A.  No.

 4          MR. KLAYMAN:  Objection, Your Honor, it misstates.

 5          THE COURT:  Overruled.

 6    BY MR. KRESS:

 7    Q.  It just merely says, convicted of -- just recently of not

 8    paying a large amount of child support?

 9    A.  That's right.

10    Q.  It refers to litigation.  In your mind, does litigation

11    usually refer to civil matters or criminal matters?

12    A.  I did not know exactly.  I -- actually, I believe that it

13    had to do more with the civil because typically child support

14    is more of a civil matter.  And it -- from what I understand

15    with Mr. Klayman, the case was in civil -- in family court and

16    there were three times where he was found in criminal contempt

17    of court for nonpayment of child support in family court, in

18    civil court and then they forwarded this to the criminal court.

19    And it was -- he was indicted in criminal court.

20        But, you know, she did not state whether it was family

21    court or criminal court.  I did not differentiate.  Basically,

22    spoke only about the fact that there was an issue with him not

23    paying child support for a while and the only reason it had --

24    you know, I think she mentioned this because there was an issue

25    that the lawsuits that were supposed to be filed were not filed
```

1    within the specific period of time and had to do with, does

2    Mr. Klayman stand by his obligations?

3         Those two lawsuits which were supposed to be filed in

4    Florida and in California were not filed by February the 17th.

5    I brought another comment that I got from somebody stating that

6    he did not take care of a case here in Florida, and the Florida

7    bar has sued him, and he was supposed to refund the money, and

8    also this issue of nonpayment of child support.  All three

9    cases had to do with the fact that there was an issue where --

10   where there was -- when Mr. Klayman did not fulfill specific

11   obligations.  But when you read the whole article, that's what

12   it was, about not fulfilling specific obligations.  It did not

13   differentiate, it did not state a crime -- he committed a

14   crime; just was convicted of nonpayment of child support.

15   Q.  And, Ms. Ruffley.

16   A.  No, I'm not Ms. Ruffley.

17   Q.  I probably -- I'm terrible with that, I apologize.

18   Ms. Taitz.  Or do you prefer Dr. Taitz?

19   A.  Either way, it's fine.

20   Q.  Okay.  If you see where my pen is here, there is a

21   reference to the Florida bar case where it talks about the two

22   -- $25,000 retainer and then there is a link below that.  You

23   got this information from somewhere --

24   A.  Yes.

25   Q.  -- somewhere other than Connie Ruffley?

1    A.   Yes, somebody has sent me this information, either via

2    E-mail or comment on my web site that there was an issue with

3    Mr. -- with this plaintiff, this client, Natalie Humm, has

4    filed a complaint against Mr. Klayman where she paid him 25,000

5    and he didn't take care of her case.  And it went to the

6    Florida bar and the Florida bar filed a lawsuit against

7    Mr. Klayman and he was supposed to refund the money within 90

8    days.  And, I believe, it was not refunded within a certain

9    period of time.

10   Q.   And if we look at this title here, this is the title of the

11   February 23, 2012, posting.  It says, "My yesterday's

12   presentation to CCIR, an update on Article II Super PAC, Larry

13   Klayman, $25,000 fundraising for nonexistent lawsuit affair --"

14            THE COURT REPORTER:  Mr. Kress, you must read slower.

15            MR. KRESS:  I'm sorry.

16   BY MR. KRESS:

17   Q.   "My yesterday's presentation to CCIR, an update on Article

18   II Super PAC, Larry Klayman, $25,000 fundraising for

19   nonexistent lawsuit affair."  Does the phrase "$25,000

20   fundraising for nonexisting lawsuit affair" refer to this

21   Florida bar matter?

22   A.   No.  No, it refers to the fact that all of those bloggers

23   were raising $25,000 and their advertisement said, We need to

24   raise $25,000, that's the retainer for Mr. Klayman, to file a

25   lawsuit by February 17th.  And it was not filed by Mr. Klayman

1    by February 17th, as promised.  And, as a matter of fact, by

2    February 23rd, there was no lawsuit.  That was the main issue

3    that was of concern of people who were reading my blog because

4    those were people who were following those lawsuits.

5         Incidentally, the case with Ms. Natalie Humm also dealt

6    with the same issue.  Apparently, that's the retainer that

7    Mr. Klayman charges, $25,000, and in that case also this woman

8    had filed a complaint because she filed -- she paid the same

9    $25,000 but the case was not done.

10             MR. KLAYMAN:  Move to strike, Your Honor.  That is

11   nonresponsive.  There is no foundation that I charge $25,000

12   for retainers.

13             THE WITNESS:  It says that in the complaint and in the

14   article.

15             MR. KLAYMAN:  Lacks foundation, Your Honor.  Move to

16   strike it, she has no knowledge.

17             MR. KRESS:  I believe she testified that's what she --

18             THE COURT:  Overruled.

19   BY MR. KRESS:

20   Q.  Turning your attention now to Joint Exhibit No. 17 which is

21   the E-mail that you received from Larry Klayman.  Part -- just

22   part of it is on the screen there --

23   A.  Yes.

24   Q.  -- and I am going to move it around a little bit.

25        You've already testified to this and you viewed this as a

 1  severe threat from Mr. Klayman, correct?

 2  A.  Absolutely.  Absolutely.  And it caused severe emotional

 3  distress to me because he is saying defamation -- can you move

 4  it a little bit down?

 5  Q.  Sure.

 6  A.  Yeah, he is saying subject:  Defamation, false light,

 7  invasion of privacy, false advertising, tortious interference

 8  with business relations and other causes of action.  He was

 9  really trying to scare me and intimidate me.  And he was

10  threatening that Ms. Miller and Ms. -- I'm sorry, that

11  Mr. Miller and Ms. Barnett are going to sue me.  But

12  incidentally Ms. Barnett was saying that he was scaring them

13  that he was going to sue them.  Yeah, that was clearly a

14  threat.

15  Q.  Okay.  I just want to refer you down to the bottom of the

16  letter.  He -- Mr. Klayman demanded that you remove these

17  comments -- and not -- remove several comments from your web

18  site.

19  A.  I think he wanted me to remove the whole article, the whole

20  thing and I just didn't want to -- to be intimidated by a

21  threat, by the threats.  You know, I didn't want to take down

22  the whole article.  I reviewed what he wrote and I saw that

23  there was just one error and I wrote a clarification and I said

24  there was just one error, here is the correction.

25  Q.  Did you intend to make any false statements about Larry

1   Klayman at any time?

2   A.  No.

3   Q.  Looking down at this last paragraph, I believe it says

4   Mr. Klayman gives you his cell phone number and gives you 48

5   hours, basically, to take care of things.  Didn't you take care

6   of things within 48 hours of this E-mail?

7   A.  Yes, within 48 hours I posted a correction.

8   Q.  And let's talk about that correction for -- just briefly

9   because you have talked about a lot already and I don't want to

10  reiterate too much.  But the article is entitled Clarification

11  Regarding Article II Legal Fund and Larry Klayman, correct?

12  A.  Yes.

13  Q.  And the article actually references some -- or, you know,

14  several points that are raised, correct?

15  A.  Yes.

16  Q.  And there -- here is 1, 2 and those don't have anything to

17  do with the Connie Ruffley or this child support issue?

18  A.  No.

19  Q.  This is continuing on to, then 3, this is the Florida bar,

20  and 4 is the one with the correction, and 5 has to do something

21  else with advertising but that's not related to Connie Ruffley,

22  correct?

23  A.  Yes.

24  Q.  Okay.  So let's look at 4.  You made the correction but you

25  also note that -- let's try to fix this a little bit.  You also

1   write, "It was also self-evident in the February 23, 2012,

2   article, as I posted the link right underneath and the link

3   stated that he was indicted and arraignment scheduled."

4   A.   Yes.

5   Q.   Is it true that you believe that the fact that he was not

6   convicted was self-evident from the February 23, 2012, posting?

7   A.   I believe so.   It was -- there was an error there and there

8   was an -- I posted a link to that article where it said that he

9   was indicted, right.

10  Q.   Okay.   I am going to, now, walk you through some other

11  documents.   It may be easier for you to look -- you can either

12  look in the exhibit book or what I put on the screen, whatever

13  is easier.

14  A.   Which number?

15  Q.   It is going to be 7 in the Joint Exhibit book.   But before

16  I get there, your web site that you used at the time, you

17  posted frequently, correct?

18  A.   Yes.

19  Q.   I don't know if it was daily but probably at least every

20  two days you were posting something.

21  A.   Yes.

22  Q.   Take a look at Joint Exhibit 7 for a moment.   And I don't

23  need you to write word-for-word -- or read word-for-word yet

24  but does this appear to be a true and correct copy of a posting

25  that you made on your web site and with the comments following?

1    A.   Yes.

2    Q.   Okay?  Let's --

3    A.   And it says, "Great news in Florida."

4    Q.   Yeah, that's what I was going to ask you.

5    A.   Yeah.

6              MR. KLAYMAN:  Your Honor, objection, beyond the scope

7    of direct.  I never asked about Exhibit 7.

8              THE WITNESS:  He specifically said Exhibit 7.

9              THE COURT:  Overruled.

10             MR. KLAYMAN:  I did not, Your Honor.

11             THE COURT:  I will allow it.  This witness is not

12   coming back next week, right?

13             MR. KLAYMAN:  Excuse me?

14             THE COURT:  She's not coming back next week.  Let's be

15   done with her testimony.

16             MR. KLAYMAN:  No.

17   BY MR. KRESS:

18   Q.   Okay.  So on February 11th, you actually posted, "Great

19   news, it has been reported that Larry Klayman, founder of

20   Judicial Watch, will be filing a ballot challenge to Obama in

21   Florida.  I think this is great news.  More challenges give

22   more visibility to the issue --

23             THE COURT REPORTER:  Slower please.

24             MR. KRESS:  I'm sorry.  Use the microphone and slower.

25   I apologize.

1    BY MR. KRESS:

2    Q.   Let me just paraphrase it then.

3        At first you thought it was great news that Larry Klayman

4    was intending to file --

5    A.   Yes.

6    Q.   The challenge, correct?

7    A.   Yes, it says "It has been reported that Larry Klayman,

8    founder of the Judicial Watch, will be filing a ballot

9    challenge to Obama in Florida.  I think this is great news.

10   More challenges will give more visibility to the issue.  His

11   challenge is expected in a week."

12       So in opposite to what Mr. Klayman accused me of, I did not

13   write something negative about him because I disliked him or

14   resented him.  It's the opposite.  Before I wrote this article

15   on February 11th, I wrote, "This is great news that there will

16   be somebody who" -- I thought he was still with the Judicial

17   Watch, actually, but I put "founder of Judicial Watch is filing

18   this case in Florida."  So there was no animosity to

19   Mr. Klayman.

20   Q.   But if you look to the next page which I have up on the

21   screen here, there is a comment from someone named Paul Jackson

22   and he writes some very negative things about Mr. Klayman,

23   correct?  Take a moment to read just that paragraph, if you --

24   A.   Let me see.  I don't remember all the comments.

25       Yes, I see it.  And by the way, I would like to state that

1    Mr. Miller, who was collecting money for Mr. Klayman, actually,

2    a couple of times E-mailed me and he said, you know, Some of

3    the people who posted negative comments, you know, posted

4    comments that were not nice to Mr. Klayman, would you please

5    take them down?  And I actually removed a few comments that

6    were negative about Mr. Klayman that dealt with things that

7    were actually public record of his divorce, statements during

8    divorce.  I actually was very nice to Mr. Klayman and I removed

9    those comments, even though they were a public record and I

10   didn't have to do it.  But I, actually, was nice to him and I

11   removed those -- a number of them.

12       And, as a matter of fact, I also E-mailed Mr. Klayman and

13   Mr. Miller a number of comments that people tried to post and I

14   did not allow them.  You know, I scan, I usually don't have

15   time to look at all the comments but like if I saw something

16   that was really not nice, I showed them, look this came and I

17   never posted it, I never allowed it for moderation.

18              MR. KLAYMAN:  Your Honor, I move to strike,

19   nonresponsive.

20              THE COURT:  Sustained.  The response is stricken.

21   BY MR. KRESS:

22   Q.  Let's talk about just some specific things in this

23   particular comment.  This individual commented to you that

24   Mr. Klayman had sued his own mother, correct?

25   A.  I believe so, yeah.  I don't see -- which line?  Can you --

1    Q.   Could you just read the whole thing of what --

2    A.   Okay.  It says Paul Jackson, February 11, 2012, 5:47 a.m.:

3    Perhaps people willing to donate to the cause should think

4    about where their money goes before jumping on the Klayman

5    bandwagon.  Maybe not such great news and money that is being

6    taken right out of your pocket, $25,000 to be exact, if it is

7    raised, for a guy who sued his own mother who was suffering

8    from dementia at the time for reimbursing for caring for her,

9    is under indictment in Ohio for criminal nonsupport of his

10   children.  This dead-beat dad was banned for life from a

11   California courtroom; had his law license suspended by the

12   disciplinary board of the Supreme Court of Pennsylvania;

13   accused by Judicial Watch of misappropriating more than

14   $200,000; and sanctioned and reprimanded by the Supreme Court

15   of Florida on behalf of the Florida bar only six months ago,

16   this stemming from the last time he -- he screwed somebody out

17   of a 25,000 retainer and who, by the way, not licensed in

18   California.

19        Yeah, I see it.

20        And by the way, I have no time to review each and every

21   comment.  I didn't even remember this comment.  I don't know if

22   I even read it.  You know, people post comments on my web site

23   and I don't have time to read each and every comment but, yep,

24   he posted this comment.

25   Q.   And this was available for the public to see, anyone who is

1    looking at your web site, correct?

2    A.  Yes, apparently.

3    Q.  And there are other comments but I am going to try to move

4    things along.  One thing I do want to point out to you on the

5    next page is actually the tenth comment.  It looks like there

6    was this posting that someone gave you a link to this Cuyahoga

7    County -- well, they posted this same thing that you later

8    posted on the 23rd about Larry Klayman, 60, of Los Angeles, was

9    indicted on two counts of criminal nonsupport, correct?

10          MR. KLAYMAN:  Your Honor, objection.  That's three

11   questions, Your Honor, compound.

12          THE COURT:  Overruled.

13          THE WITNESS:  Well, there was -- yeah, I can see here

14   there is a comment No. 10.  People post a lot of comments on

15   the web site, so this was comment No. 10 from somebody who goes

16   by name European and -- February 11th and he did provide a link

17   to -- to this proceeding against Mr. Klayman for nonpayment of

18   child support.  And it says -- yeah, he did.

19   BY MR. KRESS:

20   Q.  All right.

21   A.  But, as I stated, I do not read all the comments.  It's

22   impossible.  In some articles I get 200 comments and I cannot

23   read all of them.  And so many comments I just -- I don't see.

24   Q.  Okay.  But starting 11 days before you met Connie Ruffley,

25   before you were introduced to her, people were posting things

May 30, 2014
Larry E. Klayman v. Judicial Watch, Inc., 13-20610-CIV

1    on your web site about Larry Klayman?

2    A.   Well, but comments were not posted by me.

3    Q.   Right.

4    A.   Comments are posted by other people.

5    Q.   Correct.   That was my point exactly and I apologize if I

6    misstated the question.   You made the posting first on

7    February 11, stating that you thought it was great news?

8    A.   Yes.

9    Q.   And but then people started pouring in negative competents

10   about Mr. Klayman.

11   A.   Yes.

12   Q.   Including comments about his child support, correct?

13   A.   Yes.

14   Q.   About him suing his mother, correct?

15   A.   Yes.

16   Q.   About his bar issues, correct?

17   A.   Yes.

18   Q.   All right.   And if we go to Joint Exhibit 8 and I just want

19   to -- if you could take a look at it in the book and just tell

20   me if that is a true -- appears to be a true and accurate copy

21   of your web site posting from February 22nd?

22   A.   February 27th?

23   Q.   22nd.

24   A.   22nd.   Yes.

25   Q.   It appears to be true and accurate?

1   A.  I don't -- hold on.  I see here, I put -- I made the

2   posting, I received the memo from Pamela Barnett -- you know,

3   the only thing is I -- on mine, it does not show comments.  I

4   printed out but on this one it says four comments.

5   Q.  You have a copy that -- do you have a copy of this

6   particular posting with you?

7   A.  I don't have the comments.  I have just the -- the name but

8   I don't have the comments.  So I don't --

9   Q.  What do you show for the main?

10  A.  I received -- here, I received an E-mail from Pamela

11  Barnett, who stated that Attorney Larry Klayman is no longer

12  associated with a Article II Super PAC.  Actually, I just read

13  this.  If Article II Super PAC and their Article II Legal Fund

14  are not connected to attorney Larry Klayman, then they are not

15  connected with me.  Who are they collecting money for and how

16  much?

17  Q.  So this -- and I believe you testified earlier that you --

18  A.  Yeah.

19  Q.  Received an E-mail from Pamela Barnett, who -- who

20  indicated that there was no longer a connection between

21  Mr. Klayman and Article II Super PAC.  And that came to you

22  before the meeting at the California Coalition on Immigration,

23  correct?

24  A.  Yes, it was on the 22nd, before.

25  Q.  So before you met Connie Ruffley, a number of people had

1    given you information about Larry Klayman, correct?

2              MR. KLAYMAN:  Objection, repetitive.

3              THE COURT:  Overruled.

4              THE WITNESS:  Well, they didn't give me information.

5    They posted comments on the web site and as I stated to you,

6    Mr. Kress, I don't read all the comments.  So they posted it on

7    the web site but actually I do not read all the comments of

8    every person.

9    BY MR. KRESS:

10   Q.  You read some of them, correct?

11   A.  I read some of them but when I met Ms. Ruffley, I did not

12   recall seeing any comments about his case in Ohio.

13   Q.  But when -- before you made your posting on the 23rd, you

14   indicated that you -- and I can put it back up there for you --

15   that you had obtained information from others; a lot of people

16   had sent you information about his child support, correct?

17   A.  No.  No.  What I said that when I -- actually, when I met

18   Ms. Ruffley, she told me about the issue of nonpayment of child

19   support and I posted it.  And then I started looking and I

20   entered this information on Google.  I saw that there was

21   information on Google.  I started reading E-mails.  I get a lot

22   of E-mails which I don't have time to read, so I started

23   reading E-mails and comments and then I saw there are issues,

24   indeed, with Mr. Klayman.  And I felt that it was an important

25   issue to post for the public to see here, yes, there is an

1    issue.

2    Q.  So after you talked to Ms. Ruffley, you did some research

3    and then?

4    A.  After I spoke with Ms. Ruffley, she alerted me that there

5    is a problem with nonpayment of child support, that he is not

6    licensed in California.  As a matter of fact, I went home, I

7    was very surprised.  I actually thought that Mr. Klayman was

8    licensed in California.  So I went on the web site of the

9    California bar and checked under his last name, Klayman, Larry

10   Klayman and I did not see him as licensed.  So I saw that

11   Ms. Ruffley was telling the truth, that indeed he was not

12   licensed in California and I started looking further and I

13   found E-mails and comments saying same things.

14   Q.  Okay.  And that's where you state here, on the monitor

15   here, "A number of individuals sent me this information"?

16   A.  Yes.

17   Q.  You are referring to the E-mails you received?

18   A.  Either E-mails or comments, yes.

19   Q.  Okay.  Mr. Klayman has not sued you, has he?

20   A.  No.

21          MR. KRESS:  Your Honor, procedurally I don't know if I

22   need to do this or not but -- because they are Joint Exhibits,

23   but to the extent they need to be moved to admitted, I would

24   move to admit the Joint Exhibits 7 and 8 which are the

25   postings, the -- Ms. Taitz' web site.

1        THE COURT:  They have already been displayed.

2   Admitted.

3        (Joint Exhibit Nos. 7 and 8 were admitted into evidence.)

4   BY MR. KRESS:

5   Q.  The meeting that you attended on the 22nd, what time of the

6   day did that happen?

7   A.  It was in the evening because I remember I worked I -- as I

8   stated, I am both a doctor of dental surgery and an attorney so

9   I worked in my dental office until 5 o'clock.  And I drove to

10  Garden Grove, which is about an hour drive, so I was there at

11  the earliest maybe 6:00, maybe 7:00 in the evening.

12  Q.  Did you come to learn that Mr. Klayman also filed or became

13  involved in eligibility litigation in Alabama?

14  A.  Yes.

15  Q.  And was that after he became involved in the Florida

16  litigation; if you recall?

17  A.  Probably, around the same time.

18  Q.  Okay.

19  A.  They -- they -- no, actually later.  No, I'm sorry, it was

20  filed later.  Our Obama case was filed at the end of 2012, and

21  actually it was filed by two Alabama attorneys.  The case was

22  dismissed, it went on appeal and Mr. Klayman joined that team.

23  They filed an appeal sometime end of 2012 beginning of 2013 and

24  it was dismissed just recently.

25  Q.  Okay.  Thank you.  No further questions.

1        MR. KLAYMAN:  No further questions, Your Honor.

2        THE COURT:  Thank you, Ms. Taitz.  You are excused.

3    (Witness excused.)

4    (The proceedings excerpt adjourned at 4:21 p.m.)

5

6

7              C E R T I F I C A T E

8

9    I hereby certify that the foregoing is an

10   accurate transcription of the proceedings in the

11   above-entitled matter.

12

13

14   _06/03/14__          STEPHANIE A. McCARN, RPR
        DATE              Official United States Court Reporter
15                        400 North Miami Avenue, Twelfth Floor
                          Miami, Florida 33128
16                        (305) 523-5518

17

18

19

20

21

22

23

24

25

1

## $

**$1,014.25** [1] - 46:2
**$1,014.26** [1] - 46:22
**$200,000** [1] - 73:14
**$25,000** [13] - 7:25, 8:3, 28:10, 64:22, 65:13, 65:18, 65:19, 65:23, 65:24, 66:7, 66:9, 66:11, 73:6
**$410,404.55** [1] - 45:9
**$78,861.76** [3] - 45:24, 46:15, 53:6
**$78,861.78** [1] - 45:2

## '

**'lt** [1] - 8:8

## 0

**06/03/14** [1] - 80:13

## 1

**1** [20] - 1:8, 5:14, 5:15, 5:23, 6:2, 6:4, 6:8, 18:19, 31:8, 31:18, 42:16, 44:12, 46:7, 46:8, 46:11, 47:6, 50:4, 61:15, 68:16
**10** [2] - 74:14, 74:15
**100** [2] - 1:18, 6:14
**10th** [3] - 7:25, 23:23, 37:21
**11** [5] - 45:24, 46:15, 73:2, 74:24, 75:7
**11:24** [1] - 56:16
**11th** [3] - 70:18, 71:15, 74:16
**12** [3] - 36:20, 36:21, 36:24
**12-2** [1] - 1:7
**13-20610-CIV** [1] - 1:2
**14** [2] - 45:24, 46:15
**14110** [1] - 1:18
**15** [2] - 45:4, 45:9
**15th** [1] - 41:8
**16th** [9] - 37:7, 37:11, 39:2, 39:11, 39:15, 39:17, 40:6, 40:18, 42:12
**17** [3] - 18:1, 18:2, 66:20
**17th** [9] - 24:9, 24:14, 27:16, 27:18, 31:2, 41:7, 64:4, 65:25, 66:1
**1960** [1] - 3:14

## 2

**2** [9] - 1:10, 35:2, 46:12, 47:6, 50:20, 52:4, 52:6, 52:11, 68:16
**200** [1] - 74:22
**2009** [3] - 45:25, 46:16, 46:21
**2010** [2] - 46:1, 46:21
**2011** [3] - 46:1, 46:22, 53:6
**2012** [11] - 4:3, 46:3, 46:23, 52:14, 56:16, 65:11, 69:1, 69:6, 73:2, 79:20, 79:23
**2013** [1] - 79:23
**2014** [1] - 1:5
**22nd** [18] - 4:4, 4:5, 22:17, 22:18, 24:11, 24:18, 34:24, 37:12, 37:18, 42:11, 42:14, 59:11, 75:21, 75:23, 75:24, 76:24, 79:5
**23** [5] - 4:3, 56:16, 65:11, 69:1, 69:6
**23rd** [10] - 16:23, 18:24, 18:25, 19:15, 22:19, 53:6, 56:6, 66:2, 74:8, 77:13
**24th** [14] - 1:14, 18:8, 18:9, 18:10, 18:11, 18:12, 18:20, 18:23, 19:1, 19:9, 19:10, 22:19, 23:5, 23:9
**25,000** [3] - 29:12, 65:4, 73:17
**2540** [1] - 7:7
**25th** [4] - 16:24, 18:21, 19:4, 19:5
**26** [1] - 52:14
**26th** [6] - 16:24, 18:21, 19:5, 19:7, 23:6, 50:23
**27th** [1] - 75:22
**2:06** [3] - 1:6, 3:1, 3:3
**2:28** [1] - 20:1
**2:30** [1] - 22:2
**2:42** [2] - 22:2, 22:5

## 3

**3** [5] - 2:4, 2:21, 52:7, 52:8, 68:19
**30** [3] - 1:5, 46:1, 46:22
**305** [3] - 1:15, 1:24, 80:16
**33128** [1] - 1:23, 80:15
**33145** [1] - 1:14

**33418** [1] - 1:19
**3415** [1] - 1:14

## 4

**4** [5] - 46:7, 46:12, 52:19, 68:20, 68:24
**400** [2] - 1:22, 80:15
**44** [1] - 2:13
**447-1091** [1] - 1:15
**48** [3] - 68:4, 68:6, 68:7
**4:00** [1] - 57:5
**4:20** [1] - 26:9
**4:21** [2] - 1:6, 80:4
**4:22** [3] - 26:6, 26:7, 26:9

## 5

**5** [3] - 2:12, 68:20, 79:9
**50** [1] - 38:1
**523-5518** [2] - 1:24, 80:16
**561** [1] - 1:19
**58** [1] - 2:4
**5:47** [1] - 73:2

## 6

**6** [4] - 2:13, 44:9, 44:10, 44:21
**60** [3] - 45:22, 46:13, 74:8
**694-0070** [1] - 1:19
**6:00** [1] - 79:11

## 7

**7** [9] - 2:15, 46:3, 46:23, 69:15, 69:22, 70:7, 70:8, 78:24, 79:3
**79** [2] - 2:15, 2:16
**7:00** [1] - 79:11

## 8

**8** [4] - 2:16, 75:18, 78:24, 79:3
**80** [2] - 1:8, 2:22

## 9

**90** [1] - 65:7
**96** [2] - 8:3, 23:25

## A

**a.m** [2] - 56:16, 73:2
**abbreviate** [1] - 6:11
**able** [1] - 25:5
**above-entitled** [1] - 80:11
**abreast** [1] - 35:24
**absolutely** [10] - 32:8, 34:2, 39:1, 47:2, 47:9, 48:5, 56:2, 56:5, 67:2
**accent** [1] - 3:21
**according** [2] - 30:25, 32:20
**accountability** [6] - 56:22, 57:13, 57:15, 57:18, 57:24, 58:5
**accounting** [2] - 33:23, 34:14
**accurate** [21] - 6:9, 6:20, 7:9, 7:18, 7:21, 8:1, 8:5, 8:11, 8:15, 8:21, 9:2, 9:6, 14:21, 50:5, 50:7, 52:11, 52:23, 53:2, 75:20, 75:25, 80:10
**accuse** [2] - 28:4, 28:17, 48:9
**accused** [3] - 28:16, 71:12, 73:13
**accusing** [2] - 28:23, 48:5
**action** [7] - 39:24, 40:3, 40:10, 40:13, 40:20, 41:5, 67:8
**actions** [2] - 10:3, 35:15, 35:16
**active** [1] - 37:4
**activities** [3] - 35:23, 40:23, 42:1
**actual** [3] - 5:19, 30:20
**add** [2] - 9:22, 32:25
**additional** [2] - 9:22, 10:22
**adjourned** [1] - 80:4
**administrator** [1] - 7:4
**admit** [1] - 78:24
**ADMITTED** [2] - 2:11
**admitted** [8] - 10:12, 10:13, 10:15, 10:20, 18:1, 78:23, 79:2, 79:3
**adverse** [3] - 4:11, 4:15, 4:22
**advertisement** [15] - 7:25, 23:22, 23:23, 24:2, 29:24, 30:20, 30:21, 30:25, 32:21, 32:23, 33:16, 37:25,

**advertising** [4] - 29:14, 37:22, 67:7, 68:21
**advised** [3] - 8:14, 8:20, 49:13
**affair** [3] - 65:13, 65:19, 65:20
**affiliation** [1] - 37:10
**afield** [1] - 21:12
**afternoon** [8] - 18:11, 18:22, 19:2, 19:24, 26:6, 26:7, 26:9, 58:18
**ages** [2] - 45:24, 46:15
**ago** [3] - 27:2, 56:9, 73:15
**agree** [4] - 12:12, 20:12, 20:19, 21:11
**al** [1] - 29:22
**Alabama** [2] - 79:13, 79:21
**alerted** [1] - 78:4
**allegations** [1] - 25:4
**allow** [9] - 9:23, 10:1, 10:10, 10:11, 14:4, 27:11, 40:12, 70:11, 72:14
**allowed** [7] - 9:24, 21:9, 21:10, 21:15, 40:20, 47:4, 72:17
**alluded** [1] - 61:17
**almost** [1] - 57:5
**alone** [1] - 38:5
**ALTONAGA** [1] - 1:10
**Altonaga** [1] - 43:25
**amended** [3] - 40:8, 40:9, 40:13
**amount** [8] - 8:25, 28:10, 46:2, 46:22, 49:17, 62:24, 63:8
**Angeles** [3] - 45:22, 46:13, 74:8
**animosity** [1] - 71:18
**announced** [2] - 37:15, 45:3
**answer** [10] - 13:9, 16:3, 21:1, 21:2, 21:6, 21:10, 21:15, 47:4, 47:5
**answered** [5] - 10:18, 13:8, 13:12, 13:20, 14:1
**apologize** [6] - 21:5, 21:18, 46:18, 64:17, 70:25, 75:5
**appeal** [2] - 79:22, 79:23
**appeals** [2] - 41:17, 41:20

38:20, 65:23

**appear** [2] - 59:6, 69:24
**APPEARANCES** [1] - 1:12
**applauded** [1] - 6:18
**appreciated** [1] - 33:13
**approach** [4] - 4:12, 5:2, 5:3, 51:7
**approached** [7] - 5:4, 5:5, 6:19, 6:21, 6:24, 42:25, 60:7
**Arizona** [1] - 11:3
**arraignment** [4] - 46:2, 46:22, 53:6, 69:3
**arrangements** [1] - 59:2
**arrive** [2] - 19:13, 23:4
**arrived** [3] - 19:4, 19:5, 22:21
**Article** [16] - 7:23, 24:20, 29:11, 34:15, 34:17, 35:1, 35:2, 37:16, 65:12, 65:17, 68:11, 76:12, 76:13, 76:21
**article** [45] - 10:5, 16:25, 22:18, 22:20, 23:20, 28:7, 29:2, 35:11, 35:14, 35:18, 35:21, 36:11, 36:14, 36:16, 37:6, 39:1, 39:3, 39:12, 41:5, 47:15, 50:14, 50:17, 53:4, 56:6, 56:15, 56:18, 56:19, 56:21, 57:12, 57:21, 57:22, 57:25, 58:8, 58:9, 61:19, 64:11, 66:14, 67:19, 67:22, 68:10, 68:13, 69:2, 69:8, 71:14
**articles** [1] - 74:22
**asbestos** [1] - 34:6
**associated** [2] - 35:1, 76:12
**associates** [2] - 11:1, 11:2
**assume** [1] - 58:22
**attended** [2] - 3:25, 79:5
**attention** [7] - 5:9, 5:14, 36:14, 44:9, 44:20, 52:19, 66:20
**Attorney** [4] - 29:25, 34:25, 37:14, 76:11
**attorney** [26] - 3:16, 9:18, 9:20, 9:22, 10:2, 10:10, 10:21,

10:24, 13:14, 27:3, 29:15, 30:8, 32:24, 33:5, 34:3, 34:4, 34:6, 35:3, 38:22, 39:11, 48:6, 51:1, 56:25, 76:14, 79:8
**attorneys** [8] - 9:24, 10:1, 34:5, 34:7, 34:16, 35:8, 35:9, 79:21
**attribute** [1] - 62:21
**attributed** [1] - 62:22
**August** [2] - 46:1, 46:22
**authenticate** [1] - 59:8
**autographs** [1] - 60:19
**available** [2] - 73:25
**Avenue** [2] - 1:22, 80:15
**aware** [10] - 9:15, 10:25, 11:5, 14:20, 30:10, 30:12, 39:4, 41:1, 42:2, 43:12

**B**

**background** [1] - 3:15
**ballot** [4] - 37:17, 40:5, 70:20, 71:8
**ballotchallengeobje ction** [1] - 47:14
**ballots** [1] - 37:25
**bandwagon** [1] - 73:5
**banned** [1] - 73:10
**bar** [15] - 10:3, 28:12, 28:19, 28:22, 29:1, 32:19, 64:7, 64:21, 65:6, 65:21, 68:19, 73:15, 75:16, 78:9
**Barack** [1] - 24:8
**Barbara** [5] - 5:4, 6:24, 60:5, 60:10, 60:18
**Barnett** [13] - 22:25, 23:11, 23:15, 23:21, 25:16, 25:24, 28:24, 29:22, 33:1, 34:25, 76:2, 76:11, 76:19
**barnett** [5] - 23:8, 24:19, 24:25, 67:11, 67:12
**based** [3] - 32:18, 49:1, 53:22
**basis** [2] - 21:19, 25:17
**battle** [1] - 38:3
**Beach** [1] - 1:19
**bear** [1] - 5:21
**bearable** [1] - 20:9

**beat** [1] - 73:10
**became** [2] - 79:12, 79:15
**become** [1] - 39:10
**becoming** [1] - 9:18
**BEFORE** [1] - 1:10
**begin** [1] - 40:14
**beginning** [1] - 79:23
**behalf** [14] - 4:7, 5:8, 24:12, 29:16, 31:1, 32:21, 38:18, 39:18, 41:1, 42:24, 43:2, 43:4, 73:15
**behind** [1] - 61:10
**believes** [1] - 23:17
**below** [2] - 62:2, 64:22
**benefit** [1] - 58:1
**best** [2] - 38:3, 50:5
**better** [1] - 61:23
**between** [8] - 14:23, 15:16, 45:25, 46:16, 46:20, 60:14, 60:15, 76:20
**beyond** [2] - 56:14, 70:6
**Bill** [2] - 38:11, 45:3
**birther** [1] - 7:21
**bit** [5] - 51:13, 51:16, 66:24, 67:4, 68:25
**blog** [2] - 25:13, 66:3
**blogger** [1] - 34:14
**bloggers** [23] - 10:6, 23:21, 23:22, 24:4, 24:16, 24:20, 29:13, 29:19, 30:7, 30:22, 33:16, 35:14, 35:19, 50:14, 56:20, 56:24, 57:14, 57:19, 57:23, 58:5, 58:6, 65:22
**blood** [1] - 20:23
**blowup** [1] - 5:22
**board** [1] - 73:12
**bono** [1] - 33:10
**book** [9] - 56:10, 56:11, 58:14, 61:17, 69:12, 69:15, 75:19
**born** [2] - 3:13, 3:22
**bottom** [2] - 48:24, 67:15
**break** [4] - 15:21, 20:22, 20:23, 21:21
**briefly** [1] - 68:8
**bring** [7] - 10:22, 22:3, 32:13, 32:15, 33:4, 33:6, 33:19
**bringing** [3] - 33:9, 35:9, 38:18
**broadcast** [1] - 60:22
**brought** [19] - 24:12, 26:11, 26:14, 26:19,

26:20, 27:3, 28:9, 30:14, 33:10, 34:8, 34:23, 35:5, 35:16, 36:14, 37:9, 39:18, 41:6, 41:7, 64:5
**business** [2] - 43:2, 67:8
**businesses** [1] - 38:10
**button** [1] - 33:11
**BY** [34] - 1:21, 3:10, 5:1, 5:18, 5:24, 11:14, 12:18, 13:5, 14:18, 16:6, 16:16, 22:7, 26:2, 31:13, 36:23, 43:19, 44:8, 44:11, 45:8, 46:10, 46:19, 48:23, 51:5, 51:21, 58:17, 63:6, 65:16, 66:19, 70:17, 71:1, 72:21, 74:19, 77:9, 79:4

**C**

**California** [56] - 4:1, 4:18, 6:14, 8:4, 8:15, 8:21, 9:13, 9:15, 9:19, 9:20, 9:21, 10:7, 10:8, 10:12, 10:21, 10:25, 11:6, 19:13, 24:1, 24:8, 26:16, 27:21, 29:6, 29:7, 29:15, 29:22, 30:1, 30:3, 30:5, 30:9, 31:2, 31:3, 31:4, 32:19, 32:20, 32:22, 32:24, 33:2, 33:4, 33:5, 37:18, 38:12, 45:23, 46:13, 49:14, 58:22, 59:1, 59:13, 64:4, 73:11, 73:18, 76:22, 78:6, 78:8, 78:9, 78:12
**candidate** [1] - 6:13
**cannot** [6] - 10:8, 17:10, 29:5, 30:3, 50:23, 74:22
**capacity** [1] - 38:8
**card** [2] - 7:1, 43:2
**care** [5] - 20:17, 64:6, 65:5, 68:5
**careful** [2] - 20:4, 20:16
**caring** [1] - 73:8
**carries** [1] - 45:11
**case** [68] - 9:16, 9:18, 9:19, 9:21, 9:23, 10:7, 10:8, 10:14, 10:16, 10:22, 11:3,

11:20, 19:24, 28:8, 28:13, 28:19, 28:21, 29:14, 29:16, 29:21, 31:2, 34:3, 35:10, 36:12, 37:1, 37:3, 37:4, 37:5, 37:6, 37:7, 37:8, 37:9, 37:10, 38:18, 39:2, 39:6, 39:14, 39:15, 39:18, 39:19, 40:6, 40:16, 40:17, 40:21, 40:22, 41:8, 41:10, 41:12, 41:15, 41:16, 41:18, 41:22, 41:24, 42:9, 55:1, 55:6, 58:3, 63:15, 64:6, 64:21, 65:5, 66:5, 66:7, 66:9, 71:18, 77:12, 79:20, 79:21
**CASE** [1] - 1:2
**cases** [31] - 7:21, 8:4, 9:24, 9:25, 26:19, 26:20, 27:3, 29:6, 29:25, 30:3, 30:9, 30:14, 32:13, 33:4, 35:24, 36:1, 36:3, 36:15, 38:7, 38:21, 41:1, 41:3, 41:6, 41:14, 41:17, 42:5, 54:18, 57:16, 64:9
**casual** [1] - 61:5
**caused** [1] - 67:2
**causes** [3] - 39:24, 40:3, 67:8
**CCIR** [2] - 65:12, 65:17
**CECILIA** [1] - 1:10
**cell** [1] - 68:4
**certain** [1] - 65:8
**Certificate................. ....** [1] - 2:22
**certify** [1] - 80:9
**challenge** [8] - 5:11, 37:13, 37:14, 38:3, 70:20, 71:6, 71:9, 71:11
**challenges** [4] - 27:10, 37:17, 70:21, 71:10
**challenging** [6] - 26:12, 26:24, 30:13, 32:13, 35:23, 48:6
**changed** [1] - 27:2
**characterization** [1] - 44:5
**characterizing** [2] - 14:16, 14:17
**charge** [2] - 45:10, 66:11
**charges** [2] - 28:25,

66:7
**check** [1] - 25:17
**checked** [7] - 18:22, 19:6, 25:3, 25:11, 25:23, 32:19, 78:9
**child** [39] - 9:1, 11:23, 14:8, 15:1, 15:4, 16:15, 17:21, 18:15, 25:7, 25:9, 28:1, 29:3, 35:13, 35:21, 42:18, 44:1, 44:14, 45:4, 45:9, 49:17, 49:20, 50:1, 50:10, 50:12, 53:1, 55:20, 62:24, 63:8, 63:13, 63:17, 63:23, 64:8, 64:14, 68:17, 74:18, 75:12, 77:16, 77:18, 78:5
**children** [3] - 45:24, 46:15, 73:10
**cite** [1] - 7:25
**civil** [5] - 63:11, 63:13, 63:14, 63:15, 63:18
**claimed** [1] - 36:9
**claiming** [1] - 8:3
**clarification** [1] - 67:23
**Clarification** [1] - 68:10
**classified** [1] - 49:21
**clear** [10] - 15:25, 16:1, 16:4, 20:2, 20:24, 21:2, 32:6, 48:16, 61:18, 62:20
**clearly** [3] - 3:22, 27:18, 67:13
**Cleveland** [3] - 44:22, 45:3, 47:7
**click** [2] - 29:13, 30:24
**client** [3] - 28:9, 38:18, 65:3
**clients** [12] - 22:24, 23:10, 23:13, 23:19, 27:9, 29:17, 30:1, 30:9, 31:1, 32:22, 38:25, 39:10
**Clinton** [1] - 38:11
**closely** [3] - 42:1, 42:6, 42:7
**Club** [2] - 4:1, 6:15
**Coalition** [2] - 59:14, 76:22
**Coe** [5] - 5:4, 6:25, 60:5, 60:10, 60:18
**colleague** [1] - 29:7
**colleagues** [1] - 30:4
**collected** [5] - 23:18, 24:17, 24:25, 28:10, 33:20

**collecting** [12] - 24:16, 24:22, 29:21, 30:23, 35:4, 35:8, 35:19, 56:20, 57:15, 57:23, 72:1, 76:15
**combined** [1] - 45:9
**coming** [6] - 32:12, 57:5, 57:7, 60:19, 70:12, 70:14
**comment** [13] - 56:7, 62:15, 64:5, 65:2, 71:21, 72:23, 73:21, 73:23, 73:24, 74:5, 74:14, 74:15
**commented** [1] - 72:23
**comments** [30] - 67:17, 69:25, 71:24, 72:3, 72:4, 72:5, 72:9, 72:13, 72:15, 73:22, 74:3, 74:14, 74:21, 74:22, 74:23, 75:2, 75:4, 75:12, 76:3, 76:4, 76:7, 76:8, 77:5, 77:6, 77:7, 77:12, 77:23, 78:13, 78:18
**committed** [2] - 44:14, 64:13
**competents** [1] - 75:9
**competitive** [3] - 30:16, 30:18, 55:25
**competitiveness** [1] - 30:19
**complainant** [1] - 28:20
**complaint** [16] - 28:9, 28:21, 39:20, 39:21, 39:24, 40:7, 40:8, 40:9, 40:13, 40:14, 41:24, 55:6, 65:4, 66:8, 66:13
**complaints** [3] - 29:23, 38:13, 41:21
**complies** [4] - 51:18, 51:20, 52:5, 52:9
**compound** [1] - 74:11
**concern** [4] - 34:8, 34:11, 58:10, 66:3
**concerned** [1] - 52:16
**concerning** [2] - 23:13, 43:9
**concluded** [1] - 4:25
**conclusion** [1] - 13:12
**connected** [3] - 35:3, 35:4, 76:14, 76:15
**connection** [1] - 76:20
**Connie** [17] - 26:10, 31:15, 31:23, 60:5, 60:7, 60:15, 61:13,

61:20, 61:24, 62:7, 62:22, 63:1, 64:25, 68:17, 68:21, 74:24, 76:25
**considered** [6] - 11:19, 11:21, 14:2, 14:3, 14:9, 14:11
**Constance** [7] - 4:6, 5:2, 6:1, 6:5, 6:9, 6:23, 7:3
**contact** [4] - 16:23, 19:20, 22:9, 22:13
**contacted** [12] - 16:22, 16:24, 17:1, 17:3, 17:12, 17:17, 22:13, 22:15, 23:11, 23:15, 24:19, 25:24
**contain** [1] - 23:13
**contained** [1] - 23:12
**contempt** [2] - 25:8, 63:16
**contempts** [1] - 50:11
**continues** [1] - 23:12
**continuing** [1] - 68:19
**contributions** [1] - 56:3
**convention** [3] - 19:3, 19:12, 23:3
**conversation** [8] - 9:8, 22:17, 60:14, 60:16, 60:20, 60:21, 61:5
**convicted** [49] - 8:25, 11:15, 11:18, 11:22, 12:1, 12:6, 12:13, 14:8, 15:1, 15:3, 15:4, 16:8, 16:14, 17:2, 17:4, 17:5, 17:7, 17:13, 17:21, 17:22, 18:15, 25:6, 25:10, 27:24, 28:1, 42:18, 44:14, 49:16, 50:9, 50:11, 50:12, 53:1, 53:16, 53:20, 54:1, 54:2, 54:5, 54:13, 54:14, 54:19, 54:24, 54:25, 55:1, 62:23, 63:7, 64:14, 69:6
**conviction** [6] - 49:4, 54:14, 54:15, 54:16, 55:8, 55:10
**convictions** [3] - 12:15, 12:23, 12:25
**copy** [6] - 52:11, 58:13, 69:24, 75:20, 76:5
**correct** [75] - 3:18, 4:7, 9:16, 10:20, 11:17, 11:24, 14:24, 15:19, 16:9, 16:19,

16:21, 17:18, 17:22, 18:13, 18:16, 18:19, 18:24, 19:17, 22:15, 24:10, 26:4, 26:6, 26:12, 26:25, 27:23, 28:6, 30:17, 30:19, 31:4, 31:5, 33:8, 35:25, 37:4, 37:19, 41:2, 41:21, 42:22, 42:24, 43:15, 47:24, 48:25, 49:8, 50:6, 50:16, 50:18, 52:14, 53:2, 53:9, 56:1, 58:22, 59:17, 60:6, 60:25, 61:20, 61:25, 62:18, 67:1, 68:11, 68:14, 68:22, 69:17, 69:24, 71:6, 71:23, 72:24, 74:1, 74:9, 75:5, 75:12, 75:14, 75:16, 76:23, 77:1, 77:10, 77:16
**corrected** [2] - 16:24, 17:1
**correcting** [1] - 54:9
**correction** [21] - 18:20, 19:6, 19:8, 19:14, 22:9, 22:14, 23:4, 23:5, 25:11, 25:13, 50:16, 50:22, 50:23, 54:12, 54:13, 55:7, 67:24, 68:7, 68:8, 68:20, 68:24
**corrupt** [1] - 38:10
**Counsel** [1] - 33:1
**counsel** [3] - 29:21, 29:22, 29:25
**country** [2] - 3:22, 35:25
**counts** [6] - 45:23, 46:14, 47:17, 53:5, 53:15, 74:9
**County** [2] - 45:3, 74:7
**couple** [2] - 13:20, 72:2
**course** [1] - 3:24
**court** [30] - 5:19, 20:9, 22:10, 25:8, 25:9, 25:10, 38:14, 41:16, 41:20, 45:25, 46:16, 46:20, 48:3, 48:7, 48:11, 48:15, 48:16, 50:10, 50:11, 50:13, 59:6, 63:15, 63:17, 63:18, 63:19, 63:21
**Court** [14] - 1:22, 2:22, 27:11, 28:6, 28:8, 28:14, 28:18, 28:19, 29:2, 47:22, 73:12, 73:14, 80:14

**COURT** [63] - 1:1, 3:2, 3:7, 4:10, 4:12, 4:17, 4:20, 4:22, 11:10, 11:12, 12:9, 13:4, 13:14, 13:18, 13:20, 13:25, 14:14, 15:21, 15:25, 16:2, 16:11, 19:23, 19:25, 20:2, 20:8, 20:13, 20:15, 20:17, 20:20, 20:22, 21:9, 21:13, 21:15, 21:19, 21:24, 22:1, 22:3, 22:4, 22:6, 25:20, 43:23, 44:6, 46:17, 48:15, 51:3, 51:9, 51:14, 57:4, 57:7, 57:9, 58:15, 63:5, 65:14, 66:18, 70:9, 70:11, 70:14, 70:23, 72:20, 74:12, 77:3, 79:1, 80:2
**courtroom** [3] - 20:1, 22:5, 73:11
**Courtroom** [1] - 1:7
**cover** [1] - 38:14
**crime** [26] - 11:16, 11:18, 11:20, 12:3, 12:4, 12:6, 12:19, 13:1, 13:6, 13:10, 13:22, 14:2, 14:3, 14:6, 14:12, 15:3, 15:7, 27:25, 28:2, 43:15, 44:1, 49:5, 49:18, 63:2, 64:13, 64:14
**crimes** [5] - 12:5, 12:15, 12:20, 12:24, 43:12
**criminal** [23] - 12:1, 12:3, 12:4, 25:8, 25:10, 45:10, 45:23, 46:14, 47:17, 50:10, 50:11, 50:13, 53:5, 53:15, 55:6, 63:11, 63:16, 63:18, 63:19, 63:21, 73:9, 74:9
**cross** [2] - 57:11, 58:11
**CROSS** [3] - 2:4, 2:7, 58:16
**CROSS- EXAMINATION** [1] - 58:16
**cut** [2] - 21:19, 56:3
**Cuyahoga** [2] - 45:3, 74:6

**D**

**dad** [1] - 73:10

daily [1] - 69:19
DATE [1] - 80:14
date [8] - 27:15, 27:16, 27:22, 33:18, 36:10, 36:11, 37:3
dated [1] - 19:9
DAY [1] - 1:10
days [13] - 16:21, 19:19, 22:9, 22:11, 22:12, 22:14, 22:20, 23:25, 27:15, 65:8, 69:20, 74:24
dead [1] - 73:10
dead-beat [1] - 73:10
deals [2] - 12:1, 61:19
dealt [6] - 23:20, 35:15, 50:14, 66:5, 72:6
Dear [1] - 23:9
decades [1] - 38:9
decide [1] - 54:12
decided [2] - 40:8, 40:19
decision [5] - 43:24, 54:4, 54:6, 54:7, 55:3
declaration [2] - 4:16, 55:19
declaratory [2] - 39:24, 40:3
declare [1] - 39:25
defamation [2] - 67:3, 67:6
defamatory [4] - 23:13, 23:18, 23:19, 29:4
defaming [3] - 28:15, 28:25, 29:1
Defendant [1] - 1:8
DEFENDANT [2] - 1:17, 2:6
Defendant's [4] - 2:13, 44:9, 44:10, 44:20
defendants [2] - 45:4, 45:9
defense [1] - 34:16
defrauding [2] - 27:9, 27:13
degree [4] - 45:10, 49:2, 49:4, 49:24
degrees [1] - 3:19
demanded [1] - 67:16
dementia [1] - 73:8
democrat [1] - 47:14
democrat-files-ballotchallengeobject [1] - 47:14
denied [2] - 13:4, 40:15
dental [3] - 3:17, 79:8,

79:9
different [7] - 33:15, 35:19, 41:14, 41:24, 43:12, 49:23, 59:23
differentiate [4] - 14:23, 15:16, 63:21, 64:13
direct [1] - 70:7
DIRECT [3] - 2:4, 2:7, 3:9
directions [1] - 21:7
directly [1] - 57:17
disciplinary [1] - 73:12
disclosed [1] - 10:5
discuss [1] - 19:24
discussion [1] - 7:17
disliked [1] - 71:13
dismissed [7] - 40:16, 40:21, 41:16, 41:19, 55:14, 79:22, 79:24
displayed [1] - 79:1
dissing [3] - 8:9, 32:4, 32:9
distress [1] - 67:3
DISTRICT [3] - 1:1, 1:1, 1:11
DIVISION [1] - 1:2
divisions [1] - 14:4
divorce [2] - 72:7, 72:8
dkahle@schwedpa.com [1] - 1:20
dkress@schwedpa.com [1] - 1:20
DMV [1] - 12:23
docket [2] - 36:24, 42:5
doctor [2] - 3:16, 79:8
doctor's [1] - 3:19
document [7] - 17:25, 46:6, 47:10, 47:18, 49:7, 51:6, 51:8
documents [2] - 58:20, 69:11
domestic [3] - 45:25, 46:16, 46:20
donate [16] - 23:24, 24:3, 24:5, 24:6, 34:19, 35:7, 54:18, 56:24, 57:16, 57:17, 57:19, 58:2, 58:4, 73:3
donated [2] - 33:25, 34:21
donating [2] - 27:19, 35:9
donations [1] - 10:6
done [12] - 18:12, 28:3, 28:11, 31:6,

32:16, 33:10, 39:13, 42:13, 57:2, 58:21, 66:9, 70:15
donors [7] - 8:24, 9:20, 11:16, 18:16, 33:20, 35:6, 49:15
Doug [1] - 58:18
DOUGLAS [2] - 1:17, 1:17
down [9] - 8:13, 20:23, 51:10, 62:2, 67:4, 67:15, 67:21, 68:3, 72:5
Dr [1] - 64:18
drawn [1] - 38:13
Drive [1] - 7:8
drive [1] - 79:10
drove [3] - 6:16, 60:8, 79:9
during [7] - 9:8, 41:10, 41:12, 41:15, 41:18, 41:23, 72:7

## E

E-mail [41] - 7:24, 18:3, 18:6, 18:12, 18:25, 19:1, 19:7, 19:9, 19:10, 22:19, 22:21, 22:22, 22:23, 22:24, 23:4, 23:7, 23:8, 25:2, 25:4, 25:14, 25:15, 25:18, 25:23, 26:3, 27:4, 27:7, 28:3, 28:5, 28:16, 29:5, 30:2, 34:24, 51:1, 56:8, 56:16, 62:14, 65:2, 66:21, 68:6, 76:10, 76:19
E-mailed [2] - 72:2, 72:12
E-mails [6] - 77:21, 77:22, 77:23, 78:13, 78:17, 78:18
earliest [1] - 79:11
easier [3] - 58:14, 69:11, 69:13
educated [1] - 3:18
education [1] - 34:17
educational [1] - 3:15
effect [2] - 27:9, 54:9
either [9] - 27:17, 31:3, 34:20, 34:21, 50:2, 64:19, 65:1, 69:11, 78:18
election [6] - 38:2, 41:11, 41:13, 41:15, 41:19, 41:23
eligibility [14] - 5:10,

26:12, 26:23, 26:25, 27:10, 30:13, 32:13, 34:1, 34:18, 35:24, 36:6, 54:18, 55:25, 79:13
eligible [2] - 39:25, 40:1
Elliot [1] - 28:20
emotional [1] - 67:2
empty [1] - 18:4
end [7] - 8:10, 20:4, 32:5, 52:2, 55:22, 79:20, 79:23
English [2] - 3:20, 3:23
entered [3] - 22:5, 39:14, 77:20
entering [5] - 9:16, 29:6, 30:4, 30:10, 30:12
entire [2] - 31:12, 51:6
entitled [2] - 68:10, 80:11
Eric [1] - 38:2
erroneous [1] - 25:6
error [10] - 35:12, 50:8, 52:23, 53:8, 53:13, 54:4, 54:23, 67:23, 67:24, 69:7
ESQ [3] - 1:13, 1:17, 1:17
essence [1] - 24:6
essentially [1] - 61:25
et [1] - 29:22
European [1] - 74:16
evening [8] - 22:17, 22:19, 23:5, 26:3, 26:8, 59:1, 79:7, 79:11
event [4] - 3:25, 4:5, 5:5, 60:2
EVIDENCE [1] - 2:11
evidence [5] - 18:1, 36:20, 50:20, 57:20, 79:3
evident [2] - 69:1, 69:6
ex [4] - 55:5, 55:11, 55:19
ex-wife [4] - 55:5, 55:11, 55:19
exact [1] - 73:6
exactly [3] - 17:6, 63:12, 75:5
EXAMINATION [2] - 3:9, 58:16
examination [1] - 21:22
example [3] - 12:7, 12:22, 27:7

excellent [1] - 38:5
EXCERPT [1] - 1:10
excerpt [6] - 3:1, 45:20, 46:4, 47:12, 80:4
excited [2] - 20:5, 20:17
excuse [8] - 27:4, 29:16, 29:20, 31:16, 37:24, 51:16, 55:16, 70:13
excused [2] - 80:2, 80:3
exhibit [4] - 5:19, 29:11, 58:14, 69:12
Exhibit [39] - 2:12, 2:13, 2:15, 2:16, 5:14, 5:15, 5:23, 6:2, 6:4, 6:8, 18:1, 18:2, 18:19, 31:8, 31:18, 36:20, 36:21, 36:24, 42:16, 44:9, 44:10, 44:12, 44:20, 44:21, 46:7, 46:8, 46:11, 50:4, 50:20, 52:11, 61:15, 66:20, 69:15, 69:22, 70:7, 70:8, 75:18, 79:3
exhibits [1] - 29:10
Exhibits [2] - 78:22, 78:24
EXHIBITS [1] - 2:11
exited [1] - 20:1
expect [1] - 21:21
expected [1] - 71:11
expenses [2] - 33:13, 38:15
experience [1] - 53:22
expert [2] - 13:15, 43:18
explain [1] - 10:7
explanation [4] - 21:9, 21:16, 21:17, 33:2
extent [1] - 78:23
extremely [2] - 13:1, 25:14
eye [1] - 58:25

## F

fact [25] - 19:15, 22:15, 23:20, 24:25, 25:12, 26:6, 32:14, 33:22, 34:22, 37:11, 37:21, 41:6, 44:17, 47:16, 47:21, 55:24, 56:5, 56:19, 63:22, 64:9, 65:22, 66:1, 69:5, 72:12, 78:6
facts [3] - 25:12, 29:4,

41:22
**failure** [1] - 45:4
**false** [8] - 23:13,
42:15, 42:20, 42:22,
56:1, 67:6, 67:7,
67:25
**family** [4] - 25:9,
63:15, 63:17, 63:20
**far** [8] - 17:19, 21:12,
34:12, 37:13, 41:3,
50:7, 52:16, 55:15
**faster** [1] - 51:8
**FBI** [2] - 7:9, 7:11
**February** [43] - 4:3,
4:4, 7:25, 18:8, 18:9,
18:10, 23:23, 24:9,
24:11, 27:16, 27:18,
31:2, 34:24, 37:12,
37:18, 37:21, 41:7,
41:8, 42:11, 42:14,
46:3, 46:23, 50:23,
52:14, 53:6, 56:6,
56:16, 59:11, 64:4,
65:11, 65:25, 66:1,
66:2, 69:1, 69:6,
70:18, 71:15, 73:2,
74:16, 75:7, 75:21,
75:22
**felony** [15] - 14:23,
15:10, 15:12, 15:17,
15:19, 16:9, 43:21,
45:11, 48:25, 49:3,
49:4, 49:5, 49:18,
49:24, 50:3
**felt** [4] - 30:16, 32:14,
55:25, 77:24
**few** [4] - 47:22, 59:10,
61:15, 72:5
**field** [2] - 34:4, 34:5
**fifth** [4] - 45:10, 49:2,
49:3, 49:24
**fifth-degree** [2] -
45:10, 49:2
**figure** [1] - 48:19
**file** [21] - 9:20, 9:21,
10:6, 10:8, 10:16,
23:25, 24:7, 27:15,
27:17, 31:1, 32:21,
32:24, 36:10, 36:11,
36:12, 37:15, 37:17,
37:23, 40:12, 65:24,
71:4
**filed** [55] - 8:4, 8:10,
10:9, 10:22, 24:11,
24:14, 27:22, 28:21,
29:1, 29:14, 29:21,
31:3, 32:6, 32:18,
33:17, 33:18, 33:21,
34:10, 34:11, 35:25,
36:5, 36:8, 36:9,

36:13, 36:16, 37:1,
37:2, 37:13, 37:14,
37:20, 38:21, 39:21,
40:11, 41:1, 41:8,
41:21, 63:25, 64:3,
64:4, 65:4, 65:6,
65:25, 66:8, 79:12,
79:20, 79:21, 79:23
**files** [1] - 47:14
**filing** [4] - 30:9, 70:20,
71:8, 71:17
**finally** [1] - 8:8
**Finally** [1] - 32:3
**fine** [2] - 5:19, 64:19
**finish** [2] - 47:3, 57:8
**finished** [6] - 51:22,
52:6, 54:21, 55:16,
55:17, 57:10
**Firm** [1] - 1:13
**first** [15] - 17:22,
23:15, 25:2, 30:12,
31:8, 31:14, 31:17,
40:8, 40:9, 41:4,
49:6, 52:22, 59:10,
71:3, 75:6
**fishy** [2] - 56:14, 56:18
**fix** [1] - 68:25
**flew** [2] - 58:24, 58:25
**Floor** [2] - 1:23, 80:15
**FLORIDA** [1] - 1:1
**Florida** [48] - 1:4,
1:14, 1:19, 1:23, 8:4,
9:9, 24:1, 24:8,
27:20, 28:6, 28:8,
28:12, 28:14, 28:18,
28:19, 28:22, 29:1,
29:15, 29:21, 30:1,
30:9, 31:2, 31:3,
36:6, 37:1, 37:13,
37:18, 38:12, 39:2,
42:1, 47:14, 64:4,
64:6, 64:21, 65:6,
65:21, 68:19, 70:3,
70:21, 71:9, 71:18,
73:15, 79:15, 80:15
**flying** [1] - 59:1
**focus** [2] - 61:18,
61:23
**follow** [2] - 38:1, 42:7
**followed** [3] - 40:23,
42:1, 42:6
**following** [4] - 3:1,
4:25, 66:4, 69:25
**follows** [1] - 3:5
**fool** [1] - 38:18
**FOR** [4] - 1:13, 1:17,
2:3, 2:6
**forced** [1] - 38:9
**foregoing** [1] - 80:9
**formal** [1] - 61:2

**forth** [1] - 40:2
**forum** [1] - 60:20
**forward** [1] - 23:17
**forwarded** [3] - 41:16,
41:19, 63:18
**foundation** [3] - 58:3,
66:11, 66:15
**founder** [2] - 70:19,
71:8, 71:17
**four** [12] - 8:9, 19:19,
22:8, 22:11, 22:14,
23:25, 27:15, 32:5,
32:9, 39:17, 76:4
**frame** [1] - 45:1
**Freedom** [2] - 56:13,
58:3
**frequently** [1] - 69:17
**fulfill** [1] - 64:10
**fulfilling** [1] - 64:12
**full** [3] - 22:20, 45:17,
46:5
**fund** [7] - 34:16,
34:17, 34:18, 34:19,
35:2, 37:17, 58:4
**Fund** [3] - 58:4, 68:11,
76:13
**fundraising** [3] -
65:13, 65:18, 65:20
**funds** [5] - 27:9,
34:15, 34:19, 34:20,
34:21

### G

**Garden** [3] - 4:1, 6:15,
79:10
**Gardens** [1] - 1:19
**general** [5] - 34:19,
41:13, 41:15, 41:18,
41:23
**gentlemen** [2] - 19:23,
44:7
**George** [4] - 22:25,
23:10, 25:16, 56:4
**gist** [2] - 35:11, 35:20
**given** [6] - 6:14, 13:18,
18:16, 34:9, 42:6,
77:1
**Google** [2] - 77:20,
77:21
**Great** [2] - 70:3, 70:18
**great** [6] - 70:21, 71:3,
71:9, 71:15, 73:5,
75:7
**greatly** [1] - 33:12
**group** [5] - 7:23,
24:20, 30:22, 33:16,
57:23
**groups** [1] - 24:22
**Grove** [3] - 4:1, 6:15,

79:10
**guess** [3] - 20:5,
55:16, 61:22
**guilty** [1] - 53:23
**guy** [1] - 73:7

### H

**hac** [3] - 9:17, 10:14,
26:20
**hand** [2] - 3:2, 42:9
**handing** [1] - 43:9
**hard** [4] - 8:7, 31:25,
32:1, 32:16
**harm** [1] - 56:1
**headed** [1] - 38:7
**headquarters** [1] - 7:7
**hear** [1] - 6:17
**heard** [1] - 7:20
**hearings** [3] - 45:25,
46:15, 46:20
**held** [4] - 3:1, 45:25,
46:16, 46:20
**Helen** [2] - 34:14, 35:2
**help** [3] - 33:13, 38:14,
40:18
**helps** [1] - 34:5
**hereby** [1] - 80:9
**higher** [2] - 13:1, 14:5
**highest** [1] - 14:5
**highlighted** [1] - 41:6
**highly** [1] - 3:18
**himself** [1] - 41:8
**history** [1] - 10:1
**hmm** [2] - 18:14,
36:25
**hold** [1] - 76:1
**Holder** [1] - 38:2
**home** [5] - 19:4, 19:5,
22:18, 23:4, 78:6
**honest** [2] - 56:14,
56:17
**Honor** [32] - 4:11,
4:14, 13:3, 13:23,
14:10, 14:13, 15:5,
15:24, 20:3, 20:12,
21:3, 21:18, 21:23,
25:18, 31:11, 44:4,
48:3, 48:11, 51:7,
57:2, 58:12, 58:13,
63:4, 66:10, 66:15,
70:6, 70:10, 72:18,
74:10, 74:11, 78:21,
80:1
**Honorable** [1] - 43:25
**HONORABLE** [1] -
1:10
**hour** [3] - 6:12, 6:16,
79:10
**hours** [5] - 8:3, 23:25,

68:5, 68:6, 68:7
http://www.
politicalforum.com
/current-events
232994-breaking [1]
- 47:13
**Humm** [3] - 9:9, 65:3,
66:5
**Huntington** [1] - 7:7
**husband** [2] - 19:12,
23:3

### I

**identification** [3] -
5:15, 18:2, 44:10
**IDs** [1] - 40:1
**II** [15] - 7:23, 24:20,
29:11, 34:16, 34:17,
35:1, 37:16, 65:12,
65:18, 68:11, 76:12,
76:13, 76:21
**immediate** [1] - 22:16
**immediately** [3] -
16:20, 19:17, 22:15
**Immigration** [1] -
76:22
**immigration** [1] -
59:15
**important** [7] - 35:5,
35:6, 38:8, 40:9,
40:19, 58:10, 77:24
**impossible** [1] - 74:22
**impression** [1] - 13:17
**IN** [1] - 2:11
**inaccurate** [1] - 52:16
**inadvertent** [1] - 20:4
**inappropriate** [1] -
14:16
**inauguration** [1] -
38:4
**INC** [1] - 1:7
**incidentally** [3] -
62:20, 66:5, 67:12
**include** [1] - 23:10
**included** [1] - 62:10
**including** [4] - 20:24,
25:16, 38:10, 75:12
**inconsistency** [1] -
25:25
**incorrect** [3] - 23:1,
25:12, 50:15
**indeed** [4] - 47:16,
52:23, 77:24, 78:11
**indicated** [3] - 21:22,
76:20, 77:14
**indicted** [28] - 17:2,
17:4, 17:13, 25:9,
43:20, 45:2, 45:4,
45:23, 46:14, 47:17,

48:25, 49:8, 49:10, 49:12, 50:10, 53:5, 53:15, 54:3, 54:4, 54:14, 55:2, 55:3, 55:10, 62:17, 63:19, 69:3, 69:9, 74:9

**indictment** [5] - 47:7, 55:8, 55:14, 62:5, 73:9

**individual** [2] - 4:5, 72:23

**individuals** [7] - 25:16, 32:17, 45:18, 45:21, 46:4, 47:12, 78:15

**inexcusable** [1] - 20:20

**informal** [1] - 60:14

**information** [23] - 9:4, 11:16, 18:16, 23:1, 29:2, 29:9, 45:18, 45:22, 61:24, 62:3, 62:5, 62:11, 62:16, 63:1, 64:23, 65:1, 77:1, 77:4, 77:15, 77:16, 77:20, 77:21, 78:15

**infraction** [3] - 12:22, 14:5, 49:6

**infractions** [3] - 12:16, 12:24, 14:4

**initiated** [1] - 7:17

**injunctive** [2] - 40:4, 40:10

**innocent** [1] - 53:22

**instruct** [1] - 15:22

**instruction** [3] - 20:24, 21:4, 21:6

**integrity** [1] - 48:6

**intend** [1] - 67:25

**intending** [1] - 71:4

**intense** [1] - 23:24

**intentional** [1] - 21:5

**interested** [1] - 36:5

**interference** [1] - 67:7

**interrupt** [4] - 11:10, 21:13, 54:22, 55:17

**interview** [1] - 61:2

**intimidate** [1] - 67:9

**intimidated** [1] - 67:20

**introduced** [3] - 5:6, 60:5, 74:25

**invasion** [1] - 67:7

**involved** [3] - 7:20, 79:13, 79:15

**involving** [1] - 9:9

**issue** [20] - 11:15, 32:16, 33:19, 35:5, 39:9, 58:10, 63:22, 63:24, 64:8, 64:9,

65:2, 66:2, 66:6, 68:17, 70:22, 71:10, 77:18, 77:25, 78:1

**issued** [1] - 44:21

**issues** [2] - 75:16, 77:23

**itself** [2] - 45:7, 61:22

## J

**Jackson** [2] - 71:21, 73:2

**Jog** [1] - 1:18

**join** [8] - 9:25, 10:1, 10:10, 11:3, 33:4, 34:3, 37:5, 37:6

**joined** [13] - 36:12, 37:3, 37:7, 39:1, 39:5, 39:15, 39:19, 40:6, 40:17, 41:4, 41:9, 42:11, 79:22

**Joint** [11] - 2:15, 2:16, 18:1, 18:2, 66:20, 69:15, 69:22, 75:18, 78:22, 78:24, 79:3

**JUDGE** [1] - 1:11

**judge** [15] - 9:21, 9:22, 9:23, 10:9, 10:20, 10:21, 11:3, 32:25, 40:12, 40:15, 40:21, 41:10, 44:2, 47:3

**Judge** [1] - 43:25

**judges** [2] - 9:24, 9:25

**JUDICIAL** [1] - 1:7

**Judicial** [26] - 4:7, 5:7, 5:8, 6:16, 6:19, 6:20, 7:4, 7:14, 8:23, 17:17, 42:10, 42:24, 43:1, 43:3, 43:4, 43:5, 43:9, 49:15, 55:20, 56:12, 58:19, 70:20, 71:8, 71:16, 71:17, 73:13

**jumping** [1] - 73:4

**jury** [15] - 4:13, 20:1, 22:3, 22:5, 22:23, 27:12, 48:11, 48:12, 51:10, 54:3, 54:6, 54:7, 54:12, 55:3, 61:22

**JURY** [1] - 1:10

## K

**KAHLE** [1] - 1:17

**Kahle** [1] - 1:18

**keep** [2] - 35:24, 36:3

**kept** [2] - 36:8, 58:6

**KLAYMAN** [77] - 1:4, 1:13, 3:10, 4:11,

4:14, 4:19, 4:21, 4:24, 5:1, 5:18, 5:22, 5:24, 11:11, 11:13, 11:14, 12:11, 12:18, 13:2, 13:5, 13:13, 13:16, 13:19, 13:22, 14:13, 14:15, 14:18, 15:24, 16:1, 16:5, 16:6, 16:16, 20:3, 20:12, 20:14, 20:16, 20:19, 20:21, 21:3, 21:11, 21:14, 21:18, 21:23, 22:7, 26:2, 31:11, 31:13, 36:22, 36:23, 43:19, 44:4, 44:8, 44:11, 45:8, 46:9, 46:10, 46:18, 46:19, 48:22, 48:23, 51:5, 51:7, 51:10, 51:21, 57:2, 57:8, 58:11, 63:4, 66:10, 66:15, 70:6, 70:10, 70:13, 70:16, 72:18, 74:10, 77:2, 80:1

**Klayman** [153] - 1:13, 7:18, 8:10, 8:14, 8:20, 9:22, 10:4, 12:13, 14:8, 15:23, 17:1, 17:3, 17:12, 19:1, 20:18, 22:21, 23:2, 23:7, 23:9, 23:16, 23:25, 24:5, 24:12, 24:14, 24:16, 25:2, 25:3, 25:19, 25:23, 25:25, 27:15, 27:17, 27:19, 27:25, 28:4, 28:9, 28:12, 28:20, 28:22, 29:12, 29:15, 29:20, 29:22, 29:25, 30:3, 30:22, 30:23, 32:6, 32:19, 32:25, 33:1, 33:3, 33:15, 33:21, 33:22, 34:25, 35:3, 35:11, 35:22, 37:6, 37:10, 37:15, 37:17, 37:20, 37:25, 38:7, 38:9, 38:24, 39:7, 39:15, 39:18, 40:6, 40:11, 40:17, 41:4, 41:9, 41:12, 43:11, 45:2, 45:22, 46:13, 46:17, 47:9, 48:4, 48:13, 49:11, 49:14, 49:23, 50:9, 51:2, 52:22, 52:25, 53:14, 54:4, 54:24, 55:4, 56:2, 56:10, 56:11, 56:17, 57:16, 57:17, 58:2, 58:7, 59:2, 62:17, 63:15, 64:2, 64:10,

65:4, 65:7, 65:13, 65:18, 65:24, 65:25, 66:7, 66:21, 67:1, 67:16, 68:1, 68:4, 68:11, 70:19, 71:3, 71:7, 71:12, 71:19, 71:22, 72:1, 72:4, 72:6, 72:8, 72:12, 72:24, 73:4, 74:8, 74:17, 75:1, 75:10, 76:11, 76:14, 76:21, 77:1, 77:24, 78:7, 78:9, 78:10, 78:19, 79:12, 79:22

**Klayman's** [1] - 56:11

**knees** [1] - 38:9

**knowledge** [5] - 42:4, 42:7, 49:25, 50:5, 66:16

**known** [2] - 20:13, 38:19

**knows** [2] - 34:12, 34:20

**Kress** [4] - 1:18, 58:18, 65:14, 77:6

**KRESS** [27] - 1:17, 4:9, 13:11, 13:24, 15:20, 16:10, 36:21, 43:17, 43:22, 45:6, 46:8, 57:10, 58:13, 58:17, 63:6, 65:15, 65:16, 66:17, 66:19, 70:17, 70:24, 71:1, 72:21, 74:19, 77:9, 78:21, 79:4

## L

**lacks** [1] - 66:15

**ladies** [2] - 19:23, 44:6

**large** [5] - 8:25, 33:15, 49:17, 62:24, 63:8

**larger** [1] - 51:13

**Larry** [33] - 7:18, 8:10, 8:14, 8:20, 28:20, 29:12, 29:15, 29:25, 32:6, 34:25, 35:3, 38:7, 45:2, 45:22, 46:13, 51:1, 56:11, 56:13, 56:17, 65:12, 65:18, 66:21, 67:25, 68:11, 70:19, 71:3, 71:7, 74:8, 75:1, 76:11, 76:14, 77:1, 78:9

**LARRY** [2] - 1:4, 1:13

**last** [10] - 16:2, 31:12, 31:14, 46:1, 46:21, 52:2, 52:3, 68:3, 73:16, 78:9

**late** [2] - 38:1, 59:23

**Law** [1] - 1:13

**law** [1] - 73:11

**lawsuit** [14] - 24:7, 27:16, 32:21, 36:6, 36:16, 37:20, 42:10, 65:6, 65:13, 65:19, 65:20, 65:25, 66:2

**lawsuits** [29] - 24:1, 24:7, 24:11, 24:14, 25:15, 26:11, 26:14, 27:18, 27:22, 31:1, 32:18, 32:24, 33:6, 33:9, 33:10, 33:12, 33:14, 33:17, 33:18, 33:21, 34:1, 34:10, 35:9, 37:23, 55:25, 63:25, 64:3, 66:4

**lawyer** [5] - 11:24, 13:7, 13:13, 32:12, 32:15

**lawyers** [3] - 10:25, 11:6

**leading** [3] - 4:9, 5:10, 26:23

**learn** [1] - 79:12

**least** [1] - 69:19

**legal** [10] - 13:12, 13:15, 34:16, 35:2, 35:15, 35:16, 37:16, 38:6, 38:14, 43:18

**Legal** [2] - 68:11, 76:13

**legitimate** [6] - 33:19, 34:8, 34:11, 35:10

**leklayman@gmail. com** [1] - 1:15

**length** [1] - 35:18

**lengthy** [1] - 48:19

**letter** [1] - 67:16

**level** [5] - 12:21, 14:4, 14:6, 14:9

**Liberty** [1] - 58:4

**license** [1] - 73:11

**licensed** [18] - 3:16, 8:14, 8:21, 9:12, 9:15, 29:7, 30:4, 31:3, 32:20, 33:3, 33:5, 49:14, 73:17, 78:6, 78:8, 78:10, 78:12

**lie** [1] - 29:8

**lied** [1] - 19:22

**life** [2] - 20:9, 73:10

**light** [1] - 67:6

**limitation** [1] - 27:8

**line** [2] - 48:24, 72:25

**lined** [1] - 13:13

**link** [12] - 29:11, 29:19, 30:7, 30:20,

30:24, 53:4, 64:22,
69:2, 69:8, 74:6,
74:16
**litigation** [8] - 8:24,
34:6, 49:16, 62:23,
63:10, 79:13, 79:16
**look** [20] - 12:14,
12:22, 29:10, 30:24,
31:8, 31:17, 37:9,
51:6, 52:8, 61:23,
62:21, 65:10, 68:24,
69:11, 69:12, 69:22,
71:20, 72:15, 72:16,
75:19
**looked** [1] - 11:20
**looking** [6] - 27:4,
32:23, 68:3, 74:1,
77:19, 78:12
**looks** [1] - 74:5
**Los** [3] - 45:22, 46:13,
74:8
**lower** [4] - 12:17,
12:21, 14:3
**lowest** [1] - 12:25
**lying** [2] - 19:22, 47:25

## M

**mail** [41] - 7:24, 18:3,
18:6, 18:12, 18:25,
19:1, 19:7, 19:9,
19:10, 22:19, 22:21,
22:22, 22:23, 22:24,
23:4, 23:7, 23:8,
25:2, 25:4, 25:14,
25:15, 25:18, 25:23,
26:3, 27:4, 27:7,
28:3, 28:5, 28:16,
29:5, 30:2, 34:24,
51:1, 56:8, 56:16,
62:14, 65:2, 66:21,
68:6, 76:10, 76:19
**mailed** [2] - 72:2,
72:12
**mails** [6] - 77:21,
77:22, 77:23, 78:13,
78:17, 78:18
**main** [5] - 35:20,
57:12, 57:24, 66:2,
76:9
**man** [2] - 56:13, 56:17
**manning** [1] - 43:8
**March** [10] - 37:7,
37:11, 39:2, 39:11,
39:15, 39:16, 40:6,
40:18, 42:12
**Marino** [2] - 6:16, 7:8
**MARKED** [2] - 2:11
**marked** [6] - 5:15,
18:1, 18:2, 36:19,

44:10, 50:19
**Mason** [1] - 45:3
**match** [2] - 8:9, 32:4
**material** [1] - 23:13
**materials** [1] - 43:8
**matter** [20] - 9:9, 12:1,
12:3, 12:4, 24:25,
32:14, 33:21, 34:22,
35:10, 37:11, 37:21,
55:5, 56:5, 58:19,
64:14, 65:21, 66:1,
72:12, 78:6, 80:11
**matters** [2] - 63:11
**maximum** [1] - 45:11
**McCarn** [3] - 1:21,
48:18, 80:14
**mean** [2] - 4:23, 34:11
**meaning** [1] - 35:2
**means** [2] - 54:15,
54:24
**meant** [3] - 15:14,
31:15, 54:17
**meeting** [6] - 5:2,
59:11, 59:13, 60:5,
76:22, 79:5
**member** [2] - 6:19,
6:20
**memo** [1] - 76:2
**mentioned** [2] - 61:18,
63:24
**merely** [1] - 63:7
**met** [6] - 8:8, 32:4,
74:24, 76:25, 77:11,
77:17
**MIAMI** [1] - 1:2
**Miami** [6] - 1:4, 1:14,
1:22, 1:23, 80:15,
80:15
**microphone** [2] -
60:23, 70:24
**mid** [1] - 21:20
**mid-sentence** [1] -
21:20
**might** [1] - 58:14
**miller** [6] - 22:25,
23:21, 24:19, 67:10,
72:1, 72:13
**Miller** [6] - 22:25,
23:10, 25:16, 28:24,
56:4, 67:11
**mind** [2] - 20:24,
63:10
**mine** [1] - 76:3
**minutes** [1] - 47:23
**misappropriating** [1] -
73:13
**MISCELLANEOUS** [1]
- 2:20
**misdemeanor** [23] -
11:21, 12:17, 12:19,

13:6, 13:10, 13:17,
13:22, 14:2, 14:23,
15:6, 15:9, 15:16,
16:8, 28:2, 43:15,
43:21, 44:2, 49:5,
49:9, 49:10, 49:12,
49:19, 50:3
**misdemeanors** [6] -
12:5, 12:14, 12:16,
12:21, 12:25, 14:5
**misrepresented** [2] -
14:25, 15:2
**missed** [2] - 8:16
**misstated** [1] - 75:6
**misstates** [1] - 63:4
**mistake** [1] - 40:11
**moderation** [1] -
72:17
**moment** [3] - 23:3,
69:22, 71:23
**Monday** [2] - 57:5,
57:7
**money** [39] - 7:24,
23:17, 23:24, 24:4,
24:15, 24:17, 24:23,
24:24, 27:14, 27:19,
28:11, 28:13, 32:17,
32:25, 33:7, 33:9,
33:16, 33:20, 33:23,
33:24, 33:25, 34:9,
34:13, 34:16, 34:20,
35:4, 35:7, 35:8,
35:20, 38:14, 38:22,
57:15, 64:7, 65:7,
72:1, 73:4, 73:5,
76:15
**moneys** [6] - 30:23,
32:7, 35:19, 37:16,
56:20, 57:23
**monitor** [1] - 78:14
**month** [1] - 39:18
**months** [3] - 39:17,
55:4, 73:15
**morning** [3] - 18:21,
23:6, 58:24
**most** [4] - 35:14,
38:10, 56:19, 56:21
**mostly** [1] - 57:22
**mother** [3] - 72:24,
73:7, 75:14
**motion** [4] - 9:21,
14:19, 32:24, 40:12
**move** [13] - 6:11, 13:2,
31:11, 48:21, 57:4,
57:9, 66:10, 66:15,
66:24, 67:3, 72:18,
74:3, 78:24
**moved** [1] - 78:23
**MR** [101] - 3:10, 4:9,
4:11, 4:14, 4:19,

4:21, 4:24, 5:1, 5:18,
5:22, 5:24, 11:11,
11:13, 11:14, 12:11,
12:18, 13:2, 13:5,
13:11, 13:13, 13:16,
13:19, 13:22, 13:24,
14:13, 14:15, 14:18,
15:20, 15:24, 16:1,
16:5, 16:6, 16:10,
16:16, 20:3, 20:12,
20:14, 20:16, 20:19,
20:21, 21:3, 21:11,
21:14, 21:18, 21:23,
22:7, 26:2, 31:11,
31:13, 36:21, 36:22,
36:23, 43:17, 43:19,
43:22, 44:4, 44:8,
44:11, 45:6, 45:8,
46:8, 46:9, 46:10,
46:18, 46:19, 48:22,
48:23, 51:5, 51:7,
51:10, 51:21, 57:2,
57:8, 57:10, 58:11,
58:13, 58:17, 63:4,
63:6, 65:15, 65:16,
66:10, 66:15, 66:17,
66:19, 70:6, 70:10,
70:13, 70:16, 70:17,
70:24, 71:1, 72:18,
72:21, 74:10, 74:19,
77:2, 77:9, 78:21,
79:4, 80:1
**multiple** [10] - 25:4,
25:15, 26:15, 32:17,
56:20, 56:24, 57:14,
57:19
**must** [1] - 65:14

## N

**name** [11] - 3:11, 4:5,
7:3, 27:2, 34:14,
56:7, 56:10, 58:18,
74:16, 76:7, 78:9
**named** [1] - 71:21
**Natalia** [1] - 9:9
**Natalie** [2] - 65:3, 66:5
**nearly** [1] - 22:20
**necessarily** [1] - 12:3
**need** [11] - 8:3, 8:4,
15:21, 27:14, 38:13,
38:22, 51:13, 65:23,
69:23, 78:22, 78:23
**needed** [2] - 33:4,
38:14
**needing** [1] - 35:19
**needs** [2] - 24:7, 56:23
**negative** [5] - 71:13,
71:22, 72:3, 72:6,
75:9

**never** [35] - 8:8, 17:5,
22:10, 27:11, 27:12,
29:8, 30:1, 30:2,
30:6, 32:3, 43:4,
43:5, 45:15, 45:16,
46:5, 47:10, 47:17,
47:25, 48:8, 48:9,
48:12, 49:1, 49:4,
49:10, 49:18, 49:19,
50:2, 50:3, 55:11,
55:13, 70:7, 72:17
**Newman** [2] - 29:22,
33:1
**news** [8] - 70:3, 70:19,
70:21, 71:3, 71:9,
71:15, 73:5, 75:7
**newspaper** [1] - 28:7
**next** [9] - 8:13, 14:4,
16:23, 51:19, 60:18,
70:12, 70:14, 71:20,
74:5
**nice** [5] - 19:23, 72:4,
72:8, 72:10, 72:16
**night** [4] - 22:18,
58:25, 59:16, 61:13
**NO** [1] - 1:2
**No.1** [1] - 2:12
**nobody** [5] - 24:14,
24:24, 34:12, 34:20,
58:5
**nominee** [1] - 41:11
**none** [3] - 12:15,
12:23, 49:19
**nonexistent** [2] -
65:13, 65:19
**nonexisting** [1] -
65:20
**nonpaying** [2] - 17:21,
49:17
**nonpayment** [22] -
11:23, 14:8, 15:1,
15:4, 16:15, 18:15,
25:7, 25:8, 28:1,
29:3, 44:1, 49:20,
50:1, 50:9, 50:12,
53:1, 63:17, 64:8,
64:14, 74:17, 77:18,
78:5
**nonresponsive** [4] -
13:2, 31:12, 66:11,
72:19
**nonsupport** [8] -
45:10, 45:23, 46:14,
47:17, 53:5, 53:16,
73:9, 74:9
**North** [3] - 1:18, 1:22,
80:15
**Nos** [1] - 79:3
**notation** [1] - 24:18
**note** [1] - 68:25

**nothing** [10] - 8:10, 21:7, 23:19, 32:6, 35:12, 37:14, 42:13, 50:2, 52:16
**notice** [1] - 23:11
**number** [19] - 22:12, 23:21, 26:11, 27:3, 28:20, 40:2, 45:17, 45:21, 46:4, 47:12, 59:22, 62:2, 62:20, 68:4, 69:14, 72:11, 72:13, 76:25, 78:15

## O

**o'clock** [1] - 79:9
**oath** [2] - 17:15, 47:22
**Obama** [9] - 24:8, 37:17, 39:25, 40:4, 41:11, 47:14, 70:20, 71:9, 79:20
**Obama's** [2] - 8:8, 32:3
**object** [4] - 13:11, 13:24, 44:4, 45:6
**objection** [10] - 4:9, 14:13, 15:20, 16:10, 43:17, 43:22, 63:4, 70:6, 74:10, 77:2
**obligations** [3] - 64:2, 64:11, 64:12
**obtained** [1] - 77:15
**obviously** [2] - 36:5, 60:3
**occurred** [2] - 4:25, 18:18
**OF** [1] - 1:1
**office** [2] - 7:3, 79:9
**OFFICER** [2] - 19:25, 22:4
**Official** [1] - 80:14
**official** [1] - 1:22
**Ohio** [14] - 8:24, 11:21, 14:9, 14:11, 15:6, 44:1, 44:22, 49:16, 49:22, 49:25, 53:15, 62:23, 73:9, 77:12
**once** [1] - 20:10
**Once** [1] - 37:25
**one** [52] - 4:15, 8:16, 10:11, 11:8, 11:12, 12:9, 15:22, 17:17, 17:21, 18:18, 19:7, 20:10, 23:6, 24:1, 24:8, 25:5, 25:12, 25:24, 27:4, 27:18, 30:6, 31:19, 33:22, 34:6, 34:20, 34:21, 36:8, 36:9, 37:24,

39:24, 40:3, 43:15, 45:11, 48:10, 48:15, 50:13, 50:15, 53:22, 56:22, 56:25, 58:4, 59:16, 61:10, 63:2, 67:23, 67:24, 68:20, 74:4, 76:4
**ongoing** [2] - 33:12, 33:14, 36:12, 37:8
**opinion** [6] - 13:18, 14:1, 14:10, 14:16, 15:5, 44:5
**opponent** [1] - 59:21
**opportunity** [1] - 38:5
**opposite** [2] - 71:12, 71:14
**order** [1] - 33:6
**organization** [1] - 56:12
**organizer** [2] - 5:4, 6:24
**original** [2] - 39:21, 40:7
**Orly** [3] - 2:4, 3:12, 56:9
**ORLY** [1] - 3:4
**outside** [1] - 4:13
**overruled** [7] - 16:11, 43:23, 63:5, 66:18, 70:9, 74:12, 77:3
**owe** [1] - 45:9
**owes** [3] - 45:24, 46:14, 53:5
**owing** [1] - 45:2
**own** [8] - 20:24, 29:24, 38:18, 39:18, 54:3, 58:3, 72:24, 73:7

## P

**P.A** [1] - 1:18
**p.m** [9] - 1:6, 3:1, 3:3, 20:1, 22:2, 22:5, 80:4
**PAC** [13] - 7:23, 24:21, 29:12, 34:16, 34:17, 35:1, 37:16, 65:12, 65:18, 76:12, 76:13, 76:21
**page** [14] - 31:8, 31:15, 31:17, 31:19, 35:17, 46:7, 50:13, 51:19, 51:24, 51:25, 52:3, 52:20, 71:20, 74:5
**Page** [6] - 2:21, 46:12, 52:4, 52:6, 52:7, 52:8
**Pages** [1] - 1:8
**pages** [2] - 48:18

**paid** [2] - 65:4, 66:8
**Palm** [1] - 1:19
**Pamela** [7] - 22:24, 23:10, 25:16, 34:24, 76:2, 76:10, 76:19
**Paragraph** [5] - 46:7, 46:12, 47:6, 52:19
**paragraph** [8] - 8:13, 31:8, 31:14, 31:17, 52:3, 61:25, 68:3, 71:23
**paralegal** [1] - 39:23
**parameters** [1] - 27:14, 34:9
**paraphrase** [1] - 71:2
**part** [10] - 9:19, 21:4, 35:23, 45:19, 50:24, 56:10, 57:12, 61:19, 66:21, 66:22
**participate** [2] - 29:6, 30:3
**particular** [3] - 10:14, 72:23, 76:6
**party** [2] - 19:3, 41:12
**Paul** [2] - 71:21, 73:2
**Pause** [1] - 57:1
**pause** [8] - 16:3, 16:4, 20:25, 21:1, 21:2
**pay** [4] - 33:7, 33:13, 45:4, 56:4
**paying** [6] - 8:25, 42:18, 44:14, 62:24, 63:8, 63:23
**payment** [3] - 46:1, 46:21, 55:20
**PayPal** [1] - 33:11
**pen** [2] - 61:25, 64:20
**pending** [1] - 51:3
**Pennsylvania** [1] - 73:12
**people** [28] - 6:18, 12:13, 16:13, 24:4, 24:22, 27:19, 34:8, 36:2, 54:17, 59:22, 60:17, 60:18, 60:19, 62:2, 62:7, 66:3, 66:4, 72:3, 72:13, 73:3, 73:22, 74:14, 74:25, 75:4, 75:9, 76:25, 77:15
**per** [2] - 29:6, 30:4
**perhaps** [1] - 73:3
**period** [4] - 49:17, 55:21, 64:1, 65:9
**person** [7] - 3:18, 17:22, 26:24, 38:17, 55:2, 62:12, 77:8
**peruse** [1] - 48:18
**phone** [4] - 19:11, 22:22, 23:2, 68:4

**phrase** [1] - 65:19
**physical** [1] - 51:8
**place** [2] - 46:5, 58:4
**Plaintiff** [2] - 1:5, 3:5
**plaintiff** [5] - 36:13, 37:3, 37:9, 39:17, 65:3
**PLAINTIFF** [2] - 1:13, 2:3
**Plaintiff's** [5] - 2:12, 5:15, 36:21, 46:8, 50:19
**plaintiffs** [4] - 27:20, 33:2, 38:12
**plans** [1] - 61:12
**platform** [2] - 6:13, 38:4
**pocket** [1] - 73:6
**point** [6] - 3:25, 38:20, 39:5, 57:24, 74:4, 75:5
**points** [1] - 68:14
**politicalforum.com** [1] - 45:20
**politicians** [1] - 38:10
**portion** [1] - 46:11
**positions** [1] - 59:23
**possible** [1] - 58:21
**post** [10] - 19:14, 23:4, 29:11, 49:1, 52:22, 62:15, 72:13, 73:22, 74:14, 77:25
**posted** [53] - 6:1, 7:24, 17:14, 19:6, 19:7, 22:20, 23:6, 23:20, 23:22, 24:3, 24:10, 24:13, 24:15, 24:18, 28:5, 28:17, 29:1, 29:2, 29:24, 35:11, 35:14, 36:11, 45:16, 46:4, 50:15, 50:17, 52:11, 56:6, 56:8, 56:15, 56:16, 56:19, 59:7, 68:7, 69:2, 69:8, 69:17, 70:18, 72:3, 72:17, 73:24, 74:7, 74:8, 75:2, 75:4, 77:5, 77:6, 77:19
**posting** [13] - 23:1, 50:21, 65:11, 69:6, 69:20, 69:24, 74:6, 74:25, 75:6, 75:21, 76:2, 76:6, 77:13
**postings** [1] - 78:25
**pouring** [1] - 75:9
**precedent** [1] - 34:7
**preclude** [2] - 9:16, 9:18
**predicate** [1] - 50:21

**prefer** [1] - 64:18
**preparation** [1] - 6:14
**presence** [1] - 4:13
**presentation** [4] - 6:12, 6:18, 65:12, 65:17
**president** [5] - 30:13, 32:13, 34:18, 35:24, 38:11
**president's** [2] - 26:12, 26:24
**press** [7] - 44:21, 47:1, 47:21, 47:23, 48:8, 48:13, 48:24
**pressure** [1] - 20:23
**pretty** [1] - 41:14
**previously** [1] - 22:8
**primary** [2] - 26:24, 41:11
**printed** [3] - 5:17, 37:25, 76:4
**printout** [1] - 28:18
**prison** [1] - 45:11
**privacy** [1] - 67:7
**private** [3] - 38:7, 60:16, 60:20
**pro** [15] - 9:17, 10:14, 26:19, 26:20, 29:6, 30:4, 33:10, 36:13, 37:2, 37:9, 37:13, 37:19, 37:23, 39:17, 39:21
**problem** [2] - 21:4, 78:5
**problems** [2] - 40:1, 40:2
**procedurally** [1] - 78:21
**proceeding** [1] - 74:17
**proceedings** [4] - 3:1, 57:1, 80:4, 80:10
**Proceedings**............ .......................... [1] - 2:21
**process** [3] - 8:10, 32:5, 32:10
**profession** [1] - 39:23
**project** [2] - 28:4, 28:5
**promised** [1] - 66:1
**prosecutor** [3] - 44:21, 45:3, 47:7
**prosecutor's** [6] - 46:24, 47:21, 47:23, 48:8, 48:13, 48:24
**proven** [1] - 53:23
**provide** [1] - 74:16
**provided** [7] - 9:4, 27:23, 29:9, 30:18, 30:19, 31:5, 49:2
**providing** [1] - 29:4

**public** [27] - 9:5, 9:6, 10:7, 23:24, 27:9, 27:13, 27:21, 30:18, 30:20, 30:24, 33:3, 33:12, 33:13, 33:19, 35:6, 35:17, 35:19, 36:14, 44:18, 46:3, 56:23, 58:10, 60:20, 72:7, 72:9, 73:25, 77:25
**publication** [6] - 18:18, 18:24, 18:25, 42:16, 44:12, 45:20
**publish** [3] - 9:4, 44:18, 46:12
**published** [7] - 4:15, 6:8, 15:10, 16:7, 16:18, 17:20, 23:12
**publishing** [2] - 5:10, 9:5
**pushing** [2] - 24:4, 32:17
**put** [12] - 23:11, 29:10, 29:19, 30:7, 33:11, 40:13, 40:20, 42:5, 69:12, 71:17, 76:1, 77:14
**putting** [2] - 38:6, 52:1

**Q**

**questions** [11] - 21:22, 21:24, 47:4, 57:3, 58:11, 58:20, 59:10, 61:15, 74:11, 79:25, 80:1
**quickly** [4] - 6:12, 16:25, 55:18, 58:21
**quietly** [1] - 51:14
**quite** [1] - 48:19
**quoting** [1] - 14:17

**R**

**raise** [7] - 3:2, 27:14, 32:17, 33:9, 38:14, 38:22, 65:24
**raised** [6] - 32:8, 56:3, 58:9, 58:10, 68:14, 73:7
**raising** [5] - 27:9, 32:25, 33:7, 34:9, 65:23
**ran** [1] - 59:22
**rarely** [1] - 13:1
**rate** [1] - 11:22
**read** [44] - 14:10, 16:13, 22:10, 25:18, 27:12, 43:24, 45:1, 45:12, 45:14, 46:11,

46:17, 46:18, 48:3, 48:7, 48:15, 48:17, 51:12, 51:14, 51:15, 52:22, 56:9, 56:11, 56:18, 57:20, 57:21, 58:8, 61:22, 64:11, 65:14, 69:23, 71:23, 73:1, 73:22, 73:23, 74:21, 74:23, 76:12, 77:6, 77:7, 77:10, 77:11, 77:22
**reader** [2] - 15:19, 16:7
**readers** [2] - 53:25, 54:17
**reading** [5] - 31:14, 51:22, 66:3, 77:21, 77:23
**reality** [1] - 25:7
**realize** [1] - 17:15
**realized** [1] - 40:11
**really** [5] - 54:9, 55:13, 61:19, 67:9, 72:16
**realm** [1] - 30:13
**rearguard** [1] - 38:3
**reason** [6] - 26:22, 30:16, 40:19, 54:21, 55:13, 63:23
**received** [14] - 25:2, 25:23, 26:20, 34:24, 45:16, 46:3, 47:11, 51:1, 66:21, 76:2, 76:10, 76:19, 78:17
**receiving** [1] - 18:6
**recently** [7] - 8:25, 23:11, 49:17, 53:1, 62:23, 63:7, 79:24
**reception** [1] - 6:17
**recess** [2] - 19:24, 22:2
**recognize** [2] - 5:25, 18:3
**record** [8] - 5:22, 9:5, 9:6, 12:23, 20:8, 44:18, 72:7, 72:9
**records** [1] - 12:14
**RECROSS** [2] - 2:4, 2:7
**red** [1] - 58:25
**red-eye** [1] - 58:25
**REDIRECT** [2] - 2:4, 2:7
**refer** [3] - 63:11, 65:20, 67:15
**reference** [3] - 44:17, 45:2, 64:21
**references** [1] - 68:13
**referring** [4] - 15:9, 31:23, 53:11, 78:17
**refers** [3] - 62:22,

63:10, 65:22
**refile** [1] - 41:23
**refiled** [4] - 41:12, 41:15, 41:18, 41:25
**reflect** [1] - 5:22
**Reform** [1] - 59:15
**refund** [4] - 28:11, 28:13, 64:7, 65:7
**refunded** [1] - 65:8
**regard** [3] - 6:4, 11:15, 40:23
**Regarding** [1] - 68:11
**regards** [2] - 29:3, 52:22
**regional** [1] - 7:7
**regular** [1] - 38:22
**regularly** [1] - 59:13
**reimbursing** [1] - 73:8
**reiterate** [1] - 68:10
**related** [1] - 68:21
**relations** [4] - 45:25, 46:16, 46:20, 67:8
**release** [7] - 44:21, 47:1, 47:22, 47:24, 48:8, 48:13, 48:25
**relief** [4] - 39:25, 40:3, 40:4, 40:10
**relying** [1] - 44:2
**remainder** [1] - 21:21
**remember** [11] - 5:9, 17:9, 17:14, 17:19, 18:6, 19:10, 43:9, 71:24, 73:21, 79:7
**remove** [4] - 40:9, 67:16, 67:17, 67:19
**removed** [2] - 72:5, 72:8, 72:11
**repeat** [2] - 48:11, 59:12
**repetitive** [1] - 77:2
**replaced** [2] - 39:16, 40:6
**reported** [3] - 50:4, 70:19, 71:7
**REPORTED** [1] - 1:21
**REPORTER** [3] - 46:17, 65:14, 70:23
**Reporter** [2] - 1:22, 80:14
**reporter** [7] - 20:9, 22:10, 48:3, 48:7, 48:11, 48:15, 48:17
**Reporter's** [1] - 2:22
**represent** [5] - 27:19, 27:20, 30:1, 39:10, 58:19
**representation** [1] - 9:10
**representative** [1] - 6:15

**represented** [2] - 4:6, 38:25
**representing** [4] - 29:19, 30:8, 30:22, 40:23
**reprimanded** [1] - 73:14
**Republican** [1] - 19:3
**request** [1] - 40:15
**research** [1] - 78:2
**researched** [1] - 55:13
**resented** [1] - 71:14
**resentful** [3] - 32:12, 32:14, 33:25
**respond** [2] - 20:7, 22:22
**respondent** [1] - 28:20
**response** [3] - 31:12, 44:6, 72:20
**results** [1] - 38:2
**retainer** [4] - 64:22, 65:24, 66:6, 73:17
**retainers** [1] - 66:12
**review** [4] - 10:1, 10:2, 50:20, 73:20
**reviewed** [1] - 67:22
**rigged** [1] - 38:2
**rise** [3] - 8:3, 19:25, 22:4
**Road** [1] - 1:18
**RPR** [2] - 1:21, 80:14
**rubber** [1] - 38:2
**rubber-stamp** [1] - 38:2
**Ruffley** [60] - 4:6, 5:3, 5:6, 6:1, 6:5, 6:9, 6:23, 7:1, 7:3, 7:4, 8:13, 8:20, 9:8, 11:17, 14:7, 14:20, 15:9, 16:7, 18:13, 22:16, 25:6, 26:10, 31:15, 31:23, 32:18, 35:12, 42:16, 42:22, 44:13, 46:7, 49:3, 49:13, 50:1, 50:8, 52:25, 53:11, 56:1, 59:7, 60:6, 60:7, 60:8, 60:12, 60:15, 61:13, 61:20, 62:7, 62:22, 63:1, 64:15, 64:16, 64:25, 68:17, 68:21, 74:24, 76:25, 77:11, 77:18, 78:2, 78:4, 78:11
**Ruffley's** [2] - 5:11, 17:20
**ruling** [1] - 44:3
**run** [1] - 3:15
**running** [1] - 59:19

**runs** [1] - 56:13

**S**

**sale** [1] - 23:24
**San** [2] - 6:16, 7:8
**sanctioned** [1] - 73:14
**sanctions** [1] - 10:2
**saw** [11] - 24:14, 40:25, 45:15, 48:8, 52:23, 67:22, 72:15, 77:20, 77:23, 78:10
**scan** [1] - 72:14
**scare** [1] - 67:9
**scaring** [1] - 67:12
**scheduled** [4] - 46:2, 46:23, 59:13, 69:3
**Schwed** [1] - 1:18
**scope** [1] - 70:6
**screen** [8] - 18:4, 27:6, 31:10, 31:20, 47:8, 66:22, 69:12, 71:21
**screwed** [1] - 73:16
**scroll** [1] - 51:10
**se** [5] - 26:19, 36:13, 37:2, 37:9, 37:13, 37:19, 37:23, 39:17, 39:21
**seat** [1] - 59:19
**seated** [2] - 3:7, 22:6
**second** [12] - 16:25, 27:5, 31:8, 31:15, 31:17, 37:24, 40:13, 46:7, 48:4, 52:19, 56:23, 56:25
**security** [1] - 40:2
**SECURITY** [2] - 19:25, 22:4
**see** [30] - 18:4, 24:13, 27:5, 27:6, 31:22, 32:4, 32:7, 44:23, 48:12, 49:6, 50:23, 50:24, 51:11, 52:2, 52:4, 54:7, 57:22, 58:9, 58:14, 64:20, 71:24, 71:25, 72:25, 73:19, 73:25, 74:13, 74:23, 76:1, 77:25, 78:10
**seeing** [1] - 77:12
**self** [2] - 69:1, 69:6
**self-evident** [2] - 69:1, 69:6
**sell** [4] - 8:7, 31:25, 32:1, 32:16
**Senate** [2] - 6:13, 59:19
**send** [4] - 45:18, 45:21
**sent** [15] - 7:24, 18:22,

18:25, 19:1, 23:7, 23:9, 27:4, 47:15, 62:2, 62:7, 62:12, 62:14, 65:1, 77:16, 78:15
**sentence** [4] - 8:16, 21:20, 31:14, 45:11
**separate** [2] - 34:15, 41:21
**set** [1] - 53:6
**settled** [2] - 55:5
**settlement** [1] - 55:22
**several** [2] - 67:17, 68:14
**severe** [2] - 67:1, 67:2
**sheet** [2] - 36:24, 42:5
**show** [9] - 17:25, 36:19, 47:25, 48:1, 50:19, 50:25, 51:7, 76:3, 76:9
**showed** [3] - 47:21, 49:23, 72:16
**showing** [1] - 47:18
**sic** [1] - 3:19
**sidebar** [2] - 4:13, 4:25
**simply** [5] - 30:7, 34:8, 35:16, 47:19, 57:13
**sit** [1] - 48:17
**site** [41] - 5:10, 5:11, 6:2, 15:11, 17:3, 23:12, 24:10, 26:22, 26:23, 27:2, 28:17, 33:7, 33:11, 34:23, 35:15, 37:13, 45:16, 45:17, 46:13, 50:5, 50:22, 52:12, 54:18, 56:5, 56:8, 59:8, 62:10, 62:15, 65:2, 67:18, 69:16, 69:25, 73:22, 74:1, 74:15, 75:1, 75:21, 77:5, 77:7, 78:8, 78:25
**sites** [1] - 36:3
**sitting** [1] - 61:10
**six** [1] - 73:15
**sleep** [1] - 58:25
**Slower** [1] - 70:23
**slower** [3] - 46:17, 65:14, 70:24
**slowly** [1] - 46:18
**small** [1] - 61:19
**smaller** [2] - 51:16, 51:17
**so-called** [1] - 50:22
**social** [1] - 40:2
**solely** [1] - 60:2
**solicitation** [1] - 29:12
**solicitations** [1] - 36:15

**solicited** [1] - 37:16
**soliciting** [2] - 7:24, 10:6
**someone** [3] - 62:7, 71:21, 74:6
**sometime** [2] - 41:8, 79:23
**sometimes** [2] - 12:13, 36:1
**somewhere** [4] - 34:16, 61:8, 64:23, 64:25
**sorry** [9] - 10:4, 14:14, 21:14, 51:3, 54:21, 65:15, 67:10, 70:24, 79:19
**sound** [1] - 61:7
**source** [1] - 62:16
**SOUTHERN** [1] - 1:1
**Southern** [1] - 19:13
**speaker** [1] - 59:16
**speakers** [1] - 59:25
**speaking** [3] - 15:22, 59:21, 59:22
**speaks** [2] - 45:6, 45:8
**specific** [17] - 22:12, 27:14, 27:15, 27:16, 27:22, 28:21, 29:17, 33:17, 34:4, 34:9, 35:16, 56:24, 56:25, 64:1, 64:10, 64:12, 72:22
**specifically** [7] - 27:8, 29:18, 32:25, 49:21, 55:9, 60:8, 70:8
**speculation** [1] - 16:10
**speech** [2] - 5:5, 60:25
**stamp** [1] - 38:2
**stand** [1] - 64:2
**standing** [4] - 60:18, 61:8, 61:9, 61:11
**started** [7] - 37:22, 56:13, 75:9, 77:19, 77:21, 77:22, 78:12
**starting** [1] - 74:24
**starts** [1] - 23:9
**state** [23] - 3:11, 4:8, 5:7, 5:16, 9:25, 10:3, 14:9, 27:25, 28:12, 33:22, 41:24, 43:2, 43:25, 49:21, 49:23, 49:25, 53:15, 54:20, 54:23, 63:20, 64:13, 71:25, 78:14
**statement** [38] - 6:9, 6:20, 7:9, 7:18, 7:21, 8:1, 8:5, 8:11, 8:15, 8:21, 9:2, 9:6, 12:12,

14:20, 15:10, 16:18, 16:19, 17:18, 17:20, 24:10, 25:5, 27:23, 28:6, 28:7, 34:12, 37:19, 38:17, 38:19, 42:11, 42:15, 42:20, 42:22, 45:17, 55:18, 55:19, 56:1, 61:24, 62:21
**statements** [8] - 4:16, 5:11, 24:13, 30:19, 31:4, 31:5, 67:25, 72:7
**States** [1] - 80:14
**STATES** [2] - 1:1, 1:11
**states** [5] - 26:15, 26:18, 26:21, 34:10, 38:1
**stating** [8] - 24:18, 27:7, 28:16, 29:18, 33:1, 33:3, 64:5, 75:7
**stemming** [1] - 73:16
**STEPHANIE** [2] - 1:21, 80:14
Stephanie_McCarn @flsd.uscourts. gov [1] - 1:24
**steps** [1] - 38:4
**Steven** [2] - 56:7, 56:9
**still** [2] - 25:1, 71:16
**stood** [1] - 6:18
**stop** [1] - 40:4
**strange** [1] - 61:7
**Street** [1] - 1:14
**stricken** [2] - 44:6, 72:20
**strike** [8] - 5:25, 13:2, 30:10, 31:11, 44:5, 66:10, 66:16, 72:18
**Struck** [2] - 56:7, 56:9
**subject** [1] - 67:6
**subpoenaed** [1] - 4:20
**subsequently** [1] - 40:21
**substitute** [1] - 38:23
**substituted** [3] - 36:13, 39:19, 39:20
**succeed** [1] - 38:6
**successful** [3] - 34:3, 34:4, 34:7
**sue** [10] - 4:23, 22:25, 23:1, 23:16, 25:1, 25:24, 67:11, 67:13
**sued** [6] - 28:12, 56:12, 64:7, 72:24, 73:7, 78:19
**suffering** [1] - 73:7
**suing** [1] - 75:14
**Suite** [1] - 1:18

**summing** [1] - 50:4
**Super** [13] - 7:23, 24:20, 29:12, 34:16, 34:17, 35:1, 37:16, 65:12, 65:18, 76:12, 76:13, 76:21
**support** [39] - 9:1, 11:23, 14:8, 15:1, 15:4, 16:15, 17:21, 18:15, 25:7, 25:9, 28:1, 29:3, 35:13, 35:21, 42:18, 44:1, 44:15, 45:5, 45:10, 49:17, 49:20, 50:1, 50:10, 50:12, 53:1, 55:21, 62:24, 63:8, 63:13, 63:17, 63:23, 64:8, 64:14, 68:17, 74:18, 75:12, 77:16, 77:19, 78:5
**supposed** [11] - 27:21, 28:11, 28:13, 31:1, 32:21, 36:10, 41:7, 63:25, 64:3, 64:7, 65:7
**supposedly** [1] - 35:8
**Supreme** [9] - 28:6, 28:7, 28:13, 28:18, 28:19, 29:2, 73:12, 73:14
**surgery** [2] - 3:17, 79:8
**surprised** [1] - 78:7
**suspended** [1] - 73:11
**sustained** [2] - 4:10, 72:20
**SW** [1] - 1:14

**T**

**table** [2] - 43:8, 61:10
**Taitz** [28] - 2:4, 3:11, 3:12, 5:2, 12:4, 13:6, 13:25, 15:8, 17:25, 21:6, 21:24, 22:8, 23:10, 25:21, 26:10, 27:6, 30:10, 33:6, 35:23, 36:24, 51:12, 55:24, 56:9, 58:18, 59:10, 64:18, 80:2
**TAITZ** [1] - 3:4
**Taitz'** [1] - 78:25
**talks** [2] - 28:21, 64:21
**Tansey** [2] - 34:15, 35:2
**team** [4] - 8:8, 32:4, 38:6, 79:22
**technically** [3] - 41:3, 41:11, 41:17
**tenth** [1] - 74:5

**terrible** [1] - 64:17
**testified** [11] - 3:5, 10:19, 14:21, 19:19, 22:8, 47:22, 59:11, 61:16, 66:17, 66:25, 76:17
**testify** [1] - 59:6
**testifying** [2] - 13:14, 43:17
**testimony** [3] - 48:16, 48:18, 70:15
**THE** [85] - 1:10, 1:13, 1:17, 2:3, 2:6, 3:2, 3:6, 3:7, 3:8, 4:10, 4:12, 4:17, 4:20, 4:22, 5:16, 11:10, 11:12, 12:9, 12:12, 13:4, 13:14, 13:18, 13:20, 13:25, 14:1, 14:14, 14:17, 15:21, 15:25, 16:2, 16:11, 16:12, 19:23, 20:2, 20:7, 20:8, 20:13, 20:15, 20:17, 20:20, 20:22, 21:9, 21:13, 21:15, 21:19, 21:24, 21:25, 22:1, 22:3, 22:6, 25:20, 25:22, 43:23, 43:24, 44:6, 46:17, 48:15, 51:3, 51:4, 51:9, 51:13, 51:14, 51:16, 57:4, 57:6, 57:7, 57:9, 57:12, 58:15, 63:5, 65:14, 66:13, 66:18, 70:8, 70:9, 70:11, 70:14, 70:23, 72:20, 74:12, 74:13, 77:3, 77:4, 79:1, 80:2
**themselves** [2] - 37:23, 58:6
**thinking** [2] - 16:12, 16:13
**third** [1] - 51:24, 51:25
**threat** [4] - 22:24, 67:1, 67:14, 67:21
**threatened** [2] - 25:15, 31:5
**threatening** [8] - 23:16, 25:1, 25:14, 25:25, 26:1, 28:23, 67:10
**threats** [2] - 25:4, 67:21
**three** [17] - 16:21, 20:15, 20:16, 25:8, 34:19, 38:9, 39:2, 39:11, 41:1, 41:3, 41:17, 41:21, 42:12, 50:11, 63:16, 64:8,

74:10
**tireless** [3] - 8:9, 32:5, 32:9
**title** [2] - 65:10
**today** [1] - 57:8
**together** [3] - 5:6, 6:24, 38:6
**took** [6] - 19:19, 22:8, 40:14, 40:15, 46:24, 47:6
**top** [1] - 45:19
**tortious** [1] - 67:7
**totally** [1] - 47:11
**town** [3] - 19:2, 19:12, 23:3
**track** [2] - 36:3, 36:8
**traffic** [1] - 12:14
**transcript** [1] - 48:2
**transcription** [1] - 80:10
**transparency** [2] - 24:23, 24:24
**TRIAL** [1] - 1:10
**tried** [3] - 11:3, 40:20, 72:13
**true** [22] - 6:2, 6:6, 24:10, 27:23, 28:5, 30:7, 30:18, 31:4, 31:5, 37:19, 39:1, 43:6, 47:11, 47:19, 48:5, 53:12, 59:9, 69:5, 69:24, 75:20, 75:25
**truly** [1] - 62:17
**truth** [3] - 48:10, 78:11
**truthful** [1] - 20:6
**try** [5] - 57:9, 58:21, 61:23, 68:25, 74:3
**trying** [7] - 20:8, 20:9, 27:5, 38:24, 55:24, 56:23, 67:9
**turn** [4] - 5:9, 5:14, 44:20, 52:19
**turning** [2] - 44:9, 66:20
**Twelfth** [2] - 1:23, 80:15
**twice** [2] - 14:1, 20:14
**two** [32] - 3:19, 6:12, 22:20, 23:25, 24:7, 24:22, 29:25, 31:1, 34:10, 35:17, 39:24, 40:3, 45:23, 45:24, 46:14, 46:15, 46:20, 47:17, 50:13, 53:5, 53:15, 55:4, 56:9, 60:14, 64:3, 64:21, 69:20, 74:9, 79:21
**two-hour** [1] - 6:12
**two-page** [2] - 35:17,

50:13
**type** [1] - 43:15
**types** [1] - 43:12
**typically** [1] - 63:13

## U

**U.S** [2] - 6:13, 59:19
**ultimately** [1] - 54:19
**um-hmm** [2] - 18:14, 36:25
**unacceptable** [1] - 57:14
**unbeatable** [1] - 38:6
**under** [7] - 9:17, 10:14, 17:15, 47:22, 53:4, 73:9, 78:9
**underneath** [1] - 69:2
**UNITED** [2] - 1:1, 1:11
**United** [1] - 80:14
**up** [20] - 6:18, 11:20, 17:11, 27:6, 31:10, 31:20, 32:9, 38:4, 38:12, 39:5, 47:7, 47:20, 48:9, 48:14, 49:11, 50:4, 52:1, 61:8, 71:20, 77:14
**update** [2] - 65:12, 65:17
**urging** [1] - 23:24

## V

**verifying** [1] - 7:13
**via** [1] - 65:1
**vice** [3] - 9:17, 10:14, 26:20
**victory** [1] - 38:13
**viewed** [2] - 54:19, 66:25
**violation** [1] - 14:3
**visibility** [2] - 70:22, 71:10
**Voeltz** [19] - 39:5, 39:11, 39:13, 39:16, 39:17, 39:20, 39:21, 39:22, 40:7, 40:14, 40:18, 40:24, 41:2, 41:5, 41:8, 41:9, 42:12, 42:13
**voluntarily** [1] - 4:21
**voluntary** [2] - 46:1, 46:21
**vote** [1] - 38:3
**voter** [3] - 37:14, 37:19, 37:20
**Voters** [1] - 4:1
**voters** [4] - 5:5, 6:14, 37:23, 38:22
**vs** [1] - 1:6

## W

**wait** [1] - 25:20
**walk** [2] - 58:20, 69:10
**warm** [1] - 6:17
**Watch** [28] - 4:7, 5:7, 5:8, 6:16, 6:19, 6:21, 7:4, 7:14, 8:24, 17:17, 42:10, 42:24, 43:1, 43:3, 43:5, 43:9, 49:15, 55:20, 56:12, 56:13, 58:3, 58:19, 70:20, 71:8, 71:17, 73:13
**watch** [1] - 48:17
**WATCH** [1] - 1:7
**web** [41] - 5:10, 5:11, 6:2, 15:11, 17:3, 23:12, 24:10, 26:22, 26:23, 27:2, 28:17, 33:7, 33:11, 34:23, 35:15, 36:3, 37:12, 45:16, 45:17, 46:13, 50:5, 50:22, 52:12, 54:18, 56:5, 56:8, 59:7, 62:15, 65:2, 67:17, 69:16, 69:25, 73:22, 74:1, 74:15, 75:1, 75:21, 77:5, 77:7, 78:8, 78:25
**week** [6] - 8:5, 24:1, 24:9, 70:12, 70:14, 71:11
**weeks** [3] - 39:2, 39:11, 42:12
**western** [1] - 7:7
**whole** [16] - 10:1, 38:20, 50:23, 50:25, 56:14, 56:18, 57:21, 57:22, 57:23, 58:9, 64:11, 67:19, 67:22, 73:1
**widely** [1] - 54:18
**wife** [4] - 55:5, 55:11, 55:19
**willing** [1] - 73:3
**withdrawn** [1] - 55:7
**withdrew** [1] - 55:6
**Witness** [4] - 51:18, 51:20, 52:9, 80:3
**witness** [10] - 3:5, 4:15, 4:22, 11:10, 21:10, 52:5, 57:5, 57:7, 58:13, 70:11
**WITNESS** [20] - 3:6, 3:8, 5:16, 12:12, 14:1, 14:17, 16:12, 20:7, 21:25, 25:22, 43:24, 51:4, 51:13, 51:16, 57:6, 57:12,

66:13, 70:8, 74:13, 77:4
**WITNESSES** [3] - 2:2, 2:3, 2:6
**woman** [3] - 35:2, 35:8, 66:7
**Women's** [2] - 4:1, 6:15
**won** [1] - 34:6
**word** [9] - 12:1, 17:8, 17:10, 48:12, 50:15, 69:23
**word-for-word** [2] - 69:23
**works** [2] - 43:1, 49:15
**world** [1] - 23:12
**world's** [2] - 5:10, 26:23
**worse** [2] - 40:18, 54:10
**write** [6] - 7:17, 12:23, 46:12, 69:1, 69:23, 71:13
**writes** [1] - 57:22, 71:22
**writing** [6] - 30:2, 35:17, 35:18, 37:24, 56:21, 56:22
**written** [2] - 28:8, 37:7
**wrote** [34] - 8:7, 8:8, 10:4, 15:5, 15:14, 16:14, 16:25, 17:2, 22:18, 27:12, 32:3, 34:22, 34:23, 34:24, 36:14, 37:12, 37:19, 38:25, 39:2, 41:5, 44:2, 45:17, 45:21, 46:3, 52:25, 53:8, 53:18, 53:20, 54:12, 59:8, 67:22, 67:23, 71:14, 71:15

## Y

**year** [1] - 45:11
**years** [5] - 7:14, 8:9, 32:5, 32:9, 56:9
**Yesterday** [1] - 6:12
**yesterday's** [2] - 65:11, 65:17
**yourself** [4] - 16:1, 17:11, 51:14, 55:23

## Z

**zero** [1] - 56:11